IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT F. SMITH, *PRO SE*<br><br>4101 DAVIS PL NW #2<br>WASHINGTON, DC 20007<br><br>202-342-7325<br><br>*Plaintiff,*<br><br>vs.<br><br>UNITED STATES OF AMERICA;<br><br>JOHN O. BRENNAN, Director, Central Intelligence Agency. C/O Litigation Division, Office of General Counsel, Central Intelligence Agency, Washington, DC 20505;<br><br>ASHTON CARTER, Secretary, U.S. Department of Defense, 1000 Defense Pentagon Washington, DC 20301-1000;<br><br>JOHN KERRY, Secretary, U.S. Department of State, 2201 C Street NW, Washington, DC 20520;<br><br>JACOB LEW, Secretary, U.S. Department of Treasury; C/O General Counsel, 1500 Pennsylvania Ave NW, Washington, DC 20220;<br><br>ERNEST MONIZ, Secretary, U.S. Department of Energy, 1000 Independence Avenue SW, Washington, DC 20585;<br><br>BARACK OBAMA, President, White House, 1600 Pennsylvania Avenue, Washington, DC 20500;<br><br>PENNY PRITZKER, Secretary, U.S. Department of Commerce. C/O Office of the General Counsel, 1401 Constitution Ave., NW, Washington, DC 20230<br><br>*Defendants.* | Case: 1:16-cv-01610<br>Assigned To : Chutkan, Tanya S.<br>Assign. Date : 8/8/2016<br>Description: Pro Se Gen. Civ |

**RECEIVED**

AUG - 8 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

- 1 -

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. The Plaintiff seeks declaratory and injunctive relief against the United States and the above-named federal officials (collectively, "the Defendants") for their violations of the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq, and the Take Care Clause, U.S. CONST. art. II, § 3, cl. 5. and 28 U.S. Code § 1361.

2. This lawsuit is not about foreign policy. It is about the rule of law, presidential power, the structural limits of the U.S. Constitution, and the right of the public to understand the functions of government and informed petition of the government for redress.

3. The White House and Israeli government are negotiating a new ten-year Memorandum of Understanding (MOU) to serve as the basis for a FY2019-2028 foreign aid package of $4-5 billion annually.[1] News reports claim the Israeli government is pressing for a final deal in August.[2]

4. Congress will soon pass and the President will sign into law the final installment of the current FY2009-2018 foreign aid package. The U.S. Treasury will provide an interest-bearing cash advance in October 2017 that Israel can use to fund its own military-industrial programs and purchase U.S. arms.

5. To accomplish this, the President and many key agencies will follow the precedent of every administration since Gerald Ford by violating two longstanding amendments to the Foreign Aid Act of 1961, called the Symington & Glenn Amendments, which are currently codified in *22 USC §2799aa-1: Nuclear reprocessing transfers, illegal exports for nuclear explosive devices, transfers of nuclear explosive devices, and nuclear detonations.* Symington & Glenn prohibit U.S.

---

[1] S.3117 - 114th Congress (2015-2016): Department of State, Foreign Operations, and Related Programs Appropriations Act, 2017 | Congress.gov | Library of Congress - https://www.congress.gov/bill/114th-congress/senate-bill/3117/text?
[2] Ben Caspit, "Can Israel close US aid deal before US elections?" Israel Pulse, *ALMONITOR*, July 27, 2016.

foreign aid transfers to certain foreign states with nuclear weapons programs absent mandatory executive actions. Federal agencies such as the Department of Treasury, the Department of Defense, the Department of State, the Central Intelligence Agency and the Department of Commerce have acted unlawfully and in concert to help thwart Symington & Glenn. The Department of Energy in 2012 even created what amounts to a law criminalizing informed public federal agency discussions and analysis of the Israeli nuclear program in furtherance of undermining Symington and Glenn.

6. Defendants have collectively engaged in a violation of administrative procedure and the Take Care Clause by unlawful failure to act upon facts long in their possession while prohibiting the release of official government information about Israel's nuclear weapons program, particularly ongoing illicit transfers of nuclear weapons material and technology from the U.S. to Israel. These violations manifest in gagging and prosecuting federal officials and contractors who publicly acknowledge Israel's nuclear weapons program, imposing punitive economic costs on public interest researchers who attempt to educate the public about the functions of government, refusing to make bona fide responses to journalists and consistently failing to act on credible information available in the government and public domain. These acts serve a policy that has many names all referring to the same subterfuge, "nuclear opacity," "nuclear ambiguity," and "strategic ambiguity." In this complaint it is simply referred to as "nuclear ambiguity."

7. Such a unilateral suspension of the nation's Arms Export Control laws through violations of sunshine laws, Administrative Procedure Act, and Take Care Clause is unlawful. Only this Court's immediate intervention can offer redress to the Plaintiff's past and immanent future injuries and broader relief to American taxpayers who have suffered grave and ongoing harm since 1978.

- 3 -

**I. THE PARTIES**

8. Plaintiff, Grant F. Smith, is a public interest researcher and founder of the Institute for Research: Middle Eastern Policy, Inc. (IRmep). Smith's FOIA, mandatory declassification review (MDR) and Interagency Security Classification Appeals Panel (ISCAP) generated releases, research and analysis have been published in *The Washington Report on Middle East Affairs*, *The Wall Street Journal*, *Antiwar.com*, *The Washington Examiner*, *Mint Press News*, *LobeLog*, the *Bulletin of the Atomic Scientists*, *The Nation Magazine*, *The Weekly Standard*, *Military.com*, *The Jewish Daily Forward*, *Business Insider*, and *Courthouse News Service*. They have been carried on broadcast outlets such as C-SPAN, public and commercial U.S. radio stations, foreign broadcasts transmitted by VOA, as well as foreign news agencies like the BBC, Radio France and RT. For nearly a decade, the Plaintiff's rights to access information for use in vital public interest research have been violated by U.S. federal agencies.

9. Defendant United States of America is sued under the Administrative Procedure Act ("APA"). See 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States.").

10. Defendant John O. Brennan, Director of the Central Intelligence Agency is sued under the Administrative Procedure Act ("APA"). The CIA violates the Administrative Procedure Act ("APA"). See 5 U.S.C. § 703 to unduly slow, delay and thwart the release of information about the Israeli nuclear weapons program through systemic efforts to thwart and impose unwarranted costs on outside Freedom of Information Act and other sunshine law requesters

11. Defendant Ashton Carter is U.S. Secretary of Defense. Carter and is responsible for the Department of Defense's violations of the Administrative Procedure Act ("APA") to unduly slow, delay and thwart the release of information about the Israeli nuclear weapons program, punish

- 4 -

outside FOIA requesters through the non-payment of court-ordered settlements. Carter is also responsible for the Foreign Military Sales program which unlawfully transfers funding to weapons contractors supplying Israel and Israeli military companies even though Israel is an ineligible recipient under Symington & Glenn.

12. Defendant John Kerry, is Secretary of State. Kerry and the U.S. Department of State violates the Administrative Procedure Act ("APA") promulgating and defending and an unlawful gag law unduly slow, delay and thwart the release of information about the Israeli nuclear weapons program and punish federal employees, contractors, and outside sunshine law information requesters

13. Defendant Jacob Lew is Secretary of U.S. Treasury and violates of the Administrative Procedure Act ("APA") through the transfer of taxpayer funds to an ineligible recipient's interest-bearing account and the Foreign Military Sales budget, and failure to transfer appropriation funding to Federal Agencies to satisfy their court-ordered legal obligations when they lose sunshine law cases about Israel's clandestine nuclear program.

14. Defendant Ernest Moniz is Secretary of the U.S. Department of Energy and violates the Administrative Procedure Act ("APA") by authorizing, and implementing a secret gag law that undermines Symington & Glenn. DOE also thwarts public interest researcher attempts to understand the functions of government through sunshine laws by denying releasable information about the gag law and its own reports about Israel's theft of U.S. government-owned weapons-grade uranium.

15. Defendant Barack Obama is sued under 28 U.S. Code § 1361 - Action to compel an officer of the United States to perform his duty and the Administrative Procedure Act ("APA"). See 5 U.S.C. § 703 over his failure to uphold Symington & Glenn.

- 5 -

16. Defendant Penny Pritzker is Secretary of the U.S. Department of Commerce and violates the Administrative Procedures Act section known as the Freedom of Information Act through the application of reasonable fees for information requests seeking information about recent illicit transfers of U.S. nuclear weapons technology to Israel.

## II. JURISDICTION AND VENUE

17. The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, art. II, § 3, cl. 5, and the APA, 5 U.S.C. § 706. The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action or claim against the United States. This court particularly has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B). Finally, the Court has jurisdiction to compel an officer or employee of the above-named federal agencies to perform his or her duty under 28 U.S.C. § 1361.

18. Venue is proper in this District under 28 U.S.C. § 1391(e) because the Plaintiff is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

19. This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706, and 28 U.S.C. § 1361 which provides that "the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

# III. FACTUAL ALLEGATIONS

## A. The Symington Amendment

20. In 1976 the Ford Administration and Congress addressed growing concerns about the proliferation of nuclear weapons materials and technology undermining the U.S.-led worldwide implementation of the Nuclear Non-proliferation Treaty (NPT). Senator Stuart Symington held hearings in 1975 and 1976 as chair of the Subcommittee on Arms Control, International Organizations and Security Agreements. The International Security Assistance and Arms Export Control Act of 1976 (HR 13680) amended the Foreign Assistance Act of 1961 to prohibit U.S. aid to any non-NPT signatory building up a nuclear weapons program by acquiring the necessary equipment and materials outside International Atomic Energy Agency safeguards, and/or transferring such equipment to other states. The Symington Amendment permitted the president to provide U.S. foreign aid to violators only if within 30 days he "determines and certifies in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that—A) The termination of such assistance would have a serious adverse effect on vital United States interest; and b) he has received reliable assurances that the country in question will not acquire or develop nuclear weapons or assist other nations in doing so."[3] [Exhibit 1]

21. Symington summarized the legislative intent of his amendment in a committee report. "In effect, this amendment says to other nations, if you wish to take the dangerous and costly steps

---

[3] "International Security Assistance and Arms Export Control Act of 1976," Public Law 94-329, 94t Congress, H.R. 13680, June 30, 1976, section "Nuclear Transfers," p 1210-1211

necessary to achieve a nuclear weapons option, you cannot expect the United States to help underwrite that effort indirectly or directly."[4] [Exhibit 2]

### B. The Glenn Amendment

22. According to formerly classified, heavily redacted CIA files released to the Plaintiff in related litigation on November 4, 2015, (See *Smith v. CIA*, 2015, case no. 00224, District of Columbia) Senator John Glenn in 1977 became extremely concerned that Israel was stealing and diverting U.S. government-owned weapons-grade uranium from the Nuclear Materials and Equipment Corporation or NUMEC, a U.S. government contractor that processed nuclear fuel for the U.S. Navy, into its own nuclear weapons program at Dimona. The CIA filed an internal memo dated August 6, 1977 containing Glenn's questions to CIA Associate Deputy Director for Operations Theodore Shackley, in which Glenn asked Shackley, "Was or is there any evidence of a conspiracy to divert nuclear materials from the U.S. to Israel?"[5] [Exhibit 3]

23. Under Glenn's leadership in 1977 Congress enacted *H.R. 6884 Nuclear Enrichment And Reprocessing Transfers; Nuclear Detonations*, popularly known as the "Glenn Amendment" which extended the Symington Act's prohibitions over U.S. aid to non-NPT signatory states engaged in weapons program activities, while still permitting the President to provide foreign aid if he certified in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations "that the termination of such assistance would be seriously prejudicial to the

---

[4] "6/30/976 HR13680 International Security Assistance and Arms Export Control Act of 1976 (3)," National Archives and Records Administration, Collection GRF-0055: White House Records Office: Legislation Case Files, 8/9/1974 - 1/20/1977, page 52 https://catalog.archives.gov/id/12008722

[5] "Briefing of Senator John Glenn, Democrat, Ohio, on the NUMEC Case" CIA Memorandum for the Record, page 8, approved for declassification and release on August 25, 2015 in response to *Smith v CIA, case 1:15-cv-00224*

achievement of the United States nonproliferation objectives or otherwise jeopardize the common defense and security." Such waivers required he clearly provide a "statement setting forth the specific reasons there for." [Exhibit 4]

24. Such sanctions and waivers in compliance with Symington & Glenn have been invoked numerous times in the past. Sanctions were imposed by President William J. Clinton against India on May 13, 1998. This was two days after India broke a self-imposed 24-year moratorium on nuclear testing. President William J. Clinton invoked similar sanctions against Pakistan on May 30, 1998 following six Pakistani nuclear tests between May 28 and 30.[6] The U.S. President also issued the required waivers for continued aid to violators of Symington & Glenn on at least six occasions.[7] However, none of these sanctions or waivers have ever been properly invoked over Israel's activities. There is no option that allows the U.S. President to pretend he does not or cannot know about actions that trigger aid cutoff or the need to invoke waivers. Rather, aid cutoff or waiver issuance are required Symington & Glenn duties under the Take Care Clause of the U.S. Constitution whenever statutory circumstances arise.

**22 USC 2799aa-1**

25. The core provisions of the Symington and Glenn Amendments, as amended, are today found in *22 USC 2799aa-1: Nuclear reprocessing transfers, illegal exports for nuclear explosive devices, transfers of nuclear explosive devices, and nuclear detonations.* [Exhibit 5]

---

[6] Robert M. Hathaway, "Confrontation and Retreat; The U.S. Congress and the South Asian Nuclear Tests" Arms Control Association, *Arms Control Today*. January 1, 2000
[7] "Waiver of Certain Sanctions Against India and Pakistan," 22 U.S. Code § 2799aa–1 - Nuclear reprocessing transfers, illegal exports for nuclear explosive devices, transfers of nuclear explosive devices, and nuclear detonations, https://www.law.cornell.edu/uscode/text/22/2799aa-1

**C. Israel is a non-NPT nuclear weapons state**

26. Israel has long had a nuclear weapons program and continually engages in activities
which should trigger the cited provisions of Symington & Glenn. Among the most authoritative
and complete recently released status updates about Israel's nuclear weapons program was
contained in *Critical Technology Assessment in Israel and NATO Nations,* a report chartered by
the U.S. Department of Defense, prepared for the Office of the Under Secretary of Defense and
presented in April of 1987.

27. The report was publicly released through an unnecessarily arduous Freedom of
Information Act lawsuit before this court on February 10, 2015. The report revealed the advanced
state of Israel's program in 1987: "The SOREQ and the Dimona/Beer Shiva facilities are the
equivalent of our Los Alamos, Lawrence Livermore and Oak Ridge National Laboratories. The
SOREQ center runs the full nuclear gamut of activities from engineering, administration and
non-destructive testing to electro-optics, pulsed power, process engineering and chemistry and
nuclear research and safety. This is the technology base required for nuclear weapons design and
fabrication." Israel's nuclear weapons facilities' were essentially a scaled-down version of U.S.
facilities says the report, "The capability of SOREQ to support SDIO and nuclear technologies is
almost an exact parallel of the capability currently existing at our National Laboratories." Israel's
ambitions were not limited to simple gun-type Hiroshima bombs, but the most power nuclear
weapons since Israel was according to the report "developing the kind of codes which will enable

them to make hydrogen bombs. That is, codes which detail fission and fusion processes on a

microscopic and macroscopic level."[8]

---

[8] Edwin S. Townsley and Clarence A. Robinson "Critical Technology Assessment in Israel and NATO Nations" Prepared for Office of the Under Secretary of Defense (International Programs and Technology) April, 1987 online at http://irmep.org/cfp/dod/071987_ctaiiann.pdf

**D. Israel's activities should trigger sanctions or waivers under Symington & Glenn Amendment provisions in force at the time**

28. Israel has continually set up front organizations in the United States to build up its copycat nuclear weapons program facilities.

29. Sasha Polakow-Suransky received his doctorate in history from Oxford. From 2011 to 2015 he was a foreign policy and international affairs op-ed editor at the *New York Times* and the author of *The Unspoken Alliance: Israel's Secret Relationship with Apartheid South Africa*, which was published in 2010. In 2010 Polakow-Suransky[9] publicly released declassified South African government documents showing that Israel attempted to sell nuclear weapons to apartheid South Africa in 1975.[10]

30. Later, on September 22, 1979 an American Vela Hotel satellite detected the "double flash" of a joint Israeli-apartheid South Africa nuclear test near South Africa's Prince Edward Islands off Antarctica. The U.S. government has tried to keep most of the information about the so-called "Vela incident" classified for reasons that become obvious, but critical facts have emerged. The joint Israeli-South African test was a clear violation of Symington & Glenn Act prohibitions on U.S. aid to "a non-nuclear weapons state" that "detonates a nuclear explosive device." The Israeli nuclear weapons technology transfers that commenced before Symington & Glenn took effect, documented by Polakow-Suransky, but which carried on through the 1979 joint nuclear test made Israel and South Africa either ineligible for U.S. aid or subject to waivers under prohibitions on a country that "(1) delivers nuclear reprocessing equipment, materials, or

---

[9]

[10] Chris McGreal, "Revealed: how Israel offered to sell South Africa nuclear weapons: Secret apartheid-era papers give first official evidence of Israeli nuclear weapons" *The Guardian*, May 24, 2010 https://www.theguardian.com/world/2010/may/23/israel-south-africa-nuclear-weapons

technology to any other country or receives such equipment, materials, or technology from any other country (except for the transfer of reprocessing technology associated with the investigation, under international evaluation programs in which the United States participates, of technologies which are alternatives to pure plutonium reprocessing) ; or (2) is not a nuclear-weapon state as defined in article IX(3) of the Treaty on the Non-Proliferation of Nuclear Weapons and 21 UST 483 which detonates a nuclear explosive device." [See Exhibit 3]

31. Despite the law in force at that time, in 1979 the United States provided an inflation-adjusted $16 billion in foreign aid that year to Israel ($4.888 billion).[11]

32. In 2002 convicted American nuclear technology smuggler Richard Kelly Smyth was debriefed by the FBI. According to Smyth, the Israeli Ministry of Defense employed a network of front companies to smuggle sensitive nuclear weapons technology out of the United States. The illegal exports uncovered by the FBI between 1979 and 1983 included 15 shipments, totaling 800 "krytron" devices which are used as nuclear weapons triggers.[12] Although the U.S. prosecuted Smyth, a low-level operative, none of the required Symington & Glenn sanctions or waivers were subsequently implemented. Israeli members of the smuggling ring named in the FBI report included present-day Israeli Prime Minister Benjamin Netanyahu and Hollywood producer Arnon Milchan, who has recently admitted to many such dealings.[13]

---

[11]  Jeremy M. Sharp, "US Foreign Aid to Israel" June 10, 2015,
https://www.fas.org/sgp/crs/mideast/RL33222.pdf
[12]  Heavily redacted FBI investigation files released under Mandatory Declassification Review 2012-00006: MILCO International Incorporated/Nuclear technology exports to Israel, FOIPA 116-5836-001, June 24, 2015. http://www.israellobby.org/krytons/06242016_milchan.pdf
[13]  Grant F. Smith "Netanyahu Worked Inside Nuclear Smuggling Ring" Antiwar.com July 4, 2012 http://original.antiwar.com/smith-grant/2012/07/03/netanyahu-worked-inside-nuclear-smuggling-ring/

33. A clear pattern has emerged. Rather than properly respond to government and information in the public domain to enforce Symington & Glenn as required, the President and federal agencies instead thwart it by violating the Administrative Procedures Act, in particular government sunshine laws (FOIA, but also MDR), through improper classification, threatening federal employees fines, imprisonment, unwarranted fees and refusing to properly respond to information requests. Again, the broader umbrella under which this unlawful activity falls has a name. It is called "nuclear ambiguity."[14]

### E. The Defendants violate the Symington and Glenn Amendments through "nuclear ambiguity"

34. Rather than publicly acknowledge Israel's status as a nuclear weapons state (as they do for every other nuclear weapons state, whether or not it is a signatory to the NPT) and enforce Symington & Glenn, presidents and federal agencies have instead erected a subterfuge to rule of law known as "nuclear ambiguity." The leading expert on the relevant history is Avner Cohen. Cohen is a historian, professor and writer most known for his works about Israel's clandestine nuclear history and strategic policy. He is the Director of the Education Program and Senior Fellow at the James Martin Center for Nonproliferation Studies, and a Professor at the Middlebury Institute of International Studies. His books include *Israel and the Bomb*, a 1998 history of Israel's nuclear weapons. In 2010 Cohen released *The Worst-Kept Secret*, an aptly-titled book which is entirely about the development of "nuclear ambiguity" and why it should be ended. Cohen summarized the launch of the policy of "refusing to confirm or deny" the existence of Israel's nuclear arsenal:

---

[14] Other names include "strategic ambiguity" and "nuclear ambiguity."

> *The policy and practice of nuclear opacity was codified in 1969 in an*
> *extraordinary secret accord between Israeli Prime Minister Golda Meir and*
> *U.S. President Richard Nixon. Although this agreement has never been*
> *openly acknowledged or documented, its existence was revealed in 1991 by*
> *the Israeli journalist Aluf Benn, and more information came out in some*
> *recently declassified memos regarding Nixon's 1969 meeting with Meir*
> *written by Nixon's national security adviser, Henry Kissinger. According to*
> *the Nixon-Meir pact, as long as Israel did not advertise its possession of*
> *nuclear weapons by publicly declaring or testing them, the United States*
> *would tolerate and shield Israel's nuclear program.*[15]

35. Since providing U.S. foreign aid to a non-signatory to the NPT with a nuclear weapons program became subject to Symington & Glenn arms export laws passed by the Congress, from the Ford administration until the present day members of the executive branch have engaged in continuing misrepresentation while in office whenever they are asked about Israel's nuclear weapons program. The following are a few examples.

36. Veteran White House reporter Helen Thomas asked President Barack Obama about Israel's status as a nuclear weapons state on February 9, 2009:

> *Helen Thomas: Mr. President, do you think that Pakistan and -- are*
> *maintaining the safe havens in Afghanistan for these so-called terrorists?*
> *And, also, do you know of any country in the Middle East that has nuclear*
> *weapons?*

---

[15] Avner Cohen, Marvin Miller "Brining Israel's Bomb Out of the Basement" *Foreign Affairs*, September/October 2010. https://www.ciaonet.org/catalog/19614

37. President Obama chose to focus at length on Afghanistan, dodge the nuclear Middle East question, and quickly get another reporter to ask him other questions, as revealed in CNN's official transcript:

> *Obama: Well, I think that Pakistan -- there is no doubt that, in the FATA region of Pakistan, in the mountainous regions along the border of Afghanistan, that there are safe havens where terrorists are operating.*
>
> *And one of the goals of Ambassador Holbrooke, as he is traveling throughout the region, is to deliver a message to Pakistan that they are endangered as much as we are by the continuation of those operations and that we've got to work in a regional fashion to root out those safe havens.*
>
> *It's not acceptable for Pakistan or for us to have folks who, with impunity, will kill innocent men, women and children. And, you know, I -- I believe that the new government of Pakistan and -- and Mr. [President Asif Ali] Zardari cares deeply about getting control of the situation. We want to be effective partners with them on that issue.*
>
> *Question: (off mic)*
>
> *Obama: Well, Mr. Holbrooke is there, and that's exactly why he's being sent there, because I think that we have to make sure that Pakistan is a stalwart ally with us in battling this terrorist threat.*
>
> *With respect to nuclear weapons, you know, I don't want to speculate. What I know is this: that if we see a nuclear arms race in a region as volatile as the Middle East, everybody will be in danger.*
>
> *And one of my goals is to prevent nuclear proliferation generally. I think that it's important for the United States, in concert with Russia, to lead the way on this.*

*And, you know, I've mentioned this in conversations with the Russian president, Mr. [Dmitry] Medvedev, to let him know that it is important for us to restart the -- the conversations about how we can start reducing our nuclear arsenals in an effective way so that...*

*(CROSSTALK)*

*Obama: ... so that we then have the standing to go to other countries and start stitching back together the nonproliferation treaties that, frankly, have been weakened over the last several years. OK.*

*Question: Why do you have to speculate on who has...*

*(CROSSTALK)*

*Obama: All right. Sam Stein, Huffington Post. Where's Sam? Here. Go ahead.[16]*

38. George W. Bush administration officials similarly dodged questions about Israel's nuclear program put to them by the Communications Director of the Institute for Public Accuracy, Sam Husseini. As the founder of the website WashingtonStakeout.com, Husseini repeatedly asked executive branch officials during media opportunities, as they left Sunday morning talk shows and other venues, to confirm or deny the existence of an Israeli nuclear weapons program. The following transcripts were derived from a video documentary of his efforts.[17]

39. September 10, 2006 Vice President Dick Cheney

*Sam Husseini "Welcome!*

---

[16] CNN Transcript, "Obama takes questions on the economy," February 9, 2009.
http://www.cnn.com/2009/POLITICS/02/09/obama.conference.transcript/
[17] Sam Husseini and Chris Belcher, Stakeout: Israel Nuclear. Sam Husseini asks US government officials why they won't acknowledge the existence of Israel's nuclear arsenal.

*Vice President Dick Cheney "Good morning."*

*Sam Husseini "Do you know that Israel has nuclear weapons, Mr. Vice President?"*

*Cheney enters vehicle but does not respond.*

*Sam Husseini "Does Israel have nuclear weapons?"*

40. December 20, 2006, John Negroponte, Director of National Intelligence

*Sam Husseini "Do you know that Israel has nuclear weapons?"*

*John Negroponte, Director of National Intelligence: "I'm. I don't (shaking head) want to get into a discussion about, uh..."*

*Sam Husseini "You can't comment on whether or not Israel has nuclear weapons?"*

*John Negroponte "...about Israel's nuclear powers, thank you very much."*

*Sam Husseini "How can you expect to have any credibility on the Middle East if you can't say whether Israel has nuclear weapons?"*

*John Negroponte walks away.*

*Sam Husseini "Mr. Ambassador, you're head of National Intelligence. You can't say whether Israel has nuclear weapons?"*

*Security detail [unintelligible]*

*Sam Husseini "No, he didn't answer the question. If he answered the question I'd go away."*

41. February 25, 2007 Secretary of State Condoleezza Rice

*Sam Husseini "Secretary Rice, please, it's an important question. I don't think you've been asked this question. How do you reconcile. Madam Secretary, does Israel have nuclear weapons? Can you answer that? It's a very simple question.*

*Secretary of State Condoleezza Rice does not respond.*

*Sam Husseini: "Secretary [of Defense Robert] Gates said that they did, implied it in his confirmation hearings. Please? Please? They're two very simple questions."*

**F.  Federal Agencies directly subject employees, contractors, and indirectly public interest watchdogs to an unlawful "gag" order over Israel's nuclear weapons program under "nuclear ambiguity."**

42. Until the Obama administration, the executive branch traditionally led federal agencies by example in how to violate the Take Care Clause of the U.S. Constitution and the Administrative Procedure Act by pretending to have no knowledge of Israel's nuclear weapons program, how Symington & Glenn apply to information in the public domain and how to ignore public requests for information about U.S. policy towards Israel's nuclear weapons. However, as public awareness about Israel's nuclear weapons and calls for accountability have grown, in parallel with the growth of alternative news media, the U.S. Department of Energy and U.S. Department of State unlawfully conspired to codify "nuclear ambiguity" through a new secret gag law targeting any U.S. federal government employee or contractor from publicly communicating about the Israel's nuclear weapons program under threat of immediate employment loss, fines and imprisonment. The Plaintiff knows of no other country-specific secret U.S. federal gag law of this kind. Its main

impact is perpetuating the continued violation of Symington & Glenn through "nuclear ambiguity."

43. Citing classification powers derived from the *U.S. Department of State Classification Guide 05 D: January 2005*[18] the Department of Energy sewed out of whole cloth a new law to gag federal agencies on September 6, 2012. It is "Classification Bulletin WNP-136," and fully titled *Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability.* The bulletin is used to harshly punish (and therefore deter) any covered party who dares mention—or release via government sunshine laws—any information officially confirming that Israel is a nuclear weapons state. (Exhibit 6) Punishment under WPN-136 is swift and harsh:

> ***Los Alamos National Laboratory nuclear analyst James Doyle wrote candidly about Israel's nuclear weapons for a magazine in 2013. After a congressional staffer read the article, which had passed a classification review, it was referred to classification officials for a second review. Doyle's pay was then cut, his home computer searched, and he was fired.***[19]

44. That Classification Bulletin WNP-136 is a violation of administrative procedure designed to perpetuate the undermining of *Symington & Glenn* is made obvious consulting the authority from which the gag law it is derived. *U.S. Department of State Classification Guide 05 D* recommends that "Reporting on and analysis of the internal affairs or foreign relations of a country is a central function of U.S. foreign service posts and is vital to the formulation and execution of U.S. foreign policy. This reporting should be unclassified when the subject matter is routine,

---

[18] Department of State Classification Guide (DSCG 05-01) January 2005, Edition1
https://www.fas.org/sgp/othergov/dos-class.pdf
[19] Grant F. Smith "Lawsuit challenges U.S. Ambiguity toward Israel's Nuclear Arsenal" Special Report, Washington Report on Middle East Affairs, January/February 2015
http://www.wrmea.org/2015-january-february/lawsuit-challenges-u.s.-ambiguity-toward-israels-nuclear-arsenal.html

46. On February 18, 2015 the plaintiff filed an electronic FOIA request with the Department of Energy seeking the full release of WPN-136. On February 23, 2015 the U.S. Department of Energy confirmed receipt and assigned the request number HQ-2015-00699-F categorizing the Plaintiff as a "news media" requestor. [Exhibit 7] On July 16, 2015 Andrea Bowman of the DOE FOIA office indicated by telephone that she did not anticipate any complications releasing the bulletin, but informed the Plaintiff that the U.S. Department of State was reviewing it.

47. On August 20, 2015 the Department of Energy released WPN-136, nearly 90 percent redacted. [Exhibit 6] On August 25 the Plaintiff appealed HQ-2015-00699-F for an unredacted copy. On February 12, 2016 DOE denied the appeal for unredacted release of WPN-136, exhausting the plaintiff's administrative remedies. [Exhibit 8]

48. On August 25, 2015 the Plaintiff filed a separate FOIA seeking "all cross referenced information on the development of WPN-136, including but not limited to, key task force members, consultations with foreign governments, input from other federal agencies and the executive branch, edits and modifications, drafts of WPN-136 and agency information that identifies the perceived need for and justification for such a regulation." On September 3, 2015 the Department of Energy confirmed receipt and assigned the request number HQ-2015-01766-F. [Exhibit 9] No response has been forthcoming from the Department of Energy within the statutorily-allowed response timeframe, exhausting the Plaintiff's administrative remedies.

49. In addition to this blanket gag order over federal employees who could otherwise better inform Americans about the implications of Israel's nuclear weapons, "nuclear ambiguity" thwarts government sunshine laws and subverts government agency interactions with the public because federal agencies refuse to process, charge exorbitant search/reproduction or other fees for requests

designed to unduly delay FOIA records requests about Israel's nuclear weapons, materials and technology transfers, and halt the release of related information in court cases after the administrative process has ended. These "nuclear ambiguity" policies of thwarting government sunshine laws and proper administrative procedure are key to the continued Symington & Glenn violations and have directly injured the plaintiff.

50. A prime example of the "nuclear ambiguity" tactic of imposing unusual and excessive search fees was used in an attempt to thwart the plaintiff's FOIAs seeking government information about Israel's most recent illegal nuclear weapons technology transfers. §2799aa–1 as amended currently prohibits foreign assistance to any a non-nuclear-weapon state which, on or after August 8, 1985, "exports illegally (or attempts to export illegally) from the United States any material, equipment, or technology which would contribute significantly to the ability of such country to manufacture a nuclear explosive device..."

51. On June 6, 2012 the Plaintiff filed a FOIA with the Bureau of Industry and Security (BIS) of the US Department of Commerce about an investigation of a U.S.-based Israeli company called "Telogy." On July 2, 2012 BIS informed the Plaintiff that search and duplication fees for his request would cost an estimated $6,984.50 (plus additional per-page fees.) BIS further informed the Plaintiff that he would have to pay this fee "even if no responsive documents are located or if responsive documents are determined to be exempt from disclosure under any applicable FOIA exemptions." BIS demanded immediate payment—by August 1, 2012—"to begin processing" the request, advising the Plaintiff that "otherwise, your request will be automatically closed." [Exhibit 10].

52. It is very clear to the Plaintiff why BIS wanted to crush the FOIA through excessive fees. In a single investigative file BIS internally verified that a front company for Israel engaged in

23 instances of arms export violations subjecting Israel to Symington & Glenn, including 22 illegal oscilloscope exports [Exhibit 11]:

> *In the attached Schedule of Violations, which is incorporated herein by reference, on 22 occasions between on or about April 29, 2003 and on or about March 23, 2007, IT engaged in conduct prohibited by the Regulations when it reexported oscilloscopes controlled for nuclear non-proliferation reasons from Belgium to Israel without the Department of Commerce License required by Section 742.3 of the Regulations. By engaging in the conduct, TI committed 22 violations of Section 764.2(a) of the Regulations.[23]*

53. Presumably, it was the BIS's intention that the Plaintiff not obtain the files or write news stories about Telogy's illegal transfer of nuclear weapons-related technology, since this single Telogy case warranted an immediate application of sanctions or waivers under §2799aa–1. It was not the only such recent case bottled up inside BIS that was not properly acted upon by the administration.

54. Between 2006-2008 yet another nuclear weapons technology smuggling front for Israel, California based Mattson, shipped pressure transducers to Israel. Pressure transducers measure the gas pressure inside centrifuge cascades. They are considered dual-use equipment with nuclear weapons applications. Mattson knowingly—but surreptitiously— incorporated pressure transducers into semiconductor equipment to be smuggled to customers, failing to obtain the proper U.S. export licenses. Again, no sanctions under §2799aa–1 were applied to one country importing the nuclear weapons technology—Israel.[24] The statute explicitly makes Israel culpable,

---

[23] Proposed Charging Letter send to Telogy International NV from BIS. Obtained by the Plaintiff from the Institute for Science and International Security as an encrypted .PDF
[24] "Case Study – U.S. Company Charged with Pressure Transducer Sales: Who were the End Users?" Institute for Science and International Security, May 14, 2012

since "an export (or attempted export) by a person who is an agent of, or is otherwise acting on behalf of or in the interests of, a country shall be considered to be an export (or attempted export) by that country." Telogy and Mattson were clearly just such agents.

55. Most of the "nuclear ambiguity" anti-sunshine law tactics were waged against the Plaintiff—at great injury—in an attempt to thwart release of the previously referenced *Critical Technology Assessment in Israel and NATO Nations.* The unclassified report explicitly covers the advanced developmental state of Israel's nuclear weapons program as it existed in 1987 and makes it plain that Israel is a "non-nuclear-weapon state" that has a nuclear weapons program subject to Symington & Glenn Amendment provisions in force at the time. Under normal government guidelines, the report would have been publicly available a decade after its publication, if not sooner. Instead, the Department of Defense fought to keep the unclassified report from being publicly released.

56. The Plaintiff's previous complaint filed in *Smith v DoD, 2014, No. 01611, District of Columbia* reveals that in order to thwart release of the report, the US Department of Defense repeatedly violated statutory FOIA deadlines. From December 5, 2011 until the Plaintiff filed a lawsuit on September 23, 2014, the DoD forced the Plaintiff to file FOIAs to multiple departments of DoD because it claimed the report could not be located even though it was later revealed it had determined its precise location.

57. After the Plaintiff filed suit the DoD falsely claimed that "non-disclosure agreements" prohibited release of the report, though it could never locate any to present in court. DoD then sought three time extensions, the last in order to consult with Israeli government officials about

---

http://isis-online.org/isis-reports/detail/case-study-u.s.-company-charged-with-pressure-transduc er-sales-who-were-the/

releasing the U.S. report, an unnecessary step outside normal release procedures for a U.S. government chartered, taxpayer-funded study. The report was finally released on February 10, 2015.

58. The administrative and legal overhead cost the Plaintiff $10,328 and $624.78 in court fees and expenses. Although subject to a court order to reimburse the Plaintiff, the DoD never complied, even after receiving a reminder 100 days after the conclusion of the lawsuit. [Exhibit 12] Meanwhile, the DoD played its normal role in the FY2016 military aid transfers to Israel in October of 2015 and now plans to handle funds for the last of ten transfers ending in FY2017 (in October, 2016) while ignoring reminders and refusing to rectify the financial injuries sustained by the Plaintiff, a direct casualty of "nuclear ambiguity." There is a direct causal connection between the defendants' illegal nuclear ambiguity policy on the Israeli nuclear weapons program and financial injuries to the Plaintiff. The Plaintiff alleges he is being punished by DoD for breeching "nuclear ambiguity" and as a warning to Plaintiff and others not to seek other such government-held information that undermines "nuclear ambiguity" and erodes its ability to violate Symington & Glenn.

59. Placed in historical context these individual FOIA violations—buttressed by the gag order and executive conduct—reveal the underlying cause of the injury is the unlawful, unconstitutional "nuclear ambiguity" policy and not the bureaucratic obstacles faced by any filer seeking sensitive government records under existing sunshine laws.

60. This "nuclear ambiguity" conduct is similarly applied by federal agencies in Mandatory Declassification Reviews, which differ from FOIA in that final appeals must be heard by the Interagency Security Classification Appeals Panel (ISCAP) rather than a district court.

Given that, the preferred agency tactic is to claim the documents in question simply cannot be located.

61. One Plaintiff MDR request reveals why the Department of Energy is such a key "nuclear ambiguity" enforcement agency, and the "inability to find key reports" tactic. According to the official diary of former Atomic Energy Commission Chairman Glenn T. Seaborg, two Department of Energy officials visited him on June 21, 1978 from 2:15-315 PM. Bill Knauf and Jim Anderson of the DOE Division of Inspection told Seaborg (who was at the time retired) that traces of weapons-grade uranium-235 of a special signature and unusually high enrichment level provided to AEC's Pennsylvania contractor NUMEC had been picked up in Israel.[25] If the DOE properly advised the President of this evidence of diversion, Symington & Glenn sanctions or waivers would have been required. On October 26, 2011 the Plaintiff requested a copy of the DOE security office report that Knauf and Anderson produced. [Exhibit 13] On March 15, 2012 the Department of Energy claimed it could not locate the report, denying the Mandatory Declassification Review request, thwarting any possible declassification review by ISCAP. (Exhibit 15) As noted previously, DOE put its WPN-136 gag law into place just six months later, which the Plaintiff believes was not coincidental.

62 The U.S. Central Intelligence Agency rigorously follows "nuclear ambiguity" policy to thwart accountability and transparency. In 1978, the very year Symington & Glenn both required sanctions or waivers, in an internal memo the CIA specifically designated its NUMEC files on the illegal diversion of nuclear materials to Israel as a FOIA problem the agency had to overcome. [Exhibit 15] Today the agency continues to shield its more than quarter-century old classified

---

[25] See also Roger Mattson, *Stealing the Bomb: How Denial and Deception Armed Israel*, CreateSpace Independent Publishing, February 16, 2016

NUMEC operational files from public release even though such files are now releasable under the CIA Information Act of 1985 and other declassification guidelines. (See *Smith v. CIA*, 2015, case no. 00224, District of Columbia). The CIA also is fighting in court to shield from public scrutiny the amount of U.S. intelligence aid delivered to Israel, said by President Obama to be "unprecedented."[26] This category of top line budget number has been released in the past. (See *Smith v. CIA*, 2015, case no. 01431, District of Columbia). Combined, these two unlawful applications of "nuclear ambiguity" have cost the Plaintiff $12,795 in FOIA administrative and litigation costs and are likely to generate further injury in the near future.

63. The Plaintiff's remedies are exhausted. The plaintiff cannot avail himself of administrative processes under 5 U.S.C. § 552, MDR or any other means because of illegal "nuclear ambiguity" violations of the Administrative Procedure Act. Petitions to the Congress over his injuries-in-fact are unavailable. The Plaintiff is a resident of the District of Columbia, and does not have a voting member of Congress with the powers to legislate any kind of relief. Moreover, the Congress is both a subject and party to the same forces that demand "nuclear ambiguity" and has repeatedly demonstrated a preference for avoiding the question much like members of the administration. A 2008 congressional report on nuclear proliferation excludes Israel and carefully does "not take a position on the existence of Israeli nuclear weapons." The plaintiff therefore has no alternative, fully adequate remedy available.

64. The Plaintiff injuries quantified herein are real, but pale in comparison to those of American taxpayers that have been victimized by the violations of Symington & Glenn. Since 1976, an estimated $234 billion has been transferred to Israel in the form of U.S. taxpayer-funded foreign aid—publicly in the form of weapons and economic aid and secretly as intelligence

---

[26] https://www.whitehouse.gov/the-press-office/2015/08/05/remarks-president-iran-nuclear-deal

support.[27] Some of this intelligence support even includes raw intelligence on American citizens,
which in addition to being questionable, invasive, and likely illegal under other statutes; also
qualify as aid subject to Symington & Glenn provisions.[28]

65. The plaintiff and public will imminently suffer further direct and indirect injury as final
installments of a ten-year $30 billion aid deal are paid immediately under special arrangement in
October by the U.S. Treasury and a new Memorandum of Understanding (MOU) for another ten
years of foreign aid to Israel, predicted to be up to $4-5 billion per year, is signed with no due
abidance of Symington & Glenn under "nuclear ambiguity." The Plaintiff expects "nuclear
ambiguity" to extend injury to his information gathering and delivery beyond the next U.S. foreign
aid deliveries to Israel. Aid delivery will be a "final agency action" undeniably proving nuclear
ambiguity trumps rule of law.

66. Indirect injuries—an inevitable cost the undermining of such an important law as
Symington & Glenn has on peace and justice—have also been mounting. As far back as 1960 the
CIA correctly predicted that a confidently nuclear-armed Israel would resist pressure to enter a
peace deal with Palestinians.[29] As revealed during 9/11 Commission hearings, the continued
plight of the Palestinians, and unconditional U.S. support for Israel, were major factors motivating
the 9/11 attackers to target the United States. The conflict continues to be the longest-running in

---

[27] Grant F. Smith, "How big is the lobby and what does it do?" Presentation at the National Press
Club, April 10, 2015, slide 3.
[28] Glenn Greenwald, "NSA shares raw intelligence including Americans' data with Israel," *The
Guardian*, September 11, 2013
https://www.theguardian.com/world/2013/sep/11/nsa-americans-personal-data-israel-documents
[29] "Implications of the Acquisitions by Israel of a Nuclear Weapons Capability" Special National
Intelligence Estimate Number 100-80-60, Submitted by the Director of Central Intelligence.
Approved for release on March 5, 2009.
http://www.israellobby.org/nukes/1960SNIE_Israeli_Nukes.pdf

the region. Non-enforcement of Symington & Glenn is therefore an important factor for perpetuating conflict and the constant blowback it generates against the United States.

67. The motivation behind decades of refusals to enforce Symington & Glenn is no great mystery. Every year in the U.S. more than 300 organizations that have the advancement of Israel as their top objective raise and distribute approximately $4.0 billion in tax-exempt donations to advance their mission in the United States. By 2020, this number is on track to surpass $6 billion.[30] The figures do not include the campaign contributions, in-kind, PAC money, dark money, media and public relations support that can accrue to political appointees or elected office holders that take actions to quantifiably advance Israeli interests, including upholding "nuclear ambiguity." There is no counterbalancing "special interest." Under the current system, top officials and their political parties are rewarded for "looking the other way," doublespeak and delivering annual foreign aid packages of advanced weapons that Israel would otherwise have to (and could, at the expense of its nuclear program) purchase with its own funds. These officials, by thwarting the law, force taxpayers and public interest watchdogs to pay the very subsidy Senator Symington sought to avoid: that Americans would offset and become unwilling accomplices to Israel's nuclear weapons development program, undermining the NPT and U.S. credibility in the nonproliferation effort, and undermining a Middle East peace deal.

68. The focus of this complaint is entirely domestic in nature. Nuclear ambiguity is the unlawful fulcrum the Defendants and their predecessors have employed for decades to illegally hoist the lion's share of U.S. taxpayer funded foreign aid into the coffers of an unlawful recipient. It quantifiably injures all Americans who attempt to overcome it and expose the truth. True relief

---

[30] "The Israel Lobby: Israel Affinity Organizations" IAO database by category, name, IRS ruling year, employees, volunteers, 2012 revenue, 2020 revenue forecast. http://israellobby.org/bigisrael/

to injury therefore requires removal of the fulcrum, rather than *de novo* review of any individual or class of sunshine law cases, or reimbursement of unjust fees or unpaid court awards. Bona fide relief requires rectifying the totality of injuries forthcoming in the immediate future, sustained in the past, and restoring rule of law within the executive branch and across complicit federal agencies.

WHEREFORE, Plaintiff requests this Court:

(1) Injunctive Relief: The President, U.S. Department of Defense, U.S. Department of Treasury, Central Intelligence Agency, U.S. Department of State and all others in active concert or participation in "nuclear ambiguity" are restrained and enjoined from directly or indirectly disbursing further U.S. foreign aid to Israel;

(2) Injunctive Relief: U.S. foreign aid unlawfully provided to Israel since 1978 be clawed back for disgorgement either as a rebate to U.S. taxpayers or for use in legal and legitimate purposes that serve the common good rather than unlawfully subsidizing through offset a foreign nuclear weapons program;

(3) Injunctive Relief: Declare "nuclear ambiguity" and all of its manifestations in the form of continual misrepresentation, gag orders, systemic violations of government sunshine laws and all violations of the Administrative Procedure Act and the "Take Care" clause to be unlawful;

(4) Affirmative Relief: The President be ordered to faithfully uphold Symington & Glenn Amendments in the future under 28 U.S.C. § 1361, giving the United States district court jurisdiction of "an action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff" and;

(5) Grant such other and further relief as may deem just and proper.

Respectfully submitted,

Grant F. Smith, *Pro Se*
4101 Davis PL NW #2, Washington, DC 20007
gsmith@IRmep.org
(202) 640-3709

Dated:

# Exhibit List

Exhibit 1 "International Security Assistance and Arms Export Control Act of 1976," including the Symington Amendment, Public Law 94-329, 94t Congress, H.R. 13680, June 30, 1976

Exhibit 2 "6/30/1976 HR13680 International Security Assistance and Arms Export Control Act of 1976 (3)," National Archives and Records Administration, Collection GRF-0055: White House Records Office: Legislation Case Files, 8/9/1974 - 1/20/1977, cover & p. 51-52 Available online at https://catalog.archives.gov/id/12008722

Exhibit 3 "Briefing of Senator John Glenn, Democrat, Ohio, on the NUMEC Case" CIA Memorandum for the Record, approved for declassification and release on August 25, 2015 in response to *Smith v CIA.*

Exhibit 4 H.R. 6884, popularly known as the "Glenn Amendment," Nuclear Enrichment and Reprocessing Transfers; Nuclear Detonations, as adopted in 1977, Law Library, Library of Congress

Exhibit 5 22 USC 2799aa-1: Nuclear reprocessing transfers, illegal exports for nuclear explosive devices, transfers of nuclear explosive devices, and nuclear detonations

Exhibit 6 *"Classification Bulletin WNP-136 - Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability"* Department of Energy, September 6, 2012 and FOIA release letter

Exhibit 7 FOIA HQ-2015-00699-F confirmation letter, February 23, 2015. U.S. Department of Energy.

Exhibit 8 FOIA HQ-2015-00699-F appeal denial letter, February 12, 2016. U.S. Department of Energy.

Exhibit 9 FOIA HQ-2015-01766-F confirmation letter, September 3, 2015. U.S. Department of Energy.

Exhibit 10 FOIA BIS 12-064 confirmation letter, $6,984.50 fee request. July 2, 2012. U.S. Department of Commerce Bureau of Industry and Security

Exhibit 11 "Order relating to Telogy International NV" March 18, 2010 and supporting documents, Department of Commerce, Bureau of Industry and Security

Exhibit 12 Email thread: court settlement and attempt to collect $624.78 from Department of Defense.

Exhibit 13 October 26, 2011 MDR request for DOE Security Office report by Bill Knauf and Jim Anderson covering the illegal diversion of U-235 from NUMEC to Israel.

Exhibit 14 March 15, 2012 Department of Energy MDR denial of DOE Security Office report by Bill Knauf and Jim Anderson.

Exhibit 15 Herbert E. Hetu, Assistant for Public Affairs, Central Intelligence Agency,
"Amendments to the Freedom of Information Act" Memo date January 16, 1978,
declassified and released on March 3, 2005. Full correspondence thread on
"Formulation Of CIA Position On Legislative Relief From FOIA" available online at:
https://archive.org/details/FormulationOfCIAPositionOnLegislativeReliefFromFOIA

EXHIBIT 1

1197

UNITED STATES:   INTERNATIONAL SECURITY ASSISTANCE AND ARMS
EXPORT CONTROL ACT OF 1976*

Public Law 94-329
94th Congress, H. R. 13680
June 30, 1976

# An Act

To amend the Foreign Assistance Act of 1961 and the Foreign Military Sales
Act, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That this Act may
be cited as the "International Security Assistance and Arms Export
Control Act of 1976".

International
Security
Assistance and
Arms Export
Control Act
of 1976.
22 USC 2151
note.

## TITLE I—MILITARY ASSISTANCE PROGRAM

#### AUTHORIZATION

Sec. 101. Section 504(a) of the Foreign Assistance Act of 1961 is
amended to read as follows:

22 USC 2312.

"(a)(1) There is authorized to be appropriated to the President to
carry out the purposes of this chapter $196,700,000 for the fiscal year
1976 and $177,300,000 for the fiscal year 1977. Not more than the
following amounts of funds available for carrying out this chapter
(other than funds appropriated under section 507 of the International
Security Assistance and Arms Export Control Act of 1976) may be
allocated and made available to each of the following countries for
such fiscal years:

Limitation.

| Country | Fiscal Year 1976 Amount | Fiscal Year 1977 Amount |
|---|---|---|
| Greece | $31,000,000 | $33,000,000 |
| Indonesia | 13,000,000 | 15,000,000 |
| Jordan | 50,000,000 | 55,000,000 |
| Republic of Korea | 55,000,000 | 8,300,000 |
| Philippines | 17,000,000 | 17,000,000 |
| Thailand | 16,000,000 | 16,000,000 |
| Turkey | 31,000,000 | 50,000,000 |
| Ethiopia | 6,000,000 | 6,000,000 |

The amount specified in this paragraph for military assistance to any
such country for fiscal year 1976 or for fiscal year 1977 may be increased
by not more than 10 per centum of such amount if the President deems
such increase necessary for the purposes of this chapter.

"(2) Not to exceed $6,000,000 of the funds available for fiscal year
1976 to carry out the purposes of this chapter, and not to exceed
$3,700,000 of the funds available for fiscal year 1977 to carry out the
purposes of this chapter (other than funds appropriated under section
507 of the International Security Assistance and Arms Export Control
Act of 1976), may be used to provide assistance to international orga-
nizations and, subject to the limitations contained in paragraph (3),
to countries which are not designated in paragraph (1).

"(3) Funds available for assistance under this chapter may not be
used to furnish assistance to more than 20 countries (including those
countries designated in paragraph (1)) in fiscal year 1976. Funds
available for assistance under this chapter (other than funds appro-
priated under section 507 of the International Security Assistance and
Arms Export Control Act of 1976) may not be used to furnish assist-
ance to more than 12 countries (including those countries designated in
paragraph (1)) in fiscal year 1977.

*[This authorization act concerns the military and security
assistance of the United States foreign aid program, as distinct
from the economic and humanitarian assistance. The International
Development and Food Assistance Act of 1975, at 15 I.L.M. 119 (1976),
addresses the latter type of assistance.

[The Department of State regulations on the reporting of political
contributions, fees or commissions in connection with the sale of
defense articles appears at I.L.M. page 1191. These regulations are
mandated by section 604(b) of the International Security Assistance
and Arms Export Control Act at I.L.M. page 1216.]

1200

tractors (including instruction at civilian institutions), or by correspondence courses, technical, educational, or information publications and media of all kinds, training aids, orientation, and military advice to foreign military units and forces.".

22 USC 2321a note.

(c) Except as may be expressly provided to the contrary in this Act, all determinations, authorizations, regulations, orders, contracts, agreements, and other actions issued, undertaken, or entered into under authority of any provision of law amended or repealed by this section shall continue in full force and effect until modified, revoked, or superseded by appropriate authority.

(d) Funds made available pursuant to other provisions of law for foreign military educational and training activities shall remain available for obligation and expenditure for their original purposes in accordance with the provisions of law originally applicable to those purposes or in accordance with the provisions of law currently applicable to those purposes.

22 USC 2347 note.

## TITLE II—ARMS EXPORT CONTROLS

### CHANGE IN TITLE

22 USC 2751 note.

Sec. 201. (a) The first section of the Foreign Military Sales Act is amended by striking out "The Foreign Military Sales Act" and inserting in lieu thereof the "Arms Export Control Act".

(b) Any reference to the Foreign Military Sales Act shall be deemed to be a reference to the Arms Export Control Act.

### ARMS SALES POLICY

22 USC 2751.

Sec. 202. (a) Section 1 of the Foreign Military Sales Act is amended by striking out the last paragraph and inserting in lieu thereof the following new paragraphs:

"It shall be the policy of the United States to exert leadership in the world community to bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments. United States programs for or procedures governing the export, sale, and grant of defense articles and defense services to foreign countries and international organizations shall be administered in a manner which will carry out this policy.

"It is the sense of the Congress that the President should seek to initiate multilateral discussions for the purpose of reaching agreements among the principal arms suppliers and arms purchasers and other countries with respect to the control of the international trade in armaments. It is further the sense of Congress that the President should work actively with all nations to check and control the international sale and distribution of conventional weapons of death and destruction and to encourage regional arms control arrangements. In furtherance of this policy, the President should undertake a converted effort to convene an international conference of major arms-supplying and arms-purchasing nations which shall consider measures to limit conventional arms transfers in the interest of international peace and stability.

"It is the sense of the Congress that the aggregate value of defense articles and defense services—

"(1) which are sold under section 21 or section 22 of this Act;

or

"(2) which are licensed or approved for export under section 38 of this Act, for the use, or for the benefit of the armed forces, police, intelligence, or other internal security forces of a foreign country or international organization under a commercial sales contract;

in any fiscal year should not exceed current levels.".

"(b)(1) The President shall conduct a comprehensive study of the arms sales policies and practices of the United States Government, including policies and practices with respect to commercial arms sales, in order to determine whether such policies and practices should be changed. Such study shall examine the rationale for arms sales to foreign countries, the benefits to the United States of such arms sales, the risks to world peace as a result of such arms sales, trends in arms sales by the United States and other countries, and steps which might be taken by the United States to provide for limitations on arms sales. In addition, such study shall include an evaluation of the impact of United States arms sales policies on the economic and social development of foreign countries, and consideration of steps which might be taken to encourage the maximum use of the resources of the developing countries for economic and social development purposes.

"(2) Not later than the end of the one-year period beginning on the date of enactment of this section, the President shall submit to the Congress a report setting forth in detail (A) the findings made and conclusions reached as a result of the study conducted pursuant to paragraph (1) of this subsection, together with such recommendations for legislation as the President deems appropriate, (B) the efforts made by the United States during the five years immediately preceding the submission of such report to initiate and otherwise encourage arms sales limitations, and (C) the efforts being made by the United States at the time of the submission of such report to initiate and otherwise encourage arms sales limitations in accordance with the policies stated in the amendment made by subsection (a) of this section.

Presidential report to Congress.

Study. 22 USC 2751 note.

### TRANSFER OF DEFENSE SERVICES

Sec. 203. (a) Section 3(a)(2) of the Foreign Military Sales Act is amended, effective July 1, 1976, by inserting immediately after "article" each time it appears "or related training or other defense service".

(b) Section 505(a) of the Foreign Assistance Act of 1961 is amended, effective July 1, 1976, by inserting immediately after "articles" each time it appears "or related training or other defense service.".

22 USC 2753 and note.

22 USC 2314 and note.

### APPROVAL FOR TRANSFER OF DEFENSE ARTICLES

Sec. 204. (a) Section 3 of the Foreign Military Sales Act is amended by adding at the end thereof the following new subsections:

"(c) The President may not give his consent under paragraph (2) of subsection (a) or under the third sentence of such subsection to a transfer of a defense article, or related training or other defense service, sold under this Act and may not give its consent to such a transfer under section 505(a)(1) or 505(a)(4) of the Foreign Assistance Act of 1961 unless, 30 days prior to giving such consent, the President submits to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate a written certification with respect to such proposed transfer containing—

"(1) the name of the country or international organization proposing to make such transfer,

22 USC 2753.

Written certification, submittal to Speaker of the House and congressional committee.
22 USC 2314.

"(2) a description of the defense article or related training or other defense service proposed to be transferred, including the original acquisition cost of such defense article or related training or other defense service,

"(3) the name of the proposed recipient of such defense article or related training or other defense service,

"(4) the reasons for such proposed transfer, and

"(5) the date on which such transfer is proposed to be made.

Any certification submitted to Congress pursuant to this subsection shall be unclassified, except that information regarding the dollar value and number of defense articles, or related training or other defense services, proposed to be transferred may be classified if public disclosure thereof would be clearly detrimental to the security of the United States.

"(f) If the President receives any information that a transfer of any defense article, or related training or other defense service, has been made without regard to or in violation of this section, under section 505 of the Foreign Assistance Act of 1961, he shall report such information immediately to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate.".

(b)(1) The second sentence of subsection (a) of section 3 of the Foreign Military Sales Act is amended by striking out ", and prior" and all that follows thereafter through "transferred" the second time it appears.

(2) The first sentence of section 505(e) of the Foreign Assistance Act of 1961 is amended by striking out ", and prior" and all that follows thereafter through "transferred" the second time it appears.

### SALES FROM STOCKS

SEC. 205. Section 21 of the Foreign Military Sales Act is amended to read as follows:

"SEC. 21. SALES FROM STOCKS.—(a) The President may sell defense articles and defense services from the stocks of the Department of Defense to any eligible country or international organization if such country or international organization agrees to pay in United States dollars—

"(1) in the case of a defense article not intended to be replaced at the time such agreement is entered into, not less than the actual value thereof;

"(2) in the case of a defense article intended to be replaced at the time such agreement is entered into, the estimated cost of replacement of such article, including the contract or production costs less any depreciation in the value of such article; or

"(3) in the case of the sale of a defense service, the full cost to the United States Government of furnishing such service.

"(b) Except as provided by subsection (d) of this section, payment shall be made in advance or, if the President determines it to be in the national interest, upon delivery of the defense article or rendering of the defense service.

"(c) Personnel performing defense services sold under this Act may not perform any duties of a combatant nature, including any duties related to training, advising, or otherwise providing assistance regarding combat activities, outside the United States in connection with the performance of those defense services.

"(d) If the President determines it to be in the national interest, pursuant to subsection (b) of this section, billings for sales made

under letters of offer issued under this section after the enactment of this subsection may be dated and issued upon delivery of the defense article or rendering of the defense service and shall be due and payable upon receipt thereof by the purchasing country or international organization. Interest shall be charged on any net amount due and payable which is not paid within sixty days after the date of such billing. The rate of interest charged shall be a rate not less than a rate determined by the Secretary of the Treasury taking into consideration the current average market yield on outstanding short-term obligations of the United States as of the last day of the month preceding the billing and shall be computed from the date of the billing. The President may extend such sixty-day period to one hundred and twenty days if he determines that emergency requirements of the purchaser for acquisition of such defense articles or defense services exceed the ready availability to the purchaser of funds sufficient to pay the United States for such purchases within such sixty-day period with a special emergency request for the authorization and appropriation of additional funds to finance such purchases under this Act.

"(e)(1) After September 30, 1976, letters of offer for the sale of defense articles or for the sale of defense services that are issued pursuant to this section or pursuant to section 22 of this Act shall include appropriate charges for—

"(A) administrative services, calculated on an average percentage basis to recover the full estimated costs of administration of sales made under this Act to all purchasers of such articles and services;

"(B) any use of plant and production equipment in connection with such defense articles; and

"(C) a proportionate amount of any nonrecurring costs of research, development, and production of major defense equipment.

"(2) The President may reduce or waive the charge or charges which would otherwise be considered appropriate under paragraphs (1)(B) and (1)(C) for particular sales that would, if made, significantly advance United States Government interests in North Atlantic Treaty Organization standardization, or foreign procurement in the United States under coproduction arrangements.

"(f) Any contracts entered into between the United States and a foreign country under the authority of this section or section 22 of this Act shall be prepared in a manner which will permit them to be made available for public inspection to the fullest extent possible consistent with the national security of the United States.

"(g) In carrying out subtitle VI of title 10, the Act of October 7, 1975 (Public Law 94–106), the President may enter into North Atlantic Treaty Organization standardization agreements for the cooperative furnishing of training on a bilateral or multilateral basis, if the financial principles of such agreements are based on reciprocity. Such agreements shall include reimbursement for all direct costs but may exclude reimbursement for indirect costs, administrative surcharges, and costs of billeting of trainees (except to the extent that members of the United States Armed Forces occupying comparable accommodations are charged for such accommodations by the United States). Each such agreement shall be transmitted promptly to the Speaker of the House of Representatives and the Committee on Appropriations, Armed Services, and Foreign Relations of the Senate.".

Report to the Speaker of the House and congressional committee.
22 USC 2314.

22 USC 2753.

22 USC 2314.

22 USC 2761.

22 USC 2762.

Reductions or waiver.

NATO standardization agreements.
89 Stat. 540.

Transmittal to Speaker of the House and congressional committees.

1202

SALES FROM STOCKS AFFECTING UNITED STATES COMBAT READINESS

SEC. 206. Section 21 of the Foreign Military Sales Act, as amended by section 205 of this Act, is further amended by adding at the end thereof the following new subsection:

Ante, p. 736.

"(h)(1) Sales of defense articles and defense services which could have significant adverse effect on the combat readiness of the Armed Forces of the United States shall be kept to an absolute minimum. The President shall transmit to the Speaker of the House of Representatives and the Committees on Armed Services and Foreign Relations of the Senate on the same day a written statement giving a complete explanation with respect to any proposal to sell, under this section, any defense articles or defense services if such sale could have a significant adverse effect on the combat readiness of the Armed Forces of the United States. Each such statement shall be unclassified except to the extent that public disclosure of any item of information contained therein would be clearly detrimental to the security of the United States, but any necessarily classified information shall be confined to a supplement to such report. Each such statement shall include an explanation relating to only one such proposal to sell and shall set forth—

Written statement, transmittal to Speaker of the House and congressional committees.

"(A) the country or international organization to which the sale is proposed to be made;
"(B) the amount of the proposed sale;
"(C) a description of the defense article or service proposed to be sold;
"(D) a full description of the impact which the proposed sale will have on the combat readiness of the Armed Forces of the United States; and
"(E) a justification for such proposed sale, including a certification that such sale is important to the security of the United States. A certification described in subparagraph (E) shall take effect on the date on which such certification is transmitted and shall remain in effect for not to exceed one year.

"(2) No delivery may be made under any sale which is required to be reported under paragraph (1) of this subsection unless the certification required to be transmitted by paragraph (E) of paragraph (1) is in effect.".

PROCUREMENT FOR CASH SALES

SEC. 207. (a) Section 22(a) of the Foreign Military Sales Act is amended by adding at the end thereof the following: "Interest shall be charged on any net amount by which any such country or international organization is in arrears under all of its outstanding unliquidated dependable undertakings, considered collectively. The rate of interest charged shall be a rate not less than a rate determined by the Secretary of the Treasury taking into consideration the current average market yield on outstanding short-term obligations of the United States as of the last day of the month preceding the net arrearage and shall be computed from the date of net arrearage.".

22 USC 2762.

Interest rate.

(b) Section 22(b) of the Foreign Military Sales Act is amended by striking out the first sentence and inserting in lieu thereof the following: "The President may, if he determines it to be in the national interest, issue letters of offer under this section which provide for billing upon delivery of the defense articles or rendering of the defense services and for payment within one hundred and twenty days after the date of billing. This authority may be exercised, however, only if the President also determines that the emergency requirements of the purchaser for acquisition of such defense articles and services exceed the ready availability to the purchaser of funds sufficient to make

payments on a dependable undertaking basis and submits both determinations to the Congress together with a special emergency request for authorization and appropriation of additional funds to finance such purchases under this Act.".

EXTENSION OF PAYMENT PERIOD FOR CREDIT SALES

SEC. 208. (a) Paragraph (1) of section 23 of the Foreign Military Sales Act is amended by striking out "ten years" and inserting in lieu thereof "twelve years".

22 USC 2763.

(b) The amendment made by subsection (a) shall apply with respect to financing under agreements entered into on or after the date of enactment of this Act for the procurement of defense articles to be delivered, or defense services to be rendered, after such date.

22 USC 2763 note.

ANNUAL ESTIMATE AND JUSTIFICATION FOR SALES PROGRAM

SEC. 209. (a) Immediately after section 24 of the Foreign Military Sales Act, add the following new section:

22 USC 2765.

"SEC. 25. ANNUAL ESTIMATE AND JUSTIFICATION FOR SALES PROGRAM.—(a) The President shall transmit to the Congress, as a part of the presentation materials for security assistance programs proposed for each fiscal year, a report, which sets forth—

"(1) an estimate of the amount of sales expected to be made to each country under sections 21 and 22 of this Act, including a detailed explanation of the foreign policy and United States national security considerations involved in expected sales to each country;

22 USC 2761, 2762.

"(2) an estimate of the amount of credits and guaranties expected to be extended to each country under sections 23 and 24 of this Act;

"(3) a list of all findings which are in effect on the date of such transmission made by the President pursuant to section 3(a)(1) of this Act, together with a full and complete justification for each such finding, explaining how sales to each country with respect to which such finding has been made will strengthen the security of the United States and promote world peace; and

22 USC 2763, 2764.

"(4) an arms control impact statement for each purchasing country, including (A) an analysis of the relationship between expected sales to each country and arms control efforts relating to that country, and (B) the impact of such expected sales on the stability of the region that includes the purchasing country.

"(b) Not later than thirty days following the receipt of a request made by the Committee on Foreign Relations of the Senate or the Committee on International Relations of the House of Representatives for additional information with respect to any estimate submitted pursuant to subsection (a), the President shall submit such information to such committee.

Information, submittal to congressional committee.

"(c) The President shall make every effort to submit all of the information required by this section wholly in unclassified form. In the event the President submits any such information in classified form, he shall submit such classified information in an addendum and shall also submit simultaneously a detailed summary, in unclassified form, of such classified information.".

(b) Section 634(d) of the Foreign Assistance Act of 1961, is amended by striking out "and military sales under this or any other Act" in the fourth sentence.

22 USC 2394.

1203

## MILITARY SALES AUTHORIZATION

**22 USC 2771.** Sec. 210. (a) Section 31(a) of the Foreign Military Sales Act is amended by striking out "not to exceed $405,000,000 for the fiscal year 1975" and inserting in lieu thereof "not to exceed $1,039,000,000 for the fiscal year 1976 and not to exceed $740,000,000 for the fiscal year 1977".

**22 USC 2771.** (b) Section 31(b) of such Act is amended to read as follows:

"(b) The aggregate total of credits, or participations in credits, extended pursuant to this Act and of the principal amount of loans guaranteed pursuant to section 24(a) shall not exceed $2,374,700,000 for the fiscal year 1976, of which not less than $1,500,000,000 shall be available only for Israel, and shall not exceed $2,022,100,000 for the fiscal year 1977, of which not less than $1,000,000,000 shall be available only for Israel.".

**22 USC 2764.** (c)(1) Section 31 of such Act is further amended by adding at the end thereof the following new subsections:

**22 USC 2771.** "(c) Funds made available for the fiscal years 1976 and 1977 under subsection (a) of this section shall be obligated to finance the procurement of defense articles and defense services by Israel on a long-term repayment basis either by the extension of credits, without regard to the limitations contained in section 23, or by the issuance of guaranties under section 24. Repayment shall be in not less than twenty years, following a grace period of ten years on repayment of principal. Israel shall be released from one-half of its contractual liability to repay the United States Government with respect to defense articles and defense services financed pursuant to such credit and to such guaranties.

**22 USC 2763.** "(d) The aggregate acquisition cost to the United States of excess defense articles ordered by the President in any fiscal year after fiscal year 1976 for delivery to foreign countries or international organizations under the authority of chapter 2 of part II of the Foreign Assistance Act of 1961 or pursuant to sales under this Act may not exceed $100,000,000 (exclusive of ships and their on-board stores and supplies transferred in accordance with law).".

**22 USC 2311 et seq.**
**Repeal.**
**22 USC 2321 and note.**
**Transfer of funds.**
(2) Subsections (n), (b), (c), and (e) of section 8 of the Act entitled "An Act to amend the Foreign Military Sales Act and for other purposes" approved effective July 1, 1971 (Public Law 91–672; 84 Stat. 2053), are repealed effective July 1, 1976. All funds in the suspense account referred to in subsection (n) of such section on July 1, 1976, shall be transferred to the general fund of the Treasury.

### REPORTS ON COMMERCIAL AND GOVERNMENTAL MILITARY EXPORTS; CONGRESSIONAL ACTION

**22 USC 2776.** Sec. 211. (a) Section 36 of the Foreign Military Sales Act is amended to read as follows:

**Presidential report to Speaker of the House and congressional committee.**
"Sec. 36. REPORTS ON COMMERCIAL AND GOVERNMENTAL MILITARY EXPORTS; CONGRESSIONAL ACTION.—(a) The President shall transmit to the Speaker of the House of Representatives and to the chairman of the Committee on Foreign Relations of the Senate not more than thirty days after the end of each quarter an unclassified report (except that any material which was transmitted in classified form under subsection (b)(1) or (c)(1) of this section may be contained in a classified addendum to such report and any letter of offer referred to in paragraph (1) of this subsection may be listed in such addendum unless such letter of offer has been the subject of an unclassified certification pursuant to subsection (b)(1) of this section) containing—

**Contents.** "(1) a listing of all letters of offer to sell any major defense equipment for $1,000,000 or more under this Act to each foreign country and international organization, by category, if such letters of offer have not been accepted or cancelled;

"(2) a listing of all such letters of offer that have been accepted during the fiscal year in which such report is submitted, together with the total value of all defense articles and defense services sold to each foreign country and international organization during such fiscal year;

"(3) the cumulative dollar amounts, by foreign country and international organization, of sales credit agreements under section 23 and guaranty agreements under section 24 made during the fiscal year in which such report is submitted;

**22 USC 2763, 2764.** "(4) a numbered listing of all licenses and approvals for the export to each foreign country and international organization during such fiscal year of commercially sold major defense equipment, by category, sold for $1,000,000 or more, together with the total value of all defense articles and defense services so licensed for each foreign country and international organization, setting forth with respect to the listed major defense equipment—

"(A) the items to be exported under the license,

"(B) the quantity and contract price of each such item to be furnished, and

"(C) the name and address of the ultimate user of each such item;

"(5) projections of the dollar amounts, by foreign country and international organization, of cash sales expected to be made under section 21 and 22, credits to be extended under section 23, and guaranty agreements to be made under section 24 in the quarter of the fiscal year immediately following the quarter for which such report is submitted;

"(6) a projection with respect to all cash sales expected to be made and credits expected to be extended to each country and organization for the remainder of the fiscal year in which such report is transmitted;

"(7) an estimate of the number of officers and employees of the United States Government and of United States civilian contract personnel expected to be in each foreign country at the end of that quarter for assignments in implementation of sales and commercial exports under this Act; and

"(8) an analysis and description of the services being performed by officers and employees of the United States Government under section 21(a) of this Act, including the number of personnel so employed.

For each letter of offer to sell under paragraphs (1) and (2), the report shall specify (i) the foreign country or international organization to which the defense article or service is offered or was sold, as the case may be; (ii) the dollar amount of the offer to sell or the sale and the number of defense articles offered or sold, as the case may be; (iii) a description of the defense article or service offered or sold, as the case may be; and (iv) the United States Armed Force or other agency of the United States which is making the offer to sell or the sale, as the case may be.

**22 USC 2761, 2762.**
**Certification, submittal to Speaker of the House and congressional committee.**
"(b)(1) In the case of any letter of offer to sell any defense articles or services under this Act for $25,000,000 or more, or any major defense equipment for $7,000,000 or more, before such letter of offer is issued, the President shall submit to the Speaker of the House of Representatives and to the chairman of the Committee on Foreign Relations of the Senate a numbered certification with respect to such offer to sell containing the information specified in clauses (i) through

1204

Statement, transmittal to congressional committees.

"(iv) of subsection (a). In addition, the President shall, upon the request of such committee or the Committee on International Relations of the House of Representatives, transmit promptly to both such committees a statement setting forth, to the extent specified in such request—

"(A) a detailed description of the defense articles or services to be offered, including a brief description of the capabilities of any defense article to be offered;

"(B) an estimate of the number of officers and employees of the United States Government and of United States civilian contract personnel expected to be needed in such country to carry out the proposed sale;

"(C) the name of each contractor expected to provide the defense article or defense service proposed to be sold (if known on the date of transmittal of such statement);

"(D) an analysis of any arms control impact pertinent to such offer to sell, prepared in consultation with the Secretary of Defense;

"(E) the reasons why the foreign country or international organization to which the sale is proposed to be made needs the defense articles or services which are the subject of such sale and a description of how such country or organization intends to use such defense articles or services;

"(F) an analysis of the impact of the proposed sale on the military stocks and the military preparedness of the United States;

"(G) the reasons why the proposed sale is in the national interest of the United States;

"(H) an analysis by the President of the impact of the proposed sale on the military capabilities of the foreign country or international organization to which such sale would be made;

"(I) an analysis by the President of how the proposed sale would affect the relative military strengths of countries in the region to which the defense articles or services which are the subject of such sale would be delivered and whether other countries in the region have comparable kinds and amounts of defense articles or services;

"(J) an estimate of the levels of trained personnel and maintenance facilities of the foreign country or international organization to which the sale would be made which are needed and available to utilize effectively the defense articles or services proposed to be sold;

"(K) an analysis of the extent to which comparable kinds and amounts of defense articles or services are available from other countries;

"(L) an analysis of the impact of the proposed sale on United States relations with the countries in the region to which the defense articles or services which are the subject of such sale would be delivered; and

"(M) a detailed description of any agreement proposed to be entered into by the United States for the purchase or acquisition by the United States of defense articles, services, or equipment, or other articles, services, or equipment of the foreign country or international organization in connection with, or as consideration for, such letter of offer, including an analysis of the impact of such proposed agreement upon United States business concerns which might otherwise have provided such articles, services, or equipment to the United States, an estimate of the costs to be incurred by the United States in connection with such agreement compared with costs which would otherwise have been incurred, an estimate of the economic impact and unemployment which would result from entering into such proposed agreement, and an analysis of whether such costs and such domestic economic impact justify entering into such proposed agreement.

A certification transmitted pursuant to this subsection shall be unclassified, except that the information specified in clause (ii) and the details of the description specified in clause (iii) of subsection (a) may be classified if the public disclosure thereof would be clearly detrimental to the security of the United States. The letter of offer shall not be issued if the Congress, within thirty calendar days after receiving such certification, adopts a concurrent resolution stating that it objects to the proposed sale, unless the President states in his certification that an emergency exists which requires such sale in the national security interests of the United States.

"(2) Any such resolution shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

"(3) For the purpose of expediting the consideration and adoption of concurrent resolutions under this subsection, a motion to proceed to the consideration of any such resolution after it has been reported by the appropriate committee shall be treated as highly privileged in the Senate.

Post, p. 765.

"(c) In the case of an application by a person (other than with regard to a sale under section 21 or section 22 of this Act) for a license for the export of any major defense equipment sold under a contract in the amount of $7,000,000 or more, or of defense articles or defense services sold under a contract in the amount of $25,000,000 or more, not less than thirty days before issuing such license the President shall transmit to the Speaker of the House of Representatives and to the chairman of the Committee on Foreign Relations of the Senate an unclassified numbered certification with respect to such application specifying (1) the foreign country or international organization to which such export will be made, (2) the dollar amount of the items to be exported, and (3) a description of the items to be exported. In addition, the President shall, upon the request of such committee or the Committee on International Relations of the House of Representatives, transmit promptly to both such committees a statement setting forth, to the extent specified in such request, a description of the total number of United States personnel expected to be needed in the foreign country concerned in connection with the items to be exported and an analysis of the arms control impact pertinent to such application, prepared in consultation with the Secretary of Defense. A certification transmitted pursuant to this subsection shall be unclassified, except that the information specified in paragraph (2) and the details of the description specified in paragraph (3) may be classified if the public disclosure thereof would be clearly detrimental to the security of the United States.

Certification, transmittal to Speaker of the House and congressional committee. 22 USC 2761, 2762.

Statement, transmittal to congressional committees.

"(d) In the case of an approval under section 38 of this Act of a United States commercial technical assistance or manufacturing licensing agreement for or in a country not a member of the North Atlantic Treaty Organization which involves the manufacture abroad of any item of significant combat equipment on the United States Munitions List, before issuing an export license under section 38, the President shall submit a certification with respect to such agreement in the manner applicable to such commercial agreements under subsection (c) containing

Post, p. 744.

comparable information, except that the last sentence of such subsection shall not apply to certifications submitted pursuant to this subsection.".

22 USC 2776 note.
22 USC 2776. Infra.

"(b) The amendment made by subsection (a) of this section shall apply with respect to letters of offer for which a certification is transmitted pursuant to section 36(b) of the Arms Export Control Act on or after the date of enactment of this Act and to export licenses for which an application is filed under section 38 of such Act on or after such date.

CONTROL OF LICENSES WITH RESPECT TO ARMS EXPORTS AND IMPORTS

Sec. 212. (a) (1) Chapter 3 of the Foreign Military Sales Act is amended by adding at the end thereof the following new section:

22 USC 2778.

"Sec. 38. CONTROL OF ARMS EXPORTS AND IMPORTS.—(a)(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

"(2) Decisions on issuing export licenses under this section shall be made in coordination with the Director of the United States Arms Control and Disarmament Agency and shall take into account the Director's opinion as to whether the export of an article will contribute to an arms race, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control arrangements.

Regulations.

"(b)(1) As prescribed in regulations issued under this section, every person (other than an officer or employee of the United States Government acting in an official capacity) who engages in the business of manufacturing, exporting, or importing any defense articles or defense services designated by the President under subsection (a) (1) shall register with the United States Government agency charged with the administration of this section, and shall pay a registration fee which shall be prescribed by such regulations. Such regulations shall prohibit the return to the United States for sale in the United States (other than for the Armed Forces of the United States and its allies or for any State or local law enforcement agency) of any military firearms or ammunition of United States manufacture furnished to foreign governments by the United States under this Act or any other foreign assistance or sales program of the United States, whether or not enhanced in value or improved in condition in a foreign country. This prohibition shall not extend to similar firearms that have been so substantially transformed as to become, in effect, articles of foreign manufacture.

"(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1), no defense articles or defense services designated by the President under subsection (a)(1) may be exported or imported without a license for such export or import, issued in accordance with this Act and regulations issued under this Act, except that no license shall be required for exports or imports made to or from (A) an agency of the United States Government (i) for official use by a department or agency of the United States Government, or (B) for

carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.

"(3) No license may be issued under this Act for the export of any major defense equipment sold under a contract in the amount of $25,000,000 or more to any foreign country which is not a member of the North Atlantic Treaty Organization unless such major defense equipment was sold under this Act.

Penalties.
Post, p. 767.

"(c) Any person who willfully violates any provision of this section or section 39, or any rule or regulation issued under either section, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $100,000 or imprisoned not more than two years, or both.

"(d) This section applies to and within the Canal Zone.

50 USC app. 2405, 2406.

"(e) In carrying out functions under this section with respect to the export of defense articles and defense services, the President is authorized to exercise the same powers concerning violations and enforcement which are recognized or conferred upon departments and officials by sections 6 (c), (e), and (f) and 7 (a) and (c) of the Export Administration Act of 1969, subject to the same terms and conditions as are applicable to such powers under such Act. Nothing in this subsection shall be construed as authorizing the withholding of information from the Congress.".

22 USC 2752.

(2) Section 2(b) of the Foreign Military Sales Act is amended—
(A) by inserting "and exports" immediately after "sales" both times it appears; and
(B) by inserting "and whether there shall be delivery or other performance under such sale or export," immediately after "thereof;".

Repeal.
22 USC 1934 and note.
2778 note.

(b)(1) Section 414 of the Mutual Security Act of 1954 is repealed. Any reference to such section shall be deemed to be a reference to section 38 of the Arms Export Control Act and any reference to licenses issued under section 38 of the Arms Export Control Act shall be deemed to include a reference to licenses issued under section 414 of the Mutual Security Act of 1954.

22 USC 1934 note.

(2) All determinations, authorizations, regulations, orders, contracts, agreements, and other actions issued, undertaken, or entered into under section 414 of the Mutual Security Act of 1954 shall continue in full force and effect until modified, revoked, or superseded by appropriate authority.

CANCELLATION AND SUSPENSION OF LICENSES AND CONTRACTS

22 USC 2791.

Sec. 213. Section 42 of the Foreign Military Sales Act is amended by adding at the end thereof the following new subsection:

22 USC 2791.

"(c)(1) Each contract for sale entered into under sections 21 and 22 of this Act shall provide that such contract may be canceled in whole or in part, or its execution suspended, by the United States at any time under unusual or compelling circumstances if the national interest so requires.

22 USC 2761, 2762.

"(2)(A) Each export license issued under section 38 of this Act shall provide that such license may be revoked, suspended, or amended by the Secretary of State, without prior notice, whenever the Secretary determines such action to be advisable.

Ante, p. 744.

"(B) Nothing in this paragraph may be construed as limiting the regulatory authority of the President under this Act.

1206

22 USC 2761, 2762.

"(3) There are authorized to be appropriated from time to time such sums as may be necessary (A) to refund moneys received from purchasers under contracts of sale entered into under sections 21 and 22 of this Act that are canceled or suspended under this subsection to the extent such moneys have previously been disbursed to private contractors and United States Government agencies for work in progress, and (B) to pay such damages and costs that accrue from the corresponding cancellation or suspension of the existing procurement contracts or United States Government agency work orders involved.".

### ADMINISTRATIVE EXPENSES

22 USC 2792.

SEC. 214. Section 43 of the Foreign Military Sales Act is amended by designating the present section as subsection (a) and by adding at the end thereof the following new subsection:
"(b) Administrative expenses incurred by any department or agency of the United States Government (including any mission or group) in carrying out functions under this Act which are primarily for the benefit of any foreign country shall be fully reimbursed from amounts received for sales under sections 21 and 22.".

### DEFINITIONS

22 USC 2794.

SEC. 215. Section 47 of the Foreign Military Sales Act is amended—
(1) by striking out "and" at the end of paragraph (1);
(2) by striking out the period at the end of paragraph (2) and inserting in lieu thereof a semicolon; and
(3) by adding immediately after paragraph (2) the following new paragraphs:
"(3) 'defense article', except as provided in paragraph (7) of this section, includes—
"(A) any weapon, weapons system, munition, aircraft, vessel, boat, or other implement of war,
"(B) any property, installation, commodity, material, equipment, supply, or goods used for the purposes of making military sales,
"(C) any machinery, facility, tool, material, supply, or other item necessary for the manufacture, production, processing, repair, servicing, storage, construction, transportation, operation, or use of any article listed in this subsection, and
"(D) any component or part of any article listed in this paragraph,

42 USC 2014.

but does not include merchant vessels or (as defined by the Atomic Energy Act of 1954) source material, byproduct material, special nuclear material, production facilities, utilization facilities, or atomic weapons or articles involving Restricted Data;
"(4) 'defense service', except as provided in paragraph (7) of this section, includes any service, test, inspection, repair, training, publication, technical or other assistance, or defense information (as defined in section 644(r) of the Foreign Assistance Act of 1961), used for the purposes of making military sales;

22 USC 2403.

"(5) 'training' includes, formal or informal instruction of foreign students in the United States or overseas by officers or employees of the United States, contract technicians, or contractors (including instruction at civilian institutions), or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice to foreign military units and forces;

Ante, p. 744.

"(6) 'major defense equipment' means any item of significant combat equipment on the United States Munitions List having a non-recurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000; and
"(7) 'defense articles and defense services' means, with respect to commercial exports subject to the provisions of section 38 of this Act, those items designated by the President pursuant to subsection (a)(1) of such section.".

### ANNUAL FOREIGN SALES REPORT

22 USC 2417.

SEC. 216. Section 657 of the Foreign Assistance Act of 1961 is amended as follows:
(1) The section caption is amended by inserting "AND MILITARY Exports" after "FOREIGN ASSISTANCE".
(2) Paragraph (1) of subsection (a) is amended to read as follows:
"(1) the aggregate dollar value of all foreign assistance (including military education and training), foreign military sales, sales credits, and guaranties provided or made by the United States Government by any means to all foreign countries and international organizations, and the aggregate dollar value of such assistance, sales, sales credits, and guaranties, by category, provided or made by the United States Government to or for each such country or organization during that fiscal year;".
(3) Paragraph (3) of subsection (a) is amended to read as follows:
"(3) the aggregate dollar value and quantity of defense articles and defense services, and of military education and training, exported to each foreign country and international organization, by category, specifying whether the export was made by grant under chapter 2 of the Arms Export Control Act, by commercial sale licensed under chapter 3 of that Act, or by other authority; and".
(4) Paragraph (4) of subsection (a) is repealed.
(5) Paragraph (5) of subsection (a) is amended—
"(A) by redesignating such paragraph as paragraph (4), and
"(B) by striking out "(4)" and inserting in lieu thereof "(3)".".

### REPORT ON SALES OF EXCESS DEFENSE ARTICLES

Transmittal to Speaker of the House and congressional committee. 22 USC 2751 note.

SEC. 217. Not later than February 28, 1977, the President shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate a full report (and report regularly) on all sales made under the Arms Export Control Act during the period July 1, 1976, through December 31, 1976, of excess defense articles to foreign governments and international organizations (other than any such article sold solely for scrap). Such report shall set forth—
(1) the number of such sales;
(2) the total acquisition costs of the articles sold;
(3) the total gross price paid for such articles exclusive of administrative surcharges and costs of repairing, rehabilitation, or modifying such articles;
(4) the amount set forth under paragraphs (1), (2), and (3) totaled separately for those sales made at less than 33⅓ per centum of the acquisition costs thereof; and

(5) the estimated total proceeds of sales of articles included under paragraph (4) if such articles had been sold instead through United States Government surplus property disposal operations and the percentage thereof that would have been paid out of such proceeds to meet direct expenses incurred in connection with such dispositions pursuant to law.

STUDY OF THE EFFECTS OF ARMS EXPORT CONTROL PROVISIONS

22 USC 2751 note.

Sec. 218. (a) The Secretary of State, in consultation with the Secretary of Defense, shall conduct a comprehensive study of the effects of the enactment of the arms export control provisions contained in this title with a view to determining the consequences of such provisions on (1) the foreign policy of the United States, (2) the balance of payments of the United States, (3) the trade with foreign countries, (4) unemployment in the United States, and (5) weapons procurement by the Department of Defense.

"(b) The Secretary of State shall submit the results of such study to the President and the Congress within one year after the date of enactment of this section, together with such comments and recommendations for legislation as he deems appropriate.

## TITLE III—GENERAL LIMITATIONS

### HUMAN RIGHTS

22 USC 2304.

Sec. 301. (a) Section 502B of the Foreign Assistance Act of 1961 is amended to read as follows:

"Sec. 502B. HUMAN RIGHTS.—(a)(1) It is the policy of the United States, in accordance with its international obligations as set forth in the Charter of the United Nations and in keeping with the constitutional heritage and traditions of the United States, to promote and encourage increased respect for human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion. To this end, a principal goal of the foreign policy of the United States is to promote the increased observance of internationally recognized human rights by all countries.

"(2) It is further the policy of the United States that, except under circumstances specified in this section, no security assistance may be provided to any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights.

"(3) In furtherance of the foregoing policy the President is directed to formulate and conduct international security assistance programs of the United States in a manner which will promote and advance human rights and avoid identification of the United States, through such programs, with governments which deny to their people internationally recognized human rights and fundamental freedoms, in violation of international law or in contravention of the policy of the United States as expressed in this section or otherwise.

Report to Congress.

"(b) The Secretary of State shall transmit to the Congress, as part of the presentation materials for security assistance programs proposed for each fiscal year, a full and complete report, prepared with the assistance of the Coordinator for Human Rights and Humanitarian Affairs, with respect to practices regarding the observance of and respect for internationally recognized human rights in each country proposed as a recipient of security assistance. In determining whether a government falls within the provisions of subsection (a)(3)

and in the preparation of any report or statement required under this section, consideration shall be given to—

"(1) the relevant findings of appropriate international organizations, including nongovernmental organizations, such as the International Committee of the Red Cross; and

"(2) the extent of cooperation by such government in permitting an unimpeded investigation by any such organization of alleged violations of internationally recognized human rights.

Statement, transmittal to Congress.

"(c)(1) Upon the request of the Senate or the House of Representatives by resolution of either such House, or upon the request of the Committee on Foreign Relations of the Senate or the Committee on International Relations of the House of Representatives, the Secretary of State shall, within thirty days after receipt of such request, transmit to both such committees a statement, prepared with the assistance of the Coordinator for Human Rights and Humanitarian Affairs, with respect to the country designated in such request, setting forth—

"(A) all the available information about observance of and respect for human rights and fundamental freedom in that country, and a detailed description of practices by the recipient government with respect thereto;

"(B) the steps the United States has taken to—

"(i) promote respect for and observance of human rights in that country and discourage any practices which are inimical to internationally recognized human rights, and

"(ii) publicly or privately call attention to, and disassociate the United States and any security assistance provided for such country from, such practices;

"(C) whether, in the opinion of the Secretary of State, notwithstanding any such practices—

"(i) extraordinary circumstances exist which necessitate a continuation of security assistance for such country, and, if so, a description of such circumstances and the extent to which such assistance should be continued (subject to such conditions as Congress may impose under this section), and

"(ii) on all the facts it is in the national interest of the United States to provide such assistance; and

"(D) such other information as such committee or such House may request.

"(2)(A) A resolution of request under paragraph (1) of this subsection shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

Post, p. 765.

"(B) The term 'certification', as used in section 601 of such Act, means, for the purposes of this subsection, a resolution of request of the Senate under paragraph (1) of this subsection.

"Certification."

"(3) In the event a statement with respect to a country is requested pursuant to paragraph (1) of this subsection but is not transmitted in accordance therewith within thirty days after receipt of such request, no security assistance shall be delivered to such country except as may thereafter be specifically authorized by law from such country unless and until such statement is transmitted.

"(4)(A) In the event a statement with respect to a country is transmitted under paragraph (1) of this subsection, the Congress may at any time thereafter adopt a joint resolution terminating, restricting, or continuing security assistance for such country. In the event such a joint resolution is adopted, such assistance shall be so terminated, so restricted, or so continued, as the case may be.

1207

1208

"(B) Any such resolution shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

"(C) The term 'certification', as used in section 601 of such Act, means, for the purposes of this paragraph, a statement transmitted under paragraph (1)(A) of this subsection.

"(d) For the purposes of this section—

"(1) the term 'gross violations of internationally recognized human rights' includes torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, and other flagrant denial of the right to life, liberty, or the security of person; and

"(2) the term 'security assistance' means—

"(A) assistance under chapter 2 (military assistance) or chapter 4 (security supporting assistance) or chapter 5 (military education and training) of this part or part VI (assistance to the Middle East) of this Act;

"(B) sales of defense articles or services, extensions of credits (including participations in credits, and guarantees of loans under the Arms Export Control Act; or

"(C) any license in effect with respect to the export of defense articles or defense services to or for the armed forces, police, intelligence, or other internal security forces of a foreign country under section 38 of the Arms Export Control Act.".

(b) Section 624 of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new subsection:

"(f) There is established in the Department of State a Coordinator for Human Rights and Humanitarian Affairs. The Coordinator shall be appointed by the President with the advice and consent of the Senate. He shall be responsible to the Secretary of State for matters pertaining to human rights and humanitarian affairs (including matters relating to refugees, prisoners of war, and members of the United States Armed Forces missing in action) in the conduct of foreign policy. The Secretary of State shall carry out his responsibility under section 502B of this Act through the Coordinator for Human Rights and Humanitarian Affairs.

"(2) The Coordinator for Human Rights and Humanitarian Affairs shall maintain continuous observation and review of all matters pertaining to human rights and humanitarian affairs (including matters relating to refugees, prisoners of war, and members of the United States Armed Forces missing in action) in the conduct of foreign policy including—

"(A) gathering detailed information regarding humanitarian affairs and the observance of and respect for internationally recognized human rights in each country to which requirements of sections 116 and 502B of this Act are relevant;

"(B) preparing the statements and reports to Congress required under section 502B of this Act;

"(C) making recommendations to the Secretary of State and the Administrator of the Agency for International Development regarding compliance with sections 116 and 502B of this Act; and

"(D) performing other responsibilities which serve to promote increased observance of internationally recognized human rights by all countries.".

*Margin notes (left column):* "Certification." / Definitions. / Ante, p. 744, 22 USC 2304. / Coordinator for Human Rights. / Ante, p. 746, / 22 USC 2151n,

DISCRIMINATION AGAINST DISCRIMINATION

SEC. 302. (a) Section 505 of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new subsection:

"(g)(1) It is the policy of the United States that no assistance under this chapter should be furnished to any foreign country, the laws, regulations, official policies, or governmental practices of which prevent any United States person (as defined in section 7701(a)(30) of the Internal Revenue Code of 1954) from participating in the furnishing of defense articles or defense services under this chapter on the basis of race, religion, national origin, or sex.

"(2)(A) No agency performing functions under this chapter shall, in employing or assigning personnel to participate in the performance of any such function, whether in the United States or abroad, take into account the exclusionary policies or practices of any foreign government where such policies or practices are based upon race, religion, national origin, or sex.

"(B) Each contract entered into by any such agency for the performance of any function under this chapter shall contain a provision to the effect that no person, partnership, corporation, or other entity performing functions pursuant to such contract, shall, in employing or assigning personnel to participate in the performance of any such function, whether in the United States or abroad, take into account the exclusionary policies or practices of any foreign government where such policies or practices are based upon race, religion, national origin, or sex.

"(3) The President shall promptly transmit reports to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate concerning any transaction in which any United States person (as defined in section 7701(a)(30) of the Internal Revenue Code of 1954) is being precluded by a foreign government on the basis of race, religion, national origin, or sex, from participating in the furnishing of assistance under this chapter, or education and training under chapter 5, to any foreign country. Such reports shall include (A) a description of the facts and circumstances of any such discrimination, (B) the response thereto on the part of the United States or any agency or employee thereof, and (C) the result of such response, if any.

"(4)(A) Upon the request of the Committee on Foreign Relations of the Senate or the Committee on International Relations of the House of Representatives, the President shall, within 60 days after receipt of such request, transmit to both such committees a statement, prepared with the assistance of the Coordinator for Human Rights and Humanitarian Affairs, with respect to the country designated in such request, setting forth—

"(i) all the available information about the exclusionary policies or practices of the government of such country when such policies or practices are based upon race, religion, national origin, or sex and prevent any such person from participating in a transaction involving the furnishing of any assistance under this chapter or any education and training under chapter 5;

"(ii) the response of the United States thereto and the results of such response;

"(iii) whether, in the opinion of the President, notwithstanding any such policies or practices—

"(I) extraordinary circumstances exist which necessitate a continuation of such assistance or education and training transaction, and, if so, a description of such circumstances

*Margin notes (right column):* 22 USC 2314, / 26 USC 7701, / Reports, transmittal to Speaker of the House and congressional committees. / Ante, p. 732,

and the extent to which such assistance or education and training transaction should be continued (subject to such conditions as Congress may impose under this section), and the result of such response, if any.

"(II) on all the facts it is in the national interest of the United States to continue such assistance or education and training transaction; and

"(IV) such other information as such committee may request.

"(B) In the event a statement with respect to an assistance or training transaction is requested pursuant to subparagraph (A) of this paragraph but is not transmitted in accordance therewith within 60 days after receipt of such request, such assistance or training transaction shall be suspended unless and until such statement is transmitted.

"(C)(i) In the event a statement with respect to an assistance or training transaction is transmitted under subparagraph (A) of this paragraph, the Congress may at any time thereafter adopt a joint resolution terminating or restricting such assistance or training transaction.

"(ii) Any such resolution shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

*Pers. p. 765, "Certification,"*

"(iii) The term 'certification', as used in section 601 of such Act, means, for the purposes of this paragraph, a statement transmitted under subparagraph (A) of this paragraph.".

*22 USC 2755.*

(b) Chapter 1 of the Foreign Military Sales Act is amended by adding at the end thereof the following new section:

"SEC. 5. PROHIBITIONS AGAINST DISCRIMINATION.—(a) It is the policy of the United States that no sales should be made, and no credits (including participations in credits) or guaranties extended to or for any foreign country, the laws, regulations, official policies, or governmental practices of which, prevent any United States person (as defined in section 7701(a)(30) of the Internal Revenue Code of 1954) from participating in the furnishing of defense articles or defense services under this Act on the basis of race, religion, national origin, or sex.

*26 USC 7701.*

"(b)(1) No agency performing functions under this Act shall, in employing or assigning personnel to participate in the performance of any such functions in the United States or abroad, take into account the exclusionary policies or practices of any foreign government where such policies or practices are based upon race, religion, national origin, or sex.

"(2) Each contract entered into by any such agency for the performance of any function under this Act shall contain a provision to the effect that no person, partnership, corporation, or other entity performing functions pursuant to such contract, shall, in employing or assigning personnel to participate in the performance of any such function, whether in the United States or abroad, take into account the exclusionary policies or practices of any foreign government where such policies or practices are based upon race, religion, national origin, or sex.

*Reports, transmittal to Speaker of House and congressional committees.*

"(c) The President shall promptly transmit reports to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate concerning any instance in which any United States person (as defined in section 7701(a)(30) of the Internal Revenue Code of 1954) is prevented by a foreign government on the basis of race, religion, national origin, or sex, from participating in the performance of any sale or licensed transaction under this Act. Such reports shall include (1) a description of the facts and circum-

stances of any such discrimination, (2) the response thereto on the part of the United States or any agency or employee thereof, and (3) the result of such response, if any.

"(d)(1) Upon the request of the Committee on Foreign Relations of the Senate or the Committee on International Relations of the House of Representatives, the President shall, within 60 days after receipt of such request, transmit to both such committees a statement prepared with the assistance of the Coordinator for Human Rights and Humanitarian Affairs, with respect to the country designated in such request, setting forth—

"(A) all the available information about the exclusionary policies or practices of the government of such country when such policies or practices are based upon race, religion, national origin or sex and prevent any such person from participating in the performance of any sale or licensed transaction under this Act;

"(B) the response of the United States thereto and the results of such response;

"(C) an evaluation, in the opinion of the President, notwithstanding any such policies or practices—

"(i) extraordinary circumstances exist which necessitate a continuation of such sale or licensed transaction, and, if so, a description of such circumstances and the extent to which such sale or licensed transaction should be continued (subject to such conditions as Congress may impose under this section), and

"(ii) on all the facts it is in the national interest of the United States to continue such sale or licensed transaction; and

"(D) such other information as such committee may request.

"(2) In the event a statement with respect to a sale or licensed transaction is requested pursuant to paragraph (1) of this subsection but is not transmitted in accordance therewith within 60 days after receipt of such request, such sale or licensed transaction shall be suspended unless and until such statement is transmitted.

"(3)(A) In the event a statement with respect to a sale or licensed transaction is transmitted under paragraph (1) of this subsection, the Congress may at any time thereafter adopt a joint resolution terminating or restricting such sale or licensed transaction.

"(B) Any such resolution shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

*Pers. p. 765, "Certification."*

"(C) The term 'certification', as used in section 601 of such Act, means, for the purposes of this paragraph, a statement transmitted under paragraph (1) of this subsection.".

PROHIBITION OF ASSISTANCE TO COUNTRIES GRANTING SANCTUARY TO INTERNATIONAL TERRORISTS

*22 USC 2371.*

SEC. 303. Chapter 1 of part III of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new section:

"SEC. 620A. PROHIBITION AGAINST FURNISHING ASSISTANCE TO COUNTRIES WHICH GRANT SANCTUARY TO INTERNATIONAL TERRORISTS.—(a) Except where the President finds national security to require otherwise, the President shall terminate all assistance under this Act to any government which aids or abets, by granting sanctuary from prosecution to, any individual or group which has committed an act of international terrorism and the President may not thereafter

*Statement, transmittal to Speaker of the House and congressional committee.*

Report to Speaker of the House and congressional committees.

furnish assistance to such government until the end of the one year period beginning on the date of such termination, except that if during its period of ineligibility for assistance under this section such government aids or abets, by granting sanctuary from prosecution to, any other individual or group which has committed an act of international terrorism, such government's period of ineligibility shall be extended for an additional year for each such individual or group.

"(6) If the President finds that national security justifies a continuation of assistance to any government described in subsection (a), he shall report such finding to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate.".

INELIGIBILITY

22 USC 2314.

68 Stat. 832.
22 USC 1751
note.

SEC. 304. (a) Section 505(d) of the Foreign Assistance Act of 1961 is amended to read as follows:

"(d)(1) Assistance and deliveries of assistance under this chapter to any country shall be terminated as hereinafter provided, if such country uses defense articles or defense services furnished under this Act, the Mutual Security Act of 1954, or any predecessor Foreign Assistance Act, in substantial violation (either in terms of quantities or in terms of the gravity of the consequences regardless of the quantities involved) of any agreement entered into pursuant to any such Act (A) by using such articles or services for a purpose not authorized under section 502, or, if such agreement provides that such articles or services may only be used for purposes more limited than those authorized under section 502, for a purpose not authorized under such agreement; (B) by transferring such articles or services to, or permitting any use of such articles or services by, anyone not an officer, employee, or agent of the recipient country without the consent of the President; or (C) by failing to maintain the security of such articles or services.

22 USC 2302.

"(2)(A) Assistance and deliveries of assistance shall be terminated pursuant to paragraph (1) of this subsection if the President so determines and so states in writing to the Congress, or if the Congress so finds by joint resolution.

Presidential report to Congress.

"(B) The President shall report to the Congress promptly upon the receipt of information that a violation described in paragraph (1) of this subsection may have occurred.

"(3) Assistance to a country shall remain terminated in accordance with paragraph (1) of this subsection until such time as—

"(A) the President determines that the violation has ceased; and

"(B) the country concerned has given assurances satisfactory to the President that such violation will not recur.

"(4) The authority contained in section 614(a) of this Act may not be used to waive the provisions of this section with respect to further assistance under this chapter.".

22 USC 2753.

(b)(1) Section 3(c) of the Foreign Military Sales Act is amended to read as follows:

"(c)(1)(A) No credits (including participations in credits) may be issued and no guaranties may be extended for any foreign country under this Act as hereinafter provided, if such country uses defense articles or defense services furnished under this Act, or any predecessor Foreign Assistance Act, in substantial violation (either in terms of quantities or in terms of the gravity of the consequences regardless of the quantities involved) of any agreement entered into pursuant to any such Act (i) by using such articles or services for a purpose not authorized

22 USC 2754.

under section 4 or, if such agreement provides that such articles or services may only be used for purposes more limited than those authorized under section 4 for a purpose not authorized under such agreement; (ii) by transferring such articles or services to, or permitting any use of such articles or services by, anyone not an officer, employee, or agent of the recipient country without the consent of the President; or (iii) by failing to maintain the security of such articles or services.

"(B) No credits or deliveries pursuant to previous sales may be made with respect to any foreign country under this Act as hereinafter provided, if such country uses defense articles or defense services furnished under this Act, or any predecessor Act, in substantial violation (either in terms of quantity or in terms of the gravity of the consequences regardless of the quantities involved) of any agreement entered into pursuant to any such Act by using such articles or services for a purpose not authorized under section 4 or, if such agreement provides that such articles or services may only be used for purposes more limited than those authorized under section 4, for a purpose not authorized under such agreement.

"(2) The President shall report to the Congress promptly upon the receipt of information that a violation described in paragraph (1) of this subsection may have occurred.

"(3)(A) A country shall be deemed to be ineligible under subparagraph (A) of paragraph (1) of this subsection, or both subparagraphs (A) and (B) of such paragraph in the case of a violation described in both such paragraphs, if the President so determines and so reports in writing to the Congress, or if the Congress so determines by joint resolution.

"(B) Notwithstanding a determination by the President of ineligibility under subparagraph (B) of paragraph (1) of this subsection, cash sales and deliveries pursuant to previous sales may be made if the President certifies in writing to the Congress that a termination thereof would have significant adverse impact on United States security, unless the Congress adopts or has adopted a joint resolution pursuant to subparagraph (A) of this paragraph with respect to such ineligibility.

"(4) A country shall remain ineligible in accordance with paragraph (1) of this subsection until such time as—

"(A) the President determines that the violation has ceased; and

"(B) the country concerned has given assurances satisfactory to the President that such violation will not recur.".

Repeal.
22 USC 735.

(2) Section 3(d) of the Foreign Military Sales Act is repealed and subsections (e) and (f) of such section, as added by section 204 of this Act, are redesignated as subsections (d) and (e), respectively.

NUCLEAR TRANSFERS

22 USC 2429.

SEC. 305. Chapter 3 of part III of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new section:

"SEC. 669. NUCLEAR TRANSFERS.—(a) Except as provided in subsection (b), no funds authorized to be appropriated by this Act or the Arms Export Control Act may be used for the purpose of—

"(1) providing economic assistance;

"(2) providing military or security supporting assistance or grant military education and training; or

"(3) extending military credits or making guaranties;

to any country which the President determines delivers nuclear reprocessing or enrichment equipment, materials, or technology to any other country; or

"(B) receives such equipment, materials or technology from any other country;

unless before such delivery—

"(i) the supplying country and receiving country have reached agreement to place all such equipment, materials, and technology, upon delivery, under multilateral auspices and management when available; and

"(ii) the recipient country has entered into an agreement with the International Atomic Energy Agency to place all such equipment, materials, technology, and all nuclear fuel and facilities in such country under the safeguards system of such Agency.

"(b)(1) Notwithstanding the provisions of subsection (a) of this section, the President may, by Executive order effective not less than 30 days following its date of promulgation, furnish assistance which would otherwise be prohibited under paragraph (1), (2), or (3) of such subsection if he determines and certifies in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that—

"(A) the termination of such assistance would have a serious adverse effect on vital United States interests; and

"(B) he has received reliable assurances that the country in question will not acquire or develop nuclear weapons or assist other nations in doing so.

Such certification shall set forth the reasons supporting such determination in each particular case.

"(2)(A) The Congress may by joint resolution terminate or restrict assistance described in paragraphs (1) through (3) of subsection (a) with respect to a country to which the prohibition in such subsection applies or take any other action with respect to such assistance for such country as it deems appropriate.

"(B) Any such joint resolution with respect to a country shall, if introduced within 30 days after the transmittal of a certification under paragraph (1) with respect to such country, be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.". Post, p. 765.

## TITLE IV—PROVISIONS RELATING TO SPECIFIC REGIONS OR COUNTRIES

### MIDDLE EAST POLICY STATEMENT

22 USC 2441. SEC. 401. Section 901 of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new paragraph:

"It is the sense of Congress that the United States will continue to determine Middle East Policy as circumstances may require and that the authority contained in the joint resolution entitled 'Joint resolution to implement the United States proposal for the early-warning system in Sinai', approved October 13, 1975 (Public Law 94–110), and the authorizations contained in the amendments made by the International Security Assistance and Arms Export Control Act of 1976 do not, and shall not in any way be construed to, constitute congressional approval, acceptance, or endorsement (1) of any oral or written commitment, understanding, assurance, promise, or agreement, whether expressed or implied, or any other expression, oral or written (other than the 'United States Proposal for the Early Warning System in Sinai'), made by any official of the United States which Israel, Egypt, or any other nation or organization might construe or interpret as a basis on which it could rely or act, or (2) of any characterization of any such commitment, understanding, assurance, promise, or agreement, or other expression, as constituting a 'codification' of existing, congressionally approved United States policy.". 22 USC 2441 note.

### AID FOR CYPRIOT REFUGEES

SEC. 402. Section 495 of the Foreign Assistance Act of 1961 is amended by striking out "$30,000,000" and inserting in lieu thereof "$40,000,000". 22 USC 2292f.

### ASSISTANCE TO TURKEY

SEC. 403. Section 620(x)(1) of the Foreign Assistance Act of 1961, as amended by section 2(c) of the Act of October 6, 1975 (Public Law 94–104), is amended by striking out "*Provided*," and all that follows through the end of paragraph (1) and inserting in lieu thereof the following: "*Provided*, That for the fiscal year 1976, the period beginning July 1, 1976, and ending September 30, 1976, and the fiscal year 1977, the President may suspend the provisions of this subsection and of section 3(c) of the Arms Export Control Act with respect to cash sales and extensions of credits and guaranties under such Act for the procurement of such defense articles and defense services as the President determines are necessary to enable Turkey to fulfill her defense responsibilities as a member of the North Atlantic Treaty Organization, except that (A) during the fiscal year 1976 and the period beginning July 1, 1976, and ending September 30, 1976, the total value of defense articles and defense services sold to Turkey under such Act, either for cash or financed by credits and guaranties, shall not exceed $125,000,000, and (B) during the fiscal year 1977, the total value of defense articles and defense services sold to Turkey under such Act, either for cash or financed by credits and guaranties, shall not exceed $125,000,000. Any such suspension shall be effective only so long as Turkey observes the cease-fire on Cyprus, does not increase its military forces or its civilian population on Cyprus, and does not transfer to Cyprus any United States supplied arms, ammunition, or implements of war. The determination required by the proviso in the first sentence of this paragraph shall be made, on a case-by-case basis, with respect to each cash sale, each approval for use of credits, and each approval for use of a guaranty for Turkey. Each such determination shall be reported to the Congress and shall be accompanied by a full and complete statement of the reasons supporting the President's determination and a statement containing the information specified in clauses (A) through (D) of section 2(c)(4) of the Act of October 6, 1975 (Public Law 94–104). In any case involving the sale of significant combat equipment on the United States Munitions List in which the congressional review provisions of section 36(b) of the Arms Export Control Act do not apply, the President may not issue the letter of offer or approve the use of the credits or guaranty, as the case may be, until the end of the thirty-day period beginning on the date on which the report required by the preceding sentence is submitted to the Congress.". Suspension. 22 USC 2370. 22 USC 2753. 89 Stat. 509. Ante, p. 740.

### LIMITATION ON CERTAIN ASSISTANCE TO AND ACTIVITIES IN ANGOLA

SEC. 404. (a) Notwithstanding any other provision of law, no assistance of any kind may be provided for the purpose, or which would have the effect, of promoting or augmenting, directly or indirectly, the capacity of any nation, group, organization, movement, or individual 22 USC 2293 note.

to conduct war or paramilitary operations in Angola unless and until the Congress expressly authorizes such assistance by law enacted after the date of enactment of this section.

(b) If the President determines that assistance prohibited by subsection (a) should be furnished in the national security interests of the United States, he shall submit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate a report containing—

(1) a description of the amounts and categories of assistance which he recommends to be authorized and the identity of the proposed recipients of such assistance; and

(2) a certification that he has determined that the furnishing of such assistance is important to the national security interests of the United States and a detailed statement, in unclassified form, of the reasons supporting such determination.

(c) The prohibition contained in subsection (a) does not apply with respect to assistance which is furnished solely for humanitarian purposes.

(d) The provisions of this section may not be waived under any other provision of law.

22 USC 2293 note.

### SOVIET INTERVENTION IN ANGOLA

Sec. 405. The Congress views the large-scale and continuing Soviet intervention in Angola, including active sponsorship and support of Cuban armed forces in Angola, as being completely inconsistent with any reasonably defined policy of détente, as well as with Articles 1 and 2 of the United Nations Charter, the principle of noninterference in the affairs of other countries agreed to at Helsinki in 1975, and with the spirit of recent bilateral agreements between the United States and the Union of Soviet Socialist Republics. Such intervention should be taken explicitly into account in United States foreign policy planning and negotiations.

### LIMITATIONS ON ECONOMIC ASSISTANCE, MILITARY ASSISTANCE, SALES, AND SALES CREDITS FOR CHILE

22 USC 2370 note, 22 USC 2151 note.

Sec. 406. (a)(1) No military or security supporting assistance and no military education and training may be furnished under the Foreign Assistance Act of 1961 for Chile; and no credits (including participations in credits) may be extended and no loan may be guaranteed under the Arms Export Control Act with respect to Chile. No military education, training, assistance, credits, or guaranties may be made to Chile on or after the date of enactment of this section.

(2) No sales (including cash sales) may be made and no export license may be issued under the Arms Export Control Act with respect to Chile on or after the date of enactment of this section.

(b)(1) Notwithstanding any other provision of law, the total amount of economic assistance which may be made available for Chile during the period beginning July 1, 1976, and ending September 30, 1977, may not exceed $27,500,000. For purposes of this subsection, economic assistance includes any assistance of any kind which is provided, directly or indirectly, to or for the benefit of Chile by any department, agency, or other instrumentality of the United States Government (other than assistance provided under chapter 2, 4, or 5

22 USC 2311, 2346, note p. 732.

of title II of the Foreign Assistance Act of 1961 or credits or guaranties extended under the Arms Export Control Act), but does not include commodities furnished under title II of the Agricultural Trade Development and Assistance Act of 1954. This subsection shall not be construed to authorize the furnishing of any assistance which is prohibited under any other provision of law.

(2) The $27,500,000 limit set forth in paragraph (1) of this subsection may be increased by not to exceed $27,500,000 if the President certifies in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that the Government of Chile—

(A) does not engage in a consistent pattern of gross violations of internationally recognized human rights, including torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges or trial, or other flagrant denials of the right to life, liberty, or the security of person;

(B) has taken the unimpeded investigation, by internationally recognized commission on human rights (including the United Nations Commission on Human Rights and the Inter-American Commission on Human Rights of the Organization of American States) of alleged violations of internationally recognized human rights (as described in subparagraph (A) of this paragraph); and

(C) has taken steps to inform the families of prisoners of the condition of and charges against such prisoners.

22 USC 2151 note.

### CONTROL OF MILITARY FORCES IN THE INDIAN OCEAN

Sec. 407. (a) It is the sense of Congress that the President should undertake to enter into negotiations with the Soviet Union intended to achieve an agreement limiting the deployment of naval, air, and land forces of the Soviet Union and the United States in the Indian Ocean and littoral countries. Such negotiations should be convened as soon as possible and should consider, among other things, limitations with respect to—

(1) the establishment or use of facilities for naval, air, or land forces in the Indian Ocean and littoral countries;

(2) the number of naval vessels which may be deployed in the Indian Ocean, or the number of "shipdays" allowed therein; and

(3) the type and number of military forces and facilities allowed therein.

(b) Not later than December 1, 1976, the President shall transmit a report to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate with respect to steps he has taken to carry out the provisions of this section.

### UNITED STATES CITIZENS IMPRISONED IN MEXICO

22 USC 2291 note.

Sec. 408. (a) The Congress, while sharing the concern of the President over the urgent need for international cooperation to restrict traffic in dangerous drugs, is convinced that such efforts must be consistent with respect for the fundamental human rights of individuals. Therefore, calls upon the President to take steps to insure that United States efforts to secure stringent international law enforcement measures are

combined with efforts to secure fair and humane treatment for citizens of all countries.

(b)(1) The Congress requests that the President communicate directly to the President and Government of the Republic of Mexico, a nation with which we have friendly and cooperative relations, the continuing desire of the United States for such relations between our two countries and the concern of the United States over treatment of United States citizens arrested in Mexico.

(2) The Secretary of State shall report to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate within one hundred and twenty days after the date of enactment of this section, and every one hundred and twenty days thereafter, on progress toward full respect for the human and legal rights of all United States citizens detained in Mexico.

## EMERGENCY FOOD NEEDS OF PORTUGAL

*22 USC 2293 note.*

Sec. 409. It is the sense of the Congress that the President should undertake immediately an evaluation of the emergency food needs of Portugal. It is further the sense of the Congress that the President should take timely action to alleviate such emergency by providing Portugal with food commodities under the provisions of pertinent statutes.

## STRIFE IN LEBANON

*22 USC 2441 note.*

Sec. 410. It is the sense of the Congress that the situation in Lebanon, a nation traditionally friendly to the United States, poses a danger to peace in the Middle East. The Congress deplores the armed civil strife and the continuing erosion of national institutions which threaten to destroy the political and economic fabric of Lebanon with such tragic impact on all its people. The Congress views with grave concern any outside efforts to exploit the current strife with the purpose of transforming Lebanon into a radical state in confrontation with Israel. The Congress requests that the President use his good offices to secure an end to the civil strife and national discord in Lebanon and to preserve the traditional friendly attitude of Lebanon toward the United States.

## REPORT ON KOREA

*22 USC 2428 note.*

Sec. 411. Chapter 3 of part III of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new section:

"Sec. 668. Report on Korea.—Within ninety days after the enactment of this section, and at least once during each of the next five years, the President shall transmit to the Speaker of the House of Representatives and to the Committees on Foreign Relations and Armed Services of the Senate a report which (1) reviews the progress made under the announced program of the Republic of Korea to modernize its armed forces so as to achieve military self-sufficiency by 1980, (2) reports on the role of the United States in mutual security efforts in the Republic of Korea, and (3) reports on the prospects for or implementation of phased reduction of United States Armed Forces assigned to duty in the Republic of Korea, in coordination with the timetable of the Republic of Korea for military self-sufficiency.".

## KOREA

*22 USC 2428 note.*

Sec. 412. The Congress views with distress the erosion of important civil liberties in the Republic of Korea and requests that the President communicate this concern in forceful terms to the Government of the Republic of Korea within sixty days after enactment.

## REPEAL OF INDOCHINA ASSISTANCE

*Repeal. 22 USC 2431, 2432, 2433, 2434, 2435, 22 USC 2441 note.*

Sec. 413. (a) Part V of the Foreign Assistance Act of 1961 and sections 34, 35, 36, 37, 38, 39, and 40 of the Foreign Assistance Act of 1974 are repealed. All determinations, authorizations, regulations, orders, contracts, agreements, and other actions issued, undertaken, or entered into under authority of any provision of law repealed by this section shall continue in full force and effect until modified, revoked, or superseded by appropriate authority.

(b) Subject to the availability of appropriations therefor, the President is authorized to adopt as a contract of the United States Government, and assume any liabilities arising thereunder (in whole or in part), any contract which had been funded or approved for funding by the Agency for International Development prior to June 30, 1975, for financing with funds made available under the Foreign Assistance Act of 1961 or the Foreign Assistance Act of 1974, or any equitable claim based upon a letter of intent issued prior to April 30, 1975, in which the Agency had expressed its intention to finance the transaction subject to the availability of funds, between the former Governments of Vietnam or Cambodia (including any of their agencies) or the Government of Laos (or any of its agencies) and any person and to apply with respect to any such contract the authorities of the Foreign Assistance Act of 1961.

(c) Funds made available for the purposes of part V of the Foreign Assistance Act of 1961 and of section 36 of the Foreign Assistance Act of 1974 (including amounts certified pursuant to section 1311 of the Supplemental Appropriation Act, 1955, (31 U.S.C. 200), as having been obligated against appropriations therefor) shall, to the extent not heretofore expended or obligated, remain available until expended, to meet necessary expenses arising from the actions authorized by subsection (b) of this section and such funds are authorized to remain available until expended to meet necessary expenses arising from the termination of assistance programs authorized by such part and such section 36, which expenses may include but need not be limited to the settlement of claims and associated personnel costs.

## LEBANON HOUSING RECONSTRUCTION

*22 USC 2151 note, 2151a note.*

Sec. 414. Section 223(j) of the Foreign Assistance Act of 1961 is amended by striking out "and" in the last sentence and by inserting immediately before the period at the end of such sentence ", and in Lebanon, not exceeding a face amount of $15,000,000".

## ITALY RELIEF AND REHABILITATION

*22 USC 2183, note.*

Sec. 415. Chapter 9 of part I of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new section:

*22 USC 2292b.*

"Sec. 495B. Italy Relief and Rehabilitation.—(a) In addition to amounts otherwise available for such purpose, there is authorized to be appropriated $25,000,000 for the fiscal year 1976 to furnish

assistance under this chapter for the relief and rehabilitation of the people who have been victimized by the recent earthquake in Italy. Amounts appropriated under this section are authorized to remain available until expended.

"(b) Obligations incurred prior to the date of enactment of this section against other appropriations or accounts for the purpose of providing relief and rehabilitation assistance to the people of Italy may be charged to the appropriations authorized under this section.".

## LEBANON RELIEF AND REHABILITATION

22 USC 2292a.

Sec. 416. Chapter 9 of part I of the Foreign Assistance Act of 1961, as amended by section 415 of this Act, is further amended by adding at the end thereof the following new section:

"Sec. 495C. LEBANON RELIEF AND REHABILITATION.—(a) The Congress, recognizing that prompt United States assistance is necessary to alleviate the human suffering arising from civil strife in Lebanon and to restore the confidence of the people of Lebanon, authorizes the President to furnish assistance, on such terms and conditions as he may determine, for the relief and rehabilitation of refugees and other needy people in Lebanon.

"(b) There is authorized to be appropriated to the President for the purposes of this section, in addition to amounts otherwise available for such purposes, $20,000,000, which amount is authorized to remain available until expended.

22 USC 2292.

"(c) Assistance under this section shall be provided in accordance with the policies and general authority contained in section 491.

"(d) Obligations incurred prior to the date of enactment of this section against other appropriations or accounts for the purpose of providing relief and rehabilitation assistance to the people of Lebanon may be charged to the appropriations authorized under this section.

"(e) Not later than sixty days after the date of enactment of this section, and on a quarterly basis thereafter, the President shall transmit reports to the Committees on Foreign Relations and Appropriations of the Senate and to the Speaker of the House of Representatives regarding the programing and obligation of funds under this section.".

## TITLE V—MISCELLANEOUS AUTHORIZATIONS

### SECURITY SUPPORTING ASSISTANCE

22 USC 2346a.

Sec. 501. (a) Section 532 of the Foreign Assistance Act of 1961 is amended to read as follows:

"Sec. 532. AUTHORIZATION.—(a) There is authorized to be appropriated to the President to carry out the purposes of this chapter for the fiscal year 1976 $1,762,200,000, of which not less than $85,000,000 shall be available only for Greece, $730,000,000 shall be available only for Israel and $705,000,000 shall be available only for Egypt, and for the fiscal year 1977 $1,860,000,000, of which not less than $783,000,000 shall be available only for Israel, not less than $750,000,000 shall be available only for Egypt, not less than $27,500,000 shall be available only for Zambia, and not less than $27,500,000 shall be available only for Zaire. Amounts appropriated under this section are authorized to remain available until expended.

"(b) (1) None of the funds made available under this section for Zaire and Zambia may be used for military, guerrilla, or paramilitary activities in either such country or in any other country.

"(2) Assistance furnished under this chapter to Zaire and Zambia for fiscal year 1977 shall not be counted for purposes of the limitation contained in the last sentence of section 531 on the number of countries which may receive assistance under this chapter in any fiscal year.".

### MIDDLE EAST SPECIAL REQUIREMENT FUND

22 USC 2346.

22 USC 2443.

Sec. 502. Section 903 of the Foreign Assistance Act of 1961 is amended—

(1) in subsection (a), by striking out "for the fiscal year 1975 not to exceed $100,000,000" and inserting in lieu thereof "for the fiscal year 1976 not to exceed $50,000,000 and for the fiscal year 1977 not to exceed $35,000,000"; and

(2) by striking out subsection (c) and inserting in lieu thereof the following:

"(c) Funds appropriated under subsection (a) shall be available to assist the Governments of Egypt and Israel in carrying out activities under the Agreement of October 10, 1975, and to pay the costs of implementing the United States proposal for the early warning system in Sinai. Such funds may be obligated without regard to the provisions of subsection (b) of this section to the extent that the proposed obligation has been justified to the Congress prior to the enactment of this section.

"(d) Of the amount authorized to be appropriated in subsection (a) for the fiscal years 1976 and 1977, not less than $12,000,000 for each such year shall constitute a contribution by the United States toward the settlement of the deficit of the United Nations Relief and Works Agency for Palestine Refugees in the Middle East, if the President determines that a reasonable number of other countries will contribute a fair share toward the settlement of such deficit within a reasonable period of time after the date of enactment of the International Security Assistance and Arms Export Control Act of 1976. In determining such a share, the President shall take into consideration the economic position of each such country. Such $24,000,000 shall be in addition to any other contribution to such Agency by the United States pursuant to any other provision of law.

Ante, p. 729.

"(e) Funds made available under this section may be obligated without regard to the provisions of subsection (b) of this section for programs contained in the presentation materials submitted to Congress for the fiscal year 1977.".

### CONTINGENCY FUND

22 USC 2261.

Sec. 503. Chapter 5 of part I of the Foreign Assistance Act of 1961 is amended—

(1) in the chapter heading, by striking out "DISASTER RELIEF" and inserting in lieu thereof "CONTINGENCY FUND"; and

(2) in section 451(a)—

22 USC 2261.

(A) by striking out "for the fiscal year 1975 not to exceed $5,000,000" and inserting in lieu thereof "for the fiscal year 1976 not to exceed $5,000,000 and for the fiscal year 1977 not to exceed $5,000,000";

(B) by striking out "or by section 639";, and

(C) by adding at the end thereof the following new sentence: "Amounts appropriated under this section are authorized to remain available until expended.".

### INTERNATIONAL NARCOTICS CONTROL

*22 USC 2291a.*

Sec. 504. (a) Section 482 of the Foreign Assistance Act of 1961 is amended by inserting immediately before the period at the end of the first sentence ", $40,000,000 for the fiscal year 1976, no part of which may be obligated for or on behalf of any country where illegal traffic in opiates has been a significant problem unless and until the President determines and certifies in writing to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate that assistance furnished to such country pursuant to the authority in this chapter is significantly reducing the amount of illegal opiates entering the international market, and not to exceed $34,000,000 for the fiscal year 1977".

*22 USC 2291.*

(b) Section 484 of the Foreign Assistance Act of 1961 is amended by adding at the end thereof the following new subsection:

*Study, transmitted to Speaker of the House and President of the Senate.*

"(c)(1) Notwithstanding any other provision of law, no officer or employee of the United States may engage or participate in any direct police arrest action in any foreign country with respect to narcotics control efforts.

"(2) The President shall carry out a study with respect to methods through which United States narcotics control programs in foreign countries might be placed under the auspices of international or regional organizations. The results of such study shall be transmitted to the Speaker of the House of Representatives and the President of the Senate not later than June 30, 1977.".

### AUTHORIZATION FOR INTERNATIONAL ATOMIC ENERGY AGENCY

*22 USC 2222.*

Sec. 505. Section 302 of the Foreign Assistance Act of 1961 is amended at the end thereof the following new subsection:

"(c) In addition to amounts otherwise available under this section, there is authorized to be appropriated for fiscal year 1976 $10,000,000 and for fiscal year 1977 $2,000,000 to be available only for the International Atomic Energy Agency to be used for the purpose of strengthening safeguards and inspections relating to nuclear fissile facilities and materials. Amounts appropriated under this subsection are authorized to remain available until expended.".

### INTERIM QUARTER AUTHORIZATIONS

*22 USC 2162 note.*

Sec. 506. (a) Any authorization of appropriations in this Act, or in any amendment to any other law made by this Act, for the fiscal year 1976, shall be deemed to include an additional authorization of appropriations for the period beginning July 1, 1976, and ending September 30, 1976, in amounts which equal one-fourth of any amount authorized for the fiscal year 1976 and in accordance with the authorities applicable to operations and activities authorized under this Act or such other law, unless appropriations for the same purpose are specifically authorized in the law hereinafter enacted.

*22 USC 2751 note.*
*Ante, p. 734.*
*22 USC 2764.*

(b) The aggregate total of credits, including participations in credits, extended pursuant to the Arms Export Control Act and of the principal amount of loans guaranteed pursuant to section 24(a) of such Act during the period beginning July 1, 1976, and ending Sep-tember 30, 1976, may not exceed an amount equal to one-fourth of the amount authorized by section 31(b) of such Act to be extended and guaranteed for the fiscal year 1976.

*Ante, p. 740.*

### BASE AGREEMENTS WITH SPAIN, GREECE, AND TURKEY

Sec. 507. (a) In addition to any amounts authorized to be appropriated by any amendment made by this Act which may be available for such purpose, there are authorized to be appropriated such sums as may be necessary for the fiscal year 1977 to carry out international agreements or other arrangements for the use by the Armed Forces of the United States of military facilities in Spain, Greece, or Turkey.

(b) No funds appropriated under this section may be obligated or expended to carry out any such agreement or other arrangement until legislation has been enacted approving such agreement or other arrangement.

## TITLE VI—MISCELLANEOUS PROVISIONS

### EXPEDITED PROCEDURE IN THE SENATE.

*22 USC 2151 note.*

Sec. 601. (a)(1) The provisions of subsection (b) of this section shall apply with respect to the consideration in the Senate of any resolution required by law to be considered in accordance with such provisions.

(2) Any such law shall—

*"Resolution."*

(A) state whether the term "resolution" as used in subsection (b) of this section, means, for the purposes of such law—

(i) a joint resolution; or

(ii) a resolution of either House of Congress;

(iii) a concurrent resolution; and

(B) specify the certification to which such resolution shall apply.

(b)(1) For purposes of any such law, the continuity of a session of Congress is broken only by an adjournment of the Congress sine die, and the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of the period indicated.

(2) Paragraphs (3) and (4) of this subsection are enacted—

(A) as an exercise of the rulemaking power of the Senate and as such they are deemed a part of the rules of the Senate, but applicable only with respect to the procedure to be followed in the Senate in the case of resolutions described by subsection (a)(1) of this section; and they supersede other rules of the Senate only to the extent that they are inconsistent therewith; and

(B) with full recognition of the constitutional right of the Senate to change such rules at any time, in the same manner and to the same extent as in the case of any other rule of the Senate.

(3)(A) If the committee of the Senate to which has been referred a resolution relating to a certification has not reported such resolution at the end of ten calendar days after its introduction, not counting any day which is excluded under paragraph (1) of this subsection, it is in order to move either to discharge the committee from further consideration of the resolution or to discharge the committee from further consideration of any other resolution introduced with respect to the same certification which has been referred to the committee,

1216

except that no motion to discharge shall be in order after the committee has reported a resolution with respect to the same certification.

(B) A motion to discharge under subparagraph (A) of this paragraph may be made only by a Senator favoring the resolution, is privileged, and debate thereon shall be limited to not more than 1 hour, to be divided equally between those favoring and those opposing the resolution, the time to be divided equally between, and controlled by, the majority leader and the minority leader or their designees. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(4)(A) A motion in the Senate to proceed to the consideration of a resolution shall be privileged. An amendment to the motion shall not be in order, nor shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) Debate in the Senate on a resolution, and all debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, to be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

(C) Debate in the Senate on any debatable motion or appeal in connection with a resolution shall be limited to not more than 1 hour, to be equally divided between, and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition thereto, shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time to time under their control on the passage of a resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(D) A motion in the Senate to further limit debate on a resolution, debatable motion, or appeal is not debatable. No amendment to, or motion to recommit, a resolution is in order in the Senate.

PROCUREMENTS FROM SMALL BUSINESSES

SEC. 602. In order to encourage procurements from small business concerns under chapter 4 of the Foreign Assistance Act of 1961 (the Administration of International Development shall report to the Congress every six months on the extent to which small businesses have participated in procurements under such chapter and on what efforts the Agency has made to foster such procurements from small business concerns. The Small Business Administration shall lend all available assistance to the Agency for the purposes of carrying out this section.

PAYMENT OF CONSULTANTS

SEC. 603. Section 626(a) of the Foreign Assistance Act of 1961 is amended by striking out "$100 per diem" and inserting in lieu thereof "the daily equivalent of the highest rate which may be paid to an employee under the General Schedule established by section 5332 of title 5, United States Code".

FEES OF MILITARY SALES AGENTS AND OTHER PAYMENTS

SEC. 604. (a) Section 36 of the Foreign Military Sales Act, as amended by section 211 of this Act, is further amended as follows:

(1) In subsection (a)—
(A) strike out "and" at the end of paragraph (7);
(B) redesignate paragraph (8) as paragraph (9); and

(C) insert the following new paragraph immediately after paragraph (7):

"(8) a description of each payment, contribution, gift, commission, or fee reported to the Secretary of State under section 39, including (A) the name of the person who made such payment, contribution, gift, commission, or fee; (B) the name of any sales agent or other person to whom such payment, contribution, gift, commission, or fee was paid; (C) the date and amount of such payment, contribution, gift, commission, or fee; (D) a description of the sale in connection with which such payment, contribution, gift, commission, or fee was paid; and (E) the identification of any business information considered confidential by the person submitting it which is included in the report; and".

(2) In the first sentence of subsection (b), insert immediately before the period "and a description, containing the information specified in paragraph (8) of subsection (a), of any contribution, gift, commission, or fee paid or offered or agreed to be paid in order to solicit, promote, or otherwise to secure such letter of offer".

(b) Chapter 2 of the Foreign Military Sales Act, as amended by section 212 of this Act, is further amended by adding at the end thereof the following new section:

"SEC. 39. FEES OF MILITARY SALES AGENTS AND OTHER PAYMENTS.—(a) In accordance with such regulations as he may prescribe, the Secretary of State shall require adequate and timely reporting on political contributions, gifts, commissions and fees paid, or offered or agreed to be paid, by any person in connection with—

"(1) sales of defense articles or defense services under section 22 of this Act; or

"(2) commercial sales of defense articles or defense services licensed or approved under section 38 of this Act;

to or for the armed forces of a foreign country or international organization in order to solicit, promote, or otherwise to secure the conclusion of such sales. Such regulations shall specify the amounts and the kinds of payments, offers, and agreements to be reported, and the form and timing of reports, and shall require reports on the names of sales agents and other persons receiving such payments. The Secretary of State shall by regulation require such recordkeeping as he determines is necessary.

"(b) The President may, by regulation, prohibit, limit, or prescribe conditions with respect to such contributions, gifts, commissions, and fees as he determines will be in furtherance of the purposes of this Act.

"(c) No such contribution, gift, commission, or fee may be included, in whole or in part, in the amount paid under any procurement contract entered into under section 22 of this Act, unless the amount thereof is reasonable, allocable to such contract, and not made to a person who has solicited, promoted, or otherwise secured such sale, or has held himself out as being able to do so, through improper influence. For the purposes of this section, 'improper influence' means influence, direct or indirect, which induces or attempts to induce consideration or action by any employee or officer of a purchasing foreign government or international organization with respect to such purchase on any basis other than such consideration of merit as are involved in comparable United States procurements.

Report to Congress. 22 USC 2382 note.

22 USC 2386.

22 USC 2776.

22 USC 2779.

22 USC 2762.

EXTENSION OF AIRPORT AT PINECREEK, MINNESOTA

Sec. 608. The consent of Congress is hereby granted for the State of Minnesota or a subdivision or instrumentality thereof to enter into an agreement with the Government of Canada, a Canadian Province, or a subdivision or instrumentality of either, providing for the extension of the Pinecreek Airport at Pinecreek, Minnesota, into the Province of Manitoba, Canada, and the operation of the airport by a joint Canadian-American airport authority. The effectiveness of such agreement shall be conditioned on its approval by the Secretary of State.

Approved June 30, 1976.

LEGISLATIVE HISTORY:

HOUSE REPORTS: No. 94-1144 (Comm. on International Relations) and No. 94-1272 (Comm. of Conference).
SENATE REPORT No. 94-576 accompanying S. 3439 (Comm. on Foreign Relations).
CONGRESSIONAL RECORD, Vol. 122 (1976):
    May 19, June 2, considered and passed House.
    June 14, considered and passed Senate, amended, in lieu of S. 3439.
    June 22, House agreed to conference report.
    June 25, Senate agreed to conference report.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 12, No. 27:
    July 1, Presidential statement.

---

*Effective date. 22 USC 2776 note.*

"(d)(1) All information reported to the Secretary of State and all records maintained by any person pursuant to regulations prescribed under this section shall be available, upon request, to any standing committee of the Congress or any subcommittee thereof and to any agency of the United States Government authorized by law to have access to the books and records of the person required to submit reports or to maintain records under this section.

"(2) Access by an agency of the United States Government to records maintained under this section shall be on the same terms and conditions which govern the access by such agency to the books and records of the person concerned."

"(e) The amendments made by this section shall take effect sixty days after the date of enactment of this Act.

USE OF PERSONNEL

*22 USC 2751 note.*
*22 USC 2751 note. Ante, p. 734.*

Sec. 605. (a) Nothing in this Act is intended to authorize any additional military or civilian personnel for the Department of Defense for the purposes of this Act, the Foreign Assistance Act of 1961, or the Arms Export Control Act. Personnel levels authorized in statutes authorizing appropriations for military and civilian personnel of the Department of Defense shall be controlling over all military and civilian personnel of the Department of Defense assigned to carry out functions under the Arms Export Control Act and the Foreign Assistance Act of 1961.

*22 USC 2791.*

"(b) Section 42 of the Foreign Military Sales Act, as amended by section 213 of this Act, is further amended by adding at the end thereof the following new subsection:

"(f) The President shall, to the maximum extent possible and consistent with the purposes of this Act, use civilian contract personnel in any foreign country to perform defense services sold under this Act.".

ASSISTANCE FOR PRODUCTIVE ENTERPRISES

*22 USC 2370.*

Sec. 606. Section 620(k) of the Foreign Assistance Act of 1961 is amended by inserting immediately before the period at the end of the first sentence ", except that this sentence does not apply with respect to assistance for construction of any productive enterprise in Egypt which is described in the presentation materials to Congress for fiscal year 1977".

EXTORTION AND ILLEGAL PAYMENTS

*22 USC 2394.*
*Report to Congress.*

Sec. 607. Within 60 days after receiving information which substantiates that officials of a foreign country receiving international security assistance have (1) received illegal or otherwise improper payments from a United States corporation in return for a contract to purchase defense articles or services from such corporation, or (2) extorted, or attempted to extort, money or other things of value in return for actions by officials of that country that permit a United States citizen or corporation to conduct business in that country, the President shall submit to Congress a report outlining the circumstances of such payment or extortion. The report shall contain a recommendation from the President as to whether the United States should continue a security assistance program for that country.

EXHIBIT 2

| 94th Congress } | HOUSE OF REPRESENTATIVES | { | REPORT No. 94–1144 |
| 2d Session } | | | |

# INTERNATIONAL SECURITY ASSISTANCE AND ARMS EXPORT CONTROL ACT OF 1976

———

## REPORT

OF THE

## COMMITTEE ON INTERNATIONAL RELATIONS

TOGETHER WITH

## SUPPLEMENTAL VIEWS

ON

## H.R. 13680

TO AMEND THE FOREIGN ASSISTANCE ACT OF 1961 AND THE FOREIGN MILITARY SALES ACT, AND FOR OTHER PURPOSES



MAY 14, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

———

U.S. GOVERNMENT PRINTING OFFICE

71–277 O                    WASHINGTON : 1976

ient country without the consent of the President, or (C) by failing to maintain the security of those articles or services.

Subparagraph (B) prohibits cash sales or deliveries to any country committing a substantial violation by using defense articles or defense services for a purpose not authorized by U.S. law, or in substantial violation of an agreement entered into pursuant to law.

Paragraph (2) requires that the President report to the Congress promptly upon receipt of information that a violation described in paragraph (1) may have occurred.

Paragraph (3)(A) states that a country shall be deemed ineligible under subparagraphs (A) and/or (B) of paragraph (1) of this subsection if the President so determines and so reports in writing to the Congress or by joint resolution.

Subparagraph (B) provides that even if the President determines a country to be ineligible under subparagraph (B) of paragraph (1), cash sales and deliveries pursuant to previous cash sales may be made if the President certifies in writing to the Congress that a termination would have significant adverse impact on United States security.

Paragraph (4) states that a country shall remain ineligible until such time as the President determines that such violation has ceased and the country concerned has given assurances satisfactory to the President that the violation will not recur.

Subsection (b)(2) of section 303 repeals subsection 3(d) of the Foreign Military Sales Act relating to ineligibility.

*Section 304. Prohibition of Assistance to Countries Granting Sanctuary to International Terrorists*

Section 304 adds and new section 620 A to the Foreign Assistance Act. Subsection (a) requires termination of assistance to any country which aids or abets terrorism by granting sanctuary to international terrorists, except where the President finds national security to require a continuation of assistance. Assistance may not be furnished for a one year period after such termination. If, during its ineligibility, a country once again grants sanctuary to terrorists, its period of ineligibility shall be extended for an additional year.

Subsection (b) provides that if the President finds that national security justifies a continuation of assistance to a government described in subsection (a), he shall promptly report such finding to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate.

*Section 669. Nuclear Transfers*

The purpose of Section 669 is to require the termination of economic assistance, military assistance, security supporting assistance, grant military education and training, and military credits or guarantees to any country supplying or receiving nuclear enrichment or reprocessing equipment, materials and technology, unless:

(1) the supplier and recipient agree to place transferred equipment, materials and technology under multilateral auspices and management, when available, to avoid control by the recipient nation alone, and

(2) the recipient agrees to International Atomic Energy Agency (IAEA) safeguards on everything transferred and on all nuclear fuel and facilities.

52

Upon the motion of Senator Humphrey, the total termination of economic assistance is qualified to allow the continued provision of assistance under Title II of the Agriculture Adjustment Assistance Act in the event of natural disasters or to meet other urgent relief requirements.

By adopting this section, the Committee intends to discourage inadequately controlled and safeguarded arrangements which could give a nation without nuclear weapons uncontrolled access to nuclear enrichment or reprocessing—key elements in the development of nuclear weapons. The Committee intends also that the legislation will further the fullest possible application of IAEA safeguards, which are particularly important in instances involving the transfer of reprocessing and enrichment equipment.

Accordingly, the Committee concludes that it is both reasonable and prudent to seek the application of IAEA safeguards on all the reprocessing materials, equipment and technology transferred as well as to all nuclear fuel and facilities in the receiving country. A purchaser of fuel and enrichment equipment, materials and technology who agreed to these full safeguards would be subjected to the most thorough scrutiny and oversight that the IAEA is capable of providing.

The concepts of a multilateral approach to reprocessing and enrichment and of full safeguards was widely supported in hearings held last year and this year by the Subcommittee on Arms Control, International Organizations and Security Agreements, chaired by Senator Symington. The Committee believes that the goals of this section are consistent with the policy objectives of the executive branch. If properly implemented this section would reinforce Executive Branch efforts to impress upon other governments the United States' desire to control the dangerous spread of nuclear enrichment and reprocessing material. The Committee believes that the consequences of proliferation are so serious that the United States should be willing to impose penalties upon nations proceeding on a possible course to nuclear weapons without taking the reassuring steps this section is designed to promote.

As Senator Symington, the sponsor of this amendment, noted, "In effect, this amendment says to other nations, if you wish to take the dangerous and costly steps necessary to achieve a nuclear weapons option, you cannot expect the United States to help underwrite that effort indirectly or directly."

Since no multilateral auspices and management exist at present, the Members agreed, upon the motion of Senator Javits, that such arrangements should be required "when available." The Members anticipate that there may be attempts to create international and regional auspices and management which could be utilized in transfers. It is the intent of the legislation to bind supplier and recipient nations to avail themselves of any appropriate auspices and management and, when such are not available, to make a strong effort, in good faith, to create multilateral auspices and management. It is recognized, however, that the absence of any appropriate multilateral auspices and management, despite good faith efforts to create them, would not invoke the termination of assistance.

If there is no existing appropriate means and the supplier and the recipient attempt to create, on their own, the called-for auspices and

53

management, the resulting arrangement should involve fully both principals, as well as providing for full participation in direction and management by other parties. The supplier should take pains to avoid agreement to an essentially uncontrolled arrangement with the form, but not the substance, of multilateral involvement.

The Committee expects further that the executive branch will do its utmost to encourage a multilateral approach to enrichment and reprocessing and that the executive branch will work diligently to plan for and assist in the creation of appropriate auspices and management.

## TITLE IV. PROVISIONS RELATED TO SPECIFIC REGIONS OR COUNTRIES

### Section 401. Middle East Policy Statement

This section amends section 901 of the Foreign Assistance Act by adding to the existing statement of policy a new paragraph which expresses the sense of Congress with respect to congressional approval of executive branch undertakings to governments in the Middle East.

Specifically, this section states that the United States will continue to determine Middle East policy as circumstances may require. In order to maintain such flexibility, section 401 stipulates that neither the authority contained in the joint resolution to implement the U.S. proposal for the early warning system in the Sinai—Public Law 94-110—nor the authorizations contained in this bill, constitute congressional approval, acceptance, or endorsement of any undertaking by any U.S. official to any government in the Middle East, other than the U.S. proposal for such an early warning system.

### Section 402. Aid for Cypriot Refugees

This section amends section 495 of the Foreign Assistance Act, relating to aid for Cypriot refugees, by increasing the existing authorization for fiscal year 1976 (Public Law 94-161) for such aid from $30 million to $40 million.

### Section 403. Assistance to Turkey

This section modifies for fiscal year 1976 and the interim quarter, existing restrictions on assistance to Turkey. These restrictions began in legislation enacted in October 1974 in response to the Turkish occupation of part of Cyprus using U.S.-supplied arms.

In the foreign assistance authorization bill for fiscal year 1975 those restrictions were made part of the Foreign Assistance Act as section 620(x) under which all forms of military assistance and sales to Turkey were suspended until the President was able to certify to the Congress that Turkey was in compliance with U.S. laws regarding the use of military assistance and that substantial progress had been made regarding an agreement on military forces on Cyprus.

In October 1975, in Public Law 94-104, Congress modified that total prohibition on assistance and sales to Turkey in the hope that this modification would encourage progress in the negotiations on Cyprus. The October legislation: (1) Released military goods and services Turkey had contracted for before the ban went into effect; (2) authorized the issuance of licenses for the export of military goods purchased through commercial channels; and (3) authorized sales,

# EXHIBIT 3

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE. 25-Aug-2015

SENSITIVE

Executive Registry

77. 2003/3

(b)(3) CIAAct

6 August 1977

MEMORANDUM FOR THE RECORD

SUBJECT: Briefing of Senator John Glenn,
Democrat, Ohio, on the NUMEC Case

    1.  Background.  Senator Glenn's office had been in dialogue   (b)(3) CIAAct
with the Agency via OLC for several weeks on the question of the
NUMEC diversion issue.  The Agency had initially steered Senator
Glenn toward discussing his questions with the FBI and ERDA.  After
the Senator had completed this action he decided that he wanted to
discuss this issue further with CIA.  As a result OLC, with the A/DDCI's
approval, had arranged for Mr. Shackley, ADDO, to brief Senator Glenn
on CIA's knowledge of the NUMEC diversion issue.  As a result on 5
August 1977 Mr. Shackley, accompanied by [                    ] PCS,
and [                ] OLC, met with Senator Glenn at his office.  The   (b)(3) NSC
Senator had Mr. Leonard Weiss present at the meeting.

    2.  Briefing.  The meeting started with Senator Glenn outlining
the nature of his interest in the NUMEC case.  As a result Mr. Shackley
(b)(3) CIAAct   drew on the talking paper outline which is attached in order to make
his presentation on the NUMEC diversion issue.  After Mr. Shackley's
presentation was completed there was a lengthy question and answer
session.  The key questions that emerged from this meeting and the
essence of the answers are outlined below.

(b)(3) CIAAct

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

SENSITIVE

-2-

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1



   c.  Question:  To what level of the U.S. Government
did knowledge and/or speculation about NUMEC activity go?

      Answer:  The record reveals that Presidents,
Attorney Generals, Directors of FBI and key
people in AEC and ERDA were briefed about

25X1

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

   d.  Question:  What came back down from the top of
the Government to CIA?

      Answer:  The record shows that when
President Ford was briefed by DCI Bush on
the NUMEC issue in the 21 to 28 April 1976
time frame, President Ford directed Attorney
General Levy to have the FBI reinstitute its
investigation of NUMEC.  In this context it
was pointed out that Mr. Duckett had relayed
a vignette to us which indicated

      It was then pointed out that clarification
of this point could only really come from those
who were direct participants in the events at
the time.

(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
(b)(1)

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

e.  Question: Has President Carter been briefed
on NUMEC?

Answer: Yes.  The record indicates that
DCI Bush gave President-elect Carter information
on the NUMEC issue in the period around 19
November 1976.  Senator Glenn was also advised
that we were aware that Dr. Jessica Tuchman
had been working on preparing a briefing for
Dr. Brzezinski on the NUMEC issue in recent
days.  It was pointed out that in our discussion
with Dr. Tuchman we had been led to under-
stand that this briefing would also be made
available to President Carter.  It was stressed,
however, that authoritative answers on this type
of a question could best be obtained from direct
contact with the White House.

f.  Question: Are there any conclusions outlined in
any CIA documents that state that diversions actually
occurred?

Answer: Mr. Shackley and [        ] both          (b)(3) NSC
stated that they had not seen any single document    (b)(3) CIAAct
which flatly stated that a diversion had occurred.
In this context the whole process of deductive
reasoning and the difficulties of establishing
a counterintelligence type of case which would
lead to a flat conclusion that a diversion had
occurred was again repeated.  At the same
time it was stated that new documents might
be uncovered as we searched our files which
would alter this conclusion.

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

SENSITIVE

-4-

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

**Answer:** Mr. Weiss was told that we were
not aware of such a file and repeated essentially
the answer which was provided to question f.

h. **Question:** If a poll were to be taken of CIA officers
who were involved in the NUMEC matter, would the con-
clusion be that the materials had been diverted?

**Answer:** We are not able to estimate what
a poll would reveal. [ ] then pointed     (b)(3) NSC
out how the question had initially been raised     (b)(3) CIAAct
as to whether a diversion had occurred. In
short, all of the old ground was plowed once
again with the conclusion being that we knew
of no flat conclusion that said diversion had
occurred.

(b)(3) NSC
(b)(3) CIAAct

i. **Question:** Why keep the investigation of NUMEC
alive if there was no evidence of diversion? What does
[ ] think about this issue?

(b)(3) NSC
(b)(3) CIAAct

**Answer:** [ ] outlined his views on
what type of steps needed to be taken to establish
whether a diversion had or had not occurred.
In this context Mr. Shackley made the point
that [ ] had been part of an institutional
process at CIA which had resulted in the di-
version questions being raised. It was stressed
that this was not something that [ ]
had done alone. It was also pointed out that
[ ] was not a disaffected employee who
was on a crusade. Senator Glenn indicated
that he understood these points but simply
wanted to obtain a better feel for why the
Agency had flet compelled to press for an
investigation of [ ] NUMEC.

(b)(3) NSC
(b)(3) CIAAct

(b)(3) NSC
(b)(3) CIAAct

(b)(3) NSC
(b)(3) CIAAct

(b)(1)
(b)(3) CIAAct
EO 13526 3.3(b)(6)>25Yrs

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE. 25-Aug-2015

j.  Question:  Are there bad connections between the
FBI and CIA on NUMEC?

Answer:  No.  The point was stressed that
CIA and the FBI simply took difference approaches
to the basic question.  On the one hand CIA was
trying to obtain information which would clarify
an intelligence estimate.  On the other hand the
FBI was looking for material that could be used
in a criminal case.

k.  Question:  Was there an answer to Director Helms'
1968 letter to Attorney General Clark?

Answer:  The record had thus far not un-
covered a written response from Attorney
General Clark to DCI Helms' 2 April 1968
letter to the Attorney General.  It was stressed,
however, that the written record did show that
there was a 3 September 1969 letter from FBI
Director Hoover to Mr. Helms in which the
bottom line was the statement that the FBI was
discontinuing its active investigation

l.  Question:  Did the answer address Director Helms'
implicit suggestion that there might be diversion?

Answer:  No.

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

m.  Question:  Is Carl Duckett still with the CIA?

Answer:  No.  Mr. Duckett has retired but
is still living in the Washington area.

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

SENSITIVE

-6-

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

n.  Question:  What did Jim Angleton have to do with
the NUMEC matter?

25X1
(b)(3) NSC

Answer:  Mr. Angleton was the Chief of the
CI Staff

As a result

(b)(3) CIAAct

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1

had worked for Mr. Angleton.  In view of
this situation Mr. Angleton had obviously been
aware of and interested in _____ activities.
The point was made that such activities obviously
focused on NUMEC

(b)(3) NSC

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1

o.  Question:  Was there any U.S. involvement in the
diversion

Answer:  No.  Senator Glenn was then given
a brief review

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1

p.  Question:  What was the substance of the "cocktail
conversation"
_____ with NUMEC's help.

Answer:  The point was made that CIA could
not really comment on this question, because we
had no firm way of corelating this event to any-
thing that was in our files.

q.  Question:  Does the CIA have concerns similar to
those about NUMEC about any other U.S. plants that are
handling nuclear materials?

Answer:  No.

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

SENSITIVE

–7–

r.  **Question:**  Is NUMEC still considered an active case for CIA?

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1

**Answer:**  No.  It was stressed, however, that if CIA _____ which would shed light on the possibility that NUMEC had diverted materials to Israel, this intelligence would be made available to the Justice Department and the FBI.

s.  **Question:**  Is there no current investigative or other activity going on in the U.S. or Israel _____

(b)(1)
(b)(3) CIAAct
EO 13526 3.3(b)(6)>25Yrs

**Answer:**  This question could most properly be put to the FBI.

t.  **Question:**  Were others in NUMEC _____

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

25X1

u.  **Question:**  Would CIA's technical people differ with ERDA on the figures of materials possibly diverted?

**Answer:**  This question had never been formally put to the scientific people at CIA insofar as Mr. Shackley or _____ could ascertain from the files.  It was stated, however,

(b)(3) NSC

(b)(3) CIAAct

25X1
(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
(b)(3) CIAAct

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

SENSITIVE

-8-

that one had the impression from listening to
general conversations that had taken place with
our scientific personnel, that it was clear that
they understood the MUF concepts that ERDA
had been talking about.

v.  Question: What was done after President Ford
directed that the investigation of NUMEC be reopened?

Answer: The FBI had reopened its invest-
igation. It was stated that CIA did not know
the status of this investigation.

w.  Question: Was or is there any evidence of a con-
certed conspiracy to divert nuclear materials from the U.S.
to Israel?

Answer: CIA had no hard facts which per-
tained to this question.

x.  Question: Is the CIA aware of any conspiracies to
sabotage U.S. nuclear installations?

Answer: No.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

y.  Question: Was there any electronic surveillance
used in the U.S. [_____] or others involved in NUMEC?

Answer: This was a question that should
be put to the FBI.

z.  Question: Did the FBI investigation of NUMEC not
focus on possible diversion?

Answer: This was a question that should be
put to the FBI. It was pointed out that available
documents indicate that the FBI investigation of
NUMEC [                                    ]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

~~SENSITIVE~~

-9-

aa.  Question: Have there been changes in the nature
of the background investigations that are being conducted
on managers and others associated with licensed plants
handling nuclear materials as a result of the NUMEC affair?

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

Answer: This is a question which is beyond
CIA's competence to comment on.  It was suggested
that this issue might best be discussed with ERDA.

Answer: No.  The previous explanations
on this point were repeated once again.

cc.  Question: Would the CIA reach such a conclusion?

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

Answer: Previous answers to this question
were repeated once again.

dd.  Question: Why did the CIA continue to brief Presidents
on NUMEC?

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

Answer: CIA continued to brief Presidents
on _____ how        25X1
this might relate to NUMEC.

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs
25X1

SENSITIVE
SECRET

C05674839

APPROVED FOR RELEASE - CIA
INFO DATE: 25-Aug-2015

-10-

ff.  Question:  Is the next step for Senator Glenn to
go and seek a White House decision on what should be done
now?  Should everyone involved in the NUMEC affair (or
concerned about MUF) get together to make some decisions?

(b)(1)
(b)(3) NatSecAct
EO 13526 3.3(b)(6)>25Yrs

Answer:  It was suggested that the Senator
might want to discuss this question with someone
like Dr. Brzezinski rather than CIA.

25X1

3.  Comment.  Senator Glenn appreciated the receipt of the data
that was covered in paragraph 2.  At the conclusion of the meeting
one was clearly left with the impression that Senator Glenn was con-
sidering pursuing a more detailed investigation into the NUMEC
diversion issue via a Senate Hearing.

Theodore G. Shackley
Theodore G. Shackley
Associate Deputy Director for Operations

Attachment:
    Talking Paper Outline

Distribution:
    1 - DCI w/att
    1 - A/DDCI w/att
    1 - DDO w/att
    1 - OLC w/att
    1 - C/SIA w/att
    1 - SA/DO/O (extract) w/att

SENSITIVE
SECRET

EXHIBIT 4

| | |
|---|---|
| 22 USC 2429. | **H.R. 6884, popularly known as the "Glenn Amendment"**<br><br>**NUCLEAR ENRICHMENT AND REPROCESSING TRANSFERS; NUCLEAR DETONATIONS**<br><br>SEC. 12. Chapter 3 of part III of the Foreign Assistance Act of 1961 is amended by striking out section 669 and inserting in lieu thereof the following new sections: |
| 22 USC 2429<br><br>Assistance, agreements and safeguards.<br><br>22 USC 2751 note. | "SEC. 669. **NUCLEAR ENRICHMENT TRANSFERS.**—(a) Except as provided in subsection (b), no funds authorized to be appropriated by this Act or the Arms Export Control Act may be used for the purpose of providing economic assistance, providing military or security supporting assistance or grant military education and training, or extending military credits or making guarantees, to any country which, on or after the date of enactment of the International Security Assistance Act of 1977, delivers nuclear enrichment equipment, materials, or technology to any other country, or receives such equipment, materials, or technology from any other country, unless before such delivery—<br><br>"(1) the supplying country and receiving country have reached agreement to place all such equipment, materials, or technology, upon delivery, under multilateral auspices and management when available; and<br><br>"(2) the recipient country has entered into an agreement with the International Atomic Energy Agency to place all such equipment, materials, technology, and all nuclear fuel and facilities in such country under the safeguards system of such Agency. |
| Presidential certification, transmittal to Speaker of the House and congressional committee. | "(b) (1) Notwithstanding subsection (a) of this section, the President may furnish assistance which would otherwise be prohibited under such subsection if he determines and certifies in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that—<br><br>"(A) the termination of such assistance would have a serious adverse effect on vital United States interests; and<br><br>"(B) he has received reliable assurances that the country in question will not acquire or develop nuclear weapons or assist other nations in doing so.<br><br>Such certification shall set forth the reasons supporting such determination in each particular case. |

| Joint resolution | "(2) Any joint resolution which would *terminate* or restrict assistance described in subsection (a) with respect to a country to which the prohibition in such subsection applies shall, if introduced within thirty days after the transmittal of a certification under paragraph (1) of this subsection with respect to such country, be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976. |
|---|---|
| 90 Stat. 765.<br>22 USC 2429a | "SEC. 670. NUCLEAR REPROCESSING TRANSFERS AND NUCLEAR DETONATIONS |
| 22 USC 2751 note. | (a) Except as provided in subsection (b), no funds authorized to be appropriated by this Act or the Arms Export Control Act maybe used for the purpose of providing economic assistance, providing military or security supporting assistance or grant military education and training, or extending military credits or making guarantees, to any country which on or after the date of enactment of the International Security Assistance Act of 1977— <br><br>"(1) delivers nuclear reprocessing equipment, materials, or technology to any other country or receives such equipment, materials, or technology from any other country (except for the transfer of reprocessing technology associated with the investigation, under international evaluation programs in which the United States participates, of technologies which are alternatives to pure plutonium reprocessing) ; or |
| 21 UST 483<br><br>Presidential certification, submittal to Speaker of the House and congressional subcommittee. | "(2) is not a nuclear-weapon state as defined in article IX(3) of the Treaty on the Non-Proliferation of Nuclear Weapons and 21 UST 483.which detonates a nuclear explosive device.<br><br>"(b) (1) Notwithstanding subsection (a) of this section, the President may furnish assistance which would otherwise be prohibited under such subsection if he determines and certifies in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that the termination of such assistance would be seriously prejudicial to the achievement of United States nonproliferation objectives or otherwise jeopardize the common defense and security. The President shall transmit with such certification a statement setting forth the specific reasons therefor. |
| Joint resolution.<br><br><br><br><br>90 Stat. 765. | "(2) Any joint resolution which would terminate or restrict assistance  described in subsection (a) with respect to a country to which the prohibition in such subsection applies shall, if introduced within thirty days after the transmittal of a certification under paragraph (1) of this subsection with respect to such country, be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.". |

EXHIBIT 5

### 22 USC 2799aa-1: Nuclear reprocessing transfers, illegal exports for nuclear explosive devices, transfers of nuclear explosive devices,

### and nuclear detonations

Text contains those laws in effect on July 25, 2016, Office of the Law Revision Counsel, United States Code

**From Title 22-FOREIGN RELATIONS AND INTERCOURSE CHAPTER 39-ARMS EXPORT CONTROLSUBCHAPTER X-NUCLEAR NONPROLIFERATION CONTROLS**

§2799aa–1. Nuclear reprocessing transfers, illegal exports for nuclear explosive devices, transfers of nuclear explosive devices, and nuclear detonations

(a) Prohibitions on assistance to countries involved in transfer of nuclear reprocessing equipment, materials, or technology; exceptions; procedures applicable

(1) Except as provided in paragraph (2) of this subsection, no funds made available to carry out the Foreign Assistance Act of 1961 [22 U.S.C. 2151 et seq.] or this chapter may be used for the purpose of providing economic assistance (including assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 [22 U.S.C. 2346 et seq.]), providing military assistance or grant military education and training, providing assistance under chapter 6 of part II of that Act [22 U.S.C. 2348 et seq.], or extending military credits or making guarantees, to any country which the President determines-

(A) delivers nuclear reprocessing equipment, materials, or technology to any other country on or after August 4, 1977, or receives such equipment, materials, or technology from any other country on or after August 4, 1977 (except for the transfer of reprocessing technology associated with the investigation, under international evaluation programs in which the United States participates, of technologies which are alternatives to pure plutonium reprocessing), or

(B) is a non-nuclear-weapon state which, on or after August 8, 1985, exports illegally (or attempts to export illegally) from the United States any material, equipment, or technology which would contribute significantly to the ability of such country to manufacture a nuclear explosive device, if the President determines that the material, equipment, or technology was to be used by such country in the manufacture of a nuclear explosive device.

For purposes of clause (B), an export (or attempted export) by a person who is an agent of, or is otherwise acting on behalf of or in the interests of, a country shall be considered to be an export (or attempted export) by that country.

(2) Notwithstanding paragraph (1) of this subsection, the President in any fiscal year may furnish assistance which would otherwise be prohibited under that paragraph if he determines and certifies in writing during that fiscal year to the Speaker of the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate that the termination of such assistance would be seriously prejudicial to the achievement of United States nonproliferation objectives or otherwise jeopardize the

common defense and security. The President shall transmit with such certification a statement setting forth the specific reasons therefor.

(3)(A) A certification under paragraph (2) of this subsection shall take effect on the date on which the certification is received by the Congress. However, if, within 30 calendar days after receiving this certification, the Congress enacts a joint resolution stating in substance that the Congress disapproves the furnishing of assistance pursuant to the certification, then upon the enactment of that resolution the certification shall cease to be effective and all deliveries of assistance furnished under the authority of that certification shall be suspended immediately.

(B) Any joint resolution under this paragraph shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

(b) Prohibitions on assistance to countries involved in transfer or use of nuclear explosive devices; exceptions; procedures applicable

(1) Except as provided in paragraphs (4), (5), and (6), in the event that the President determines that any country, after the effective date of part B of the Nuclear Proliferation Prevention Act of 1994-

(A) transfers to a non-nuclear-weapon state a nuclear explosive device,

(B) is a non-nuclear-weapon state and either-

(i) receives a nuclear explosive device, or

(ii) detonates a nuclear explosive device,

(C) transfers to a non-nuclear-weapon state any design information or component which is determined by the President to be important to, and known by the transferring country to be intended by the recipient state for use in, the development or manufacture of any nuclear explosive device, or

(D) is a non-nuclear-weapon state and seeks and receives any design information or component which is determined by the President to be important to, and intended by the recipient state for use in, the development or manufacture of any nuclear explosive device,

then the President shall forthwith report in writing his determination to the Congress and shall forthwith impose the sanctions described in paragraph (2) against that country.

(2) The sanctions referred to in paragraph (1) are as follows:

(A) The United States Government shall terminate assistance to that country under the Foreign Assistance Act of 1961 [22 U.S.C. 2151 et seq.], except for humanitarian assistance or food or other agricultural commodities.

(B) The United States Government shall terminate-

(i) sales to that country under this chapter of any defense articles, defense services, or design and construction services, and

(ii) licenses for the export to that country of any item on the United States Munitions List.

(C) The United States Government shall terminate all foreign military financing for that country under this chapter.

(D) The United States Government shall deny to that country any credit, credit guarantees, or other financial assistance by any department, agency, or instrumentality of the United States Government, except that the sanction of this subparagraph shall not apply-

(i) to any transaction subject to the reporting requirements of title V of the National Security Act of 1947 [50 U.S.C. 3091 et seq.] (relating to congressional oversight of intelligence activities),

(ii) to medicines, medical equipment, and humanitarian assistance, or

(iii) to any credit, credit guarantee, or financial assistance provided by the Department of Agriculture to support the purchase of food or other agricultural commodity.

(E) The United States Government shall oppose, in accordance with section 262d of this title, the extension of any loan or financial or technical assistance to that country by any international financial institution.

(F) The United States Government shall prohibit any United States bank from making any loan or providing any credit to the government of that country, except for loans or credits for the purpose of purchasing food or other agricultural commodities, which includes fertilizer.

(G) The authorities of section 4605 of title 50 shall be used to prohibit exports to that country of specific goods and technology (excluding food and other agricultural commodities), except that such prohibition shall not apply to any transaction subject to the reporting requirements of title V of the National Security Act of 1947 [50 U.S.C. 3091 et seq.] (relating to congressional oversight of intelligence activities).

(3) As used in this subsection-

(A) the term "design information" means specific information that relates to the design of a nuclear explosive device and that is not available to the public; and

(B) the term "component" means a specific component of a nuclear explosive device.

(4)(A) Notwithstanding paragraph (1) of this subsection, the President may, for a period of not more than 30 days of continuous session, delay the imposition of sanctions which would otherwise be required under paragraph (1)(A) or (1)(B) of this subsection if the President first transmits to the Speaker of the House of Representatives, and to the chairman of the Committee on Foreign Relations of the Senate, a certification that he has determined that an immediate imposition of sanctions on that country would be detrimental to the national security of the United States. Not more than one such certification may be transmitted for a country with respect to the same detonation, transfer, or receipt of a nuclear explosive device.

(B) If the President transmits a certification to the Congress under subparagraph (A), a joint resolution which would permit the President to exercise the waiver authority of paragraph (5) of this subsection shall, if introduced in either House within thirty days of continuous session after the Congress receives this certification, be considered in the Senate in accordance with subparagraph (C) of this paragraph.

(C) Any joint resolution under this paragraph shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

(D) For purposes of this paragraph, the term "joint resolution" means a joint resolution the matter after the resolving clause of which is as follows: "That the Congress having received on _____ a certification by the President under section 102(b)(4) of the Arms Export Control Act with respect to ____, the Congress hereby authorizes the President to exercise the waiver authority contained in section 102(b)(5) of that Act.", with the date of receipt of the certification inserted in the first blank and the name of the country inserted in the second blank.

(5) Notwithstanding paragraph (1) of this subsection, if the Congress enacts a joint resolution under paragraph (4) of this subsection, the President may waive any sanction which would otherwise be required under paragraph (1)(A) or (1)(B) if he determines and certifies in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that the imposition of such sanction would be seriously prejudicial to the achievement of United States nonproliferation objectives or otherwise jeopardize the common defense and security. The President shall transmit with such certification a statement setting forth the specific reasons therefor.

(6)(A) In the event the President is required to impose sanctions against a country under paragraph (1)(C) or (1)(D), the President shall forthwith so inform such country and shall impose the required sanctions beginning 30 days after submitting to the Congress the report required by paragraph (1) unless, and to the extent that, there is enacted during the 30-day period a law prohibiting the imposition of such sanctions.

(B) Notwithstanding any other provision of law, the sanctions which are required to be imposed against a country under paragraph (1)(C) or (1)(D) shall not apply if the President determines and certifies in writing to the Committee on Foreign Relations and the Committee on Governmental Affairs of the Senate and the Committee on Foreign Affairs of the House of Representatives that the application of such sanctions against such country would have a serious adverse effect on vital United States interests. The President shall transmit with such certification a statement setting forth the specific reasons therefor.

(7) For purposes of this subsection, continuity of session is broken only by an adjournment of Congress sine die and the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of any period of time in which Congress is in continuous session.

(8) The President may not delegate or transfer his power, authority, or discretion to make or modify determinations under this subsection.

(c) "Non-nuclear-weapon state" defined

As used in this section, the term "non-nuclear-weapon state" means any country which is not a nuclear-weapon state, as defined in Article IX(3) of the Treaty on the Non-Proliferation of NuclearWeapons.

(Pub. L. 90–629, ch. 10, §102, as added Pub. L. 103–236, title VIII, §826(a), Apr. 30, 1994, 108 Stat. 516 ; amended Pub. L. 105–194, §2(a)–(c), July 14, 1998, 112 Stat. 627 ; Pub. L. 113–276,title II, §208(a)(1), Dec. 18, 2014, 128 Stat. 2992 .)

REFERENCES IN TEXT

The Foreign Assistance Act of 1961, referred to in subsecs. (a)(1) and (b)(2)(A), is Pub. L. 87–195, Sept. 4, 1961, 75 Stat. 424 , as amended, which is classified principally to chapter 32(§2151 et seq.) of this title. Chapters 4 and 6 of part II of the Act are classified generally to parts IV (§2346 et seq.) and VI (§2348 et seq.), respectively, of subchapter II of chapter 32 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2151 of this title and Tables.

This chapter, referred to in subsecs. (a)(1) and (b)(2)(B)(i), (C), was in the original "this Act", meaning Pub. L. 90–629, Oct. 22, 1968, 82 Stat. 1321 , which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 2751 of this title and Tables.

Section 601(b) of the International Security Assistance and Arms Export Control Act of 1976, referred to in subsecs. (a)(3)(B) and (b)(4)(C), is section 601(b) of Pub. L. 94–329, title VI, June 30, 1976, 90 Stat. 765 , which is not classified to the Code.

For effective date of part B of the Nuclear Proliferation Prevention Act of 1994 [part B of title VIII of Pub. L. 103–236], referred to in subsec. (b)(1), as 60 days after Apr. 30, 1994, see section 831 of Pub. L. 103–236, set out as an Effective Date note under section 6301 of this title.

The National Security Act of 1947, referred to in subsec. (b)(2)(D)(i), (G), is act July 26, 1947, ch. 343, 61 Stat. 495 , which was formerly classified principally to chapter 15 (§401 et seq.) of Title 50, War and National Defense, prior to editorial reclassification in chapter 44 (§3001 et seq.) of Title 50. Title V of the Act is now classified generally to subchapter III (§3091 et seq.) ofchapter 44 of Title 50. For complete classification of this Act to the Code, see Tables.

Section 102 of the Arms Export Control Act, referred to in subsec. (b)(4)(D), is classified to this section.

AMENDMENTS

2014-Subsec. (a)(2). Pub. L. 113–276 substituted "the Speaker of the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, and" for "the Speaker of the House of Representatives and".

1998-Subsec. (b)(2)(D)(ii). Pub. L. 105–194, §2(c), inserted "medicines, medical equipment, and" after "to".

Subsec. (b)(2)(D)(iii). Pub. L. 105–194, §2(a), added cl. (iii).

Subsec. (b)(2)(F). Pub. L. 105–194, §2(b), inserted ", which includes fertilizer" before period at end.

CHANGE OF NAME

Committee on Governmental Affairs of Senate changed to Committee on Homeland Security and Governmental Affairs of Senate, effective Jan. 4, 2005, by Senate Resolution No. 445, One Hundred Eighth Congress, Oct. 9. 2004.

EFFECTIVE DATE OF 1998 AMENDMENT

Pub. L. 105–194, §2(d), July 14, 1998, 112 Stat. 627 , provided that: "The amendment made by subsection (a)(3) [amending this section] shall apply to any credit, credit guarantee, or other financial assistance provided by the Department of Agriculture before, on, or after the date of enactment of this Act [July 14, 1998] through September 30, 1999."

DELEGATION OF FUNCTIONS

Functions of President under subsec. (a)(2) of this section delegated to Secretary of State by section 1(a)(iii) of Ex. Ord. No. 13346, July 8, 2004, 69 F.R. 41905, set out as a note undersection 301 of Title 3, The President.

WAIVER OF CERTAIN SANCTIONS AGAINST NORTH KOREA

Pub. L. 110–252, title I, §1405, June 30, 2008, 122 Stat. 2337 , as amended by Pub. L. 113–188, title VIII, §801, Nov. 26, 2014, 128 Stat. 2020 ; Pub. L. 113–235, div. J, title VII, §7034(i), Dec. 16, 2014, 128 Stat. 2624 , provided that:

"(a) Waiver Authority.-

"(1) In general.-Except as provided in subsection (b), the President may waive in whole or in part, with respect to North Korea, the application of any sanction contained in subparagraph (A), (B), (D) or (G) under section 102(b)(2) of the Arms Export Control Act (22 U.S.C. 2799aa–1(b)[(2)(A), (B), (D), (G)]), for the purpose of providing assistance related to-

"(A) the implementation and verification of the compliance by North Korea with its commitment, undertaken in the Joint Statement of September 19, 2005, to abandon all nuclearweapons and existing nuclear programs as part of the verifiable denuclearization of the Korean Peninsula; and

"(B) the elimination of the capability of North Korea to develop, deploy, transfer, or maintain weapons of mass destruction and their delivery systems.

"(2) Limitation.-The authority under paragraph (1) shall expire 5 years after the date of enactment of this Act [June 30, 2008].

"(b) Exceptions.-

"(1) Limited exception related to certain sanctions and prohibitions.-The authority under subsection (a) shall not apply with respect to a sanction or prohibition under subparagraph (B) or (G) of section 102(b)(2) of the Arms Export Control Act [22 U.S.C. 2799aa–1(b) [(2)(B), (G)], unless the President determines and certifies to the appropriate congressional committees that-

"(A) all reasonable steps will be taken to assure that the articles or services exported or otherwise provided will not be used to improve the military capabilities of the armed forces of North Korea; and

"(B) such waiver is in the national security interests of the United States.

"(2) Limited exception related to certain activities.-Unless the President determines and certifies to the appropriate congressional committees that using the authority under subsection (a) is vital to the national security interests of the United States, such authority shall not apply with respect to-

"(A) an activity described in subparagraph (A) of section 102(b)(1) of the Arms Export Control Act [22 U.S.C. 2799aa–1(b)(1)(A)] that occurs after September 19, 2005, and before the date of the enactment of this Act [June 30, 2008];

"(B) an activity described in subparagraph (C) of such section that occurs after September 19, 2005; or

"(C) an activity described in subparagraph (D) of such section that occurs after the date of enactment of this Act.

"(3) Exception related to certain activities occurring after date of enactment.-The authority under subsection (a) shall not apply with respect to an activity described in subparagraph (A) or (B) of section 102(b)(1) of the Arms Export Control Act [22 U.S.C. 2799aa–1(b)(1)(A), (B)] that occurs after the date of the enactment of this Act.

"(4) Limited exception related to lethal weapons.-The authority under subsection (a) shall not apply with respect to any export of lethal defense articles that would be prevented by the application of section 102(b)(2) of the Arms Export Control Act [22 U.S.C. 2799aa–1(b)(2)]."

"(c) Appropriate Congressional Committees Defined.-In this section, the term 'appropriate congressional committees' means-

"(1) the Committees on Appropriations, Armed Services, and Foreign Relations of the Senate; and

"(2) the Committees on Appropriations, Armed Services, and Foreign Affairs of the House of Representatives."

[Amendment of section 1405 of Pub. L. 110–252, set out above, by section 7034(i) of div. J of Pub. L. 113–235, which directed that subsec. (c) of section 1405 be repealed, was not executed

to reflect the probable intent of Congress and the prior amendment by section 801 of Pub. L. 113–188, which struck out subsec. (c) and redesignated subsec. (d) as (c).]

EXEMPTION FOR RHINOCEROS, TIGER, ASIAN ELEPHANT, AND GREAT APE CONSERVATION PROGRAMS

Pub. L. 107–63, title I, Nov. 5, 2001, 115 Stat. 421 , provided in part: "That funds made available under this Act [see Tables for classification], Public Law 106–291 [see Tables for classification], and Public Law 106–554 [see Tables for classification] and hereafter in annual appropriations Acts for rhinoceros, tiger, Asian elephant, and great ape conservation programs are exempt from any sanctions imposed against any country under section 102 of the Arms Export Control Act (22 U.S.C. 2799aa–1)."

Similar provisions were contained in the following prior appropriation acts:

Pub. L. 106–291, title I, Oct. 11, 2000, 114 Stat. 927 .

Pub. L. 106–113, div. B, §1000(a)(3) [title I], Nov. 29, 1999, 113 Stat. 1535 , 1501A-141.

WAIVER OF CERTAIN SANCTIONS AGAINST INDIA AND PAKISTAN

Pub. L. 106–79, title IX, §9001, Oct. 25, 1999, 113 Stat. 1283 , as amended by Pub. L. 107–228, div. B, title XIV, §1405(b), Sept. 30, 2002, 116 Stat. 1458 , provided that:

"(a) Waiver Authority.-Except as provided in subsections (b) and (c) of this section, the President may waive, with respect to India and Pakistan, the application of any sanction contained in section 101 or 102 of the Arms Export Control Act (22 U.S.C. 2799aa or 22 U.S.C. 2799aa–1), section 2(b)(4) of the Export Import Bank Act of 1945 (12 U.S.C. 635(b)(4)), or section 620E(e) of the Foreign Assistance Act of 1961, as amended, (22 U.S.C. 2375(e)).

"(b) Exception.-The authority to waive the application of a sanction or prohibition (or portion thereof) under subsection (a) shall not apply with respect to a sanction or prohibition contained in subparagraph (B), (C), or (G) of section 102(b)(2) of the Arms Export Control Act [22 U.S.C. 2799aa–1(b)(2)(B), (C), (G)], unless the President determines, and so certifies to the Congress, that the application of the restriction would not be in the national security interests of the United States.

"(c) Termination of Waiver.-The President may not exercise the authority of subsection (a), and any waiver previously issued under subsection (a) shall cease to apply, with respect to India or Pakistan, if that country detonates a nuclear explosive device after the date of the enactment of this Act [Oct. 25, 1999] or otherwise takes such action which would cause the President to report pursuant to section 102(b)(1) of the Arms Export Control Act [22 U.S.C. 2799aa–1(b)(1)].

"(d) Targeted Sanctions.-

"(1) Sense of the congress.-

"(A) it is the sense of the Congress that the broad application of export controls to nearly 300 Indian and Pakistani entities is inconsistent with the specific national security interests of the United States and that this control list requires refinement; and

"(B) export controls should be applied only to those Indian and Pakistani entities that make direct and material contributions to weapons of mass destruction and missile programs and only to those items that can contribute to such programs.

"(2) Reporting requirement.-Not later than 60 days after the date of the enactment of this Act [Oct. 25, 1999], the President shall submit both a classified and unclassified report to the appropriate congressional committees listing those Indian and Pakistani entities whose activities contribute to missile programs or weapons of mass destruction programs.

"(e) Congressional Notification.-The issuance of a license for export of a defense article, defense service, or technology under the authority of this section shall be subject to the same requirements as are applicable to the export of items described in section 36(c) of the Arms Export Control Act (22 U.S.C. 2776(c)), including the transmittal of information and the application of congressional review procedures. The application of these requirements shall be subject to the dollar amount thresholds specified in that section.

"(f) Repeal.-[Repealed section 101(a) [title IX] of div. A of Pub. L. 105–277, formerly set out below.]"

### INDIA-PAKISTAN RELIEF

Pub. L. 105–277, div. A, §101(a) [title IX], Oct. 21, 1998, 112 Stat. 2681 , 2681-40, known as the India-Pakistan Relief Act, provided for a one-year waiver of certain sanctions against India and Pakistan under the Arms Export Control Act, prior to repeal by Pub. L. 106–79, title IX, §9001(f), Oct. 25, 1999, 113 Stat. 1284 , effective Oct. 21, 1999.

### EFFECT ON EXISTING SANCTIONS

Pub. L. 105–194, §2(e), July 14, 1998, 112 Stat. 627 , provided that: "Any sanction imposed under section 102(b)(1) of the Arms Export Control Act [subsec. (b)(1) of this section] before the date of the enactment of this Act [July 14, 1998] shall cease to apply upon that date with respect to the items described in the amendments made by subsections (b) and (c) [amending this section]. In the case of the amendment made by subsection (a)(3) [amending this section], any sanction imposed under section 102(b)(1) of the Arms Export Control Act before the date of the enactment of this Act shall not be in effect during the period beginning on that date and ending on September 30, 1999, with respect to the activities and items described in the amendment."

### SANCTIONS AGAINST INDIA FOR DETONATION OF A NUCLEAR EXPLOSIVE DEVICE

Determination of President of the United States, No. 98–22, May 13, 1998, 63 F.R. 27665, provided a determination that India, a non-nuclear-weapon state, detonated a nuclear explosive device on May 11, 1998, and imposed sanctions described in subsec. (b)(2) of this section.

SANCTIONS AGAINST PAKISTAN FOR DETONATION OF A NUCLEAR EXPLOSIVE DEVICE

Determination of President of the United States, No. 98–25, May 30, 1998, 63 F.R. 31881, provided a determination that Pakistan, a non-nuclear-weapon state, detonated a nuclear explosive device on May 28, 1998, and imposed sanctions described in subsec. (b)(2) of this section.

WAIVER OF CERTAIN SANCTIONS AGAINST INDIA AND PAKISTAN

Provisions relating to waiver of sanctions against India and Pakistan consistent with section 9001 of Pub. L. 106–79, set out as a note above, or section 101(a) [title IX, §902] of Pub. L. 105–277, formerly set out in a note above, were contained in the following:

Determination of President of the United States, No. 2001–28, Sept. 22, 2001, 66 F.R. 50095.

Determination of President of the United States, No. 2001–23, Aug. 9, 2001, 66 F.R. 44521.

Determination of President of the United States, No. 2001–11, Jan. 19, 2001, 66 F.R. 8503.

Determination of President of the United States, No. 2000–18, Mar. 16, 2000, 65 F.R. 16297.

Determination of President of the United States, No. 2000–4, Oct. 27, 1999, 64 F.R. 60649.

Determination of President of the United States, No. 99–7, Dec. 1, 1998, 34 Weekly Compilation of Presidential Documents 2402, Dec. 7, 1998.

EXHIBIT 6

~~SECRET//NOFORN~~

D000 35187



U.S. Department of Energy
Office of Classification
Washington, DC 20585

**OFFICIAL USE ONLY**
**REDACTED COPY**

September 6, 2012

# CLASSIFICATION BULLETIN

**WNP-136**

### (U) Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability

(OUO)



(OUO)

(OUO)





Derivative Declassifier review
required prior to declassification

~~NOFORN~~

Classified By: Glen D. Kre, General Engineer, DOE/HS-62
Derived From: Dept. of State Class. Guide 03-1, D: January 2005

~~SECRET//NOFORN~~
**OFFICIAL USE ONLY**

~~SECRET//NOFORN~~

2



(U) Classifiers should cite Department of State Classification Guide 05-1, D, dated January 2005, as the derivative classification source.

(OUO) DOE (b)(7)(F)



(OUO) DOE (b)(7)(F)
DOE (b)(7)(F)

(OUO) DOE (b)(7)(F)

(U) This bulletin will be incorporated into future changes or revisions to CG-NP-3.

Andrew P. Weston-Dawkes
Director
Office of Classification
Office of Health, Safety and Security



# Department of Energy
**Washington, DC 20585**

August 20, 2015

Mr. Grant F. Smith
IRmep
PO Box 32041
Washington, DC 20007

Via email: gsmith@irmep.org

Re: HQ-2015-00699-F

Dear Mr. Smith:

This is in final response to the request for information that you sent to the Department of Energy (DOE) under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. You requested "DOE Classification Bulletin WPN-136 on Foreign Nuclear Capabilities."

Your request was assigned to DOE's Office of Environment, Health, Safety and Security (AU) to conduct a search of its files for responsive records. AU began its search for responsive documents on March 12, 2015, which is the cutoff date for responsive records, and located one (1) document responsive to your request. The document is being released to you as described in the accompanying index.

DOE has determined that certain information should be withheld in this document pursuant to Exemption 7(E) of the FOIA, 5 U.S.C. § 552(b)(7)(E). In addition, please be advised that the U.S. Department of State (DOS) has also withheld information in the document pursuant to Exemption 1 of the FOIA, 5 U.S.C. § 552 (b)(1).

Exemption 1 of the FOIA protects from disclosure information that has been deemed classified "under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and is "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552 (b)(1).

Exemption 7(E) of the FOIA provides that an agency may exempt from disclosure records compiled or recompiled for law enforcement (including national or homeland security) purposes if they could reasonably be expected to "disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." ·5 U.S.C. § 552(b)(7)(E).

Information withheld pursuant to Exemption 7(E) contains information that would provide insight into the types of documents the Government considers classified. If this information were to be released, it would materially assist efforts to discern classified or sensitive information through comparison of de-classified information. Release would reduce and/or nullify the effectiveness of the still-in-use classification procedure and would impair the DOE's ability to enforce laws related to the protection of classified information from public release.

This satisfies the standard set forth in the Attorney General's March 19, 2009, memorandum that the agency is justified in not releasing material that the agency reasonably foresees would harm an interest protected by



one of the statutory exemptions. This also satisfies DOE's regulations at 10 C.F.R. § 1004.1 to make records available which it is authorized to withhold under 5 U.S.C. § 552 when it determines that such disclosure is in the public interest. Accordingly, we will not disclose this information.

Pursuant to 10 C.F.R. §1004.7(b)(2), I am the individual responsible for the determination to withhold the information described above. The FOIA requires that "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). As a result, a redacted version of the document is being released to you in accordance with 10 C.F.R. § 1004.7(b)(3).

This decision, as well as the adequacy of the search, may be appealed within 30 calendar days from your receipt of this letter pursuant to 10 C.F.R. § 1004.8. Appeals should be addressed to Director, Office of Hearings and Appeals, HG-1, L'Enfant Plaza, U.S. Department of Energy, 1000 Independence Avenue, S.W., Washington, D.C. 20585-1615. The written appeal, including the envelope, must clearly indicate that a FOIA appeal is being made. You may also submit your appeal by e-mail to OHA.filings@hq.doe.gov, including the phrase "Freedom of Information Appeal" in the subject line. The appeal must contain all the elements required by 10 C.F.R. § 1004.8, including a copy of the determination letter. Thereafter, judicial review will be available to you in the Federal District Court either (1) in the district where you reside, (2) where you have your principal place of business, (3) where DOE's records are situated, or (4) in the District of Columbia.

The FOIA provides for the assessment of fees for the processing of requests. *See* 5 U.S.C. § 552(a)(4)(A)(i); *see also* 10 C.F.R. § 1004.9(a). In our February 23, 2015, letter, you were advised that your request was placed in the "news media" category for fee purposes. Requesters in this category are charged fees for duplication only and are provided 100 pages at no cost. In that letter, we informed you that the information you provided satisfied your request for a fee waiver. As such, you will not be charged any fees for processing this FOIA request.

If you have any questions about the processing of your request, or this letter, you may contact Mr. Aykut Ozger or me at:

> MA-90/ Forrestal Building
> 1000 Independence Avenue, SW
> Washington, DC 20585
> (202) 586-5955

I appreciate the opportunity to assist you with this matter.

Sincerely,

Alexander C. Morris
FOIA Officer
Office of Information Resources

Enclosures

## INDEX

### Request #: HQ-2015-00699-F

**Final response to the request from Mr. Grant Smith for:**

### "DOE Classification Bulletin WPN-136 on Foreign Nuclear Capabilities."

The Office of Environment, Health, Safety and Security (AU) conducted a search of its files and located one (1) document responsive to your request.

- One (1) document *is being released in part, pursuant to Exemptions (b)(1) and (b)(7)(E).* Information withheld by DOE pursuant to Exemption 7(E) contains information that would provide insight into the types of documents the Government considers classified.

3

EXHIBIT 7



**Department of Energy**
Washington, DC 20585

February 23, 2015

Mr. Grant F. Smith
IRmep
PO Box 32041
Washington, DC 20007

Re:  HQ-2015-00699-F

Dear Mr. Smith:

This is an interim response to the request for information that you sent to the Department of
Energy (DOE) under the Freedom of Information Act (FOIA), 5 U.S.C. 552.  You requested the
"DOE Classification Bulletin WPN-136 on Foreign Nuclear Capabilities."

I have assigned your request to the DOE's Office of the Associate Under Secretary for the Office
of Environment, Health, Safety and Security (AU) to conduct a search of its files for responsive
documents.  Upon completion of the search and review of any records located, you will be
provided a response.

In your letter, you requested a waiver of all fees associated with the processing of the request.
For purposes of assessment of any fees, you have been categorized under the DOE regulation
that implements the FOIA at Title 10, Code of Federal Regulations (CFR), Section 1004.9(b)(3),
as a "news media" requestor.  Requestors in this category are charged fees for duplication only
and are provided 100 pages at no cost.

Pursuant to 10 CFR § 1004.9(8), I have reviewed the information you provided in the request to
support your request for a fee waiver.  I have determined the information satisfies the criteria
considered for a waiver of fees.  A waiver, therefore, is appropriate for any fees that may be
incurred because the subject of the request relates to a government activity, and information
about the activity could lead to greater understanding by the public about the matter.  You also
have demonstrated the ability and intent of your organization to disseminate the information to
the public in a form that can further understanding of the subject matter.

In addition, you also requested expedited processing of your request.  You stated that
"Americans are being bombarded with propaganda about the Iran nuclear threat, which is non-
existent, and do not understand the corruption that enables the Israeli nuclear program through
illicit materials transfers."

The FOIA permits agencies to expedite the processing of requests if requesters demonstrate a
"compelling need."  5 U.S.C. § 552(a)(6)(E)(i)(I).  A "compelling need" is established when one



of two criteria are met. 5 U.S.C. § 552(a)(6)(E)(v)(II). The criteria are met when (1) failure to obtain the records quickly "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or (2) if the "requester is primarily engaged in disseminating information" and can demonstrate that there is an "urgency to inform the public concerning actual or alleged Federal Government activity." Id.

The reasons you have provided do not adequately address the basis for which a request may be expedited. You have not provided material that establishes that there is any threat to the life or safety of an individual that would justify expeditious processing of the request.

You also have not identified an actual or alleged activity that poses any particular urgency that requires the dissemination of information in an expedited manner. In order to determine whether a requester has demonstrated an "urgency to inform," and hence a "compelling need," courts consider at least three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity. Al-Fayed v. C.I.A., 254 F. 3d 300, 310 (D.C. Cir. 2001); Associated Press v. DOE, Case No. TFA-0273 (September 11, 2008). Your request does not address factors one or two.

For these reasons, I am denying your request for expedited processing. The request will be processed in accordance with provisions of the FOIA.

You may challenge the denial of expedited processing by submitting a written appeal to the Director, Office of Hearings and Appeals, at HG-1 L'Enfant Plaza Building, Department of Energy, 1000 Independence Avenue, SW, Washington, DC 20585-1615. You should submit the appeal within 30 calendar days of receipt of this determination.

The written appeal, including the envelope, must clearly indicate that a FOIA appeal is being made. The appeal must contain elements required by 10 CFR § 1004.8, including a copy of this letter. Judicial review will thereafter be available in the Federal District Court either (1) in the district where you reside; (2) in the district where you have your principal place of business; (3) in the district where the DOE records are located; or (4) in the District of Columbia.

*Please refer* to the above referenced number in any communications with the DOE about the request. If you have questions about the processing of the request or this letter, please contact Ms. Yordanos Woldai in this office at MA-90/Forrestal Building, 1000 Independence Avenue, SW, Washington, DC 20585, or (202) 586-7504.

Sincerely,

Alexander C. Morris
FOIA Officer
Office of Information Resources

EXHIBIT 8



**Department of Energy**
Washington, DC 20585

*FEB 1 2 2016*

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Grant F. Smith
IRmep
P.O. Box 32041
Washington, DC 20007

        Re: OHA Case No. FIC-15-0003
           FOIA Case No. HQ-2015-00699-F

Dear Mr. Smith:

The Department of Energy has considered the Freedom of Information Act Appeal you filed on August 25, 2015, regarding DOE Classification Bulletin WPN-136. As the enclosed Decision and Order indicates, the DOE has determined that your submission be denied.

If you have any questions regarding this Decision and Order, please call or write to William Schwartz, Staff Attorney, Office of Hearings and Appeals, U.S. Department of Energy, Washington, DC 20585-1615, telephone number (202) 287-1522. You may also reach him by e-mail at William.Schwartz@hq.doe.gov.

Sincerely,

*Theal J. Brown*

Poli A. Marmolejos
Director
Office of Hearings and Appeals

Enclosures

Printed with soy ink on recycled paper



**Department of Energy**
Washington, DC 20585

## United States Department of Energy
## Office of Hearings and Appeals

In the Matter of Grant F. Smith          )
                                         )
Filing Date: August 25, 2015             )
                                         )     Case No. FIC-15-0003
_____  )

Issued:  FEB 1 2 2016
_____

### Decision and Order
_____

Grant F. Smith filed an Appeal from a determination that the Office of Information Resources (IOR) issued to the Institute for Research: Middle Eastern Policy (IRmep) on August 20, 2015 (Request No. HQ-2015-00699-F). In that determination, OIR released a document responsive to a request that IRmep filed under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. OIR withheld portions of that document under Exemptions 1 and 7(E) of the FOIA. This Appeal, if granted, would require the DOE to release the portions of the responsive document that were previously withheld from disclosure.

## I. Background

On February 18, 2015, IRmep filed a FOIA request seeking a copy of "DOE Classification Bulletin WPN-136 on Foreign Nuclear Capabilities." *See* Determination Letter from Alexander C. Morris, Director, OIR, to Grant F. Smith, IRmep (August 20, 2015). On August 20, 2015, OIR responded to the FOIA request, releasing a document entitled "Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability, WPN-136" (Guidance) with redactions, which it justified pursuant to FOIA Exemptions 1 and 7(E). *Id.*

Mr. Smith challenged OIR's determination to withhold information in an Appeal dated August 25, 2015. In his Appeal, Mr. Smith contends that the information withheld pursuant to Exemptions 1 and 7(E) should be released because "the Executive no longer treats the Israeli nuclear arsenal as classified." Appeal at 1. Because, as explained below, the information withheld under Exemption 1 is classified information, we referred the Appeal to the DOE Office of Environment, Health, Safety and Security (EHSS), which reviewed that withheld information, to determine whether it was properly classified under current guidance, as well as the information withheld pursuant to Exemption 7(E). We have now received EHSS's report of its review.

2

## II. Analysis

The FOIA requires that documents held by federal agencies generally be released to the public upon request. The FOIA, however, lists nine exemptions that set forth the types of information that may be withheld at the discretion of the agency. 5 U.S.C. § 552(b). Those nine categories are repeated in the DOE regulations implementing the FOIA. 10 C.F.R. § 1004.10(b). We must construe the FOIA exemptions narrowly to maintain the FOIA's goal of broad disclosure. *Dep't of the Interior v. Klamath Water Users Prot. Ass'n,* 532 U.S. 1, 8 (2001) (citation omitted). The agency has the burden to show that information is exempt from disclosure. *See* 5 U.S.C. § 552(a)(4)(B). To the extent permitted by law, the DOE will release documents exempt from mandatory disclosure under the FOIA whenever it determines that disclosure is in the public interest. 10 C.F.R. § 1004.1.

### Exemption 1

Exemption 1 of the FOIA provides that an agency may exempt from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1); *accord* 10 C.F.R. § 1004.10(b)(1). Executive Order 13526 is the current Executive Order that provides for the classification, declassification and safeguarding of national security information (NSI). When properly classified under this Executive Order, NSI is exempt from mandatory disclosure under Exemption 1. 5 U.S.C. § 552(b)(1); *see* 10 C.F.R. § 1004.10(b)(1).

The Associate Under Secretary for Environment, Health, Safety and Security is the official who makes the final determination for the DOE regarding FOIA appeals involving the release of classified information. DOE Order 475.2B, § 5(b)(8) (NSI per Executive Order 13526). Upon referral of this Appeal from the Office of Hearings and Appeals, the Associate Under Secretary reviewed the Guidance, focusing on the applicability of Exemptions 1 and 7(E) to its contents.

The Associate Under Secretary reported the results of his review in a memorandum dated December 14, 2015. In that review, he explained that the requested document contains information pertaining to the Israeli government that the Department of State has determined to be NSI. He further stated that the DOE coordinated its review with the Department of State at the time of IRmep's initial request, roughly 90 days before the review his office undertook at OHA's request. Because he could find no change in policy in the interim, he determined that the DOE must continue to respect its sister agency's determination that the portion of the Guidance deleted and marked "DOS (b)(1)" is still properly classified by the Department of State as NSI pursuant to Executive Order 13526. As stated above, when NSI is properly classified under that Executive Order, it is exempt from mandatory disclosure under Exemption 1.

3

**Exemption 7(E)**

Exemption 7(E) of the FOIA provides that an agency may exempt from disclosure records compiled or recompiled for law enforcement (including national or homeland security) purposes if their production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

The federal courts have interpreted Exemption 7(E) to apply to techniques and procedures used in civil as well as criminal law enforcement investigations. *See, e.g., Nowak v. IRS,* 210 F.3d 384, No. 98-56656, 2000 WL 60067, at *1 (9th Cir. Jan. 18, 2000); *Mosby v. U.S. Marshals Serv.,* No. 04-2083, 2005 WL 3273974, at *5) (D.D.C. Sept. 1, 2005). Moreover, in a Supreme Court concurring opinion, Justice Alito opined that the phrase "compiled for law enforcement purposes" should be construed to encompass not only investigation and prosecution, but also "proactive steps designed to prevent criminal activity and to maintain security. *Milner v. Dep't of the Navy,* 131 S. Ct. 1259, 1272 (2011). Similarly, other federal courts have upheld the application of Exemption 7(E) in the context of preventative law enforcement. *See, e.g., Asian Law Caucus v. DHS,* No. 08-00842, 2008 WL 5047839, at *4 (N.D. Cal. Nov. 24, 2008) (protecting the details of "watch list" programs); *Judicial Watch, Inc. v. Dep't of Commerce,* 337 F. Supp. 2d 146, 181-82 (D.D.C. 2004) (approving withholding of firearm and radio details used by agents protecting the Secretary of Commerce).

In his report, the Associate Under Secretary explained that the Guidance contains DOE sensitive unclassified information related to guidance on the handling of certain information pertaining to the Israeli government that the Department of State has determined to be NSI. According to the Associate Under Secretary, this information, which was withheld pursuant to Exemption 7(E), constitutes information that would provide insight into the types of documents the government considers to be classified. If this information were released, it would materially assist efforts to discern classified or sensitive information through comparison with de-classified information. Its release would reduce, and possibly nullify, the effectiveness of the classification procedure described in the Guidance, which is still in effect, and would impair the DOE's ability to enforce laws related to protecting classified information from public release.

Based on the information presented in that report, we find that Exemption 7(E) was properly applied to withhold the information redacted from the document provided to Mr. Smith. That information is not related directly to law enforcement investigations or prosecutions, but because it is guidance concerning the treatment of certain information as classified or sensitive, it is a form of preventative law enforcement. As such, it falls within the range of information that federal courts have protected by application of that exemption.

4

Consequently, this information is exempt from mandatory disclosure under Exemption 7(E).

## III. Conclusion

The denying official for these withholdings is Matthew B. Moury, Associate Under Secretary for Environment, Health, Safety and Security, Department of Energy.

Based on the Associate Under Secretary's review, we have determined that Executive Order 13526 requires the DOE to continue withholding the portion of the Guidance pursuant to Exemption 1 of the FOIA. Although the DOE regulations at 10 C.F.R. § 1004.1 state that a finding of exemption from mandatory disclosure generally requires our subsequent consideration of the public interest in releasing the information, such consideration is not permitted where, as in the application of this exemption, the disclosure is prohibited by executive order. Therefore, the portion of the Guidance previously withheld under Exemption 1 must continue to be withheld from disclosure.

We have also determined, based on the Associate Under Secretary's review, that Exemption 7(E) was properly applied to redact the remaining withheld portions of the Guidance. We must, however, consider whether the disclosure of those portions exempt from mandatory disclosure under Exemption 7(E) would nevertheless be in the public interest. 10 C.F.R. § 1004.1. After due consideration, we have determined that the public interest will be best served by protecting, rather than disclosing, the information previously and appropriately withheld pursuant to Exemption 7(E). Accordingly, Mr. Smith's Appeal will be denied.

It Is Therefore Ordered That:

(1) The Appeal filed by Grant F. Smith on August 25, 2015, Case No. FIC-15-0003, is hereby denied.

(2) This is a final order of the Department of Energy from which any aggrieved party may seek judicial review pursuant to 5 U.S.C. § 552(a)(4)(B). Judicial review may be sought in the district in which the requester resides or has a principal place of business, or in which the agency records are situated, or in the District of Columbia.

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

5

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road-OGIS
College Park, MD  20740
Web:  ogis.archives.gov
E-mail:  ogis@nara.gov
Telephone:  202-741-5770
Fax:  202-741-5769
Toll-free:  1-877-684-6448

*Fred J. Brown*

Poli A. Marmolejos
Director
Office of Hearings and Appeals

Date:  FEB 1 2 2016

EXHIBIT 9



# Department of Energy
## Washington, DC 20585

September 3, 2015

Mr. Grant F. Smith
IRmep
PO Box 32041
Washington, DC 20007

Re:  HQ-2015-01766-F

Dear Mr. Smith:

This is an interim response to the request for information that you sent to the Department of Energy (DOE) under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.  You requested the following:

> All cross-referenced information on the development of WPN-136, including but
> not limited to, key task force members, consultations with foreign governments,
> input from other federal agencies and the executive branch, edits and modifications,
> drafts of WPN-136 and agency information that identifies the perceived need for
> and justification for such a regulation.

I have assigned your request to the Office of Environment, Health, Safety, and Security (AU) to conduct a search of its files for responsive documents.  Upon completion of the search and review of any records located, you will be provided a response.

In your letter, you requested a waiver of all fees associated with the processing of this request.  For purposes of assessment of any fees, you have been categorized under the DOE regulation that implements the FOIA at Title 10, Code of Federal Regulations (CFR), Section 1004.9(b)(5), as a "news media" requestor.  Requestors in this category are charged fees for duplication only, and are provided 100 pages at no cost.

Pursuant to 10 CFR 1004.9(8), I have reviewed the information you provided in the request to support your request for a fee waiver.  I have determined that the information satisfies the criteria considered for a waiver of fees.  A waiver, therefore, is appropriate for any fees that may be incurred because the subject of the request relates to a government activity, and information about the activity could lead to greater understanding by the public about the matter.  You also have demonstrated the ability and intent of your organization to disseminate the information to the public at a form that can further understanding of the subject matter.

In addition, you requested expedited processing of your request.  You stated that "Congress votes on the Iran nuclear deal on September 9" and that it is "important for the public to understand the ramifications of the U.S. cover-up of non-NNPT signer Israel's nuclear weapons within the context of regional nuclear proliferation."

The FOIA permits agencies to expedite the processing of requests if requesters demonstrate a "compelling need."  A "compelling need" is established when one of two criteria are met.  The criteria are met when (1) failure to obtain the records quickly "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or (2) if the "requester is primarily engaged in disseminating



information" and can demonstrate that there is an "urgency to inform the public concerning actual or alleged Federal Government activity."

The reasons you have provided do not adequately address the basis for which a request may be expedited. You have not provided material that establishes that there is any threat to the life or safety of an individual that would justify expeditious processing of the request.

You also have not identified an actual or alleged activity that poses any particular urgency that requires the dissemination of information in an expedited manner. In order to determine whether a requester has demonstrated an "urgency to inform," and hence a "compelling need," courts consider at least three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity. *Al-Fayed v. C.I.A.*, 254 F. 3d 300, 310 (D.C. Cir. 2001); *Associated Press v. DOE*, Case No. TFA-0273 (September 11, 2008). Your request does not address factor one or two.

For these reasons, I am denying your request for expeditious processing. The request will be processed in accordance with provisions of the FOIA.

You may challenge the denial of expedited processing by submitting a written appeal to the Director, Office of Hearings and Appeals, at HG-1, L'Enfant Plaza Building, Department of Energy, 1000 Independence Avenue, SW, Washington, DC 20585-1615. You should submit the appeal within 30 calendar days of receipt of this determination.

The written appeal, including the envelope, must clearly indicate that a FOIA appeal is being made. You may also submit your appeal by e-mail to OHA.filings@hq.doe.gov. Including the phrase "Freedom of Information Appeal" in the subject line. Thereupon, you may, if you so choose, seek judicial review of this letter. Judicial review will thereafter be available in the Federal District Court either in the district where you reside, the district where the DOE records are located, or in the District of Columbia.

Please refer to the above referenced number in any communications with the DOE about the request. If you have questions about the processing of this request or this letter, please contact Mr. Aykut Ozgun in this office at M1596 Forrestal Building, 1000 Independence Avenue, SW, Washington, DC 20585, or at (202) 586-5955.

I appreciate the opportunity to assist you with this matter.

Sincerely,

Alexander C. Morris
FOIA Officer
Office of Information Resources

2

EXHIBIT 10



**UNITED STATES DEPARTMENT OF COMMERCE**
**Bureau of Industry and Security**
Washington, D.C. 20230

July 2, 2012

Mr. Grant F. Smith
Director, Institute for Research
Middle Eastern Policy, Inc.
P.O. Box 32041
Washington, DC 20007

Subject: Freedom of Information Act Request, BIS 12-064

Dear Mr. Smith,

This is in response to your June 6, 2012 Freedom of Information Act (FOIA) request to the
Bureau of Industry and Security (BIS), U.S. Department of Commerce for a copy of all files
concerning the BIS investigation of the U.S. based Israeli company Telogy.

BIS has categorized the nature of your request to fall under the "all other requesters" provision of
the Department's FOIA regulations. See 15 C.F.R. § 4.11(c)(1)(iv)(2011). As such, the
Department's FOIA regulations require BIS to charge you for the search and duplication of
documents responsive to your request.

Fees may be assessed based on the category of the review. Under the Department's FOIA
regulations, "all other requesters" are assessed fees for search and duplication (excluding the
cost of the first two hours of search and 100 pages). BIS has estimated that the cost of
searching for documents responsive to your FOIA request is $6,984.50. In addition, you will
be charged $0.16 per page for duplication for paper copies as well as actual direct cost of
reproductions for computer disk, printout, microfilm, microfiche, or microform, including
operator time. 15 C.F.R. § 4.11(c)(2)(iii)-(iv).

To begin processing your request, BIS will need to receive payment by August 1, 2012.
Otherwise, your request will be automatically closed. Please forward a check or money order
made payable to the **"Treasury of the United States"** for the amount specified above to
Mark Crace, FOIA Officer, U.S. Department of Commerce, 14th & Constitution Ave., NW, BIS,
HCHB Room 6622, Washington, DC 20230.

Please be advised that you will be charged a search fee in connection with your FOIA request,
even if no responsive documents are located or if responsive documents are determined to be
exempt from disclosure under any applicable FOIA exemptions. 15 C.F.R. § 4.11(c)(3).

If the estimated fee for your FOIA request exceeds the actual total fee by $1 or more, BIS will
refund the difference to you. To receive a refund, BIS must have your company's employer
identification number. Therefore, please include this number with your payment. If the actual
total fee exceeds the estimated fee, BIS will inform you and require full payment before making



any releasable documents available to you.  You will be expected to pay any remaining balance within 30 days of the notice.  If we do not receive payment, the balance owned will be forwarded for collection and interest will be accessed. 15 C.F.R. § 4.11(g).

If you would like to discuss reformulating your requests to reduce its cost or if you have any other questions regarding the processing of your requests, please contact Mark Crace at (202) 482-8093.

Sincerely,

Gay Shrum
Chief Financial Officer and
 Director of Administration

EXHIBIT 11

UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C. 20230

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| Telogy International NV | ) |
| Wayenborstraat 27 | ) |
| Mechelen 2800 | ) |
| Belgium | ) |
| | ) |
| Respondent | ) |

## ORDER RELATING TO TELOGY INTERNATIONAL NV

The Bureau of Industry and Security, U.S. Department of Commerce ("BIS") has notified

Telogy International NV ("TI"), of its intention to initiate an administrative proceeding against

TI pursuant to Section 766.3 of the Export Administration Regulations (the "Regulations"),[1] and

Section 13(c) of the Export Administration Act of 1979, as amended (the "Act"),[2] through

issuance of a proposed charging letter to TI that alleged that it committed 23 violations of the

Regulations. Specifically, these charges are:

---

[1] The Regulations are currently codified in the Code of Federal Regulations at 15 C.F.R. Parts 730-774 (2009). The charged violations occurred between 2003 and 2007. The Regulations governing the violations at issue are found in the 2003 through 2007 versions of the Code of Federal Regulations (15 C.F.R. Parts 730-774 (2003-2007)). The 2009 Regulations set forth the procedures that apply to this matter.

[2] 50 U.S.C. app. §§ 2401-2420 (2000). Since August 21, 2001 the Act has been in lapse. However, the President, though Executive Order 13222 of August 17, 2001 (3 C.F.R., 2001 Comp. 783 (2002)), which has been extended by successive Presidential Notices, the most recent being that of August 13, 2009 (74 Fed. Reg. 41,325 (Aug. 14, 2009)), has continued the Regulations in effect under International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq).

SECOND, that, pursuant to the Debt Collection Act of 1982, as amended (31 U.S.C. §§ 3701-3720E (2000)), the civil penalty owed under this Order accrues interest as more fully described in the attached Notice, and if payment is not made by the due date specified herein, TI will be assessed, in addition to the full amount of the civil penalty and interest, a penalty charge and an administrative charge, as more fully described in the attached Notice.

THIRD, that the timely payment of the civil penalty set forth above is hereby made a condition to the granting, restoration, or continuing validity of any export license, license exception, permission, or privilege granted, or to be granted, to TI. Accordingly, if TI should fail to pay the civil penalty in a timely manner, the undersigned may issue an Order denying all of TI's export privileges for a period of one year from the date of this Order.

FOURTH, that the Proposed Charging Letter, the Settlement Agreement, and this Order shall be made available to the public.

This Order, which constitutes the final agency action in this matter, is effective immediately.

David W. Mills
Assistant Secretary of Commerce
for Export Enforcement

Issued this ___18___ day of ___March___, 2010.

UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C. 20230

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| Telogy International NV | ) |
| Wayenborstraat 27 | ) |
| Mechelen 2800 | ) |
| Belgium | ) |
| | ) |
| Respondent | ) |

### SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made by and between Telogy

International NV ("TI") and the Bureau of Industry and Security, U.S. Department of

Commerce ("BIS") (collectively, the "Parties"), pursuant to Section 766.18(a) of the

Export Administration Regulations (the "Regulations"),[1] issued pursuant to the Export

Administration Act of 1979, as amended (the "Act").[2]

WHEREAS, TI filed a voluntary self-disclosure with BIS's Office of Export

Enforcement in accordance with Section 764.5 of the Regulations concerning the

transactions at issue herein;

---

[1] The Regulations are currently codified in the Code of Federal Regulations at 15 C.F.R.
Parts 730-774 (2009). The charged violations occurred between 2003 and 2007. The
Regulations governing the violations at issue are found in the 2003 through 2007 versions
of the Code of Federal Regulations. *See* 15 C.F.R. Parts 730-774 (2003-2007). The 2009
Regulations govern the procedural aspects of this case.

[2] 50 U.S.C. app. §§ 2401-2420 (2000). Since August 21, 2001 the Act has been in lapse.
However, the President, though Executive Order 13222 of August 17, 2001 (3 C.F.R.,
2001 Comp. 783 (2002)), which has been extended by successive Presidential Notices,
the most recent being that of August 13, 2009 (74 Fed. Reg. 41,325 (Aug. 14, 2009)), has
continued the Regulations in effect under International Emergency Economic Powers Act
(50 U.S.C. §§ 1701 *et seq.*).

Settlement Agreement
Telogy International NV
Page 2 of 5

WHEREAS, BIS has notified TI of its intention to initiate an administrative

proceeding against it, pursuant to the Act and the Regulations;

WHEREAS, BIS has issued a Proposed Charging Letter to TI that alleged that TI

committed 23 violations of the Regulations, specifically:

**Charges 1-22**          **15 C.F.R. § 764.2(a) – Unlicensed Reexports of Oscilloscopes to**
                          **Israel**

On 22 occasions between on or about April 29, 2003 and on or about March 23, 2007, TI
engaged in conduct prohibited by the Regulations when it reexported oscilloscopes[3]
controlled for nuclear non-proliferation reasons from Belgium to Israel without the
Department of Commerce license required by Section 742.3 of the Regulations.  By
engaging in this conduct, TI committed 22 violations of Section 764.2(a) of the
Regulations.

**Charge 23**            **15 C.F.R. § 764.2(a) – Unlicensed Reexport of Spectrum**
                         **Analyzer to South Africa**

On or about May 17, 2007, TI engaged in conduct prohibited by the Regulations when it
reexported a spectrum analyzer[4] controlled for national security reasons from Belgium to
South Africa without the Department of Commerce license required by Section 742.4 of
the Regulations.  By engaging in this conduct, TI committed one violation of Section
764.2(a) of the Regulations.

WHEREAS, TI has reviewed the Proposed Charging Letter and is aware of the

allegations made against it and the administrative sanctions which could be imposed

against it if the allegations are found to be true;

WHEREAS, TI fully understands the terms of this Agreement and the Order

("Order") that the Assistant Secretary of Commerce for Export Enforcement will issue if

he approves this Agreement as the final resolution of this matter;

---

[3] The items are subject to the Regulations and classified under Export Control
Classification Number ("ECCN") 3A292.

[4] The item is subject to the Regulations and classified under ECCN 3A002.

Settlement Agreement
Telogy International NV
Page 3 of 5

WHEREAS, TI enters into this Agreement voluntarily and with full knowledge of its rights;

WHEREAS, TI states that no promises or representations have been made to it other than the agreements and considerations herein expressed;

WHEREAS, TI neither admits nor denies the allegations contained in the Proposed Charging Letter;

WHEREAS, TI wishes to settle and dispose of all matters alleged in the Proposed Charging Letter by entering into this Agreement; and

WHEREAS, TI agrees to be bound by the Order, if issued;

NOW THEREFORE, the Parties hereby agree, for purposes of this Settlement Agreement, as follows:

1.    BIS has jurisdiction over TI, under the Regulations, in connection with the matters alleged in the Proposed Charging Letter.

2.    The following sanction shall be imposed against TI in complete settlement of the alleged violations of the Regulations relating to the transactions specifically detailed in the Proposed Charging Letter:

a.    TI shall be assessed a civil penalty in the amount of $437,000. TI shall pay $75,000 to the U.S. Department of Commerce within 30 days of the date of the Order. Payment shall be made in the manner specified in the attached instructions. Payment of the remaining $362,000 shall be suspended for a period of one (1) year from the date of issuance of the Order and thereafter shall be waived, provided that during the period of suspension, TI has committed no

violation of the Act, or any regulation, order, or license issued thereunder and has made full and timely payment of $75,000 as set forth above.

b.      The timely payment of the civil penalty agreed to in paragraph 2.a is hereby made a condition to the granting, restoration, or continuing validity of any export license, permission, or privilege granted, or to be granted, to TI. Failure to make timely payment of the civil penalty set forth above may result in the denial of all of TI's export privileges for a period of one year from the date of imposition of the penalty.

3.      Subject to the approval of this Agreement pursuant to paragraph 8 hereof, TI hereby waives all rights to further procedural steps in this matter (except with respect to any alleged violations of this Agreement or the Order, if issued), including, without limitation, any right to:  (a) an administrative hearing regarding the allegations in any charging letter; (b) request a refund of any civil penalty paid pursuant to this Agreement and the Order, if issued; and (c) seek judicial review or otherwise contest the validity of this Agreement or the Order, if issued.

4.      BIS agrees that, upon issuance of the Order, it will not initiate any further administrative proceeding against TI in connection with any violation of the Act or the Regulations arising out of the transactions specifically detailed in the Proposed Charging Letter.

5.      BIS will make the Proposed Charging Letter, this Agreement, and the Order, if issued, available to the public.

6.      This Agreement is for settlement purposes only.  Therefore, if this Agreement is not accepted and the Order is not issued by the Assistant Secretary of

Settlement Agreement
Telogy International NV
Page 5 of 5

Commerce for Export Enforcement pursuant to Section 766.18(a) of the Regulations, no

Party may use this Agreement in any administrative or judicial proceeding and the Parties

shall not be bound by the terms contained in this Agreement in any subsequent

administrative or judicial proceeding.

7.    No agreement, understanding, representation or interpretation not

contained in this Agreement may be used to vary or otherwise affect the terms of this

Agreement or the Order, if issued; nor shall this Agreement serve to bind, constrain, or

otherwise limit any action by any other agency or department of the U.S. Government

with respect to the facts and circumstances addressed herein.

8.    This Agreement shall become binding on the Parties only if the Assistant

Secretary of Commerce for Export Enforcement approves it by issuing the Order, which

will have the same force and effect as a decision and order issued after a full

administrative hearing on the record.

9.    Each signatory affirms that he has authority to enter into this Settlement

Agreement and to bind it respective party to the terms and conditions set forth herein.


BUREAU OF INDUSTRY AND SECURITY
U.S. DEPARTMENT OF COMMERCE

Jean Sonderman
Acting Director
Office of Export Enforcement

Date: 3 / 15 , 2010


TELOGY INTERNATIONAL NV

Brent Gary Phillips
Director
Telogy International NV

Stephen Dale Jacobson
Director
Telogy International NV

Date: 9 MAR , 2010

## PROPOSED CHARGING LETTER

### REGISTERED MAIL - RETURN RECEIPT REQUESTED

Telogy International NV
Wayenborstraat 27
Mechelen 2800
Belgium

     *Attention: Mr. Brent Gary Phillips, Director*

Dear Mr. Phillips:

The Bureau of Industry and Security, U.S. Department of Commerce ("BIS"), has reason to believe that Telogy International NV, of Belgium ("TI"), committed 23 violations of the Export Administration Regulations (the "Regulations"),[1] which are issued under the authority of the Export Administration Act of 1979, as amended (the "Act").[2] Specifically, BIS charges that TI committed the following violations:

**Charges 1-22**     **15 C.F.R. § 764.2(a) – Unlicensed Reexports of Oscilloscopes to Israel**

As further described in the attached Schedule of Violations, which is incorporated herein by reference, on 22 occasions between on or about April 29, 2003 and on or about March 23, 2007, TI engaged in conduct prohibited by the Regulations when it reexported oscilloscopes[3] controlled for nuclear non-proliferation reasons from Belgium to Israel without the Department of Commerce license required by Section 742.3 of the Regulations. By engaging in this conduct, TI committed 22 violations of Section 764.2(a) of the Regulations.

---

[1] The Regulations are currently codified in the Code of Federal Regulations at 15 C.F.R. Parts 730-774 (2009). The violations charged occurred between 2003 and 2007. The Regulations governing the violation at issue are found in the 2003 through 2007 versions of the Code of Federal Regulations. *See* 15 C.F.R. Parts 730-774 (2003-2007). The 2009 Regulations govern the procedural aspects of this case.

[2] 50 U.S.C. app. §§ 2401- 2420 (2000). Since August 21, 2001 the Act has been in lapse. However, the President, though Executive Order 13222 of August 17, 2001 (3 C.F.R., 2001 Comp. 783 (2002)), which has been extended by successive Presidential Notices, the most recent being that of August 13, 2009 (74 Fed. Reg. 41,325 (Aug. 14, 2009)), has continued the Regulations in effect under International Emergency Economic Powers Act (50 U.S.C. §§ 1701-1707).

[3] The items are subject to the Regulations and classified under Export Control Classification Number ("ECCN") 3A292.

Telogy International NV
Proposed Charging Letter
Page 2

**Charge 23**        **15 C.F.R. § 764.2(a) – Unlicensed Reexport of Spectrum Analyzer to South Africa**

As further described in the attached Schedule of Violations, which is incorporated herein by reference, on one occasion on or about May 17, 2007, TI engaged in conduct prohibited by the Regulations when it reexported a spectrum analyzer[4] controlled for national security reasons from Belgium to South Africa without the Department of Commerce license required by Section 742.4 of the Regulations. By engaging in this conduct, TI committed one violation of Section 764.2(a) of the Regulations.

\* \* \* \* \*

Accordingly, TI is hereby notified that an administrative proceeding is instituted against TI pursuant to Section 13(c) of the Act and Part 766 of the Regulations for the purpose of obtaining an order imposing administrative sanctions, including any or all of the following:

- The maximum civil penalty allowed by law of up to the greater of $250,000 per violation, or twice the value of the transaction that is the basis of the violation;[5]

- Denial of export privileges; and/or

- Exclusion from practice before BIS.

If TI fails to answer the charges contained in this letter within 30 days after being served with notice of issuance of this letter, that failure will be treated as a default. *See* 15 C.F.R. §§ 766.6 and 766.7 (2009). If TI defaults, the Administrative Law Judge may find the charges alleged in this letter to be true without a hearing or further notice to TI. The Under Secretary of Commerce for Industry and Security may then impose up to the maximum penalty based on the charge in this letter.

TI is further notified that it is entitled to an agency hearing on the record if he files a written demand for one with its answer. *See* 15 C.F.R. § 766.6 (2009). TI is also entitled to be represented by counsel or other authorized representative who has power of attorney to represent it. 15 C.F.R. §§ 766.3(a) and 766.4 (2009).

TI is additionally notified that under the Small Business Regulatory Enforcement Flexibility Act, it may be eligible for assistance from the Office of the National

---

[4] The item is subject to the Regulations and classified under Export Control Classification Number ("ECCN") 3A002.

[5] *See* International Emergency Economic Powers Enhancement Act of 2007, Pub. L. No. 110-96, 121 Stat. 1011 (2007).

Telogy International NV
Proposed Charging Letter
Page 3

Ombudsman of the Small Business Administration in this matter. To determine
eligibility and get more information, please see: http://www.sba.gov/ombudsman/.

The Regulations provide for settlement without a hearing. *See* 15 C.F.R. § 766.18 (2009).
Should TI have a proposal to settle this case, TI or its representative should transmit it
through the attorney representing BIS, who is named below.

The U.S. Coast Guard is providing administrative law judge services in connection with
the matters set forth in this letter. Accordingly, TI's answer must be filed in accordance
with the instructions in Section 766.5(a) of the Regulations with:

    U.S. Coast Guard ALJ Docketing Center
    40 S. Gay Street
    Baltimore, Maryland  21202-4022

In addition, a copy of TI's answer must be served on BIS at the following address:

    Chief Counsel for Industry and Security
    Attention:  Charles Wall, Esq.
    Room H-3839
    United States Department of Commerce
    14th Street and Constitution Avenue, N.W.
    Washington, D.C.  20230

Charles Wall is the attorney representing BIS in this case; any communications that TI
may wish to have concerning this matter should occur through him. Mr. Wall may be
contacted by telephone at (202) 482-5301.

Sincerely,


John Sonderman
Acting Director
Office of Export Enforcement

Telogy International Schedule of Violations

| Charge | Date of Re-Export | End User | Commodity | | S/N | ECCN | Value |
|---|---|---|---|---|---|---|---|
| 1 | 4/29/03 | Israel | Tektronix | TDS 7104 | B020764 | 3A292 | $20,900 |
| 2 | 8/12/03 | Israel | Tektronix | TDS 7404 | B010486 | 3A292 | $60,500 |
| 3 | 11/4/03 | Israel | Tektronix | TDS 540B | B010471 | 3A292 | $3,027 |
| 4 | 12/16/03 | Israel | Tektronix | TDS 7104 | B020520 | 3A292 | $16,380 |
| 5 | 12/23/03 | Israel | Tektronix | TDS 380 | B015709 | 3A292 | $1,705 |
| 6 | 1/16/04 | Israel | Tektronix | TDS 520D | B032158 B040328 | 3A292 | $7,400 |
| 7 | 9/2/04 | Israel | Tektronix | TDS 784D | B010246 | 3A292 | $10,410 |
| 8 | 1/13/05 | Israel | Tektronix | TDS 5054B | B010378 | 3A292 | $12,500 |
| 9 | 1/31/05 | Israel | Tektronix | TDS 794D | B031869 | 3A292 | $13,882 |
| 10 | 2/11/05 | Israel | Tektronix | TDS 3054 | B014295 | 3A292 | $5,482 |
| 11 | 3/1/05 | Israel | Tektronix | TDS 784C | B010780 | 3A292 | $9,400 |
| 12 | 4/8/05 | Israel | Tektronix | TDS 520D | B010098 | 3A292 | $5,058 |
| 13 | 4/20/05 | Israel | Agilent | 54835A | US40020129 | 3A292 | $6,995 |
| 14 | 4/20/05 | Israel | Tektronix | TDS 744A | B020980 | 3A292 | $3,675 |
| 15 | 5/24/05 | Israel | Tektronix | TDS 784C | B010663 | 3A292 | $7,710 |
| 16 | 11/3/05 | Israel | Agilent | 54846B | MY41000207 | 3A292 | $11,000 |
| 17 | 2/8/06 | Israel | Tektronix | TDS 5054 | B021184 | 3A292 | € 6,000 |
| 18 | 4/21/06 | Israel | Tektronix | TDS 7254B | B010053 | 3A292 | $15,315 |
| 19 | 9/22/06 | Israel | Tektronix | TDS 794D | B010273 | 3A292 | $9,800 |
| 20 | 10/24/06 | Israel | Lecroy | LC534AL | 2510 | 3A292 | $4,000 |
| 21 | 12/22/06 | Israel | Agilent | 54846A | MY40000187 | 3A292 | $10,500 |
| 22 | 3/23/07 | Israel | Tektronix | TDS 540C | B010673 | 3A292 | $2,155 |
| 23 | 5/14/07 | South Africa | Agilent | 8565E | 3650A00572 | 3A002.c | $26,500 |

EXHIBIT 12

EXHIBIT 13



IRmep
Calvert Station
P.O. Box 32041
Washington, DC 20007

http://www.irmep.org
info@irmep.org
Phone: 202-342-7325
Fax: 202-318-8009

Institute for Research: Middle Eastern Policy

10/26/2011

Alexander Morris - MA-90
US Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585

**RE: Mandatory Declassification Review:  Confidential 1978 DOE Security Office Report - NUMEC**

Dear David M. Hardy,

This is a request for a mandatory declassification review (MDR) under the terms of Section 3.5 of Executive Order 13526 of the above referenced report.  According to the office diary of former Atomic Energy Commission (AEC) chairman Glenn T. Seaborg, on June 21, 1978 he met for an hour with Bill Knauf and Jim Anderson of the DOE Division of Inspection.  They were investigating the diversion of U-235 from the NUMEC plant in PA to Israel.  During the interview, they told Seaborg that "some enriched uranium which can be identified as coming from Portsmouth, Ohio has been picked up in Israel." (Attachment A[1])

On July 12, 1978 Thomas Chang made an appointment with Seaborg to review Bill Knauf's confidential report, sending a courier with the report, and then returning it to DOE. (Attachment B[2]).  Seaborg made penciled suggestions to the report, which was returned by courier (Ernie Hodges) to DOE before July 21, 1978. (Attachment C[3]).  We would like the declassification and release of the final DOE report (along with any available review drafts with original markings by reviewers such as Seaborg).

In order to help to determine my status to assess fees, you should know that I am affiliated with an educational, noncommercial research institution, and this request is made for a scholarly purpose. However we do not request waiver of all fees even though disclosure of the requested information to IRmep is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in my commercial interest.  We will pay up to $25 to defray duplication/CD burning costs. **Although we do not formally request expedited processing, we do hope to be processed as a high priority.**

Thank you for your consideration of this request.

Sincerely,

Grant F. Smith
Director of Research

Attachments

---

[1] Glenn T. Seaborg Papers, Manuscript Division, Library of Congress, Box 556, Folder "Nuclear Materials and Equipment Corporation," Office Diary Entry 6/21/1978
[2] Glenn T. Seaborg Papers, Manuscript Division, Library of Congress, Box 556, Folder "Nuclear Materials and Equipment Corporation," Office Diary Entry 7/12/1978
[3] Glenn T. Seaborg Papers, Manuscript Division, Library of Congress, Box 556, Folder "Nuclear Materials and Equipment Corporation," Office Diary Entry 7/21/1978

June 21, 1978
2:15 p.m.

INTERVIEW: Bill Knauf
Jim Anderson
Department of Energy
Division of Inspection

I met from 2:15 to 3:15 p.m. with Bill Knauf and Jim Anderson
of the Division of Inspection of the Department of Energy. Their
purpose was to interview me on the allegation that Zalman Shapiro of
the Nuclear Materials and Equipment Corporation of Apollo, Pennsylvania
diverted large amounts of highly enriched Uranium-235 to Israel in the
1960's.

They questioned me about the degree of serveilance of the Atomic
Energy Commission commissioners on the NUMEC and the actions of the
Commission when the loss of material was reported. I described the
manner in which the commission operated and the responsibility of the
staff in this connection.

They focussed a good deal on the dispute which the commissioners
had with John Mitchell in 1970 when he wanted to deny the upgrading
of Shapiro's clearance without granting him due process.

In response to this questioning I said that the commissioners
were motivated by the desire to give Shapiro a proper hearing as well
as by their concern that the scientific and legal community would
disapprove of any denial of due process.

They were interested in how the matter was finally settled. They
told me that they had already discussed this with Ramey and I agreed
with them that Ramey served as the means by which a position was found
for Shapiro with the Westinghouse Corporation hence rendering the
question of clearance upgrading as moot. They told me that as late
as 1971 the CIA wanted to pursue this further but Mitchell declined to
do so.

They asked about any discussions I have had with Helms about this
matter and I described the luncheon meeting I had with him in 1968 or
1969 during which I asked Helms if he had any evidence beyond that which
I had and Helms replied that he did not. They are going to interview
Helms. They are probably going to interview Hardin but not John
Mitchell.

They have interviewed Howard Brown and the BBC has also inter-
viewed Howard Brown, giving him a hard time. They indicated that BBC
may try to interview me. They said that Shapiro has now engaged the
law firm of Arnold and Porter and this law firm may get in touch with
me.

I asked them if any responsible persons feel that Shapiro actually
diverted material to Israel. They replied that nobody with a scientific
background believes this but that it is difficult to convince some members



June 21, 1978

of Congress.  They said that some enriched uranium-235 which is
represented as coming from the Portsmouth, Ohio plant has been picked
up in Israel, which of course, has excited some members of Congress.
However, such enriched material has been sold to us on an official basis
so Israel, and this could be the source of the clandestine sample.

They indicated that they would let me read the draft of
their summary of our conversation today in order that I might make
any necessary corrections.

Glenn T. Seaborg



July 21, 1978

Friday, July 21
5:30 p.m.

DR. SEABORG

Bill Knauf called to ask if you had retained a copy of
the draft report of his and Anderson's interview with
you on June 21st regarding the NUMEC affairs.

I told him that you did not have a copy, that the
material was hand delivered to our office by a DOE
employee - Ernie Hodges - at about 1:30 p.m., that
Mr. Hodges waited in the office while you read the
draft and he then took it back to the DOE-San office.
I told him that you had pencilled in some suggested
changes but that I did not know what they were.

He said he was concerned because they had not received
the parcel back from DOE-SAN.  I suggested he call
Mr. Chang who set up the appointment for you to read
the material.

pat

EXHIBIT 14



# Department of Energy
Washington, DC 20585

March 15, 2012

Mr. Grant F. Smith
IRmep
Institute for Research
Middle Eastern Policy
Calvert Station
P.O. Box 32041
Washington, DC 20007

Subject: Mandatory Declassification Review Request 2012-0001

Dear Mr. Smith:

This is in final response to your request for Mandatory Declassification Review, under
section 3.5 of Executive Order 13526, *Classified National Security Information*. In your
request, dated October 26, 2011, you requested the declassification review and release of
the "Confidential 1978 DOE Security Office Report – NUMEC."

The Office of Classification has completed a file search for the document responsive to
your request, and forwarded a search request to several organizations within the
Department of Energy which may have had the responsive document. The search,
however, did not locate any existing copies of the document. Therefore, I am unable to
provide the requested document.

Pursuant to Title 10, Code of Federal Regulations (C.F.R.), section 1004.7 (b)(2),
I am responsible for the determination that no documents exist in the Office of
Classification.

Pursuant to 10 C.F.R. 2001.33, the adequacy of a search may be appealed in writing
within 60 calendar days of receipt of a letter denying any portion of the request. The
appeal should be made to the Chief Health, Safety and Security Officer, HS–1/Forrestal
Building, Department of Energy, 1000 Independence Avenue, SW, Washington, DC
20585. The written appeal, including the envelope, must clearly indicate that a
Mandatory Review Appeal is being made. The appeal must contain all other elements
required by 10 C.F.R. 1045.53.

2

I appreciate the opportunity to assist you with this matter.  If you have any questions about the request or this correspondence, please contact Mr. Fletcher Whitworth, of my staff, at (301) 903-3865.

Sincerely,

Andrew P. Weston-Dawkes
Director
Office of Classification
Office of Health, Safety and Security

EXHIBIT 15

Approved For Release 2005/03/24 : CIA-RDP81M00980R000200020038-7

16 January 1978

MEMORANDUM FOR:  George Cary, OLC

FROM            :  Herbert E. Hetu
                   Assistant for Public Affairs

SUBJECT         :  Amendments to the Freedom of Information Act

REFERENCE       :  Memo of 30 December 1977, same subject

1.  In addition to the concerns raised by the Director in the referenced memorandum, I believe the Agency's image has suffered unnecessary damage and the public has been mislead because of the FOIA requirement to release bits and pieces of information. Three good examples are:

   a.  MKULTRA and related programs --- It is impossible to convince the public that these programs had their origins in the Fifties and were terminated in the early Seventies.

25X1

   b.  Glomar                                                          25X1

   c.  Israeli firing on the Liberty -- Because of the partial and unevaluated disclosures, the public has reached a conclusion that is contrary to the one arrived at if all the material is taken into account.

2.  The Berlin Tunnel operation, NUMEC and the Kennedy assassination are just three FOIA requests and appeals that have potential for similar damage.                                      25X1

                                     Herbert E. Hetu

Approved For Release 2005/03/24 : CIA-RDP81M00980R000200020038-7