IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT F. SMITH, *PRO SE* | ) |
| IRmep | ) |
| P.O. Box 32041 | ) |
| Washington, D.C. 20007 | ) |
| 202-342-7325 | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA; | ) |
| | ) CIVIL ACTION NO. 1:16-cv-01610 |
| JOHN O. BRENNAN, Director, Central Intelligence | ) |
| Agency, C/O Litigation Division, Office of General | ) |
| Counsel, Central Intelligence Agency, Washington, DC | ) |
| 20505; | ) |
| | ) |
| ASHTON CARTER, Secretary, U.S. Department of | ) |
| Defense, 1000 Defense Pentagon Washington, DC | ) |
| 20301-1000; | ) |
| | ) |
| JOHN KERRY, Secretary, U.S. Department of State, | ) |
| 2201 C Street NW, Washington, DC 20520; | ) |
| | ) |
| JACOB LEW, Secretary, U.S. Department of Treasury; | ) |
| C/O General Counsel, 1500 Pennsylvania Ave NW, | ) |
| Washington, DC 20220; | ) |
| | ) |
| ERNEST MONIZ, Secretary, U.S. Department of | ) |
| Energy, 1000 Independence Avenue SW, Washington, | ) |
| DC 20585; | ) |
| | ) |
| BARACK OBAMA, President, White House, 1600 | ) |
| Pennsylvania Avenue, Washington, DC 20500; | ) |
| | ) |
| PENNY PRITZKER, Secretary, U.S. Department of | ) |
| Commerce, C/O Office of the General Counsel, 1401 | ) |
| Constitution Ave., NW, Washington, DC 20230 | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

- 1 -

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... 3

INTRODUCTION .............................................................................................................. 5

STATEMENT OF THE NATURE OF THE PROCEEDING ....................................................... 7

STATEMENT OF THE ISSUE TO BE RULED UPON BY THE COURT ................................... 8

SUMMARY OF ARGUMENT .............................................................................................. 8

ARGUMENT ................................................................................................................... 10

   I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS ........................................... 10

     A. Defendants Violated the Take Care Clause ................................................... 11

     B. Defendants Violated the APA ....................................................................... 16

  II. PLAINTIFF WILL INCUR IRREPARABLE INJURIES ................................................. 22

     A.    Plaintiff will be irreparably harmed by ongoing subversions of sunshine laws ......... 22

     B. Without A Preliminary Injunction, It Will Be Difficult Or Impossible To Reverse Defendants' Actions .......................................................................................... 23

  II.    THE BALANCE OF EQUITIES TIPS IN PLAINTIFF'S FAVOR ............................. 24

  III.   THE PUBLIC INTEREST NECESSITATES A PRELIMINARY INJUNCTION ...... 25

CONCLUSION ................................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) .................................................. 14

*Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293 (1945) ................................ 12

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ............................................ 18

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ................................................................. 23

*Chamber of Commerce v. DOL*, 174 F.3d 206 (D.C. Cir. 1999) ............................................... 18

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ..................................................... 20

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) .......................................................... 17

*Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994) .................................. 13

*EEOC v. Service Temps Inc.*, 679 F.3d 323, 338 (5th Cir. 2012) .......................................... 8

*Franklin, 505 U.S.* at 803 ............................................................................ 25

*General Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ................................................ 18

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................................ 13

*INS v. Chadha*, 462 U.S. 919 (1983) ..................................................................... 6

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ....................................................... 23

*Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838) ............................................ 12, 16

*Mapp v. Ohio*, 367 U.S. 643 (1961) ..................................................................... 22

*Medellin v. Texas*, 552 U.S. 491 (2008) ................................................................ 12

*Morton v. Ruiz*, 415 U.S. 199 (1974) ............................................................... 17, 20

*Nat'l Ass'n of Farmworkers Organizations v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980) ................... 22

*National Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ...................................... 20

*Nicholas v. INS*, 590 F.2d 802 (9th Cir. 1979 .......................................................... 17

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ...................................................... 25

*Role Models Am., Inc. v. White*, 317 F.3d 327 (D.C. Cir. 2003) ......................................... 22

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) .......................................... 19

*Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ...................................... 25

*Winter v. NRDC*, 555 U.S. 7, 20 (2008) .................................................................. 8

*Youngstown Sheet & Tube Co. v. Sawyer*, U.S. 579, 637 (1952) .................................... 12, 16, 25

**Other Authorities**

Christopher N. May, Presidential Defiance Of Unconstitutional Laws 16 (1998) ....................... 11

David J. Bederman, The Classical Foundations of the American Constitution: Prevailing Wisdom, Cambridge University Press (2011) .................................................................. 13

Douglas Birch and R. Jeffrey Smith, "Israel's Worst-Kept Secret, Is the Silence over Israeli nukes doing more harm than good?" The Atlantic, September 16, 2014 .......................................... 19

English Bill of Rights of 1689, art. 1 ............................................................. 11

H.R.2029 – Consolidated Appropriations Act, 2016 ................................................... 24

H.R.83 - Consolidated and Further Continuing Appropriations Act, 2015 ................................... 24

Jack Rakove, Original Meanings 20 (1996) ................................................................................ 11

James Wilson, Lectures On Law Part 2, In Collected Works Of James Wilson 829, 878 (Kermit L. Hall & Mark David Hall eds., 2007) ...................................................................................... 11

Senate Foreign Relations Committee Investigation into the Activities of Agents of Foreign Principals in the United States, 88th Congress, 1st session, Washington, U.S. Government Printing Office, May 23, 1963 .............................................................................................. 15

The Records Of The Federal Convention Of 1787 (Max Farrand rev. ed., 1966) ....................... 11

## Regulations

*Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability* ................................................................................................................................ passim

*U.S. Department of State Classification Guide 05 D* ................................................................ 21

## Constitutional Provisions

First Amendment ............................................................................................................... 6, 7, 22

U.S. CONST. art. II, § 3, cl. 5 ............................................................................................... passim

## Federal Statutes

22 USC §2799aa-1 ............................................................................................................... passim

5 U.S.C. § 552 ............................................................................................................................... 5

5 U.S.C. § 553 ............................................................................................................................. 16

5 U.S.C. § 706(2)(a) .............................................................................................................. 16, 20

Administrative Procedure Act .......................................................................................... 6, 8, 10

Freedom of Information Act ............................................................................................... passim

## Executive Orders

Executive Order 13526 Classified National Security Information ..................................... 7, 17, 21

## Executive Agreements

Memorandum of Understanding with Israel – FY2009-FY2018 ........................................... 6, 14

Memorandum of Understanding with Israel - FY2019-FY2028 ..................................... 6, 14, 23

# INTRODUCTION

This matter is ripe for a thorough judicial review. On 38 occasions—dating back to 1978 and as recently as 2015— the President of the United States has suspended the Symington & Glenn Amendments to the Foreign Assistance Act of 1961, 22 USC §2799aa-1 (Symington & Glenn) in order to deliver annual taxpayer-funded U.S foreign assistance packages and supplemental aid to Israel. Aid to nuclear states that are not signatories to the Nuclear Non-Proliferation Treaty (NPT) is subject to Symington and Glenn waivers and sanctions. Consequently, high officials attempt to dodge the question of Israel's nuclear weapons program whenever it is publicly raised. In 2009 President Barack Obama asserted he did not wish to "speculate" about whether Israel, the largest historic recipient of U.S. foreign aid, was a nuclear power. In 2012, his administration issued a gag order prohibiting informed official discussions of Israel's nuclear weapons and subverting sunshine law release, particularly the Freedom of Information Act 5 U.S.C. § 552, of such information to the public. This cut off what meager information flow was available before the order.

The President's, and his predecessors'—actions all serve a nefarious purpose. By dodging, avoiding and obfuscating facts long in the public domain and readily available to them from U.S. intelligence agencies and other official government sources, they believe they can ignore Symington & Glenn requirements. Presidents turn the Constitution 180 degrees—by implementing and enabling, and strengthening an executive "law" called "nuclear ambiguity" they thwart other laws in order to "negotiate" 10-year executive aid agreements with Israel, called

"Memorandums of Understanding" heavily lobbied by Israel affinity organizations in the United Staes and then sign into law yearly aid package and supplemental appropriations passed by congress that fund the MOUs. This is not how our system works. The constitutional separation of powers requires Congress to pass laws and the President to faithfully execute all of them; the President can no more pass his own laws (or "execute" nonexistent ones) than Congress can exercise the veto or pardon powers. *Cf. INS v. Chadha*, 462 U.S. 919 (1983).

The President(s) unilateral lawmaking violates the Take Care Clause of the U.S. Constitution and the Administrative Procedure Act ("APA"). The Department of Energy's 2012 codification of "nuclear ambiguity" as a legislative rule demands this Court's emergency intervention because it will be difficult or impossible to undo the President and his agency cohorts' lawlessness after they pay the final installment impending under the last Memorandum of Understanding , and various pending supplemental packages, and begin implementing a new MOU for even more foreign aid under the next president. All the while members of public interest watchdog organizations and reporting community are being denied information, financially penalized, ignored and otherwise thwarted under "nuclear ambiguity" as they try to interpret and report on U.S. policy through sunshine laws including the Freedom of Information Act. Two constitutionally guaranteed First Amendment protections, both right to freedom of speech, and infringing on Freedom of the Press, are violated by the gag order.

The public interest necessitates blocking further foreign aid to Israel and suspension of WPN-136 until the federal courts can decide on whether this President and his predecessors have violated arms export controls they find politically inconvenient and have remade United States Code with new legislative rules disguised as "classification guidelines," through WPN-136.

Given the heavy costs imposed by the Defendants' actions, Plaintiff respectfully requests a

hearing on this motion as soon as practicable, including the right to present *in camera* compelling video evidence such as U.S. State Department Spokesperson John Kirby's September 19, 2016 responses to questions about U.S. aid to Israel and applicability Symington & Glenn,[1] and other documentary evidence of First Amendment right violations by government officials,[2] with an injunction in place so that the issue is not made moot by impending legislation incorporated into omnibus spending bills funding U.S. aid to Israel which are usually immediately signed into law by the President in the middle of the month of December.

It is also noted that the Defendants will leave office on January 20, 2017.

## STATEMENT OF THE NATURE OF THE PROCEEDING

On September 6, 2012, the Department of Energy promulgated WPN-136 *Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability* which criminalizes any official discussion about Israel's nuclear weapons program, vastly expanding and codifying the informal "nuclear ambiguity" policy already in place since the Nixon administration. The Plaintiff as a public interest researcher and news reporter has been and will continue to be irreparably injured by the Defendants' actions. Plaintiff therefore urges this Court to issue a preliminary injunction to block further U.S. foreign aid payments to Israel and suspension of WPN-136 while adjudicating whether the Defendants violated the Plaintiff's First Amendment rights, the Constitution's Take Care Clause, the Administrative Procedure Act, including the Freedom of Information Act, and 2009 Executive Order 13526 Classified National Security

---

[1] U.S. State Department Spokesperson John Kirby Dodges Israel Nuke Questions, September 19, 2016, YouTube , https://www.youtube.com/watch?v=NXvi9QDWyO4
[2] Sam Husseini and Chris Belcher, Stakeout: Israel Nuclear. Sam Husseini asks US government officials why they won't acknowledge the existence of Israel's nuclear arsenal, YouTube, https://www.youtube.com/watch?v=RSuIFDNz5KE&t=143s

Information and consider encompassing remedies such as "claw back" of unlawfully transferred U.S. taxpayer funds to an ineligible recipient.

It is and has long been the President's mandatory duty to either terminate aid or issue a waiver on U.S. aid to any foreign country triggering strict Symington & Glenn criteria. In promulgating "nuclear ambiguity" and newly codifying it in WPN-136, in concert the Defendants failed to faithfully execute the amendments to the Foreign Aid Act of 1961. They unconstitutionally created their own law in order to continue violating Symington & Glenn, violating the APA by acting contrary to a law enacted by Congress.

## STATEMENT OF THE ISSUE TO BE RULED UPON BY THE COURT

The issue raised by the Plaintiff is whether the Defendants' are systemically violating sunshine laws under an illegal gag order that should be preliminarily suspended, in order to undermine the Symington & Glenn Amendments and illegally make foreign aid payments to Israel that should be preliminarily enjoined. "[T]he question of whether to award injunctive relief is generally within the trial court's discretion." *EEOC v. Service Temps Inc*., 679 F.3d 323, 338 (5th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish [I] that he is likely to succeed on the merits, [II] that he is likely to suffer irreparable harm in the absence of preliminary relief, [III] that the balance of equities tips in his favor, and [IV] that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Plaintiff meets that four-part standard.

## SUMMARY OF ARGUMENT

I. Plaintiffs are likely to prevail on the merits. First, the President violated his obligation to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3, cl. 5. The Take Care Clause enshrines the ancient principle that the President cannot dispense with laws he dislikes.

Here, the Defendants have sought to codify a longstanding program of "nuclear ambiguity" by creating a new gag law derived from classification guidelines that advise precisely the opposite action—further disclosure and warranted policy guidance of information already in the public domain. If the Congress had wanted arms export laws, and the U.S. reputation on all matters relating to the NPT to be qualified, they could simply have amended the following seven words into §2799aa–1 "This law does not apply to Israel." However, Congress has not done that. This is therefore an example of impermissible executive lawmaking, as demonstrated by Supreme Court precedent.

Defendants also violated the APA in two respects. The DOE classification bulletin violated the procedural requirements of the APA because it was adopted without notice and comment. It also violated the substantive requirements of the APA because it is contrary to the statutory regime created by Congress.

II. Absent a preliminary injunction, Plaintiff will be irreparably injured. Defendants continue to refuse to properly respond to Plaintiff's sunshine law requests for benign information, particularly under the Freedom of Information Act. If this conduct is allowed to continue, it will be more difficult to obtain a claw back of illegal aid once the Defendants divvy aid up between military contractors in the United States and Israel after a December omnibus bill mandates funding. Seeing legal challenges on the horizon, the Defendants could even act to advance ten years' worth of aid before leaving office in January, 2017. Plaintiff and other public interest reporting entities will be forced to continue to rely on federal agencies operating under an unlawful executive—"nuclear ambiguity"— law that have demonstrably proven their dedication to improperly withholding information.

III. The balance of equities tips in the Plaintiff's favor. The Obama administration has

branded itself as the "rule of law" presidency. Barak Obama once told a group of students in 2011 that "America is a nation of laws, which means I, as the president, am obligated to enforce the law. I don't have a choice about that. That's part of my job."[3] Clearly, when he made this and other statements, the Symington & Glenn amendments were still awaiting enforcement. But rather than enforce this law, the Obama administration one year later took steps to "legislate" the means to continue violating it.

IV. The public interest necessitates a preliminary injunction. The Defendants' invented law only became public when it was partially released under FOIA and threat of legal action this year (in 2016). As the Plaintiff challenges, it is an illegal legislative rule designed solely to enable violations of Symington & Glenn, since delivering the funding subject to that law would be virtually impossible to reverse once WPN-136 and the superstructure of "nuclear ambiguity" is found to be unlawful. The public and Plaintiff deserve a reasoned and unhurried judicial evaluation before this comes to pass. A preliminary injunction would serve the public interest by protecting the statutory policy of the Legislature and public's right to understand the functions of government under sunshine laws.

## ARGUMENT

### I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

Since the time of Nixon, "nuclear ambiguity" has been the de facto law of the land. But the Constitution's Take Care Clause, U.S. CONST. art. II, § 3, cl. 5, forbids such executive lawmaking. And the Presidents unilateralism is procedurally and substantively unlawful under the APA. The Plaintiffs therefore are likely to succeed on the merits.

---

[3] "Remarks by the President at Univision Town Hall," The White House, Office of the Press Secretary, March 28, 2011

### A. Defendants Violated the Take Care Clause

1. The Take Care Clause has its roots in the dispute between King James II and Parliament in the late 17th Century. At the time, English monarchs claimed the power to "suspend" laws of Parliament (abrogating the law completely) or to "dispense" with such laws (nullifying the law in particular cases.). King James's use of these powers infuriated Parliament, and he was overthrown in the Glorious Revolution of 1688. The subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all authority to suspend or dispense with laws. See English Bill of Rights of 1689, art. 1 ("[T]he pretended power of suspending of laws, or the execution of laws, by regal authority, without consent of parliament, is illegal.").

The Glorious Revolution had a profound influence on America's Constitutional Convention. *See* Jack Rakove, Original Meanings 20 (1996). For instance, the Framers unanimously rejected a proposal to grant dispensation powers to the President. See 1 The Records Of The Federal Convention Of 1787, at 103-104 (Max Farrand rev. ed., 1966). And historical evidence suggests that the Take Care Clause was understood by the founding generation to expressly repudiate the President's ability to suspend or dispense with Acts of Congress. See 2 James Wilson, Lectures On Law PART 2, in Collected Works Of James Wilson 829, 878 (Kermit L. Hall & Mark David Hall eds., 2007) (explaining that the President has "authority, not to make, or alter, or dispense with the laws, but to execute and enforce the laws, which [are] established"); Christopher N. May, Presidential Defiance Of Unconstitutional Laws 16 (1998) (explaining that the Take Care Clause "is a succinct and all-inclusive command through which the Founders sought to prevent the executive from resorting to any of the panoply of devices employed by English kings to evade the will of Parliament"). Supreme Court precedent makes clear that the Take Care Clause is judicially enforceable against presidential invocations of the dispensing power. For

example, in *Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838), the Court affirmed mandamus

to a cabinet official ordering him to settle claims with mail contractors as required by an act of

Congress. The cabinet official argued that he could ignore the act because the President had an

exclusive duty to execute the laws, id. at 545-47, 612, but the Court disagreed: "To contend that

the obligation imposed on the President to see the laws faithfully executed, implies a power to

forbid their execution, is a novel construction of the [C]onstitution and entirely inadmissible." Id.

at 613; see also *Medellin v. Texas*, 552 U.S. 491, 525 (2008) (President has "an array" of

discretionary obligations to enforce international law, "but unilaterally converting a

non-self-executing treaty into a self-executing one is not among them"); *Youngstown Sheet &

Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes

measures incompatible with the expressed or implied will of Congress, his power is at its lowest

ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers

of Congress over the matter."); *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293,

296 (1945) ("[E]xplicit statutory requirements . . . must be observed and are beyond the dispensing

power of Treasury officials.").

The limits on presidential discretion were important to key framers of the Constitution. In

the 1806 Neutrality Act case of United States v. Smith, the defendants plead that their actions had

been authorized by President Jefferson, and therefore that prosecution could not proceed. Justice

William Paterson, an important delegate to the Philadelphia Convention, unequivocally rejected

this argument, holding that "the president of the United States cannot control the statute, nor

dispense with its execution, and still less can he authorize a person to do what the law forbids. If he

could, it would render the execution of the laws dependent on his will and pleasure; which is a

doctrine that has not been set up, and will not meet with an y supporters in our government. In

particular, the law is paramount. Who has dominion over it? None but the legislature; and even they are not without their limitation in our republic." *See* David J. Bederman, The Classical Foundations of the American Constitution: Prevailing Wisdom, 203, Cambridge University Press (2011).

2. The Defendants have unlawfully exercised the dispensing power in violation of the Take Care Clause. The executive does not have a blank check to dispense with the law. The seminal Supreme Court decision addressing presidential discretion, *Heckler v. Chaney*, 470 U.S. 821 (1985), upheld one particular exercise of executive power. But in so doing, Chaney makes clear that there are real and judicially enforceable limits on the President's ability to invoke discretion as a basis for non-enforcement. In particular, the President cannot unilaterally, "consciously[,] and expressly adopt[ ] a general policy" of non-enforcement that applies across-the-board. Id. at 833 n.4.

While the Department of Energy attempted to put beyond public scrutiny federal agency records that further underscore how blatantly the President and his officers violated the Take Care Clause, the enactment of gag orders such as WPN-136 is unsupported by case law.

a. First, the Defendants violated the Take Care Clause by unilaterally creating a massive federal information control program designed solely to compartmentalize and prevent case-by-case Symington & Glenn reviews and public scrutiny. It is well-settled that a federal agency can make a "single-shot non-enforcement decision . . . in the context of an individual case." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994). But it is equally well-settled that the President cannot adopt a "general policy" of non-enforcement. Chaney, 470 U.S. at 833 n.4.

In promulgating WPN-136 the Defendants sought to completely staunch public knowledge

of Israeli violations that make foreign aid subject to Symington & Glenn. These violations have

been going on so long and under such intense U.S. public interest watchdog and international

scrutiny that simply ignoring the waiver or cutoff provisions by claiming the conditions that

trigger them are "unknowable" or "classified" was presumably no longer considered by the

Defendants to be viable. So, the Defendants instead sought to cut off the flow of information to the

public that reveals how deep and ongoing Israel's activities subject to Symington & Glenn are, in

order to continue systemic subversion of enforcement.

And the President and Defendants' have sought to guarantee continued violations for ten

more years under a new Memorandum of Understanding with Israel executed at the U.S.

Department of State on September 14, 2016 promising $3.8 billion per year. The president this

summer claimed in an address to American University U.S. foreign aid to Israel was already

"unprecedented." The new MOU replaces the George W. Bush administration's Memorandum of

Understanding with Israel that expires at the end of FY2018. The new MOU is even more

generous and signals a determination to continue Symington & Glenn violations.

B. Second, the Defendants cannot hide behind enforcement discretion when they openly

tolerate violations of federal law and reward those violations with legal benefits. See, e.g., *Adams

v. Richardson*, 480 F.2d 1159, 1164 (D.C. Cir. 1973) (en banc) (federal agency cannot use

enforcement discretion to openly tolerate violations of federal law and reward them with federal

funds). Almost every year, despite the gag order and "nuclear ambiguity" word of new instances of

Israeli nuclear material or technology smuggling from the U.S. and deployed arsenal leak into the

public domain. The most recent is former U.S. Secretary of State Colin Powell's affirmation that

Israel had 200 nuclear weapons pointed at Tehran. In other cases, at intense cost to Plaintiffs and

under court order, Defendants have been compelled to admit that they know Israel has nuclear

weapons (see 1ˢᵗ Amended Complaint, Exhibit 18). By ignoring the violations, and flouting Symington & Glenn, the Defendants reward violations with vast flows of foreign aid, much of it in the form of weapons platforms like jet fighters that are nuclear-delivery capable. But they have also in the past delivered at taxpayer expense vast amounts of cheap commodities, such as jet aviation fuel, needed to fly the nuclear-capable aircraft. Defendants have therefore directly thwarted the legislative intent of Symington & Glenn and rewarded the very behavior Congress sought to inhibit. As Senator Stuart Symington noted, "In effect, this amendment says to other nations, if you wish to take the dangerous and costly steps necessary to achieve a nuclear weapons option, you cannot expect the United States to help underwrite that effort indirectly or directly."[4] Yet U.S. taxpayers are now underwriting the vast quantities of conventional weapons Israel needs to offset its own ongoing expenditures on nuclear weapons development.

The Defendants cannot claim their actions are legal simply because U.S. foreign aid to Israel has been ongoing since 1948 and popular with many members of Congress, particularly a large number that benefit greatly from campaign contributions and other forms of support from Israel's massive U.S. lobbying and public relations network. It should be noted that much of the seed funding to build this U.S. Israel lobby came from foreign sources. See Senate Foreign Relations Committee Investigation into the Activities of Agents of Foreign Principals in the United States, 88th Congress, 1st session, Washington, U.S. Government Printing Office, May 23, 1963

Though subject to many of the same lobby pressures before, during and after leaving

---

[4] "6/30/976 HR13680 International Security Assistance and Arms Export Control Act of 1976 (3)," National Archives and Records Administration, Collection GRF-0055: White House Records Office: Legislation Case Files, 8/9/1974 - 1/20/1977, page 52 https://catalog.archives.gov/id/12008722

office, it is the President's responsibility to strictly enforce all arms export and open government laws passed by Congress. He cannot play favorites. As the Supreme Court has held Article II does not "vest[ ] in the President a dispensing power, which has no countenance for its support in any part of the constitution; and . . . would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." Kendall, 37 U.S. (12 Pet.) at 613; see also Youngstown, 343 U.S. at 587 ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

Plaintiffs therefore are likely to succeed on the merits of their claim under the Take Care Clause.

## B. Defendants Violated the APA

Shortly after the President was publicly challenged to name a country in the Middle East that had nuclear weapons by the late White House reporter Helen Thomas, Defendants U.S. Department of Energy in consultation with the U.S. State Department began secretly crafting a directive to remove any future potential pressure on aid to Israel generated by reporter, FOIA and other sunshine law requests for information on transactions triggering Symington & Glenn. If the DOE Directive is a "legislative rule" under the APA, then it must comply with specific procedural and substantive requirements. Procedurally, an agency in general cannot promulgate a rule without notice-and-comment rulemaking — which requires the agency to publish a notice of proposed rulemaking in the Federal Register and to accept and consider public comments on its proposal. See 5 U.S.C. § 553. Substantively, an agency cannot promulgate a rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" — that is, the agency's rule cannot conflict with what Congress has said. Id. § 706(2)(A).

The Plaintiff has two APA claims. First, the DOE gag order is a "legislative rule" to which the APA's notice-and-comment requirements apply; accordingly, even Defendants must concede it is unlawful because they failed to follow the APA's notice-and-comment procedures. Second and independently, the Directive is also unlawful substantively because it conflicts with a higher classification authority, *Executive Order 13526 Classified National Security Information*, that expressly forbids using classification and official secrecy to cover-up wrongdoing, in this case the violations of Symington & Glenn. If all information about Israel's nuclear weapons programs is gagged, there can be no enforcement of Symington & Glenn or legitimate use of government sunshine laws by outsiders to monitor compliance. The gag order also conflicts with the very U.S. Department of State classification authority from which it is derived.

1. The gag order is a "legislative" rule, and as such, it must comply with the APA's procedural and substantive requirements. See *Nicholas v. INS*, 590 F.2d 802, 807-08 (9th Cir. 1979. That is so for four independent reasons.

First, the gag order "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-03 (1979); *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). In Ruiz, for example, the Supreme Court held that the Bureau of Indian Affairs could not create "eligibility requirements" for allocating funds to Native Americans without complying with the APA. Id. at 230. The Court reasoned that, if the BIA wanted to deny funds to Native Americans living outside of reservations, its efforts would affect the individual rights of Native Americans — and hence must be done in accordance with the APA:

> ***It is essential that the legitimate expectation of these needy Indians not be extinguished by what amounts to an unpublished ad hoc determination of the agency that was not promulgated in accordance with . . . the***

> *Administrative Procedure Act. . . . Before benefits may be denied to these*
> *otherwise entitled Indians, the BIA must first promulgate eligibility*
> *requirements according to established procedures.*

*Id*. at 236. Like the BIA, the Department of Energy created and the other Defendants enforce eligibility "criteria," in this case by making sure benefits for which Israel is ineligible are not challenged by efficient federal government circulation of Symington & Glenn triggers and outside public knowledge of the triggers. The gag order criteria have a profound effect: more than simply affecting access to money, the gag order undermines the entire Nuclear Non-Proliferation Treaty the U.S. has publicly championed. It funds a clandestine nuclear power in violation of Symington & Glenn. If funding eligibility triggers the APA, it follows *a fortiori* that eligibility as determined by government records handling does as well.

Second, the gag order is a legislative rule because it is binding on all federal officials and contractors. A rule is substantive (and hence must comply with the APA) "if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted). And the gag order meets both of those criteria. "[F]rom beginning to end [it] reads like a ukase. It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

Third, the gag order is a legislative rule because it "puts a stamp of agency approval or disapproval on a given type of behavior." *Chamber of Commerce v. DOL*, 174 F.3d 206, 212 (D.C. Cir. 1999) (internal quotation marks and alteration omitted). In Chamber of Commerce, the Court of Appeals held that the Labor Department promulgated a substantive rule when it told employers that they could avoid 70-90% of workplace inspections if they participated in a new "Cooperative Compliance Program." Id. at 208. So too here; the Defendants have told every federal employee,

contractor and public watchdog that they can only remain gainfully employed, steer clear of criminal prosecution if they avoid public discussion of Israel's nuclear weapons and subvert sunshine law (including FOIA) requests for such material. This has generated dismay and confusion inside the government where knowledge of both improperly classified and open-source information about Israel's program is widespread. *See* Douglas Birch and R. Jeffrey Smith, "Israel's Worst-Kept Secret, Is the Silence over Israeli nukes doing more harm than good?" The Atlantic, September 16, 2014

> *[James] Doyle's [a national laboratory employee fired over the gag order] reference to the existence of Israel's nuclear arsenal reflects the consensus intelligence judgment within DOE nuclear weapons-related laboratories, former officials say. But some said they find it so hard to avoid any public reference to the weapons that classification officers periodically hold special briefings about skirting the issue. "It was one of those things that was not obvious," a former laboratory official said, asking not to be identified due to the sensitivity of the topic. "Especially when there's so much about it in the open domain.".[5]*

Finally, the gag order is a legislative rule because it cannot possibly be construed as an interpretive rule. "Generally speaking, it seems to be established that 'regulations,' 'substantive rules,' or 'legislative rules' are those which create law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (internal quotation marks omitted). There is no conceivable argument that the gag order rests on an interpretation of anything. It orders

---

[5] http://www.theatlantic.com/international/archive/2014/09/israel-nuclear-weapons-secret-united-states/380237/

compliance with a set of rules that are diametrically opposed to the classification authority from which it is allegedly derived. It is so contrary to the free exchange of information upon which government employee and contractors depend to perform their duties to the public that they must even be specially trained on "skirting the issue."

Because the gag order is a legislative rule, it must comply with the APA's procedural requirements. E.g., *Morton v. Ruiz*, 415 U.S. at 230. But the gag law is procedurally unlawful because DOE promulgated it without notice-and-comment rulemaking — a prerequisite for rules that create substantive rights and duties. See, e.g., *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014).

Even if the Defendants did comply with the APA's notice-and-comment requirements, they still could not lawfully promulgate and enforce the gag order. That is because the Defendants' actions are not "in accordance with" the laws enacted by Congress. 5 U.S.C. § 706(2)(a). Contrary to Symington & Glenn requirements, the Defendants have now mandated that government officials not communicate information which would trigger enforcement of these amendments to the 1961 Foreign Aid Act. Put another way, the Defendants have disabled the possibility of enforcement of *22 USC §2799aa-1: Nuclear reprocessing transfers, illegal exports for nuclear explosive devices, transfers of nuclear explosive devices, and nuclear detonations* for four decades and have since 2012 moved to codify and enable even more massive ongoing future violations.

In Symington & Glenn the Congress enacted a specific statutory scheme limiting and conditioning the provision of U.S. foreign aid to foreign Non-NPT countries with clandestine nuclear programs. The APA prohibits agencies from turning around and enabling the very thing that Congress foreclosed. See, e.g., *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress.").

That the gag order, Classification Bulletin WNP-136, is a violation of administrative procedure designed to perpetuate the undermining of *Symington & Glenn* is made even more obvious consulting the authority from which the gag law it is derived. *U.S. Department of State Classification Guide 05 D* recommends that "Reporting on and analysis of the internal affairs or foreign relations of a country is a central function of U.S. foreign service posts and is vital to the formulation and execution of U.S. foreign policy. This reporting should be unclassified when the subject matter is routine, already in the public domain, or otherwise not sensitive."[6] Israel's nuclear weapons program is not a secret that can be made so by a gag order, nor can a gag order lawfully subvert the consequences of that program.

The 2012 Department of Energy gag order also contradicts and violates a prior, higher authority on classification, the December 29, 2009 White House *Executive Order 13526 Classified National Security Information*. The gag order implementation seeks to "train" and hold to account federal employees and contractors about how to withhold and "skirt" the circulation of information about Israel's nuclear weapons so that the Defendants can unlawfully work in concert to deliver aid to Israel. *Executive Order 13526* expressly forbids such use of classification to "conceal violations of law." The sole purpose of the gag order is to conceal violations of law that enable smooth and uninterrupted aid delivery.

In short, the Defendants' actions are unlawful under both the U.S. Constitution and the APA. And under either claim, the appropriate remedy is a preliminary injunction against the gag order and all activities derived from its promulgation, from the withholding of government

---

[6] Department of State Classification Guide (DSCG 05-01) January 2005, Edition1, pp 13-14
https://www.fas.org/sgp/othergov/dos-class.pdf

information to the dispensing of foreign aid to Israel. See, e.g., Youngstown, 343 U.S. at 584

(appropriate remedy for Take Care violation is preliminary injunction); *Nat'l Ass'n of*

*Farmworkers Organizations v. Marshall*, 628 F.2d 604, 606 (D.C. Cir. 1980) (appropriate remedy

for procedural APA claim is preliminary injunction); *Role Models Am., Inc. v. White*, 317 F.3d

327, 328-29 (D.C. Cir. 2003) (appropriate remedy for substantive and procedural APA claim is

preliminary injunction).

## II. PLAINTIFF WILL INCUR IRREPARABLE INJURIES

In the absence of this Court's emergency intervention, the Plaintiff, other public interest

groups and the public will suffer irreparable injuries, including First Amendment protections.

### A.  Plaintiff will be irreparably harmed by ongoing subversions of sunshine laws

The Plaintiff will be unlawfully prohibited from performing public interest research and

reporting as Defendants continue to violate his First Amendment rights. The public will, deprived

of information sufficient to provide any real consent as fully informed voters will, once again, be

forced to pay for foreign aid that a law enacted by Congress expressly forbids. More gravely,

growing public perceptions that some government acts and actors are above the law imperils the

government. The resultant danger is recognized. "Nothing can destroy a government more quickly

than its failure to observe its own laws, or worse, its disregard of the charter of its own existence."

See *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)

These injuries are more than sufficient to establish the Plaintiff's standing and to warrant a

preliminary injunction.

As has been seen recently in this very court, some of the Defendants are determined to

dispense with proper abidance by sunshine laws (including FOIA) when information

pertaining to Israel's nuclear weapons program are involved, effectively neutering Symington & Glenn.

If the gag order and principles embedded within it are allowed to continue guiding the Defendant's activities, the Plaintiff's core public information research and dissemination project will end. This is already happening. With the exception of information released under costly FOIA litigation, since 2012 the plaintiff has received no substantive U.S. government information about Israel's nuclear weapons program and U.S. policy to disseminate to his nonprofit public interest group readership or inform the American public. The Plaintiff's income from his support base has declined 80 percent because of this, while expenses for litigation, unpaid damage awards and sunshine law administrative costs have spiraled. The public should be informed about U.S. policy toward Israel's nuclear weapons and withheld government information about it lawfully can and should be released to the Plaintiff. But it is not because of an illegal gag order. That is the paradigmatic irreparable injury, see, e.g., *Janvey v. Alguire*, 647 F.3d 585, 600-01 (5th Cir. 2011), it is more than sufficient to necessitate a preliminary injunction now that the Defendants have signaled their intention to implement another, much larger MOU. As the Supreme Court has held, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) (internal quotation marks omitted).

**B. Without A Preliminary Injunction, It Will Be Difficult Or Impossible To Reverse Defendants' Actions**

Injuries to the Plaintiff, other watchdog groups and public do not stop there. The Defendant has contrived a monopoly on all information relevant to triggering Symington & Glenn. When the Defendants once again fail to abide by it and hand out $3-$4 billion in annual aid plus

supplemental aid in December, 2016, it will be difficult or impossible for taxpayer advocates or public interest watchdogs to unscramble the egg. For example, a bill for MOU aid transfer to Israel was signed into law by President Obama on December 18, 2015 as part of omnibus appropriations legislation. *See H.R.2029* – Consolidated Appropriations Act, 2016. Israel aid was similarly transferred, with no Symington & Glenn enforcement, on December 16, 2014. *See H.R.83* - Consolidated and Further Continuing Appropriations Act, 2015. It is therefore logical to expect the President to sign, and Defendants to execute, Israel aid with no Symington & Glenn enforcement, in a mid-December, 2016 omnibus appropriation. Once it has been disbursed from the U.S. Treasury to various defense contractors and entities in Israel, it is difficult to conceive how it might be returned to legitimate purposes. Both Plaintiff and public are forced to rely on the federal government to faithfully uphold Symington & Glenn and will be harmed if the Defendants are allowed to flout that responsibility once again and over the next year and decade.

## II. THE BALANCE OF EQUITIES TIPS IN PLAINTIFF'S FAVOR

This court in response to earlier Plaintiff actions has begun forcing the Defendants to come clean in releasing sensitive information about its activities and knowledge of Israel's nuclear weapons program, though it has not yet acted on the broader implications of those activities and harm both to Plaintiff and the American public. State Department officials, and by extension the United States, are now subject to routine public ridicule in news and social media and during press conferences for attempting to dodge questions about aid and Israel's nuclear weapons. Their persistence in doing so reveals a great deal about the stakes involved. U.S. public opinion is overwhelming in believing that illegal aid promised in Israel MOUs should instead be spent on lawful and productive purposes. No principle of equity countenances such unilateral

- 24 -

capriciousness.

### III.    THE PUBLIC INTEREST NECESSITATES A PRELIMINARY INJUNCTION

Finally, the public interest necessitates a preliminary injunction. First, the Defendants' disbursement will be virtually impossible to reverse once it goes into effect. Second, Defendants seek to reshape the separation of powers in this country, potentially allowing wholesale presidential revisions of the United States Code. The public deserves a reasoned and unhurried judicial evaluation before this vision becomes a reality. Third, a preliminary injunction would serve the public interest by protecting the statutory policy of the Legislature. As the Supreme Court has held, that "is in itself a declaration of the public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937).

There are many productive forms such an injunction may take. The Supreme Court has held that courts may enjoin the President's subordinates from carrying out an unconstitutional act instead of the President if doing so would be likely to redress the plaintiff's harm. *Franklin, 505 U.S.* at 803, 112 S.Ct. 2767 (plurality); id. at 801, 112 S.Ct. 2767 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). In this case, an order banning further disbursements of taxpayer funds from the U.S. Treasury or covert aid from the Central Intelligence Agency "black budgets" could suffice while core issues are litigated.

## CONCLUSION

Plaintiff's motion for a preliminary injunction should be granted.

Respectfully submitted,

_____

Grant F. Smith, *PRO SE*
IRmep
P.O. Box 32041
Washington, D.C. 20007

For process service:

Grant F. Smith c/o IRmep
1100 H St. NW Suite 840
Washington, D.C. 20005

(202) 342-7325

Dated:   November 28, 2016