IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| GRANT F. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-01610-TSC |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 2

I.      STATUTORY BACKGROUND.......................................................................... 2

II.     FOREIGN ASSISTANCE TO ISRAEL............................................................. 7

III.    PLAINTIFF'S AMENDED COMPLAINT......................................................... 7

STANDARD OF REVIEW ............................................................................................ 10

ARGUMENT .................................................................................................................. 11

I.      THE COURT SHOULD DISMISS PLAINTIFF'S FIRST CLAIM ............................. 11

        A.      Plaintiff Lacks Standing To Challenge The Government's Compliance
                with 22 U.S.C. § 2799aa-1...................................................................... 11

        B.      The Amended Complaint Fails To State A Claim That Government
                Officials Violated 22 U.S.C. § 2799aa-1 .............................................. 16

                1.      Plaintiff Has No Cause Of Action Against The President........................ 16

                        a.      Administrative Procedure Act........................................ 16

                        b.      22 U.S.C. § 2799aa-1 .................................................... 17

                        c.      Mandamus Act ............................................................... 19

                        d.      Take Care Clause of the U.S. Constitution.................... 20

                2.      The Amended Complaint Fails To State A Claim Against The
                        Secretaries Of Defense And The Treasury ................................ 21

        C.      The Political Question Doctrine Bars Plaintiff's First Claim ............... 22

        D.      The Court Should Decline To Provide Discretionary Relief................. 25

II.     THE COURT SHOULD DISMISS PLAINTIFF'S SECOND CLAIM ........................... 26

        A.      Executive Order 13526 Does Not Create A Private Right of Action ................. 27

        B.      Plaintiff's Second Claim Is Not Actionable Under The APA .............. 28

                1.      Plaintiff Does Not Challenge Discrete Agency Action And Thus
                        His Claim Is Not Reviewable Under The APA ......................... 28

        2.       Plaintiff Has An Adequate Remedy That Precludes APA Review........... 30

C.      Plaintiff's Challenge to Classification Bulletin WNP-136 Should Be
Dismissed For Additional Reasons ...................................................................... 33

        1.       Plaintiff Lacks Standing To Challenge The Classification Bulletin ......... 34

        2.       Plaintiff's Challenge to the Classification Bulletin Is Not Ripe ............... 35

        3.       Plaintiff's Challenge To The Department of Energy Classification
Bulletin Fails To State A Claim Upon Which Relief May Be
Granted.................................................................................................. 37

CONCLUSION ...................................................................................................... 40

# TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner,*
 387 U.S. 136 (1967) ................................................................................................ 35

*Abusharar v. Hagel,*
 77 F. Supp. 3d 1005 (C.D. Cal. 2014) ........................................................ 1, 15, 23

*\*Aerotrade, Inc. v. Agency for Int'l Dev.,*
 387 F. Supp. 974 (D.D.C. 1974) .......................................................... passim

*Alexander v. Sandoval,*
 532 U.S. 275 (2001) ......................................................................................... 17, 18

*Am. Jewish Cong. v. Vance,*
 575 F.2d 939 (D.C. Cir. 1978) .............................................................................. 12

*Arden Wood, Inc. v. U.S. Citizenship & Immigration Servs.,*
 480 F. Supp. 2d 141 (D.D.C. 2007) ...................................................................... 29

*Armstrong v. Exceptional Child Ctr., Inc.,*
 135 S. Ct. 1378 (2015) .......................................................................................... 21

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ................................................................................. 10, 13, 34

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA,*
 539 F. Supp. 2d 4 (D.D.C. 2008) .......................................................................... 35

*Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank,*
 251 F. Supp. 2d 126 (D.D.C. 2003) .................................................. 14, 18, 20, 24

*\*Baker v. Carr,*
 369 U.S. 186 (1962) .................................................................................. 21, 23, 24

*Banner Health v. Sebelius,*
 797 F. Supp. 2d 97 (D.D.C. 2011) ........................................................................ 29

*Bennett v. Spear,*
 520 U.S. 154 (1997) .............................................................................................. 37

*Bernstein v. Kerry*,
     962 F. Supp. 2d 122 (D.D.C. 2013) ............................................................ 12, 14, 16

*Betteroads Asphalt Corp. v. United States*,
     106 F. Supp. 2d 262 (D.P.R. 2000) ...................................................................... 15

*Cabais v. Egger*,
     690 F.2d 234 (D.C. Cir. 1982) ............................................................................. 37

*Cannon v. Univ. of Chicago*,
     441 U.S. 677 (1979) ............................................................................................. 18

*Chicago & S. Air Lines v. Waterman S. S. Corp.*,
     333 U.S. 103 (1948) ............................................................................................. 24

*Clark v. United States*,
     609 F. Supp. 1249 (D. Md. 1985) ........................................................................ 19

*Claybrook v. Slater*,
     111 F.3d 904 (D.C. Cir. 1997) ............................................................................. 38

*Clayton v. District of Columbia*,
     36 F. Supp. 3d 91 (D.D.C. 2014) ......................................................................... 31

*Cobell v. Norton*,
     240 F.3d 1081 (D.C. Cir. 2001) ........................................................................... 29

*Commonwealth of Mass.* v. Mellon,
     262 U.S. 447 (1923) ............................................................................................. 12

*Corrie v. Caterpillar, Inc.*,
     503 F.3d 974 (9th Cir. 2007) ............................................................................... 23

*Cronin v. F.A.A.*,
     73 F.3d 1126 (D.C. Cir. 1996) ............................................................................. 36

*Dalton v. Specter*,
     511 U.S. 462 (1994) ...................................................................................... 17, 21

*Davis v. Fed. Election Comm'n*,
     554 U.S. 724 (2008) ............................................................................................. 13

*Del Monte Fresh Producer N.A., Inc. v. United States*,
     706 F. Supp. 2d 116 (D.D.C. 2010) ..................................................................... 29

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ........................................................................................ 32, 38, 39

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
No. CV 10-476 (RMC), 2016 WL 3030226 (D.D.C. May 26, 2016) ...................................... 32

*Dickson v. Ford*,
521 F.2d 234 (5th Cir. 1975) ........................................................................................ 23, 25

*Do Thi Tran v. U.S. Dep't of State*,
No. 13-646, 2014 WL 1877414 (E.D. La. May 9, 2014) ...................................................... 15

*Doe I v. State of Israel*,
400 F. Supp. 2d 86 (D.D.C. 2005) ........................................................................................ 22, 24

*Dorsey v. Jacobson Holman PLLC*,
764 F. Supp. 2d 209 (D.D.C. 2011) ........................................................................................ 31

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) ........................................................................................ 38

*Edmonds Inst. v. U.S. Dep't of Interior*,
383 F. Supp. 2d 105 (D.D.C.2005) ........................................................................................ 31

*Envtl. Def. Fund, Inc. v. Massey*,
986 F.2d 528 (D.C. Cir. 1993) ........................................................................................ 27

*Feinman v. FBI*,
713 F. Supp. 2d 70 (D.D.C. 2010) ........................................................................................ 30, 33

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ........................................................................................ 14

*Flast v. Cohen*,
392 U.S. 83 (1968) ........................................................................................ 12

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................................................................ 17, 32

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ........................................................................................ 11, 13

*Havens v. Mabus*,
759 F.3d 91 (D.C. Cir. 2014) ........................................................................................ 26

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ................................................................................. 19

*Hein v. Freedom From Religion Found., Inc.*,
   551 U.S. 587 (2007) ................................................................. 11, 12, 13

*Israel Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*,
   16 F.3d 198 (7th Cir. 1994) ..................................................................... 18

*Japan Whaling Ass'n. v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986) ................................................................................. 22

*Kenney v. DOJ*,
   603 F. Supp. 2d 184 (D.D.C. 2009) ....................................................... 31

*Kursar v. Transp. Sec. Admin.*,
   581 F. Supp. 2d 7 (D.D.C. 2008) ........................................................... 10

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ......................................................... 32, 38

*Levine v. Farley*,
   107 F.2d 186 (D.C. Cir. 1939) ................................................................ 20

*\*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ....................................................................... passim

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ......................................................................... 30, 36

*\*Mahorner v. Bush*,
   224 F. Supp. 2d 48 (D.D.C. 2002) ................................................. 1, 12, 23

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ................................................................. 21

*Miller v. Casey*,
   730 F.2d 773 (D.C. Cir. 1984) ................................................................ 39

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1866) .................................................................. 20

*Mobarez v. Kerry*,
   No. 15-CV-516 (KBJ), 2016 WL 2885871 (D.D.C. May 17, 2016) ........................................ 24

*Munsell v. Dep't of Agric.*,
    509 F.3d 572 (D.C. Cir. 2007) .......................................................................... 36

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*,
    658 F. Supp. 2d 105 (D.D.C. 2009) ................................................................ 28

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003) ........................................................................................ 35

*NextWave Personal Commc'ns, Inc. v. FCC*,
    254 F.3d 130 (D.C. Cir. 2001) .......................................................................... 31

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ........................................................................................ 17

*\*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) .................................................................................... 28, 30

*Oetjen v. Cent. Leather Co.*,
    246 U.S. 297 (1918) ........................................................................................ 23

*Oryszak v. Sullivan*,
    576 F.3d 522 (D.C. Cir. 2009) .......................................................................... 39

*Payne Enters., Inc. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) .......................................................................... 33

*Physicians Comm. for Responsible Med. v. Dep't of Health and Human Servs.*,
    480 F. Supp. 2d 119 (D.D.C. 2007) ................................................................ 31

*Power v. Barnhart*,
    292 F.3d 781 (D.C. Cir. 2002) .................................................................... 19, 20

*Prosser v. Fed. Agric. Mortg. Corp.*,
    593 F. Supp. 2d 150 (D.D.C. 2009) ................................................................ 12

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
    344 U.S. 237 (1952) ........................................................................................ 35

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................ 34

*\*RCM Technologies, Inc. v. U.S. Department of Homeland Security*,
    614 F. Supp. 2d 39 (D.D.C. 2009) .................................................................. 29

*Sanchez-Espinoza v. Reagan,
  770 F.2d 202 (D.C. Cir. 1985) ..................................................................... 25, 26

Savage v. Burwell,
  No. 15-CV-00791 (CRC), 2016 WL 4132196 (D.D.C. Aug. 3, 2016) ................... 27

Schneider v. Kissinger,
  412 F.3d 190 (D.C. Cir. 2005) ............................................................................ 23

Shekoyan v. Sibley Int'l Corp.,
  217 F. Supp. 2d 59 (D.D.C. 2002) ...................................................................... 28

Sibley v. Obama,
  866 F. Supp. 2d 17 (D.D.C. 2012) ...................................................................... 13

Sierra Club v. Morton,
  405 U.S. 727 (1972) ........................................................................................... 34

Smith v. Obama,
  No. CV 16-843 (CKK), 2016 WL 6839357 (D.D.C. Nov. 21, 2016) ..................... 24

Spokeo, Inc. v. Robins,
  136 S. Ct. 1540 (2016) ....................................................................................... 11

Steel Co. v. Citizens for a Better Env't,
  523 U.S. 83 (1998) ............................................................................................. 10

Talenti v. Clinton,
  102 F.3d 573 (D.C. Cir. 1996) ........................................................................ 15, 16

Tel-Oren v. Libyan Arab Republic,
  726 F.2d 774 (D.C. Cir. 1984) ............................................................................ 23

Texas v. United States,
  523 U.S. 296 (1998) ........................................................................................... 36

*Toilet Goods Assoc. v. Gardner,
  387 U.S. 158 (1967) ....................................................................................... 36, 37

Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,
  454 U.S. 464 (1982) ........................................................................................... 12

Warth v. Seldin,
  422 U.S. 490 (1975) ....................................................................................... 13, 34

*Webster v. Doe*,
486 U.S. 592 (1988) ........................................................................... 38, 39

*Women's Equity Action League v. Cavazos*,
906 F.2d 742 (D.C. Cir. 1990) ................................................................ 27

## STATUTES

5 U.S.C. § 551 ................................................................................. 28

5 U.S.C. § 552 ............................................................................. 32, 38

5 U.S.C. § 701 ................................................................................. 38

5 U.S.C. § 704 ........................................................................... 30, 37

5 U.S.C. § 706 ...................................................................... 16, 21, 37

22 U.S.C. § 2763 ............................................................................... 3

22 U.S.C. § 2799aa-1 ................................................................... passim

28 U.S.C. § 1361 ............................................................................... 8

28 U.S.C. § 2401 ............................................................................. 26

## RULES

Fed. R. Civ. P. 12 ........................................................................... 10

## REGULATIONS

32 C.F.R. § 2001.15 ......................................................................... 36

32 C.F.R. § 2001.33 ......................................................................... 32

## UNITED STATES CONSTITUTION

U.S. Const., art. II, §2 ..................................................................... 39

U.S. Const., art. II, §3 ....................................................................... 8

## OTHER AUTHORITIES

Exec. Order No. 13346, 69 Fed. Reg. 41,905 (July 13, 2004)...................... 6

Exec. Order No. 13526, 75 Fed. Reg. 707 (Jan. 5, 2010) ........................................................ passim

H.R. Rep. No. 103-482, *reprinted in* 1994 U.S.C.C.A.N. 398 ............................................. passim

Pub. L. No. 87-195 (Jan. 3, 1961) ................................................................................................ 3

Pub. L. No. 90-629 (Jan. 15, 1968) .............................................................................................. 2

Pub. L. No. 94-329 (June 30, 1976) ............................................................................................. 3

Pub. L. No. 95-92 (Aug. 4, 1977) ................................................................................................ 3

Pub. L. No. 103-236 (Apr. 30, 1994) ........................................................................................... 3

Pub. L. No. 114-113 (Dec. 18, 2015) .................................................................................... passim

## INTRODUCTION

Plaintiff brings this action to enforce section 102(a) of the Arms Export Control Act of 1961, as amended, which prohibits the United States from providing foreign assistance to any country that the President determines has engaged in certain specified conduct relating to nuclear technology and equipment.  *See* 22 U.S.C. § 2799aa-1(a).  Plaintiff claims, first, that the President (and prior presidents) should have determined that Israel engaged in such conduct as early as 1978 and that Congress should have declined to provide any foreign aid to Israel on that basis; and, second, that the Executive Branch has implemented a systemic policy, which plaintiff calls "nuclear ambiguity," to thwart the release of information about Israel's alleged conduct. Both of plaintiff's claims should be dismissed for numerous reasons.  Indeed, courts have routinely dismissed similar claims.  *See, e.g.*, *Abusharar v. Hagel*, 77 F. Supp. 3d 1005 (C.D. Cal. 2014); *Mahorner v. Bush*, 224 F. Supp. 2d 48 (D.D.C. 2002) (dismissing case *sua sponte*); *Aerotrade, Inc. v. Agency for Int'l Dev.*, 387 F. Supp. 974 (D.D.C. 1974).

As to the first claim, plaintiff lacks standing to assert it.  He has not alleged any particularized injury stemming from the Government's provision of foreign assistance to Israel. And, even if he had, he cannot show that any injury was caused by the Government, as opposed to the actions of third parties, or that any particularized injury would be redressed by the requested relief.  Plaintiff also has not stated a claim under § 2799aa-1 and, even if he had, resolution of that claim would present a non-justiciable political question.  The foreign assistance program at the heart of plaintiff's case constitutes a paradigmatic exercise of the foreign affairs power of the United States.  There is no basis to conclude that Congress intended to provide any role in overseeing foreign assistance appropriations to courts, much less private individuals such as plaintiff.

Plaintiff's second claim also fails.  Executive Order 13526, which the President issued to "prescribe[] a uniform system" for Executive Branch agencies and officials to use in "classifying, safeguarding, and declassifying information,"  Exec. Order No. 13526, 75 Fed. Reg. 707 (Jan. 5, 2010), does not create a cause of action for private individuals like plaintiff to sue to enforce its provisions.  Moreover, a systemic attack on the alleged Government-wide policy of so-called "nuclear ambiguity" is not the sort of discrete agency action that can be reviewed under the Administrative Procedure Act ("APA").  In addition, the Freedom of Information Act ("FOIA") provides an adequate remedy for all of plaintiff's claims concerning the Government's purported efforts to thwart the release of information about Israel's alleged conduct; that FOIA remedy precludes plaintiff's APA claim.  Finally, plaintiff's effort to challenge the Department of Energy's Classification Bulletin WNP-136 (as one purported manifestation of the Government's alleged policy of nuclear ambiguity) falters as well for three reasons.  First, plaintiff lacks standing to challenge the Classification Bulletin.  Second, any challenge would not be ripe until the Classification Bulletin is applied to withhold particular information from plaintiff in response to a FOIA request.  Third, the guidance contained in the Classification Bulletin, which concern the protection of information relating to national security issues, is committed to agency discretion by law.

For these reasons, as explained more fully below, the Court should grant defendants' motion to dismiss.

## BACKGROUND

## I.    STATUTORY BACKGROUND

The Arms Export Control Act ("AECA"), Pub. L. No. 90-629 (1968), as amended, authorizes the President to, *inter alia*, finance the procurement of defense articles and defense

services by friendly foreign countries.  *See* 22 U.S.C. § 2763.  Foreign Military Financing (or

FMF) is a type of foreign assistance authorized by § 2763 of the AECA and funded through

appropriations to the Foreign Military Financing Program account.  *See, e.g.*, Department of

State, Foreign Operations, and Related Programs Appropriations Act, 2016, Div. K, Pub. L. No.

114-113.  The Foreign Assistance Act of 1961 ("FAA"), Pub. L. No. 87-195, as amended,

authorizes a variety of international assistance programs, including both military and non-

military assistance.  *See* 22 U.S.C. § 2151 *et seq.*

In 1976 and 1977, Congress amended the FAA to limit the circumstances in which the

United States could provide foreign assistance to a country that has engaged in specified conduct

relating to nuclear technology and equipment.  *See* International Security Assistance and Arms

Export Control Act of 1976, § 305, Pub. L. No. 94-329 (June 30, 1976); International Security

Assistance Act of 1977, § 12, Pub. L. No. 95-92 (Aug. 4, 1977).  In 1994, these provisions,

which are collectively known as the "Glenn-Symington amendment," were themselves amended

and re-codified in sections 101 and 102 of the AECA.  *See* Foreign Relations Authorization Act,

Fiscal Years 1994 and 1995, § 826(a), Pub. L. No. 103-236 (Apr. 30, 1994).  The provisions are

currently codified at 22 U.S.C. § 2799aa-1 and have remained largely unchanged (except for

minor amendments not relevant here) since 1994.

Section 2799aa-1(a) prohibits the United States from providing specified foreign

assistance under the FAA or the AECA to "any country which *the President determines--*"

> (A) delivers nuclear reprocessing equipment, materials, or technology to any other
> country on or after August 4, 1977, or receives such equipment, materials, or
> technology from any other country on or after August 4, 1977 . . . , or

> (B) is a non-nuclear-weapon state which, on or after August 8, 1985, exports
> illegally (or attempts to export illegally) from the United States any material,
> equipment, or technology which would contribute significantly to the ability of
> such country to manufacture a nuclear explosive device, if the President

> determines that the material, equipment, or technology was to be used by such country in the manufacture of a nuclear explosive device.

22 U.S.C. § 2799aa-1(a)(1) (emphasis added).  Section 2799aa-1(b) similarly prohibits

the provision of specified foreign assistance to any country that "*the President*

*determines*," "after the effective date of part B of the Nuclear Proliferation Prevention

Act of 1994--"

> (A) transfers to a non-nuclear-weapon state a nuclear explosive device,
>
> (B) is a non-nuclear-weapon state and either--
>
>> (i) receives a nuclear explosive device, or
>>
>> (ii) detonates a nuclear explosive device,
>
> (C) transfers to a non-nuclear-weapon state any design information or component which is determined by the President to be important to, and known by the transferring country to be intended by the recipient state for use in, the development or manufacture of any nuclear explosive device, or
>
> (D) is a non-nuclear-weapon state and seeks and receives any design information or component which is determined by the President to be important to, and intended by the recipient state for use in, the development or manufacture of any nuclear explosive device[.]

*Id*. § 2799aa-1(b)(1) (emphasis added).[1]

The statute, therefore, makes the termination of U.S. foreign assistance

contingent, in the first instance, upon a determination by the President that a country has

engaged in conduct specified in the statute.  *Id*. § 2799aa-1(a)(1), (b)(1); *see* H.R. REP.

NO. 103-482, at 264 (1994) (Conf. Rep.), *reprinted in* 1994 U.S.C.C.A.N. 398, 509

(explaining that the 1994 amendments "clarif[y] that the determinations under this

---

[1] "Non-nuclear-weapon state" is defined as a country that did not manufacture and explode a nuclear weapon or other nuclear explosive device prior to January 1, 1967.  *See* 22 U.S.C. § 2799aa-1(c) (referring to definition in Article IX(3) of the Treaty on the Non-Proliferation of Nuclear Weapons, July 1, 1968, 21 U.S.T. 483, 493, 729 U.N.T.S. 161, 174).

section are to be made by the President").  The statute permits but does not require that

the President make such a determination.  Moreover, the statute does not limit the

President's discretion to decide whether, how, and when to make such a determination.

If the President exercises his or her discretion to determine that a country has

engaged in the specified conduct, the United States may nevertheless continue to provide

foreign assistance to that country if certain statutory conditions are met.  22 U.S.C.

§ 2799aa-1(a)(2), (b)(4)-(6).  These so-called "waiver" provisions differ under the two

subsections of the statute.

Under § 2799aa-1(a), the United States may furnish foreign assistance to a

country notwithstanding a determination by the President that the country engaged in the

specified conduct if

> . . . [the President] determines and certifies in writing during [the relevant] fiscal
> year to the Speaker of the House of Representatives, the Committee on Foreign
> Affairs of the House of Representatives, and the Committee on Foreign Relations
> of the Senate that the termination of such assistance would be seriously
> prejudicial to the achievement of United States nonproliferation objectives or
> otherwise jeopardize the common defense and security.

*Id*. § 2799aa-1(a)(2).  Under this provision, the President must provide "a statement

setting forth the specific reasons" for his certification.  *Id*.  Congress, in turn, may

override that certification, and thus terminate foreign assistance, if it "enacts a joint

resolution stating in substance that the Congress disapproves the furnishing of assistance

pursuant to the certification."  *Id*. § 2799aa-1(a)(3)(A).

Section 2799aa-1(b) establishes different waiver regimes that correspond to

different Presidential determinations about the type of conduct in which a country has

engaged.  *See id*. § 2799aa-1(b)(4)-(6).  The President may waive any foreign assistance

sanctions that would otherwise apply after making a determination that a country engaged

in conduct specified in § 2799aa-1(b)(1)(A) or (B), if Congress enacts a joint resolution

permitting the President to exercise his waiver authority and the President subsequently

> . . . determines and certifies in writing to the Speaker of the House of
> Representatives and the Committee on Foreign Relations of the Senate that the
> imposition of such sanction would be seriously prejudicial to the achievement of
> United States nonproliferation objectives or otherwise jeopardize the common
> defense and security.

*Id*. § 2799aa-1(b)(4)-(5).  In contrast, the President alone may waive any foreign

assistance sanctions that would otherwise apply after making a determination that a

country engaged in conduct specified in § 2799aa-1(b)(1)(C) or (D) if he

> determines and certifies in writing to the Committee on Foreign Relations and the
> Committee on Governmental Affairs of the Senate and the Committee on Foreign
> Affairs of the House of Representatives that the application of such sanctions
> against such country would have a serious adverse effect on vital United States
> interests.

*Id*. § 2799aa-1(b)(6)(B).  Under both waiver regimes, the President must provide "a statement

setting forth the specific reasons" for his certification.  *Id*. § 2799aa-1(b)(5)-(6).[2]

On the whole, these waiver provisions recognize that, if and when the President first

determines that a country has engaged in conduct specified in the statute, it is the province of the

President and Congress to determine whether the United States should continue providing

foreign assistance to that country.  No provision of § 2799aa-1 authorizes or contemplates

judicial review of determinations made by the President or exercises of the waiver authority by

the President or Congress.

---

[2] The President has delegated his waiver authority under § 2799aa-1(a)(2) to the Department of
State, *see* Exec. Order No. 13346, § 1(a)(iii), 69 Fed. Reg. 41,905 (July 13, 2004), but he has not
delegated his authority under § 2799aa-1(a)(1) to make determinations that a country engaged in
conduct specified in that subsection.  The President is prohibited from "delegat[ing] or
transfer[ring] his power, authority, or discretion to make or modify determinations" under
§ 2799aa-1(b).  22 U.S.C. § 2799aa-1(b)(8).

## II.     FOREIGN ASSISTANCE TO ISRAEL

The United States and Israel enjoy a strong defense relationship built on a mutual

commitment to democratic values and shared security interests in the Middle East.

United States foreign assistance has been a critical facet of that relationship, and, in terms

of total money received since World War II, Israel is the largest recipient of U.S. foreign

assistance.  JEREMY M. SHARP, CONG. RESEARCH SERV., RL33222, U.S. FOREIGN AID TO

ISRAEL, Summary, 1-4 (2015).

Today, nearly all U.S. foreign assistance to Israel is in the form of FMF.[3]  *Id*.,

Summary, 1, 5.  Annual grants represent nearly one fifth of the Israeli defense budget.

*Id*. at 5; JIM ZANOTTI, CONG. RESEARCH SERV., R44245, ISRAEL:  BACKGROUND AND

U.S. RELATIONS IN BRIEF, 5 (2016).  FMF assistance to Israel is appropriated annually by

Congress as a mandatory "hard earmark."  *See, e.g.*, Department of State, Foreign

Operations, and Related Programs Appropriations Act, 2016, Div. K, Pub. L. No. 114-

113 (". . . of the funds appropriated under this heading, not less than $3,100,000,000 shall

be available for grants only for Israel.").  Congress has made these appropriations with

full knowledge of existing laws regarding potentially applicable restrictions and the

President's authority to waive such restrictions.

## III.    PLAINTIFF'S AMENDED COMPLAINT

Plaintiff describes himself as "a public interest researcher" who has published numerous

articles based on information he has obtained from government agencies through FOIA.  Am.

Compl. ¶ 8, ECF No. 17.  He brought this action against the United States, President Barack

---

[3] Prior to 2008, the United States also provided significant economic assistance to Israel.  *See*
JEREMY M. SHARP, CONG. RESEARCH SERV., RL33222, U.S. FOREIGN AID TO ISRAEL, Summary,
1 n.3 (2015).

Obama, and various federal officials on August 8, 2016, even though the actions he challenges date back decades. *Id.* ¶¶ 5, 9-16. He raises two claims.

Plaintiff's first claim asserts that, "since 1978," various defendants (and their predecessors in office) have repeatedly violated § 2799aa-1 by providing foreign aid to Israel. *Id.* ¶ 7. According to plaintiff, Israel "continually engages in activities which should trigger" the prohibitions on foreign assistance in § 2799aa-1. *Id.* ¶ 26. Specifically, plaintiff alleges that Israel transferred "nuclear weapons technology" to South Africa, culminating in Israel and South Africa jointly "detonat[ing] a nuclear explosive device" in 1979. *Id.* ¶ 30. Plaintiff further asserts that, "between 1979 and 1983," Israel "smuggle[d] sensitive nuclear weapons technology out of the United States," *id.* ¶ 32, and that there are "ongoing illicit transfers of nuclear weapons material and technology from the U.S. to Israel." *Id.* ¶ 6.

Plaintiff contends that these alleged actions should have led the President (and prior presidents) to make a determination under § 2799aa-1(a)(1) and/or (b)(1) that Israel has engaged in conduct specified in those subsections, thereby requiring the President (and Congress) to either exercise the waiver authority in § 2799aa-1(a)(2) and/or (b)(4)-(6) or terminate foreign assistance to Israel. *Id.* ¶¶ 5, 24. Plaintiff claims the President's failure to make such a determination violates § 2799aa-1. *Id.* Plaintiff also asserts that the Secretaries of Defense and the Treasury have acted unlawfully by "transfer[ring] fund[s]" to Israel, to "weapons contractors supplying Israel," and to "Israeli military companies," because "Israel is an ineligible recipient" of foreign aid under § 2799aa-1. *Id.* ¶ 11; *see id.* ¶ 13.

Plaintiff pursues his claim against the President under the APA, 22 U.S.C. § 2799aa-1, the Mandamus Act (28 U.S.C. § 1361), and the Take Care Clause of the U.S. Constitution (U.S. Const., art. II, § 3). *See* Am. Compl. ¶¶ 15, 24. He brings his claims against the Secretaries of

Defense and the Treasury under the APA.  *Id.* ¶¶ 11, 13.  With respect to this first claim, plaintiff

seeks (1) an order enjoining defendants from "disbursing further U.S. foreign aid to Israel;" (2)

"disgorgement" of all "U.S. foreign aid unlawfully provided to Israel since 1978;" and (3) an

order directing the President to "faithfully uphold [§ 2799aa-1] in the future."  *Id.*, Prayer for

Relief.

Plaintiff's second claim asserts that, to perpetuate their alleged violations of § 2799aa-1,

defendants have engaged in a "systemic" policy of "nuclear ambiguity," which is itself allegedly

unlawful.  *Id.* ¶¶ 6, 10, 33.  Plaintiff describes this alleged policy of "nuclear ambiguity" as

"prohibiting the release of official government information about Israel's nuclear weapons

program."  *Id.* ¶ 6.  According to plaintiff, the policy manifests itself in three ways.  First,

government officials purportedly refuse to "make bona fide responses to journalists" inquiring

about "Israel's nuclear weapons program."  *Id.* ¶ 6; *see id.* ¶ 35.  Second, when responding to

FOIA or Mandatory Declassification Review ("MDR") requests, government agencies allegedly

delay or "refuse to process" such requests, *id.* ¶¶ 10, 49, "deny[] releasable information," *id.*

¶ 14, and/or "charge exorbitant search/reproduction or other fees," *id.* ¶ 49.  In his amended

complaint, plaintiff identifies eight FOIA requests and one MDR request in response to which

the nuclear ambiguity policy was allegedly applied.[4]  *Id.* ¶¶ 27, 46-51, 61-62, 70.  Third, plaintiff

claims that the Department of Energy issued Classification Bulletin WNP-136, which allegedly

"is used to harshly punish (and therefore deter)" any "U.S. federal government employee or

---

[4] Plaintiff alleges that he filed separate suits under FOIA to challenge the agencies' responses to three of these FOIA requests.  *See* Am. Compl. ¶¶ 27, 62.  As far as defendants are aware, plaintiff has not filed any FOIA actions with respect to the remaining FOIA requests.  Plaintiff does not raise FOIA as a basis for relief in this case.  *See id.* ¶¶ 1, 9-16.

contractor" who "mention[s]—or release[s] via government sunshine laws—any information officially confirming that Israel is a nuclear weapons state." *Id.* ¶¶ 42-43.

Plaintiff pursues his second claim against all of the federal official defendants under Executive Order 13526 and the APA.  With respect to this claim, plaintiff seeks an order "[d]eclar[ing] 'nuclear ambiguity' and all of its manifestations in the form of continual misrepresentation, gag orders, systemic violations of government sunshine laws and all violations of the [APA] and the 'Take Care' clause to be unlawful."  Am. Compl., Prayer for Relief.  He also requests an order compelling the Department of State to release the Memorandum of Understanding between the United States and Israel for fiscal years 2009 to 2018 and fiscal years 2019 to 2028.  *Id.*

## STANDARD OF REVIEW

Defendants move to dismiss the case for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(1), (b)(6).  Plaintiff bears the burden to show subject matter jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).  Where, as here, the defendant challenges jurisdiction on the face of the complaint, the complaint must be dismissed unless it has pleaded sufficient facts to establish that jurisdiction exists.  *Kursar v. Transp. Sec. Admin.*, 581 F. Supp. 2d 7, 14 (D.D.C. 2008).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice;" nor do "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* at 678.  Courts, moreover, do not assume the truth of legal conclusions set forth in the complaint.  *Id.*

## ARGUMENT

### I.   THE COURT SHOULD DISMISS PLAINTIFF'S FIRST CLAIM

Plaintiff contends that each President in office since 1978 should have made a determination that Israel engaged in conduct specified in § 2799aa-1 and that the Secretaries of Defense and the Treasury, in turn, should not have transferred foreign assistance to Israel.  This claim fails for numerous, independent reasons, as explained below.

### A.   Plaintiff Lacks Standing To Challenge The Government's Compliance with 22 U.S.C. § 2799aa-1

"[T]he irreducible constitutional minimum of standing" requires that a plaintiff (1) have suffered an injury in fact, (2) that is caused by the defendant's conduct, and (3) that is likely to be redressed by a favorable ruling.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiff bears the burden of alleging facts to establish each element.  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  The necessary facts "must affirmatively appear in the record" and "cannot be 'inferred argumentatively from averments in the pleadings.'"  *Id*.  Plaintiff has not established any of the requirements for standing.

First, plaintiff fails to allege any particularized injury stemming from the Government's provision of foreign aid to Israel.  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal quotations omitted).  To be particularized, an injury "must affect the plaintiff in a personal and individual way."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016); *accord Lujan*, 504 U.S. at 560 n.1.  It is not enough that the plaintiff "suffers in some indefinite way in common with people generally."  *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007).  Moreover, a desire to "force the government to act in accordance with the law" or "merely complaining about the expenditure of taxpayer

11

dollars" is not sufficient to establish an injury-in-fact.  *Prosser v. Fed. Agric. Mortg. Corp.*, 593

F. Supp. 2d 150, 154 (D.D.C. 2009); *see Bernstein v. Kerry*, 962 F. Supp. 2d 122, 128 (D.D.C.

2013) ("[S]tanding cannot be based on plaintiffs' interest, common among all citizens, in the

government following the law.").

As plaintiff himself concedes, he alleges only generalized grievances that he shares with

"all Americans."  Am. Compl. ¶ 72; *see id.* ¶ 74.  The amended complaint does not identify any

"personal and individual way" in which plaintiff has been harmed by the Government's

provision of foreign assistance to Israel.  *Lujan*, 504 U.S. at 560 n.1.  He claims injury to the

purse of "American taxpayers," Am. Compl. ¶ 65; *see id.* ¶¶ 7, 66, but mere "status as a taxpayer

does not afford [plaintiff] standing to . . . challenge . . . the granting of foreign aid by the federal

government," *Mahorner*, 224 F. Supp. 2d at 50.  *See Flast v. Cohen*, 392 U.S. 83, 106 (1968)

(Standing does not exist "where a taxpayer seeks to employ a federal court as a forum in which

to air his generalized grievances about the conduct of government."); *Commonwealth of Mass. v.*

*Mellon*, 262 U.S. 447, 488 (1923).

The Supreme Court has recognized a narrow exception to the doctrine against taxpayer

standing.  *See Flast*, 392 U.S. at 102-103.  That exception, however, has no application where

the plaintiff's complaint is directed at actions of the Executive Branch, rather than an "exercise[]

of congressional power."  *Id.*; *see Hein*, 551 U.S. at 603-08; *Valley Forge Christian Coll. v.*

*Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 479 (1982).  Indeed, the

D.C. Circuit has "repeatedly held that 'challenges to actions of the executive branch are not

cognizable in a federal taxpayer action.'"  *Mahorner*, 224 F. Supp. 2d at 51 (citing cases); *see*

*Am. Jewish Cong. v. Vance*, 575 F.2d 939, 944 (D.C. Cir. 1978) (holding the plaintiffs lacked

standing as taxpayers to challenge the actions of Executive Branch officials engaged in economic

programs with Saudi Arabia).  Because plaintiff's claim is directed at the actions of Executive

Branch officials (*i.e.*, the President and the Secretaries of Defense and the Treasury), he cannot

establish standing merely by virtue of being a taxpayer.

Plaintiff also attempts to blame the provision of foreign aid to Israel for the conflict

between Israel and the Palestinians, and he claims that U.S. aid to Israel was a "major factor[]

motivating the 9/11 attackers."  Am. Compl. ¶ 67.  Even assuming the truth of these conclusory

statements (which the Court is not required to do, *see Iqbal*, 556 U.S. at 678; *FW/PBS, Inc.*, 493

U.S. at 231), plaintiff has failed to allege that he was, or imminently will be, injured by the

Israeli-Palestinian conflict or the September 11 attacks in a personal way that is distinct from any

effects felt by people generally.  *See Lujan*, 504 U.S. at 560 n.1.  Bare allegations about the

general effects of foreign assistance to Israel are insufficient to establish that plaintiff has

sustained "some direct injury" that differentiates him from other Americans.  *Hein*, 551 U.S. at

599; *see Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized

grievance' shared in substantially equal measure by all or a large class of citizens, that harm

alone normally does not warrant exercise of jurisdiction."); *Sibley v. Obama*, 866 F. Supp. 2d 17,

20 (D.D.C. 2012).[5]

Second, even if the Court were to determine that plaintiff's passing reference to the

Israeli-Palestinian conflict and the September 11 attacks is sufficient to allege an injury-in-fact,

plaintiff still has not established causation or redressability.  The causation prong of the standing

analysis asks whether "it is substantially probable that the challenged acts of the defendant, not

---

[5] Plaintiff's amended complaint also alleges financial and informational injuries stemming from
the Government's purported policy of nuclear ambiguity.  *See* Am. Compl. ¶¶ 8, 58.  These
alleged injuries relate to plaintiff's second claim and thus do not satisfy plaintiff's burden to
establish standing for his first claim.  *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734
(2008) ("A plaintiff must demonstrate standing for each claim he seeks to press.").

of some absent third party, [caused or] will cause the particularized injury of the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (internal citation omitted).  An injury caused by "unfettered choices made by independent actors not before the court[]" is insufficient to confer standing.  *Lujan*, 504 U.S. at 562.  As to redressability, for a complaint to survive dismissal, "it must be 'likely,' as opposed to merely 'speculative,' that the [alleged] injury will be 'redressed by a favorable decision.'" *Id*. at 561 (citation omitted).

Plaintiff's attempt to blame the Government's provision of foreign assistance to Israel for the Israeli-Palestinian conflict and the September 11 attacks fails.  Plaintiff can only speculate that these events—much less any particularized injury plaintiff may have suffered as a result of them—were caused by the provision of foreign assistance to Israel, as opposed to the independent actions of third parties.  There is nothing in the amended complaint to suggest that, in the absence of such assistance, the Israeli-Palestinian conflict would not exist or would cease, or that the September 11 attacks would not have occurred.  In short, plaintiff's theory of standing rests on a speculative and "protracted chain of causation" that courts have repeatedly rejected— including in the foreign aid context.  *Fla. Audubon Soc'y*, 94 F.3d at 670; *see, e.g.*, *Bernstein*, 962 F. Supp. 2d at 128-29 (holding that the plaintiffs' fear of future terrorist attacks was not fairly traceable to the provision of U.S. aid to the Palestinian Authority because it required the Court to "speculate on whether defendants' funding policies were in fact aiding terrorists, whether the terrorists were using these funds for activities intended to harm plaintiffs, and whether these activities were leading to a 'certainly impending' injury for plaintiffs"); *Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126, 129-30 (D.D.C. 2003).

For similar reasons, plaintiff has not demonstrated redressability.  Even assuming the Court could order the President to determine that Israel has engaged in conduct specified in

§ 2799aa-1 (which it cannot do, as explained below), that order would not redress any alleged injuries plaintiff may have suffered as a result of the Israeli-Palestinian conflict or the September 11 attacks.  To begin, "the central fallacy in plaintiff's argument is that the President is not required to terminate aid to [Israel]" even if the President determines that Israel has engaged in the specified conduct.  *Aerotrade*, 387 F. Supp. at 975.  The statute "explicitly recognize[s] the power of the President, [in conjunction with Congress, in some instances,] to continue aid to an offending government if [the President] finds a cutoff would" be contrary to the United States' interests.  *Id.*; *see* 22 U.S.C. § 2799aa-1(a)(2), (b)(4)-(6).  Plaintiff, therefore, cannot show that a favorable decision will result in the termination of foreign assistance to Israel, much less that the termination of such assistance would redress any injuries plaintiff may have suffered as a result of the Israeli-Palestinian conflict or the September 11 attacks.  *See, e.g.*, *Talenti v. Clinton*, 102 F.3d 573, 577-78 (D.C. Cir. 1996) (concluding the plaintiff lacked standing in a case involving a similar statute that "confide[d] authority to waive its provisions if the President finds waiver in the national interest"); *Do Thi Tran v. U.S. Dep't of State*, No. 13-646, 2014 WL 1877414, at *3- *4 (E.D. La. May 9, 2014); *Aerotrade*, 387 F. Supp. at 975-96; *see also Abusharar*, 77 F. Supp. 3d at 1007.

        As to whether any termination of foreign aid would redress plaintiff's alleged injury, "[c]ountries respond to the suspension of foreign assistance in many ways."  *Betteroads Asphalt Corp. v. United States*, 106 F. Supp. 2d 262, 268 (D.P.R. 2000).  It would be pure speculation to conclude that, if U.S. foreign aid to Israel were terminated, Israel and other countries would change their policies or practices in the Middle East.  Any relief thus depends upon the "exercise of broad and legitimate discretion" of third parties that the court "cannot presume either to control or to predict," meaning plaintiff's alleged injury is not likely to be redressed by a

favorable decision.  *Lujan*, 504 U.S. at 562; *see, e.g.*, *Talenti*, 102 F.3d at 575-78 (uncertainty as

to how Italy would react to the withholding of foreign assistance precluded a finding that the

plaintiff's injury would be redressed); *Bernstein*, 962 F. Supp. 2d at 130 (the plaintiffs' "belief

that a change in policy would reduce the threat of terrorism is, at best, mere speculation," and

thus, it is insufficient to establish redressability); *Aerotrade*, 387 F. Supp. at 975 (holding the

plaintiff lacked standing because there was "considerable uncertainty" as to whether suspension

of aid to Haiti "would aid plaintiff in collecting its debt or would tend to drive Haiti into even

greater intransigence.").  The termination of foreign assistance to Israel also would not alleviate

any past harms plaintiff may have suffered as a result of the September 11 attacks, which in any

event are not attributable to U.S. foreign aid policies.

Because plaintiff has failed to establish standing to assert his first claim, that claim

should be dismissed for lack of jurisdiction.

**B.      The Amended Complaint Fails To State A Claim That Government Officials
         Violated 22 U.S.C. § 2799aa-1**

**1.      Plaintiff Has No Cause Of Action Against The President**

Plaintiff claims that the President (and his predecessors in office) violated 22 U.S.C.

§ 2799aa-1 by failing to make a determination that Israel engaged in conduct specified in the

statute.  He seeks an order compelling the President to make such a determination under the

APA, § 2799aa-1, the Mandamus Act, and the Take Care Clause.  *See* Am. Compl. ¶¶ 15, 24.

None of these provisions, however, provide plaintiff with a cause of action.

**a.      Administrative Procedure Act**

The APA permits courts to review and compel "agency action" in specified

circumstances.  5 U.S.C. § 706.  But the Supreme Court has made clear that the President is not

an "agency" within the meaning of the APA and thus his actions, or failures to act, are not

reviewable under the APA.  *See Dalton v. Specter*, 511 U.S. 462, 470 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).  Section § 2799aa-1 vests the President with sole authority to determine (or not) that a country has engaged in conduct specified in the statute.  22 U.S.C. § 2799aa-1(a)(1), (b)(1); *see* H.R. REP. No. 103-482, at 264 ("the determinations under this section are to be made by the President").  Because the President is not an "agency," the APA does not provide plaintiff with an avenue to challenge the President's § 2799aa-1 determinations or his failure to make such determinations.

### b.      22 U.S.C. § 2799aa-1

Plaintiff also cannot proceed directly under § 2799aa-1.  The statute does not contain an express cause of action for private citizens (or anyone else) to sue the President to enforce its provisions.  The absence of an express provision is dispositive, as "an express statement by Congress" is required before "the President's performance of his statutory duties" is subject to judicial review.  *Franklin*, 505 U.S. at 801; *see id*. at 800 ("Out of respect for the separation of powers and the unique constitutional position of the President, . . . textual silence is not enough to subject the President['s]" actions to judicial review.); *cf. Nixon v. Fitzgerald*, 457 U.S. 731, 748-49 (1982) (Supreme Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President).

Moreover, even if an express statement were not required, there is no basis for concluding that Congress intended to provide private citizens with a cause of action to enforce § 2799aa-1.  "[P]rivate rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Id*.

17

In addition to lacking an express cause of action, § 2799aa-1 also does not contain the sort of "rights-creating language" that courts have found "critical" to imputing to Congress an intent to create a private right of action. *Id.* at 288; *id.* at 288-89 (distinguishing between the rights-creating language, "[n]o person . . . shall . . . be subjected to discrimination," and its antithesis, "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [the statute]"). Section 2799aa-1 does not "explicitly confer [any] right," either procedural or substantive, "directly on" private citizens. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979). In fact, it does not mention "persons" at all. Instead, it is "phrased as a directive to federal agencies engaged in the distribution of public funds" in the event the President makes a determination that a country has engaged in conduct specified in the statute. *Sandoval*, 532 U.S. at 289. Courts do not infer a cause of action in such circumstances. *See id.*

The structure of the statute confirms that it creates no cause of action. The statute vests the President with sole discretion to determine (or not) that a country has engaged in the specified conduct. *See* 22 U.S.C. § 2799aa-1(a)(1), (b)(1); H.R. REP. No. 103-482, at 264. If the President makes such a determination, the statute then provides a specific process by which the President (in conjunction with Congress, in some circumstances) can "override" that determination to continue providing foreign assistance. *See* 22 U.S.C. § 2799aa-1(a)(2), (b)(4)-(6). This structure makes clear that it is for the political branches of government, and not for private citizens or the courts, to determine what countries are permitted to receive foreign aid. *See Israel Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*, 16 F.3d 198, 202 (7th Cir. 1994) ("It would be imprudent for a court to create rights of action that might interfere with the conduct of foreign policy."). Accordingly, even were an express cause of action not required in this instance (and it is), there is no basis to infer a cause of action under § 2799aa-1. *See Atl. Tele-*

18

*Network*, 251 F. Supp. 2d at 130-31 (concluding that comparable restrictions on foreign assistance did not create private rights of action); *Clark v. United States*, 609 F. Supp. 1249, 1251 (D. Md. 1985) (same); *Aerotrade*, 387 F. Supp. at 976 (same).

### c.   Mandamus Act

Mandamus is a "drastic" remedy, to be invoked only in "extraordinary circumstances." *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002). It is available only where, among other limitations, "the defendant owes . . . a clear nondiscretionary duty" to the plaintiff, *Heckler v. Ringer*, 466 U.S. 602, 616 (1984), and "the plaintiff has a clear right to relief," *Power*, 292 F.3d at 784. Plaintiff cannot demonstrate either.

The President owes no duty to plaintiff—much less a clear nondiscretionary one—to determine that Israel has engaged in the conduct specified in § 2799aa-1. The statute leaves it to the President to decide whether, how, and when to make such a determination. *See* 22 U.S.C. § 2799aa-1(a)(1), (b)(1); H.R. REP. NO. 103-482, at 264. In making a determination (or not), the President has discretion to decide, among other things, what type of evidence to rely on, whether any evidence is credible, and what quantum of proof is sufficient to justify a determination. The President also has discretion to interpret the phrase "nuclear reprocessing equipment, materials, or technology," 22 U.S.C. § 2799aa-1(a)(1)(A); to decide whether material, equipment, or technology "would contribute significantly to the ability of [a] country to manufacture a nuclear explosive device" and is in fact "to be used . . . in the manufacture" of such a device, *id.* § 2799aa-1(a)(1)(B); to decide whether design information or a component are "important to" and "intended . . . for use in" the development or manufacture of a nuclear explosive device, *id.* § 2799aa-1(b)(1)(C), (D); and to decide whether a transferring country has the requisite knowledge to fall within the terms of the statute, *id.* § 2799aa-1(b)(1)(C).

19

Plaintiff may believe that Israel has engaged in conduct specified in the statute, but the President has no clear duty to agree with plaintiff's assessment. Instead, the statute appropriately leaves to the President the exclusive authority and discretion to make that determination, based on all of the relevant information and considerations. *See Aerotrade*, 387 F. Supp. at 976-77 (concluding mandamus was "inappropriate" with respect to a similar provision of the FAA because "the very generality of the statutory language implies . . . discretion in the President to construe and apply it in particular factual situations"); *Levine v. Farley*, 107 F.2d 186, 191 (D.C. Cir. 1939) (explaining that, in a mandamus action, a court may not "go behind the official findings of the postal authorities and try the questions of fact all over again").

In addition, plaintiff does not have a "clear and indisputable" right to relief, as required by the Mandamus Act. *Power*, 292 F.3d at 784. Quite the opposite: he lacks standing to raise his claim, *see supra* pp. 11-16, and the statute he seeks to enforce does not provide him with a private right of action, *see supra* pp. 17-19. *See Atl. Tele-Network*, 251 F. Supp. 2d at 131 (holding the plaintiff had "no clear right to relief" for purposes of mandamus relief "because there is no private cause of action" under the statutory provisions it sought to enforce). Therefore, the Mandamus Act cannot be used to compel the President to make a determination that Israel has engaged in the conduct specified in § 2799aa-1.

### d.      Take Care Clause of the U.S. Constitution

Plaintiff's effort to proceed under the Take Care Clause fares no better. The Supreme Court has long recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866). Thus, the Take Care Clause does not furnish citizens with a right to sue to challenge the President's actions or

inaction.  *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383-84 (2015)

(holding that the Supremacy Clause does not confer an implied right of action).  Indeed,

recognizing such a right would express a "lack of the respect due" to the Nation's highest elected

official, *Baker v. Carr*, 369 U.S. 186, 217 (1962), by assuming judicial superintendence over the

exercise of Executive power that the Take Care Clause commits to the President.  *Cf. Dalton*,

511 U.S. at 474-75 (refusing to address whether the President improperly closed a military base

because judicial review "is not available" when a statute or constitutional provision "commits the

decision to the discretion of the President"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66

(1803) (Under "the constitution of the United States, the president is invested with certain

important political powers, in the exercise of which he is to use his own discretion, and is

accountable only to his country in his political character.").

Because none of the provisions on which plaintiff relies create a cause of action to

compel the President to make a determination under § 2799aa-1, plaintiff has failed to state a

claim against the President.

## 2. The Amended Complaint Fails To State A Claim Against The Secretaries Of Defense And The Treasury

Plaintiff's first claim also contends that the Secretaries of Defense and the Treasury have

"unlawfully transfer[red] fund[s]" to Israel, to "weapons contractors supplying Israel," and to

"Israeli military companies."  Am. Compl. ¶ 11; *see id.* ¶ 13.  According to plaintiff, the transfer

of funds is "not in accordance with law" as contemplated by the APA, 5 U.S.C. § 706(2)(A),

because the President should have determined that Israel engaged in conduct specified in

§ 2799aa-1, which would render "Israel . . . an ineligible recipient" of foreign assistance, Am.

Compl. ¶ 11.  Plaintiff acknowledges, however, that the President has not made such a

determination with respect to Israel.  *See id.* ¶ 24.  And, as explained above, plaintiff cannot

challenge the President's failure to do so.  Congress has vested the discretion whether to make

such a threshold determination in the President.  Because the President has not determined that

Israel engaged in conduct specified in the statute, plaintiff cannot show that the provision of

foreign assistance to Israel was contrary to § 2799aa-1.  Indeed, Congress has consistently

supported the provision of U.S. foreign assistance to Israel by annually appropriating FMF grant

funding for Israel.  *See, e.g.*, Department of State, Foreign Operations, and Related Programs

Appropriations Act, 2016, Div. K, Pub. L. No. 114-113.  Accordingly, plaintiff's claim that the

Secretaries have acted unlawfully fails as a matter of law.

### C.	The Political Question Doctrine Bars Plaintiff's First Claim

Plaintiff's first claim also should be dismissed because it presents a non-justiciable

political question, *i.e.*, whether the President should determine that Israel has engaged in conduct

specified in § 2799aa-1.  The political question doctrine is an "outgrowth of fidelity to the

concept of separation of powers."  *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 111 (D.D.C.

2005).  "It is based upon respect for the pronouncements of coordinate branches of government

that are better equipped and properly intended to consider issues of a distinctly political nature."

*Id*.; *see Japan Whaling Ass'n. v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

In *Baker v. Carr*, the Supreme Court identified six indicia of political questions, any one

of which can render a claim non-justiciable:

> [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding without
> an initial policy determination of a kind clearly for nonjudicial discretion; or [4]
> the impossibility of a court's undertaking independent resolution without
> expressing lack of respect due coordinate branches of government; or [5] an
> unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.

369 U.S. at 217.  The President's exercise of exclusive discretion to determine whether Israel has engaged in conduct specified in § 2799aa-1, and thus, whether Israel may continue to receive U.S. foreign assistance without invocation of the waiver provisions of the statute, implicates several of these factors.

First, there can be "no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government."  *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (discussing relevant constitutional provisions); *see Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 (D.C. Cir. 1984) ("Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied.").  Courts, therefore, have repeatedly held that determinations about the provision of foreign aid are political questions for the Executive and Legislative Branches.  *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983 (9th Cir. 2007) ("Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations."); *Dickson v. Ford*, 521 F.2d 234, 236 (5th Cir. 1975) ("We hold that a determination of whether foreign aid to Israel is necessary at this particular time is a . . . decision 'of a kind for which the Judiciary has neither [the] aptitude, facilities, nor responsibility . . . .'"); *Mahorner*, 224 F. Supp. 2d at 53 (concluding that claims relating to the provision of foreign aid to Israel presented non-justiciable political questions); *Abusharar*, 77 F. Supp. 3d at 1006.

Second, although fact-finding is a task courts are typically competent to undertake, the statute at issue here provides no judicially discoverable or manageable standards for the Court to use in evaluating the President's determinations (or lack thereof).  *See* 22 U.S.C. § 2799aa-1(a)(1), (b)(1).  The statute does not purport to specify what types of evidence the President

should consider or the quantum of proof that is required.  It instead calls for judgments to be

made by the President, taking into account complex and evolving diplomatic and national

security circumstances.  *See Atl. Tele-Network*, 251 F. Supp. 2d at 131 ("To grant or deny a loan

to a foreign nation is a decision fraught with foreign policy implications."); *see also Smith v.

Obama*, No. CV 16-843 (CKK), 2016 WL 6839357, at *13 (D.D.C. Nov. 21, 2016); *Mobarez v.

Kerry*, No. 15-CV-516 (KBJ), 2016 WL 2885871, at *10 (D.D.C. May 17, 2016).  Moreover,

even if the Court could invent and apply its own standards, it should decline to do so for the very

reason the political question doctrine exists: the Constitution commits these sorts of decisions to

the political branches.  *See Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111

(1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. . .

. They are decisions of a kind for which the Judiciary has neither aptitude, facilities, nor

responsibility and have long been held to belong in the domain of political power not subject to

judicial intrusion or inquiry.").  Indeed, here, Congress has explicitly stated that the President

alone—not the courts or even Congress—has the authority to make a determination that a

particular country has engaged in the specified conduct for the purposes of this statute.  22

U.S.C. § 2799aa-1(a)(1), (b)(1); *see* H.R. REP. NO. 103-482, at 264.

Finally, judicial second-guessing of the President's determinations, or lack thereof, in this

area would "express[] lack of [] respect" for the "coordinate branches of government" and could

potentially result in "embarrassment from multifarious pronouncements by various departments

on one question."  *Baker*, 369 U.S. at 217; *see Doe I*, 400 F. Supp. 2d at 112.  No President has

determined that Israel has engaged in the conduct specified in the statute since the relevant

amendments were first enacted in the late 1970s.  Am. Compl. ¶ 24.  During this time, moreover,

Congress has continued to appropriate funds for foreign assistance to Israel.  *See, e.g.*,

24

Department of State, Foreign Operations, and Related Programs Appropriations Act, 2016, Div.

K, Pub. L. No. 114-113.  The decisions whether or not to make a determination under § 2799aa-1

and whether or not to appropriate foreign aid are quintessentially political in nature, and this

Court should not second-guess them.  *See Dickson*, 521 F.2d at 236 ("a determination of whether

foreign aid to Israel is necessary . . . is a 'question uniquely demand[ing] [of a] single-voiced

statement of the Government's views'").  For these reasons, plaintiff's claim is barred by the

political question doctrine.

### D.      The Court Should Decline To Provide Discretionary Relief

Finally, even if plaintiff's first claim were justiciable despite all the hurdles discussed

above, the Court nevertheless should decline to adjudicate it.  All of the relief plaintiff seeks—

injunctive, mandamus, and declaratory, *see* Am. Compl., Prayer for Relief—is discretionary.

*See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207-08 (D.C. Cir. 1985) (citing cases).  And the

Court should decline to exercise any discretion it may have in this case because of the sensitive

foreign affairs and national security issues it raises.

In *Sanchez-Espinoza*, the D.C. Circuit concluded that "it would be an abuse of discretion

to provide discretionary relief" in a case involving comparable issues.  770 F.2d at 208.  The

plaintiffs there challenged the Government's alleged "plan . . . to destabilize and overthrow the

government of Nicaragua," which purportedly included the provision of substantial "financial

assistance" to train paramilitary groups.  *Id*. at 205.  Without deciding whether the case was "so

entirely committed to the care of the political branches as to preclude" review under the political

question doctrine, the court nonetheless determined that "the withholding of discretionary relief"

was required.  *Id*. at 208.  The court observed that the actions it was asked to review had,

according to the complaint, "received the attention and approval of the President [and other

25

Executive Branch officials] and involve[d] the conduct of our diplomatic relations with [several] foreign states."  *Id.*  Under such circumstances, the court concluded it would be inappropriate to weigh in on "so sensitive a foreign affairs matter."  *Id.*

The same reasoning applies here.  Congress enacted a statute that provides the President with exclusive discretion to determine whether a country has engaged in conduct specified in the statute.  In doing so, Congress did not authorize private citizens to challenge—or courts to second-guess—the President's determinations or lack thereof.  No President has determined that Israel has engaged in the specified conduct, *see* Am. Compl. ¶ 24, and Congress has continued to appropriate funds annually for foreign assistance to Israel, *see, e.g.*, Department of State, Foreign Operations, and Related Programs Appropriations Act, 2016, Div. K, Pub. L. No. 114-113.  Even assuming *arguendo* that these factors (and those discussed above) were insufficient to render plaintiff's claim a non-justiciable political question, they at least warrant the withholding of any discretionary relief.

For all of the reasons discussed above, plaintiff's first claim should be dismissed.[6]

## II.    THE COURT SHOULD DISMISS PLAINTIFF'S SECOND CLAIM

Plaintiff's second claim seeks to challenge the Government's alleged policy of "nuclear ambiguity" under both Executive Order 13526 and the APA.  *See* Am. Compl. ¶¶ 9-14.  Plaintiff, however, cannot state a claim under either of these provisions.  Moreover, plaintiff's specific

---

[6] If the Court does not dismiss plaintiff's first claim in its entirety for one or more of the reasons above, the Court still should dismiss any portion of the claim that challenges Government action (or inaction) that occurred more than six years ago.  *See, e.g.*, Am. Compl. ¶¶ 28-32 (alleging violations beginning in 1978); *id.*, Prayer for Relief.  Except in limited circumstances not relevant here, claims against the United States must be brought "within six years after the right of action first accrues."  28 U.S.C. § 2401(a); *see, e.g.*, *Havens v. Mabus*, 759 F.3d 91, 100 (D.C. Cir. 2014) (dismissing APA challenge to decisions made more than six years before complaint was filed).

challenge to Department of Energy Classification Bulletin WNP-136 (as one purported

manifestation of the Government's alleged policy of nuclear ambiguity) fails for additional,

independent reasons.  Accordingly, as explained below, plaintiff's second claim also should be

dismissed.

### A.    Executive Order 13526 Does Not Create A Private Right of Action

Plaintiff cannot state a claim under Executive Order 13526, because the Executive Order

does not provide a cause of action for private individuals to enforce its provisions.  The

Executive Order was issued by the President to "prescribe[] a uniform system" for Executive

Branch agencies and officials to use in "classifying, safeguarding, and declassifying

information."  Exec. Order No. 13526, 75 Fed. Reg. 707 (Jan. 5, 2010).  Even assuming

*arguendo* that the President could create a private right of action to enforce the Executive Order,

he has not done so.  *See Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750 (D.C.

Cir. 1990) ("indulging, without approving, the notion that the executive can create a right of

action," but concluding that the Executive Order at issue in that case did not "evidence . . . an

intent to create" a private cause of action).  Executive Order 13526 does not contain any

provision authorizing private parties to sue the Government to enforce its terms.  Indeed, it does

just the opposite, by expressly foreswearing that it "create[s] any right or benefit, substantive or

procedural, enforceable at law by a party against the United States, [or its agencies]."  *Id.*

§ 6.2(d).  Under such circumstances, no cause of action exists.  *See, e.g.*, *Women's Equity Action

League*, 906 F.2d at 750; *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 530 (D.C. Cir. 1993);

*Savage v. Burwell*, No. 15-CV-00791 (CRC), 2016 WL 4132196, at *3 (D.D.C. Aug. 3, 2016)

(concluding that language identical to that found in Executive Order 13526 precluded a

determination that a private right of action existed); *Nat. Res. Def. Council, Inc. v. U.S. Dep't of*

*State*, 658 F. Supp. 2d 105, 108 (D.D.C. 2009) (same with respect to similar language); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 69–70 (D.D.C. 2002).  Therefore, plaintiff cannot bring his second claim under Executive Order 13526.

**B.      Plaintiff's Second Claim Is Not Actionable Under The APA**

**1.      Plaintiff Does Not Challenge Discrete Agency Action And Thus His Claim Is Not Reviewable Under The APA**

Plaintiff also cannot challenge the Government's alleged "systemic" policy of "nuclear ambiguity" under the APA.  Am. Compl. ¶ 10.  In his amended complaint, plaintiff describes this purported policy as "prohibiting the release of official government information about Israel's nuclear weapons program" by "gagging and prosecuting federal officials . . . who publicly acknowledge Israel's nuclear weapons program, imposing punitive economic costs on public interest researchers" who attempt to gain information through FOIA and MDR requests, and "refusing to make bona fide responses to journalists."  *Id.* ¶ 6; *see id.* ¶¶ 33, 49.  Plaintiff makes clear that he is not seeking to challenge any "individual" application of the alleged nuclear ambiguity policy, *id.* ¶ 72; rather, he seeks an order declaring the purported policy and "all of its manifestations" unlawful.  *Id.*, Prayer for Relief.  Such a systemic challenge is not cognizable under the APA.

"[A]gency action" made reviewable under the APA is limited to "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Because these categories all share the "same characteristic of discreteness," the Supreme Court has made clear that APA review is limited to "circumscribed, discrete agency actions."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62-63 (2004).  A plaintiff cannot use the APA to mount a generalized attack or seek broad programmatic changes.  *Id.* at 64-65.

In *Del Monte Fresh Producer N.A., Inc. v. United States*, 706 F. Supp. 2d 116 (D.D.C. 2010), for example, the plaintiff sought to challenge the U.S. Food and Drug Administration's alleged pattern and practice of delay in sampling and inspecting the plaintiff's produce for import to the United States.  The complaint identified several instances of such delay, but the plaintiff directed its challenge at the alleged ongoing practice of the agency instead of seeking relief from any specific instance of delay.  *Id.* at 118-19.  The court determined that "[s]uch broad review of agency operations" is not justiciable under the APA, as it would lead to "the sort of 'entanglement' in daily management of the agency's business that the Supreme Court has instructed is inappropriate."  *Id.* at 119.

Similarly, in *RCM Technologies, Inc. v. U.S. Department of Homeland Security*, 614 F. Supp. 2d 39 (D.D.C. 2009), the plaintiffs sought to challenge an agency policy that allegedly required certain professionals to have a master's degree to obtain a particular type of visa.  Because the plaintiffs' challenge was directed at "an alleged 'policy,' not the specific denial of a visa application made pursuant to that policy," the court concluded the case was not justiciable.  *Id.* at 45.  It observed that, under the APA, a plaintiff "must direct its attack against some particular 'agency action' that causes it harm."  *Id.* at 43.  Echoing the Supreme Court, the court acknowledged that the "case-by-case approach" may be "frustrating" when "'across-the-board protection' is sought by a plaintiff.  'But this is the traditional, and remains the normal, mode of operation of the courts.'"  *Id.* at 45 (internal citation omitted); *see also Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("While a single step or measure is reviewable, an on-going program or policy is not, in itself, a 'final agency action' under the APA."); *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 110-11 (D.D.C. 2011); *Arden Wood, Inc. v. U.S. Citizenship & Immigration Servs.*, 480 F. Supp. 2d 141, 149-50 (D.D.C. 2007).

29

Here too, plaintiff seeks to mount an impermissible systemic attack on the Government's alleged policy of "nuclear ambiguity." Indeed, plaintiff's challenge is even broader than those rejected in *Del Monte* and *RCM Technologies* because it is aimed at a purported Government-wide policy rather than the alleged policy of a single agency. *See* Am. Compl. ¶¶ 6, 33, 49. Although plaintiff identifies several "manifestations" of the alleged policy in his amended complaint, he is explicitly bringing a systemic challenge. *Id.*, Prayer for Relief. The amended complaint states that "[t]rue relief . . . requires removal of the fulcrum," *i.e.*, the alleged nuclear ambiguity policy, "rather than *de novo* review of any individual or class of sunshine law cases, or reimbursement of unjust fees or unpaid court awards." Am. Compl. ¶ 72; *see also id.*, Prayer for Relief (asking the Court to "[d]eclare 'nuclear ambiguity' and all of its manifestations in the form of continual misrepresentation, gag orders, systemic violations of government sunshine laws and all violations of the [APA] and the 'Take Care' clause to be unlawful"). Such a broad programmatic challenge is not permitted under the APA. Plaintiff instead must direct his energies at a "circumscribed, discrete agency action[]," *S. Utah Wilderness*, 542 U.S. at 62, as he has done in the several FOIA cases mentioned in the amended complaint, or to "the offices of the [various agencies] or the halls of Congress, where programmatic improvements are normally made," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

## 2. Plaintiff Has An Adequate Remedy That Precludes APA Review

The APA does not provide an actionable basis for plaintiff's second claim for the additional reason that plaintiff has an adequate remedy under FOIA. Relief under the APA is limited to circumstances in which "there is no other adequate remedy in a court." 5 U.S.C. § 704. Courts, therefore, have "uniformly declined jurisdiction over APA claims that sought remedies made available by FOIA." *Feinman v. FBI*, 713 F. Supp. 2d 70, 76 (D.D.C. 2010). For

example, courts have refused to consider APA claims that seek review of an agency's alleged

unreasonable delay in responding to a FOIA request, *see Edmonds Inst. v. U.S. Dep't of Interior*,

383 F. Supp. 2d 105, 111 (D.D.C.2005); an agency's alleged unlawful withholding of documents

sought pursuant to FOIA, *see Kenney v. DOJ*, 603 F. Supp. 2d 184, 190 (D.D.C. 2009); and an

agency's denial of a FOIA fee waiver request, *see Physicians Comm. for Responsible Med. v.*

*Dep't of Health and Human Servs.*, 480 F. Supp. 2d 119, 121 n. 2 (D.D.C. 2007).

Like the plaintiffs in the cases cited above, plaintiff here seeks relief that is available

under FOIA.  Plaintiff's allegations that government agencies have delayed or "refus[ed] to

process" FOIA requests, "den[ied] releasable information," "charge[d] exorbitant

search/reproduction or other fees" for FOIA requests, and failed to pay a FOIA settlement, Am.

Compl. ¶¶ 11, 14, 49, are all cognizable under FOIA.  Indeed, plaintiff's amended complaint

demonstrates as much, by acknowledging that plaintiff has in fact sued several agencies under

FOIA to challenge their responses to his FOIA requests.  *See id.* ¶¶ 27, 56, 62.[7]

FOIA also provides an adequate remedy for plaintiff's assertion that government

agencies have improperly denied Mandatory Declassification Review requests.  *See id.* ¶¶ 60-61.

MDR is a mechanism established by the President in which individuals may request that an

agency review certain records to determine if they should remain classified.  *See* Exec. Order No.

13526, § 3.5.  A requester may appeal an agency's MDR decision to the Interagency Security

---

[7] To the extent plaintiff's nuclear ambiguity claim relies on pending or resolved FOIA cases, *see* Am. Compl. ¶¶ 27, 56, 62, that reliance is barred by the doctrines of claim splitting and claim preclusion.  *See, e.g.*, *Clayton v. District of Columbia*, 36 F. Supp. 3d 91, 94 (D.D.C. 2014) (explaining that the rule against claim splitting prohibits a plaintiff from "maintain[ing] two actions on the same subject in the same court, against the same defendant at the same time"); *NextWave Personal Commc'ns, Inc. v. FCC*, 254 F.3d 130, 143 (D.C. Cir. 2001) ("Claim preclusion prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim."); *Dorsey v. Jacobson Holman PLLC*, 764 F. Supp. 2d 209, 212-13 (D.D.C. 2011).

Classification Appeals Panel—a panel of Executive Branch officials designated to "advis[e] and assist[] the President in the discharge of his constitutional and discretionary authority to protect the national security of the United States." *Id.* § 5.3(b)(3), (e).  Although Panel decisions are not subject to judicial review, *see id.*, there is no requirement that an individual seek declassification through the MDR process as opposed to submitting a FOIA request, *see* 32 C.F.R. § 2001.33(f), (g).  An individual may submit a FOIA request for documents and, if he does so and any of those documents are classified, the agency's decision to withhold the documents is subject to judicial review under FOIA.  *See* 5 U.S.C. § 552(a)(4)(B); *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009).  Plaintiff, therefore, has a FOIA remedy for his MDR allegations as well.[8]

Plaintiff's effort to direct his challenge at the Government's alleged policies and practices in responding to FOIA requests (including Classification Bulletin WNP-136), *see, e.g.*, Am. Compl. ¶¶ 6, 10, 33, 43, 49, 60, does not render FOIA an inadequate remedy (although, as explained above, it does foreclose relief under the APA).  In adjudicating challenges to specific FOIA responses, courts can review applications of an agency's alleged policy or practice.  Moreover, because FOIA does not limit the equitable powers of courts, the D.C. Circuit has indicated that courts may declare unlawful an agency policy or practice relating to FOIA if the

---

[8] Plaintiff cannot challenge MDR decisions under the APA for additional reasons as well.  First, in resolving MDR appeals, the Panel acts on behalf of the President in the exercise of his constitutional and discretionary authority to classify information bearing on national security. *See* Exec. Order No. 13526, § 5.3(e); *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).  MDR decisions are thus "presidential in nature," making them unreviewable under the APA.  *Detroit Int'l Bridge Co. v. Gov't of Canada*, No. CV 10-476 (RMC), 2016 WL 3030226, at *11 (D.D.C. May 26, 2016) (concluding that the Department of State's issuance of a permit was not reviewable agency action under the APA because the agency was "exercise[ing] . . . discretionary authority committed to the President"); *see Franklin*, 505 U.S. at 801.  Second, even if MDR decisions were not presidential in nature, they would not be reviewable under the APA because they are committed to agency discretion.  *See infra* pp. 38-40.

agency's conduct is "sufficiently outrageous."  *Payne Enters., Inc. v. United States*, 837 F.2d

486, 494 (D.C. Cir. 1988).  Accordingly, FOIA provides an adequate remedy precluding

plaintiff's APA claim even though plaintiff seeks to challenge alleged policies or practices.  *See*

*Feinman*, 713 F. Supp. 2d at 78 (dismissing APA claim that sought to challenge an agency's

alleged policy for responding to certain FOIA requests because FOIA provided an adequate

remedy).[9]

### C.    Plaintiff's Challenge to Classification Bulletin WNP-136 Should Be Dismissed For Additional Reasons

As indicated above, one aspect of the Government's purported nuclear ambiguity policy

that plaintiff seeks to challenge in his amended complaint is Department of Energy Classification

Bulletin WNP-136, entitled Guidance on Release of Information Relating to the Potential for an

Israeli Nuclear Capability.  *See* Am. Compl. ¶¶ 42-44; *see id.*, Ex. 6.  Classification bulletins are

"a documentary form of classification guidance issued by an original classification authority that

identifies the elements of information regarding a specific subject that must be classified and

establishes the level and duration of classification for each such element."  Exec. Order No.

13526, § 6.1(h).  According to plaintiff, Classification Bulletin WNP-136 prohibits "any U.S.

federal government employee or contractor from publicly communicating about [] Israel's

nuclear weapons program under threat of immediate employment loss, fines and

imprisonment."[10]  Am. Compl. ¶ 42.  Plaintiff claims the Classification Bulletin is unlawful

---

[9] Defendants dispute that their responses to plaintiff's FOIA requests were unlawful, much less
sufficiently outrageous to warrant injunctive relief.  To obtain dismissal of plaintiff's APA claim,
however, defendants need not establish that plaintiff has a chance of succeeding in his FOIA
actions.  Defendants only need to show that the relief plaintiff seeks in his APA claim is
available under FOIA, which it is.  *See Feinman*, 713 F. Supp. at 77-78.

[10] The Department of Energy produced a heavily redacted copy of Classification Bulletin WNP-
136 in response to plaintiff's FOIA request.  *See* Am. Compl., Ex. 6, at 1-2; *see also id.*, Ex. 6, at

because it allegedly requires classification of information that plaintiff does not believe should be classified.  *Id.* ¶¶ 42-44.

To the extent the Classification Bulletin is a purported "manifestation" of the government's alleged policy of nuclear ambiguity, Am. Compl., Prayer for Relief, plaintiff's challenge to the Classification Bulletin fails for the reasons discussed above—*i.e.*, Executive Order 13526 does not create a private right of action to enforce its provisions, plaintiff does not challenge discrete agency action as required under the APA, and plaintiff has an adequate remedy under FOIA precluding review under the APA.  But plaintiff's effort to invalidate the Classification Bulletin fails for additional reasons as well.  As explained below, plaintiff lacks standing, his challenge is not ripe, and the guidance in the Classification Bulletin is committed to agency discretion.

### 1.      Plaintiff Lacks Standing To Challenge The Classification Bulletin

Plaintiff has not alleged a "distinct and palpable injury to himself" stemming from the Classification Bulletin.  *Warth*, 422 U.S. at 501.  Plaintiff asserts that the Classification Bulletin "target[s]" "U.S. federal government employee[s]" and "contractors" with the "threat of . . . employment loss, fines, and imprisonment," Am. Compl. ¶ 42; *see id.* ¶ 6, and he identifies one employee who was allegedly "punish[ed]" pursuant to the Classification Bulletin, *id.* ¶ 43.  The injury-in-fact requirement, however, cannot be satisfied by alleging harm to others; plaintiff "himself" must be "among the injured."  *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972); *see Raines v. Byrd*, 521 U.S. 811, 819 (1997) (stressing that the alleged injury must be

---

3-4 (explaining that agency redacted classified material and information that would provide insight into the types of material the Government considers classified).  For purposes of this motion, defendants assume the truth of plaintiff's factual allegations regarding what is contained in the Classification Bulletin.  *See Iqbal*, 556 U.S. at 678.

"particularized as to [the plaintiff]"); *Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F.

Supp. 2d 4, 19 (D.D.C. 2008) ("[P]laintiffs cannot rely on the legal rights and interests of

[others] to substitute for their own lack of standing.").  Because plaintiff has failed to allege any

facts to show that he has suffered a personal injury as a result of the Classification Bulletin, he

lacks standing to challenge it.

### 2.    Plaintiff's Challenge to the Classification Bulletin Is Not Ripe

The ripeness doctrine "prevent[s] the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies."

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003).  It requires

that an issue "have taken on fixed and final shape so that a court can see what legal issues it is

deciding, what effect its decision will have on the adversaries, and some useful purpose to be

achieved in deciding them."  *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244

(1952).  In assessing ripeness, courts evaluate both "the fitness of the issues for judicial decision

and the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner*,

387 U.S. 136, 149 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 105

(1977).

As noted above, classification guides, like Classification Bulletin WNP-136, are prepared

by agencies with original classification authority to facilitate the proper and uniform derivative

classification of information.  Exec. Order No. 13526, §§ 2.2, 6.1(h).  Derivative classification is

"the incorporating, paraphrasing, restating, or generating in new form information that is already

classified, and marking the newly developed material consistent with the classification markings

that apply to the source information."  *Id*. § 6.1(o).  Classification guides instruct derivative

classifiers about the type of information that should be classified and the level and duration of

such classification.  *Id.* § 6.1(h); 32 C.F.R. § 2001.15(b).  Classification guides are modified

regularly based on ongoing assessments of the type of information that, if disclosed, "reasonably

could be expected to result in damage to the national security."  Exec. Order No. 13526,

§ 1.1(a)(4); *see id.* § 2.2(c)-(d); 32 C.F.R. § 2001.15(d).

Plaintiff claims the Classification Bulletin is unlawful because it may be used by

derivative classifiers to classify documents or information that plaintiff does not believe should

be classified.  *See* Am. Compl. ¶¶ 42-44.  But internal guidance like the Classification Bulletin is

not ripe for judicial review (assuming it is reviewable at all) "until the scope of the controversy

has been reduced to more manageable proportions, and its factual components fleshed out, by

some concrete action applying [it] to the claimant's situation in a fashion that harms or threatens

to harm him."  *Lujan*, 497 U.S. at 891.  Accordingly, plaintiff must await the agency's reliance

on the Classification Bulletin to withhold specific documents or information in response to a

FOIA request before seeking judicial review, if appropriate.  Assisted by consideration of "a

specific application of" the Classification Bulletin, any decision of the Court will "stand on a

much surer footing . . . than could be the case in the framework of the generalized challenge"

brought here.  *Toilet Goods Assoc. v. Gardner*, 387 U.S. 158, 164 (1967); *see also Munsell v.*

*Dep't of Agric.*, 509 F.3d 572, 586 (D.C. Cir. 2007).  In the meantime, the Court will avoid

opining on the legality of a classification guide that may be modified as ongoing assessments are

made about the type of information that could damage the United States' national security.  *See*

*Texas v. United States*, 523 U.S. 296, 300 (1998); *Cronin v. F.A.A.*, 73 F.3d 1126, 1132 (D.C.

Cir. 1996) ("It makes no sense for us to anticipate a wrong when none may ever arise.").[11]

---

[11] To the extent plaintiff alleges that the Department of Energy has already relied on
Classification Bulletin WNP-136 to withhold information plaintiff sought through a FOIA

Plaintiff, moreover, will not suffer any hardship from denial of review, much less the sort

of significant and "irremediable adverse consequences" that might warrant review of internal

guidance in the absence of an agency action applying it. *See Toilet Goods*, 387 U.S. at 164-65.

If and when the Department of Energy withholds information from plaintiff in response to a

FOIA request (whether in reliance on the Classification Bulletin or otherwise), plaintiff may seek

review of the agency's decision under FOIA. *See Cabais v. Egger*, 690 F.2d 234, 240 (D.C. Cir.

1982) (concluding claims were not ripe where plaintiff had another adequate remedy).

Accordingly, plaintiff's generalized challenge to the Classification Bulletin also should be

dismissed as unripe.[12]

### 3.    Plaintiff's Challenge To The Department of Energy Classification Bulletin Fails To State A Claim Upon Which Relief May Be Granted

Lastly, even if the Court had jurisdiction to consider plaintiff's challenge to the

Classification Bulletin, the claim should be dismissed as a matter of law.  Plaintiff fails to state a

claim that the Classification Bulletin is "not in accordance with law" under the APA, 5 U.S.C.

§ 706(2)(A), because the amended complaint does not identify any law that the Classification

Bulletin allegedly violates.  Plaintiff asserts that the Classification Bulletin is inconsistent with

"*Department of State Classification Guide 05 D*," Am. Compl. ¶ 44, but classification guides are

not laws, *see* Exec. Order No. 13526, § 6.1(h).

The amended complaint could be read to suggest that Classification Bulletin WNP-136 is

contrary to Executive Order 13526, which authorizes the classification of information that meets

---

request, plaintiff's remedy is to challenge the agency's withholding under FOIA, not to attack the
Classification Bulletin under the APA.  *See supra* pp. 30-33.

[12] For similar reasons, the Classification Bulletin is not "final agency action," and thus, is not
subject to judicial review under the APA on this ground as well.  5 U.S.C. § 704; *see Bennett v.
Spear*, 520 U.S. 154, 177-78 (1997).

certain criteria.  *See* Am. Compl. ¶ 64.  But, as explained above, the Executive Order expressly

states that it does not "create any right or benefit, substantive or procedural, enforceable at law

by a party against the United States, [or its agencies]."  Exec. Order No. 13526, § 6.2(d).

Plaintiff, therefore, cannot rely on the Executive Order to establish binding standards that are

enforceable through the APA.

Furthermore, even if plaintiff could rely on the Executive Order in this manner, his claim

as raised under the APA still would fail because the Executive Order commits to agency

discretion the contours of their classification guides.  The APA precludes review of agency

action that is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  An action is

committed to agency discretion when a statute is "drawn in such broad terms that . . . there is no

law to apply" or there is "no meaningful standard against which to judge the agency's exercise of

discretion."  *Webster v. Doe*, 486 U.S. 592, 599-600 (1988).  For example, the D.C. Circuit has

held that statutes that require action when an agency "determines it to be in the public interest,"

*Claybrook v. Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997), or "is *of the opinion*" that certain

conditions are met, *Drake v. FAA*, 291 F.3d 59, 72 (D.C. Cir. 2002), do not provide sufficient

standards to permit review under the APA.[13]

As Commander in Chief, the President has the constitutional authority—and

responsibility—to "classify and control access to information bearing on national security."

---

[13] As explained above, Congress has provided for limited review of agency classification
decisions under FOIA.  *See* 5 U.S.C. § 552(a)(4)(B).  This express FOIA remedy does not mean
that an APA remedy is also appropriate.  *See Egan*, 484 U.S. at 530 *("[U]nless Congress
specifically has provided otherwise*, courts traditionally have been reluctant to intrude upon the
authority of the Executive in military and national security affairs." (emphasis added)).  Indeed,
the "deferential posture" adopted by courts in reviewing agency classification decisions under
FOIA further confirms that classification decisions, which implicate the "'uniquely executive
purview' of national security," are committed to agency discretion for purposes of the APA.
*Larson*, 565 F.3d at 865.

*Egan*, 484 U.S. at 527; *see* U.S. Const., art. II, § 2.  The President has delegated this authority to various agencies through an Executive Order that permits classification if "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security."  Exec. Order No. 13526, § 1.1(a)(4); *see id.* §§ 1.2, 1.3.  The Executive Order specifically empowers original classification authorities to create classification guides to "facilitate the proper and uniform derivative classification of information."  *Id.* § 2.2(a).

The Executive Order's instruction that an original classification authority must classify information that "reasonably could be expected to result in damage to the national security," *id.* § 1.1(a)(4), and must provide guidance for the derivative classification of such information, does not provide a meaningful standard for courts to assess agency classification guidance, such as the Department of Energy Classification Bulletin.  The development of classification guides, which describe what information must be protected for national security reasons, involve "[p]redictive judgment[s] . . . made by those with the necessary expertise in protecting classified information." *Egan*, 484 U.S. at 529.  Indeed, courts have consistently held that certain questions regarding access to classified information are committed to agency discretion.  *See id.* ("For 'reasons too obvious to call for enlarged discussion,' the protection of classified information must be committed to the broad discretion of the agency responsible." (internal citation omitted)).[14]

---

[14] *See also Webster*, 486 U.S. at 600 (concluding statute that permits termination of employee when CIA head deems it "necessary or advisable in the interests of the United States" "fairly exudes deference" and "appears . . . to foreclose the application of any meaningful judicial standard of review"); *Egan*, 484 U.S. at 528 (holding that determination regarding whether grant of security clearance is "clearly consistent with the interests of the national security" is committed to agency discretion and judicially unreviewable); *Oryszak v. Sullivan*, 576 F.3d 522, 525-26 (D.C. Cir. 2009); *Miller v. Casey*, 730 F.2d 773, 778 (D.C. Cir. 1984) (refusing to review CIA decision to deny access to records under agency's discretionary historical research program).

Because the kind of determinations that go into establishing a classification guide are committed to agency discretion, plaintiff's challenge under the APA to the Department of Energy Classification Bulletin fails to state a claim.

    For all of the reasons discussed above, plaintiff's second claim should be dismissed.

## <u>CONCLUSION</u>

    The Court should dismiss this case in its entirety.

    Respectfully submitted this 1st day of December, 2016,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

ANTHONY J. COPPOLINO
Deputy Director

 s/ Michelle R. Bennett          
MICHELLE R. BENNETT (CO Bar No. 37050)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W. Room 7310
Washington, D.C. 20530
Tel: (202) 305-8902
Fax: (202) 616-8470
Email: michelle.bennett@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which sent notice of such filing to all represented

parties.  I further certify that on the same day, I emailed a copy of the foregoing to the following

*pro se* party:

> GRANT F. SMITH
> IRmep
> P.O. Box 32041
> Washington, DC  20007
> gsmith@IRmep.org

> s/ Michelle R. Bennett
> MICHELLE R. BENNETT