IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT F. SMITH, *PRO SE*<br>IRmep<br>P.O. Box 32041<br>Washington, D.C. 20007<br>202-342-7325<br><br>*Plaintiff,*<br><br>vs.<br><br>UNITED STATES OF AMERICA;<br><br>JOHN O. BRENNAN, Director, Central Intelligence<br>Agency, C/O Litigation Division, Office of General<br>Counsel, Central Intelligence Agency, Washington, DC<br>20505;<br><br>ASHTON CARTER, Secretary, U.S. Department of<br>Defense, 1000 Defense Pentagon Washington, DC<br>20301-1000;<br><br>JOHN KERRY, Secretary, U.S. Department of State,<br>2201 C Street NW, Washington, DC 20520;<br><br>JACOB LEW, Secretary, U.S. Department of Treasury;<br>C/O General Counsel, 1500 Pennsylvania Ave NW,<br>Washington, DC 20220;<br><br>ERNEST MONIZ, Secretary, U.S. Department of<br>Energy, 1000 Independence Avenue SW, Washington,<br>DC 20585;<br><br>BARACK OBAMA, President, White House, 1600<br>Pennsylvania Avenue, Washington, DC 20500;<br><br>PENNY PRITZKER, Secretary, U.S. Department of<br>Commerce, C/O Office of the General Counsel, 1401<br>Constitution Ave., NW, Washington, DC 20230<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 1:16-cv-01610<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' REPLY IN OPPOSITION TO**

**MOTION FOR DISMISSAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. 4

INTRODUCTION ............................................................................................................... 5

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ...................................................................................................................... 9

I.      THE COURT SHOULD NOT DISMISS THE PLAINTIFF'S FIRST CLAIM .................... 9

    A.      Plaintiff has standing to challenge the government's compliance with 22 U.S. C. § 2799aa-1 ................................................................................................................................. 9

    B. The amended complaint proves that government officials violated 22 U.S.C. § 2799aa-... 10

        1. The Plaintiff has a course of action against the President. ............................................. 10

        b. 22 U.S.C. § 2799aa-1 ................................................................................................. 12

        c. Mandamus Act .............................................................................................................. 13

        d. Take Care Clause of the U.S. Constitution .................................................................. 13

        2. The amended complaint states a valid claim against the Secretaries of Defense and the Treasury ................................................................................................................................. 18

    C. "Political Question" doctrine bars no claims ...................................................................... 19

    D. the court must provide discretionary relief ......................................................................... 20

II THE COURT SHOULD NOT DISMISS THE PLAINTIFF'S SECOND CLAIM ................ 24

    A.      Executive order 13526 reveals WPN-136 is not a bona fide classification guideline ... 24

    B.      Plaintiff's second claim is actionable under the APA .................................................... 25

        1.      Plaintiff challenges discrete agency action and thus his claim is reviewable under the APA  25

        2.      Plaintiff has no other remedy than APA review. ....................................................... 25

    C.      Plaintiff's challenge to overturn Classification bulletin WNP-136 should be granted. . 27

        1.      Plaintiff has standing to challenge the Classification Bulletin .................................. 28

        2.      Plaintiff's challenge to the Classification Bulletin is ripe ......................................... 28

        3.      Plaintiff's challenge to the Department of Energy Classification Bulletin states that it is an unlawful gag order masquerading as a classification bulletin .................................... 29

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328 (1994) ........................................................ 19

*Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995)...................... 24

*Smith v DoD, 2014*, No. 01611, District of Columbia,.............................................................. 27

Steel Seizure Cases ..................................................................................................................... 15

*United States v. Jewell,* 532 F.2d (9th Cir. 1976), ..................................................................... 12

*United States v. Texas, 579 U.S. ___ (2016)* .............................................................................. 13

*Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ............................................ 30

*Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952)* .......................... 14, 15,16, 18, 23

## Other Authorities

Arn Menconi, Podcast interview "Rep Jared Polis on Iran Deal Etc.".......................................... 20

Douglas Birch and Jeffrey Smith, The Atlantic, Israel's Worst Kept Secret: Is silence over Israeli
   nukes doing more harm than good?" September 16, 2014 ....................................................... 19

Fact Sheet: Memorandum of Understanding Reached with Israel ................................................ 8

*National Archives and Records Administration Special Handling Policies and Procedures for
   Sensitive Records about Israel or US-Israel Relations*, March 25, 2011 ................................. 6

Neal K. Katyal & Laurence H. Tribe, Waging War, Deciding Guilt: Trying the Military
   Tribunals, 111 YALE L.J. 1259, 1274 (2002)....................................................................... 16

*The Israel Lobby and U.S. Foreign Policy, September 2, 2008, Farrar, Straus and Giroux; 1st
   edition* ...................................................................................................................................... 8

The Vela Incident: South Atlantic Mystery flash in September 1979 Raised Questions about
   Nuclear Test." National Security Archive ............................................................................. 19

## Regulations

*Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability* 7,
   18, 29

*S.2943 – National Defense Authorization Act for Fiscal Year 2017* ............................................ 9

## Federal Statutes

22 U.S. Code Chapter 39 - ARMS EXPORT CONTROL .................................................... 12, 25

22 U.S.C. § 2799aa-1 ...................................................................................... 10, 11, 13, 18

Administrative Prcedure Act...................................................................................... 12, 14, 22

## Executive Orders

Executive Order 13526 ................................................................................................................ 25

Mandatory Declassification Review ............................................................................................ 27

## INTRODUCTION

The Defendant mischaracterizes the essence of the Plaintiff's action, overemphasizes the trivial while near completely ignoring quantifiable injuries sustained at the terminus of a very, very simple chain of causation. The Plaintiff deeply resents the Defendant's characterization of his 1st Amendment accomplishments as largely those of a "self-proclaimed" reporter in what appears to be an effort to diminish and minimize his work. (See *Opp cite* 7, "Plaintiff describes himself as a 'public interest researcher' who has published number of articles based on information he has obtained through FOIA" but not citing any of the numerous examples of his very real, pioneering reporting accomplishments.

Before the year 2012, the Plaintiff exposed a great deal of wrongdoing occurring at the very top echelons of federal agencies through his work as a public interest researcher. He exposed Israeli Prime Minister Benjamin Netanyahu's role in an Israeli nuclear technology smuggling ring targeting the United States. Plaintiff used the FBI's own documents from 2003 criminal investigations Plaintiff obtained through FOIA that did not involve costly litigation. He obtained a 1978 General Accounting Office (now Government Accountability Office) report based upon which he wrote an authoritative report about the utter failure of the FBI and CIA to thoroughly investigate and punish an Israeli-Zionist nuclear material smuggling ring that targeted the United States in the 1960s. The GAO report was obtained via an arduous FOIA process, but did not involve costly, punitive litigation. The plaintiff did so without the aid of courts by "reaching into" federal agencies through the Freedom of Information Act and Mandatory Disclosure Review, herein referred to as "sunshine" laws. There were no "special" or

"superseding" legislative rules, that never cited but which nevertheless were authoritative and binding on anything touching upon U.S. foreign policy regarding Israel. The legal counsel to the National Archives and Records Administration certified that past state of affairs in 2011 See *National Archives and Records Administration Special Handling Policies and Procedures for Sensitive Records about Israel or US-Israel Relations*, March 25, 2011 (Exhibit 1) But the Defendants have not just "reached back", they've "hit back."

This Plaintiff 's sunshine law activity was displeasing to the Defendants and many of their supporters in the vast pro-Israel ecosystem of campaign contributors, lobbyists and pressure groups. It became increasingly difficult to square the government's own damning, released documents affirming the existence of Israel's nuclear weapons program, a program substantially built upon unpunished pilfered U.S. materials and technologies, with longstanding legal prohibitions that required mandatory, escalating protocols against delivering U.S. aid to countries that have not signed the Nuclear Non-Proliferation Treaty, and engaged in prohibited activities.

Since 1978, U.S. presidents and their administrations have attempted "plausible deniability" or, as President Obama did in 2008, express "willful ignorance" about the established fact that Israel has long had nuclear weapons programs. Because that ploy was wearing thin, in 2012, the Defendants legislated a gag order, Classification Bulletin WNP-136, *Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability* staunching any further government document release on all nuclear weapons program information relating to (and only to) Israel. Their gag order even bore an Orwellian title, "Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability" as if the question itself was somehow in doubt. The order superseded and rendered null and void the sunshine laws used by the Plaintiff as a public interest researcher, and his followers, to better

understand the functions of government.

The "chain of causation" between the Defendant's desire to institutionalize "willful ignorance" (a device that the Plaintiff must note is not available to the American people, especially during prosecutions of drug related offenses) in order to deliver aid to Israel unfettered by Arms Export Control Act laws and demonstrable injuries to the Plaintiff are clear. The Defense asks why now, "the actions he challenges date back decades," *Opp cite 8* It is very simple. In their drive to unlawfully provide aid to Israel, the Obama administration went further than any preceding administration by actually implementing a gag order. They administratively prohibited the release of written or verbal information under a secret legislative order, that itself was exempt from FOIA. The plaintiff immediately suffered injuries, in the form of punitive non-payment of court costs for successful FOIA court challenges, having to litigate at great personal cost in order to obtain information that was available under the FOIA administrative process in place before the Defendant's gag order. Facing FOIA denials for previously released, even unclassified information, as FOIA officials received training in how to follow the gag order, which involved providing other "legitimate reasons" for denial, such as non-existent "non-disclosure agreements" or "inability to locate documents" excuses (even after the Plaintiff informed FOIA officials of locations) and other types of parallel construction that hid the true authority behind the denials. Because the Defendants have gutted FOIA to pursue their unlawful scheme, no other remedy but an APA challenge is suitable. The gag order's impact on FOIA goes beyond "fruit of the poinsonous tree" doctrine. It has cut down the FOIA tree, and there is no fruit.

But for the president's desire to violate Symington & Glenn, there would be no WPN-136 gag order masquerading as a "classification" authority. Absent the gag order, there would be no

plaintiff injuries as documented in the complaint, or First Amendment right violations that we are more than willing to elaborate more completely in a 2nd amended complaint, if necessary.

The Plaintiff, who would not, indeed cannot, avail himself of similar claims of "willful ignorance" in matters of great import rejects forcibly being made part of the Defendants system of "willful ignorance" so that they may uphold a corrupt system that the Plaintiff, and the majority of Americans polled, strongly oppose: U.S. foreign aid to Israel.

These questions are ripe for review. At this very moment, the President has on his desk a bill seeking over $600 million in cash to be transferred from the U.S. Treasury into an unauditable Israeli missile program. See *S.2943 – National Defense Authorization Act for Fiscal Year 2017*. https://www.congress.gov/bill/114th-congress/senate-bill/2943?q=%7B%22search%22%3A%5B%22national+defense+authorization%22%5D%7D&r=1

Even the White House has admitted the Israeli government has never sufficiently prioritized the program to provide its own funding. See "Fact Sheet: Memorandum of Understanding Reached with Israel" White House, September 14, 2016 https://www.whitehouse.gov/the-press-office/2016/09/14/fact-sheet-memorandum-understanding-reached-israel   Once the funds leave U.S. shores, taxpayers will have no way to audit how it is spent. But some will feel that, once again, they've been made complicit, against their will, in providing unconditional, unlawful support to a cause that has nothing to do with national security, and everything to do with a lobby that has a harmful, undue influence over America *see*.John Mearsheimer and Stephen Walt, *The Israel Lobby and U.S. Foreign Policy, September 2, 2008, Farrar, Straus and Giroux; 1st edition.*

## STANDARD OF REVIEW

The Plaintiff has made many compelling claims upon which any number of proposed relief can and should be granted. This court can overturn the gag order that unlawfully deputizes him to become part of the "willful ignorance" bureaucracy advanced by the Defendants. The court may issue an injunction, as already requested by the Plaintiff, blocking additional aid from leaving the U.S. Treasury Department. All of the facts necessary to establish jurisdiction are present.

## ARGUMENT

## I.   THE COURT SHOULD NOT DISMISS THE PLAINTIFF'S FIRST CLAIM

Each president, since 1978 and most particularly the current office holder, should not have transferred foreign assistance to Israel because it was, and they knew it was, subject to 2799aa-1. The violations were of such a magnitude (including a joint nuclear test with Apartheid South Africa) that the Secretaries of Defense and the Treasury, in turn, should not have transferred foreign assistance to Israel.

### A. Plaintiff has standing to challenge the government's compliance with 22 U.S. C. § 2799aa-1

The Plaintiff has been "deputized" into the "willful ignorance" system that enables Defendants to pretend 22 U.S.C. § 2799aa-1 does not apply to Israel. The WPN-136 tactics lodged against the Plaintiff, nonpayment of court fees, hiding material subject to FOIA, and parallel construction are all demonstrated injuries in fact. The Plaintiff has established these injuries and their linkage to 22 U.S. C. § 2799aa-1 despite the Defendant's wish to ignore them.

As noted, the Plaintiff has been injured through being forced into becoming an uninformed accomplice to the Plaintiff's "willful ignorance." He can no longer inform the public, as he once did, about the proliferation threat of Israel's program, how it destabilizes the Middle East, the unfair leverage it provides against the U.S. government, and why these factors demand the termination (as the top-level consequence under 22 U.S. C. § 2799aa-1 for this level of violation). These are not "general" injuries shared with the public and all taxpayers, but rather very specific to the plaintiff in the profession he has decided to pursue. When all information about a particular domain of government activity suddenly dries up, is no longer reported on, and uncommented by any government official, the public assumes there is no longer anything worth reporting.   Such a state is inimical to democracy. The Plaintiff as a recognized information provider in this field, therefore decidedly does not concede "only generalized grievances that he shares with "all Americans" as contended by the Defendants. *Opp cite* 12.

The Plaintiff again urges to court to review all the instances of compliance that the Defendants resorted to (claims of non-disclosure agreements that did not exist, claims of inability to locate documents) and injuries (nonpayment of court fees) in the case *Smith v Dod*.

While the Plaintiff clearly has suffered the same injuries as all other American taxpayers in the maintenance of "willful ignorance" system that enables nuclear ambiguity, that was never the primary argument.   It speaks volumes the extent to which the Defendants rehash that aspect of standing in their attempts to discredit the Plaintiff and his work.

**B. The amended complaint proves that government officials violated 22 U.S.C. § 2799aa-**

### 1. The Plaintiff has a course of action against the President.

The President and his predecessors had the responsibility to uphold 22 U.S.C. § 2799aa-1

by using information in the government and public domain to fully apply maximum sanctions under the statute when required. Rather than perform the duties required, the Presidents have chosen to claim "willful ignorance." Further, they deputized the unwitting Plaintiff into their cause through an unlawful gag order. When the President become aware of the possibility of violations of the Arms Export Control Act, the law requires a report to Congress on the potential violations. No report has ever been made despite ongoing, overwhelming evidence of violations.

Willful blindness is a situation in which a party attempts to avoid civil (or criminal) liability for a wrongful act by intentionally keeping himself unaware of facts that would render him liable. However, neither lowly drug dealers or vaunted political leaders can use willful blindness as a defense, much less enact an entire set of administrative procedures to implement it.

For example, in a number of cases in the United States of America, persons transporting packages containing illegal drugs have asserted that they never asked what the contents of the packages were and so lacked the requisite intent to break the law. Such defenses have never succeeded, as courts have been quick to determine that the defendant should have known what was in the package and exercised criminal recklessness by failing to find out. See *United States v. Jewell,* 532 F.2d 697 (9th Cir. 1976),

### a. Administrative Procedure Act

The APA permits courts to review and compel "agency action." The President's actions can be redressed by curtailing or enjoining agencies from carrying out unlawful actions. Therefore, his actions, and failure to act, are reviewable.

The most recent case is similar to the present action. President Obama, frustrated at the inability of Congress to pass comprehensive immigration reform, ordered federal agencies to

promulgate legislative rules that would stop deportations, "deputize" states into, among other things providing drivers licenses and other state aid to undocumented immigrants. A federal court enjoined the President and his agencies actions. See *United States v. Texas, 579 U.S. ___ (2016)*, a United States Supreme Court case regarding the constitutionality of the Deferred Action for Parents of Americans (DAPA) program. In a one-line *per curiam* decision, an equally divided Court affirmed the lower-court injunction blocking the President's program. The case had been decided by an eight-member bench due to the death of Justice Antonin Scalia.

Section § 2799aa-1 requires the President to enforce its sliding scale of measures with all information at his disposal. There is neither an "escape clause" nor "willful ignorance" provision. A suspect being prosecuted for a drug related charge can claim he did not know what was in his glove compartment as he crossed a U.S. border, but if it contained illegal narcotics, he will not prevail in court. Similarly, a president may not administratively promulgate a gag rule that requires federal employees and FOIA officers to "not know" what they clearly do, that Israel has nuclear weapons. He cannot deputize the public into his "willful ignorance" cause by withholding releasable information.

Because agencies are responsible for implementing programs flowing through § 2799aa-1 reviews (or non-reviews) they are also named as defendants in this complaint.

### b. 22 U.S.C. § 2799aa-1

**The Plaintiff can proceed under** § 2799aa-1 because his injuries lie along a "chain of causation" that was unlawfully implemented for no other reason than to sustain violations of § 2799aa-1. If this court finds, as it should, that the Obama administration's gag order unlawfully violates FOIA and the Plaintiff's First Amendment rights, it will then necessarily and inevitably

travel up the chain of causation to redress the larger violations of the APA.

The record is well established that there is a sound basis for private parties to challenge in court similar executive overreach beginning with *Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952) as* explored below

### c. Mandamus Act

The Defendants claims they do not owe "a clear nondiscretionary duty" to the plaintiff or that the plaintiff even has "a clear right to relief." The Plaintiff, for the reasons cited above, disagrees. The President's abidance by § 2799aa-1 is simply not discretionary and only binding if the President chooses to perceive it. Because the Plaintiff disagrees and has been injured, Mandamus is a highly suitable response to the gravity of the violations perpetrated by the defendants.

It is not a simple matter that "the President has no clear duty to agree with plaintiff's assessment" When there is a preponderance of evidence, the matter of § 2799aa-1 application becomes a duty, not a "discretionary matter." The President does not have the authority to suppress evidence through legislative acts, like the gag order, that harm the Plaintiff. The Defendants have deployed an elaborate system to sustain willful ignorance where no ignorance truly exists, in the name of non-enforcement of laws that do exist, and that they are required to enforce.

### d. Take Care Clause of the U.S. Constitution

**The Supreme Court has long recognized that "the duty of the President in the**

**exercise of the power to see that the laws are faithfully executed"** is a judicially reviewable matter.

The legal standard governing Plaintiffs' Take Care claim comes from the Steel Seizure Cases, which are the canonical authority governing unilateral exercises of executive power. See *Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952)*. There, President Truman directed his Secretary of Commerce to seize the Nation's steel mills, and the mill owners brought constitutional claims against the Commerce Secretary. The plaintiffs argued, among other things, that Truman unconstitutionally tried "to dispense with the laws" in violation of the Take Care Clause — just as James II did before him. Brief for Petitioners at 35-38, Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952) (No. 51-744) (App. 1112-15) (explaining that Article II and the Take Care Clause find their roots in James II's invocation of the dispensing power).

In response, the Department of Justice defended Truman's unilateral dispensation in terms virtually identical to those it uses here. Consider this colloquy between Truman's DOJ lawyer arguing for actions in support of the president's most important foreign policy, and U.S. District Judge David Pine, defending the rights of the American people:

> *The Court*: So you contend the Executive has unlimited power in time of an emergency?
>
> *Mr. Baldridge:* He has the power to take such action as is necessary to meet the emergency.
>
> *The Court:* If the emergency is great, it is unlimited, is it?
>
> *Mr. Baldridge:* I suppose if you carry it to its logical conclusion, that is true. But I do want to point out that there are two limitations on the *Executive power.* One is the ballot box and the other is impeachment.

*The Court:* Then, as I understand it, you claim that in time of

emergency the Executive has this great power.

*Mr. Baldridge:* That is correct.

*The Court:* And that the Executive determines the emergencies and the

Courts cannot even review whether it is an emergency.

*Mr. Baldridge:* That is correct.

\* \* \*

*The Court:* So, when the sovereign people adopted the Constitution, it

enumerated the powers set up in the Constitution but limited the

powers of the Congress and limited the powers of the judiciary, but it

did not limit the powers of the Executive. Is that what you say?

*Mr. Baldridge:* That is the way we read Article II of the Constitution.

\* \* \*

It is our position that the President is accountable only to the country,

and that the decisions of the President are conclusive.


*Id.* at 27-28 (App. 1104-05) (internal quotation marks and citations omitted). Judge Pine

responded exactly how we are asking the court to respond, he rejected the Executive Branch's

limitless-power and discretion argument and issued a preliminary injunction.

The Supreme Court affirmed and made clear that the President is not a law unto himself:

"In the framework of our Constitution, the President's power to see that the laws are faithfully

executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. And in one

of the most influential concurring opinions in Supreme Court history, Justice Jackson enunciated

a three-part framework for analyzing presidential pleas for deference to executive power:

1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.

\* \* \*

2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain.

\* \* \*

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

\* \* \*

Id. at 635-38 (Jackson, J., concurring) (footnote omitted); see also Neal K. Katyal &

Laurence H. Tribe, Waging War, Deciding Guilt: Trying the Military Tribunals, 111 YALE L.J. 1259, 1274 (2002) ("Justice Jackson's concurrence outlined the three now canonical categories that guide modern analysis of separation of powers.").

c. Defendants cannot ignore *Youngstown*. because Defendant's embrace the same unbridled theory of executive power that it previously (and unsuccessfully) leveled in defense of Truman's seizure of the steel mills. Compare Opp. 21 (arguing any check on Defendants' actions "is a non-justiciable political question").

In the first "zone" of the *Youngstown* framework, when the Defendants, particularly the President who signs aid bills into law, and the State Department which negotiates MOUs operate with the "express or implied authorization of Congress, [its] authority is at its maximum." 343 U.S. at 635 (Jackson, J., concurring). At the other end of the spectrum is the third "zone": when the Executive "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." Id. at 637 (Jackson, J., concurring). (arguing only check on executive power "is the ballot box and . . . impeachment"). The Defendant speculates that "because Congress has continued to appropriate funds for foreign assistance to Israel" the "Court should not second-guess them." However, as explored further, Congress made the law, but has removed itself from the enforcement question. So, when the President signs Israel aid bills into law, without due application of Symington & Glenn (the law of the land), he is not acting in a way that is compatible with the expressed or implied will of Congress.

WPN-136 though Defendants believe it has the power of law, does not enjoy the express or implied acquiesce of Congress, because it is solely design to further the subversion of Symington & Glenn, which Congress passed and has not repealed. Therefore, it falls into "Zone Three" of the *Youngstown* framework. In passing measures to strengthen and enhance FOIA this

year, Congress has taken numerous affirmative steps to foreclose the kind of sunshine law

subversion enacted by the Defendants in their 2012 gag order. WPN-136 violates the entirety of

Congress's recent effort by throwing away FOIA's provisions and instead mandating a highly-

particularized treatment of government information regarding Israel's nuclear weapons that

render superfluous the idea of citizens understanding the function of government. FOIA, as

revised, does not grant any exceptions to information about Israel's nuclear weapons program,

and the Defendants have no right to undermine or rewrite the FOIA or create superseding rules to

better suit their purposes. See, e.g., *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338-39

(1994) ("[I]t is generally presumed that Congress acts intentionally and purposely" when it

"includes particular language in one section of a statute but omits it in another," and as a

consequence, an agency cannot find administrative power where Congress omitted it).

## 2. The amended complaint states a valid claim against the Secretaries of Defense and the Treasury

The Plaintiff has alleged that the Secretary of Defense and Treasury have participated in

the chain of conduct that injured him, in the motion for injunction, and even recommends that

blocking funds from leaving the Treasury as a reasonable measure for upholding the law.

To counter the Plaintiff's claims, the Defendants have advanced two uniquely baseless

assertions. The first is that "Because the President has not determined that Israel engaged in

conduct specified in the statute, plaintiff cannot show that the provision of foreign assistance to

Israel was contrary to § 2799aa-1."

The complaint adequately documents, with government documents, that the Defendants

should, and the court should oversee, the enforced maximum measure of § 2799aa-1 because the

egregious conduct has indisputably and repeatedly occurred. The "purposeful ignorance" stance

cannot prevail in the face of so much evidence.

The Defendant is factually incorrect about a president never finding conduct subject to §

2799aa-1. The Carter Administration concluded that Israel and Apartheid South Africa

conducted a joint nuclear test in 1979, through satellite detection known as the "Vela Incident."

Rather than follow the then-new Symington & Glenn Amendments, they engaged in a

"Whitewash" according to their own records. (See The Vela Incident: South Atlantic Mystery

flash in September 1979 Raised Questions about Nuclear Test." National Security Archive

http://nsarchive.gwu.edu/nukevault/ebb570-The-22-September-1979-Vela-Satellite-Incident/.)

## C. "Political Question" doctrine bars no claims

So this is not a "non-justiciable political question." It is much more similar in nature to

the recently decided question about whether this very President can implement a legislative rule

to engage in foreign affairs, that of immigration-related activity. He cannot. He also cannot make

secret that which is broader public domain and inter-governmental knowledge base, in order to

unlawfully deliver the lion's share of U.S. foreign aid to the country of passionate attachment of

large campaign contributors and patrons. When the President is indisputably aware of violations

of § 2799aa-1, the law requires a report to Congress on the potential violations and

commensurate action. Where the activities are most egregious, the maximum response under the

law—aid cutoff—is required.

A second, major, factually incorrect assertion by the Defendants is "Congress has made

these [foreign aid] appropriations [to Israel with full knowledge of existing laws regarding

potentially applicable restrictions and the President's authority to waive such restrictions.

Congress is on record as being equally committed to "willful ignorance" as the

Defendants (see Douglas Birch and Jeffrey Smith, The Atlantic, Israel's Worst Kept Secret: Is

silence over Israeli nukes doing more harm than good?" September 16, 2014

> *Even Congress has been coy on the subject. When the Senate Foreign Relations*
> *Committee published a 2008 report titled "Chain Reaction: Avoiding a Nuclear Arms*
> *Race in the Middle East," it included chapters on Saudi Arabia, Egypt, and Turkey—but*
> *not Israel. The 61-page report relegated Israel's nuclear arms to a footnote that*
> *suggested that Israel's arsenal was a "perception.*

Some individual members of Congress appear to know facts about "willful ignorance" in

the U.S. federal agencies toward Israel's nuclear weapons, but not that laws passed by Congress

must impose consequences after such awareness. Arn Menconi, Podcast interview "Rep Jared

Polis on Iran Deal Etc." https://soundcloud.com/arnmenconi/rep-jared-polis-on-iran-deal-etc :

> *"Everybody knows they [Israel\ have nuclear capabilities, but they're not declared for*
> *some technical reason." Congressman Jared Polis*

This combined willful and possibly unwilful ignorance of the applicable laws further

buttresses the argument for review by a third branch that is not as highly subject to

campaign contributions and patronage, rather than substantiating the Defendant's

pronouncements about the legality of aid, presidential infallibility and impossibility of

judicial review.

## D. the court must provide discretionary relief

The president and his agencies may not, by decree, violate the law crying "foreign affairs

and national security!" The violations herein listed may be in service to patronage-driven aid to a

foreign country, but their implementation manifest in the most banal and unsophisticated form:

targeting freedom of the press through illegal gag orders. The fact that Israel and its agents have

pillage the United States in order to build their nuclear program, and that U.S. officials desirous of patronage wish to cover it all up, has little to do with foreign affairs and much more to do with mundane questions of corruption.

The Obama administration's implementation of a "willful ignorance" administrative procedures have gone beyond what his predecessors have done in order to maintain the pretense of supporting non-proliferation, while delivering the foreign aid that the American Israel Public Affairs Committee (AIPAC) and other elements of the $6 billion/year Israel lobby demand. It is this codification of nuclear ambiguity that is unlawful, and its enactment that harmed the Plaintiff. *Opp cite 9*

The Plaintiff is comforted knowing that many of the injuries sustained unfurled in this very court, and their factual nature is therefore not in dispute. They are not the "threadbare recitals" the Defendants wish them to be.

 The Defendant claim they can dispense with federal law and unilaterally resolve a citizen challenge to an uninterrupted string of illegal aid transfers by appealing to unreviewable "foreign affairs" and "control of access to information bearing on national security." They further claim that their efforts are challengeable by no plaintiff, reviewable by no court, and subject to no public input under the Administrative Procedure Act. See *Opp cite 2* "Such relief undoubtedly would interfere with the actions and judgements of the political branches and thus would be contrary to public interest" and *Opp 8* "the claim presents a non-justiciable political question."

The Defendant intimates that foreign policies "in place for years" are legitimated by their duration, and presumably bear no connection to the implementation in 2012 of Classification Bulletin WNP-136 which sought to shore up their increasingly crumbling legal foundations. Far

from seeking to "alter, not preserve, the status quo" the Plaintiff in fact seeks to uphold the public interest, which was best expressed by Senators Stuart Symington, and a verifiable American hero, John Glenn, who died last week even as forces hostile to his wise amendment advanced illegal aid legislation in Congress.

The Defendant further claims, incorrectly, that *Opp 7* "the Take Care Clause does not provide a private cause of action." Presidents Obama is only the most recent president to violate the Take Care Clause. Harry S Truman was actually held to account over his illegal acts violating the Take Care Clause through private action, and serves as an appropriate example here and its applicability is examined at length. The Supreme Court enjoined the attempt in the Steel Seizure Cases. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952). This court should respond likewise.

Like Truman, the Defendants have unilaterally created a new program (gagging release and informed, fact-based discussion and information releases of all aspects of the Israeli nuclear program), Legislated the eligibility criteria for it (WPN-136), and then elevated it over all FOIA and other sunshine act administration touching on the Israeli nuclear weapons program. In 2011, the head of the National Archives and Records Administration could truthfully tell the plaintiff that there were no legislative acts superseding FOIA and MDR when release reviews dealt with information pertaining to sensitive information about Israel (See Exhibit A). Since 2012 when the Obama administration WNP-136 gag order was enacted, no FOIA officer may truthfully make the same claim.

The Plaintiff's is likely to succeed on his APA claim. The APA's notice and comment and judicial review provisions apply whenever an agency creates such a program with administrative enforceability that bind agency officials (including FOIA/MDR officers) and

confer benefits on other parties (U.S. military and service providers, Israeli military and service providers). See *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995).

The gag order WNP-136 easily meets that standard because its sole function is to obligate the retention of sensitive materials so that unlawful aid deliveries to Israel may continue. WNP-136 (as its title suggests) applies to no other foreign aid beneficiary or country other than U.S. and Israeli contractors providing goods and services to Israel. It confers legal rights to deny the existence and withhold from any FOIA process the sensitive information in question, impacting members of the public who have been mostly unaware of its existence. Because it supersedes and supplants FOIA and other sunshine laws, none of this may be resolved through multiple FOIA cases as the Defendants propose. Instead, it must be resolved as an APA review.

It is irrelevant that Department of Energy and Department of State call WNP-136 a "classification guideline." If it were truly a classification guideline, it would apply to many countries, and many nuclear programs. It does not. The federal court must therefore look behind the misuse of the "classification" veil to perceive the substance and practical effect of the agency's attempt keep the illegal gravy train of foreign aid flowing. (*See Prof'ls & Patients*, 56 F.3d at 596 n.27.. Indeed, it would be most useful for the court to conduct an *in camera* review of WNP-136 in order to determine that it is not about classification or national security, but rather a cog in an illegal aid delivery conveyor belt.

The Plaintiff has standing to raise his Take Care and APA claims. Unless enjoined by this court, the Defendants will use their gag order and will continue to impose heavy, unreimbursed court costs on the Plaintiff as he performs his public service role seeking information that should be in the public domain, but is withheld because the Defendants have gutted FOIA by violating

the APA. The Plaintiff has documented and quantified his direct injuries that result from the

Defendants' attempts to guarantee that no member of the public—or unconstrained public

official—ever rises to challenge the perpetual violation of Arms Export Control laws in concert.

Against his injuries, there is no emergency or lofty claim of "national defense" or

"absolute foreign policy jurisdiction" or other ethereal (but never well-substantiated) claim of

privilege. Indeed the *Youngstown* Court held that no emergency or foreign policy imperative—

not even President Truman's engagement of the Korean War—can allow the Executive to violate

the Take Care Clause. Finally, the public interest favors preserving the status quo (no subversion

of sunshine laws, enabling no aid deliveries to Israel) until the federal courts can make a

considered judgment regarding the lawfulness of the gag order. Otherwise the Executive will

escape judicial enforcement of the Constitution's separation of power simply by racing to violate

it.

## II THE COURT SHOULD NOT DISMISS THE PLAINTIFF'S SECOND CLAIM

### A. Executive order 13526 reveals WPN-136 is not a bona fide classification guideline

Executive Order 13526 clearly reveals that WPN-136 is not a bona fide classification

guideline. The Plaintiff notes the Defendant does not mention, and therefore must be conceding,

the following criteria of Executive Order 13526:

*"(a)   In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1)   conceal violations of law…"*

The only purpose of WPN-136 is to conceal violations of law. As such, it cannot be a

classification guideline, under 13526. If it is not a classification guideline, it must be a legislative

rule. If so, procedures would have had to have been met for it to be as widely promulgated as it has been to date.

## B.  Plaintiff's second claim is actionable under the APA

### 1.  Plaintiff challenges discrete agency action and thus his claim is reviewable under the APA

The Plaintiff has outlined the governments "systemic" policy of "nuclear ambiguity" under the APA, empowered by the gag order. Even if the Plaintiff would like to see the entire system abolished in the interest of the American people does not preclude that he has been very focused on overturning WPN-136, which would lead to the demise of nuclear ambiguity, which would terminate aid to Israel because its revealed actions demand the ultimate sanctions under Symington and Glenn.

The Plaintiff's targeted APA attack on WPN-136 is therefore entirely warranted, legally justiciable, and appropriate, especially in the absence of remedies under FOIA as outlined below.

### 2.  Plaintiff has no other remedy than APA review.

The APA provides the only actionable basis for plaintiffs second claim for the reason that FOIA can no longer provide relief. Before 2012, the Plaintiff had a written assurance from the National Archives and Records Administration that the types of information he routinely solicits were not subject to unique criteria, above and beyond FOIA, that were secret, unchallengeable, and of unknown provenance.

There is no available means FOIA, for challenging how WPN-136 negates other FOIA cases through parallel construction, obfuscation and denial. There is no means under FOIA, for

attributing how its provisions impacted a particular case, since its provision and provenance are secret. Consider the hypothetical courtroom challenge to WPN-136

Plaintiff: I want you to release the DoD unclassified report on the state of Israel's nuclear weapons program in 1987. The only thing keeping you from turning it over is that WPN-136 which says you can't release it because the President doesn't want aid to Israel to be affected.

Defendant: WPN-136? Never heard of it. And if I did, it's secret. And if it does supersede FOIA, I can't talk about that.

Plaintiff: Gimme the report.

Defendant: (Acting under the dictates of WPN-136). We can't find the report. And if we can, it's not releasable because the authors made us sign a Non-Disclosure Agreements. And if the didn't we'd have to review it with the Israelis first, etc. etc. etc.

For the record, this was more or less the Plaintiffs experience in *Smith v DoD, 2014*, No. 01611, District of Columbia, over which WPN-136 loomed large, but could never be directly challenged. FOIA administrative and legal challenges are not a remedy. It certainly led to "outrageous" behaviors, but was never subject to FOIA challenges.

FOIA does not "provide adequate remedy for plaintiff's assertion that government agencies have improperly denied Mandatory Declassification Review requests" as the Defendants assert. The two processes are separate and distinct, with MDR requests being even more indirect (usually filed through a cleared NARA employee, who then interfaces with equity agency personnel) subject to entirely different appeal windows and procedures, and timeframes. MDR requests are even less transparent than FOIA administrative processes. The Plaintiff has filed many MDR appeals to the ISCAP, there is no time limit on their consideration requests, no transparency into ISCAP review panels, no available Vaughan index ever made available. Some

- 26 -

information, because of the nature of custodianship at NARA facilities in secure facilities, is only

subject to MDR review. It is inaccurate to assert, as Defendants do, that "Plaintiff, therefore, has

a FOIA remedy for his MDR allegations as well." Opp 32.

### C. Plaintiff's challenge to overturn Classification bulletin WNP-136 should be granted.

The Plaintiff has repeatedly substantiated that, unlike any preceding administration, the

Defendants have codified and illegal gag order in service to their "willful ignorance" scheme of

"nuclear ambiguity."

It is not really a classification bulletin because of the attributes explored below. To

continue to characterize it as such, and then cite the various authorities of legitimate

classification guidelines is a red herring. Although it has been used to punish innocent federal

contractors and employees, it has also been wielded against the plaintiff. The injuries to the

Plaintiff are severe enough to explore the APA violations that were engaged in to obtain a gag

order that renders FOIA moot, emasculates FOIA filers in administrative and court procedures,

but does not reveal itself since it is secret for very good reasons (and very bad ends). None of the

questions raise, as Defendants assert, are "available under FOIA." Opp 33. The Defendants note

"The Department of Energy produced a heavily reacted copy of Classification Bulletin WNP-136

in response to plaintiff's FOIA request." It would be most useful for the court to conduct an *in*

*camera* review of WNP-136 in order to finally determine that it is not about classification or

national security, but rather a cog in an illegal aid delivery conveyor belt.

### 1.    Plaintiff has standing to challenge the Classification Bulletin

The Plaintiff alleges that the "distinct and palpable injury to himself" stem, from WPN-136. It is this gag order, wielded by trained FOIA officers, citing in parallel construction, used as the authority to throw numerous spurious objections to his FOIA requests, outright fabrications in this very court, and that lie at the heart of non-payment of court fees in an attempt to further injure. It is the weapon the Defendants use to transfer undeserved funding to an illegitimate recipient, in repayment for past and future patronage.

### 2.    Plaintiff's challenge to the Classification Bulletin is ripe

The core Plaintiff claim is not that WPN-136 "Plaintiff claims the Classification Bulletin is unlawful because it may be used by derivative classifiers to classify documents or information that plaintiff does not believe should be classified." *Opp cite 36.* Rather it is that WPN-136 is not a classification bulletin, but rather a gag order that supersedes FOIA and other sunshine laws. This court has already heard three cases in which government document requests lying at the nexus of nuclear weapons Israel caused bureaucratic contortions that could not be explained away by normal FOIA proceedings.

It has finally emerged that, Classification Bulletin WNP-136 is the reason for these contortions. It seeks to put a genie back into a bottle, and therefore more resembles black magic than a classification bulletin. Indeed, none of the "technical" provisions of legitimate classification bulletins are present. Because it has emerged that Classification Bulleting WNP-136 is the linchpin for the provision of illegal aid to Israel, and billions more in aid are forthcoming, the question consideration stage is "overripe" if not already rotten. Protecting the statutory policy of the Legislature, in this case FOIA, as the Supreme Court has held, "is in itself

a declaration of the public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552

(1937).

> **3.   Plaintiff's challenge to the Department of Energy Classification Bulletin states that it is an unlawful gag order masquerading as a classification bulletin**

Legitimate classification bulletins are easy to distinguish from illegal gag orders. Their

titles do not presume to call into question widely known facts (as WPN-136 appears to question

whether there is an Israeli nuclear program, when other government files insist there is).

Legitimate classification guidelines apply to many countries, not a single country. Legitimate

classification guidelines about nuclear weapons programs don't play favorites.

The Plaintiff challenges the assertion that WPN-136 is a classification guideline because

it violates the provisions that legitimate classification guidelines cannot be used to cover-up

wrongdoing. Because covering for wrongdoing is the sole purpose of WPN-136, the Plaintiff's

request for relief is that it be overturned and made public, along with the institutional history of

its agency champions, their names and all related information about how and why it was

developed.

The claim raised under APA, that the "classification bulletin" is really a legislative rule

promulgated without proper public disclosure or review stands.

## CONCLUSION

Defendant's motion to dismiss should be denied.

Respectfully submitted,

_____

Grant F. Smith, *PRO SE*
IRmep
P.O. Box 32041
Washington, D.C. 20007

For process service:

Grant F. Smith c/o IRmep
1100 H St. NW Suite 840
Washington, D.C. 20005

(202) 342-7325

Dated:   December 18, 2016