IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT F. SMITH, *PRO SE*<br>IRmep<br>P.O. Box 32041<br>Washington, D.C. 20007<br>202-342-7325<br><br>*Plaintiff*,<br><br>vs.<br><br>UNITED STATES OF AMERICA;<br><br>JOHN O. BRENNAN, Director, Central Intelligence<br>Agency, C/O Litigation Division, Office of General<br>Counsel, Central Intelligence Agency, Washington, DC<br>20505;<br><br>ASHTON CARTER, Secretary, U.S. Department of<br>Defense, 1000 Defense Pentagon Washington, DC 20301-<br>1000;<br><br>JOHN KERRY, Secretary, U.S. Department of State, 2201<br>C Street NW, Washington, DC 20520;<br><br>JACOB LEW, Secretary, U.S. Department of Treasury; C/O<br>General Counsel, 1500 Pennsylvania Ave NW, Washington,<br>DC 20220;<br><br>ERNEST MONIZ, Secretary, U.S. Department of Energy,<br>1000 Independence Avenue SW, Washington, DC 20585;<br><br>BARACK OBAMA, President, White House, 1600<br>Pennsylvania Avenue, Washington, DC 20500;<br><br>PENNY PRITZKER, Secretary, U.S. Department of<br>Commerce, C/O Office of the General Counsel, 1401<br>Constitution Ave., NW, Washington, DC 20230<br><br>*Defendants*. | CIVIL ACTION NO. 1:16-cv-01610 |

**REPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I. THE COURT SHOULD CONSIDER WPN-136 TO BE A LEGISLATIVE RULE ................ 2

    A.   Plaintiff has standing to challenge WPN-136 an unlawful legislative rule ......................... 2

    B.   Classification Bulletin WPN-136 is a legislative rule that is ripe for review ................... 13

    C.   WPN-136 is not challengeable under FOIA ..................................................... 15

    D.   The Plaintiff has many interwoven claims upon which relief may be granted ................. 17

II. DEFENDANTS HAVE INJURED THE PLAINTIFF AS A DIRECT FUNCTION OF
PROVIDING AID TO ISRAEL ................................................................................... 22

    A.   Plaintiff was injured by the Defendant's enactment of their foreign aid delivery scheme 22

    B.   There is no Political Question Doctrine barrier to redressing Plaintiff claims ................. 27

CONCLUSION ................................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Baker v. Carr, 369 U.S. 186 (1962).* ...................................................................................... 24

*Citizens for Better Forestry v. United States Dep't of Agric.,* 481 F. Supp. 2d (N.D. Cal. 2007) ............... 3

*Community Nutrition Institute v. Young,* 818 F.2d (D.C. Cir. 1987) ........................................ 3

*Kelley v. SOCIETE ANONYME BELGE D'EXPLOITATION, ETC.,* 1965 ............................... 28

*Levine v. Farley,* 107 F.2d 186 (D.C. Cir. 1939) ............................................................... 26

*Marbury vs Madison* ......................................................................................................... 27

*Marbury, 5 U.S. (1 Cranch)* .............................................................................................. 27

*Meshal v. Higgenbotham, 2015* ........................................................................................... 5

*Nat'l Mining Ass'n v. McCarthy,* 758 F.3d 243. (D.C. Cir. 2014) ...................................... 15

*Nat'l Mining Ass'n,* 758 F.3d .............................................................................................. 5

*Syncor Inern corp v Shalala 127 F.3d* ............................................................................... 15

*US Department of Energy Office of Hearings and Appeals, Case No WBU-14-002, June 24, 2014* .......... 7

*Williams v. Van Buren,* 117 Fed. (5th Cir. Tex. 2004) ........................................................ 3

## Statutes

Administrative Procedure Act ......................................................................................... 2, 3

## Other Authorities

*Daniel P. Moynihan and Larry Combest "Secrecy: A brief Account of the American Experience" at-59 Yale University Press, 1999.* .......................................................................................... 10

*Douglas Birch, Israel's Worst Kept Secret: Is Silence over Israeli Nukes doing more Harm than Good? The Atlantic, September 16, 2014* .................................................................................. 12

*Douglas Birch, Nuclear weapons lab employee fired after publishing scathing critique of the arms race, Center for Public Integrity, July 31, 2014.* ......................................................................... 7

Goggle Consumer Surveys "Do You believe Israel has nuclear weapons?" 2014 ...................... 9

*James E. Doyle, Why Eliminate Nuclear Weapons, February 1, 2013 at the International Institute for Strategic Studies.* ................................................................................................................. 6

*Michael P. Colaresi "Democracy Declassified; the Secrecy Dilemma in National Security." Oxford University Press P 6 201* ...................................................................................................... 10

*Revealed: the secrets of Israel's nuclear arsenal, October 5 1986 The Sunday Times* .............. 7

*Avner Cohen, Israel and the Bomb, 1998 Columbia University Press* ...................................... 8

*Seymour Hersh, The Samson Option: Israel's Nuclear Arsenal and American Policy, 1991 Random House* .................................................................................................................................. 8

*The Vela Incident: South Atlantic Mystery Flash in September 1979 Raised Questions about Nuclear Test, National Security Archive, December 8, 2016* .................................................... 23, 25

*Trust in Government, Gallup Poll* ......................................................................................... 28

*Victor Marchetti in* The *CIA and the Cult of Intelligence,  Knopf, 1974* ................................ 5

## Rules

WNP-136 *Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability* ....................................................................................................................................................passim

## Federal Statutes

Arms Export Control Act ....................................................................................................................... 4, 10

## Executive Orders

Executive Order 12958 ............................................................................................................................... 4
Executive Order 13292 ............................................................................................................................... 4
Executive Order 13526 ......................................................................................................................passim

# INTRODUCTION

The Defendants, acting in concert, through an easily visible chain of causation, have implemented a legislative rule that not only gags and punishes government employees and contractors who dare mention Israel's nuclear weapons program, but also injures parties outside government conducting public interest research such as the Plaintiff. This legislative rule has but one purpose: enable unlawful US foreign aid deliveries to Israel, which otherwise would not stand if injured parties, such as the Plaintiff, were able to continue to expose the government's own deep, longstanding knowledge of Israel's nuclear weapons program and how failure to act violates the Arms Export Control Act. The Defendant's legal arguments do not address the key facts in the Plaintiff's first amended complaint, but rather seek to misdirect, inappropriately atomize, reprioritize, misstate and apply precedents that have little real bearing on the important legal questions raised by the Defendants' improper actions.

The court clearly has jurisdiction to redress the series of injuries inflicted upon the Plaintiff through a clearly discernable chain of causation by the Defendants pursuit of unlawful activities.

# ARGUMENT

# I. THE COURT SHOULD CONSIDER WPN-136 TO BE A LEGISLATIVE RULE

### A.  Plaintiff has standing to challenge WPN-136 an unlawful legislative rule

Contrary to the assertions of the Defendants, that "Plaintiff's challenge to the Classification Bulletin fails to State a Claim upon which relief may be Granted" See *Opp cite Doc 27 page 12*, we do have claims. WPN-136 must be declared an unlawful legislative rule by this court. This legislative rule is an embodiment of the Defendant's desire to codify "nuclear ambiguity" in deference to its Israel lobby patrons. This legislative rule did not follow any of steps required to come into being. The court must impose an immediate injunction against its further implementation to redress Plaintiff's injuries in fact and further harm to American taxpayers.

A legislative rule is one of the four categories of rules developed by administrative agencies in the exercise of lawmaking powers. The federal Administrative Procedure Act (APA) provides guidelines to administrative agencies in proposing and enacting rules. Administrative rulemaking is the process by which administrative agencies adopt rules that have the force of law. Sometimes, when administrative agencies claim to possess the expertise and specialization to deal with certain matters, the legislature delegates its rulemaking power to the agencies. But procedures must be followed for legislative rules to be enacted by agencies.

According to the federal APA, administrative rules are differentiated into legislative rules, interpretive rules, procedural rules, and general statements of policy. A legislative rule is a rule adopted by an administrative agency according to the procedures laid down by the APA. This rule has the force of law and imposes new duties on affected parties. A legislative rule is created in concurrence with the legislature's intention. An administrative agency creates a legislative rule for the proper implementation of a general statutory provision.

Through legislative rules, administrative agencies provide new law, rights, or duties which bring a change in existing laws. Legislative rules also impose fresh rights and obligations on public. See *Citizens for Better Forestry v. United States Dep't of Agric.,* 481 F. Supp. 2d 1059 (N.D. Cal. 2007) Administrative rulemaking in the form of legislative rules creates a substantial impact on the people to whom the rules apply. Therefore, legislative rules are also known as substantive rules. See *Williams v. Van Buren,* 117 Fed. Appx. 985 (5th Cir. Tex. 2004) Legislative rules are generally implementary rules to existing laws.

Legislative rules are binding on all individuals and courts. These rules have the effect of law and can be enforced accordingly. The primary criterion to distinguish a legislative rule from the other rules is its binding effect on courts and individuals. A legislative rule does not leave the agency and its decision makers free to exercise discretionary power. See *Community Nutrition Institute v. Young,* 818 F.2d 943 (D.C. Cir. 1987).

The question of whether WNP-136 *Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability* is a classification guideline properly enacted under the authority of Executive Order 13526 that legitimately protects national defense information of the United States, or is in reality is an unlawful legislative rule that was promulgated with no due process, and that the Defendants have deliberately—in concert—used to injure the Plaintiff, is a key

3

question that overarches all the others. Once this question is properly addressed, the path toward necessary injunction against U.S. foreign aid to Israel that is out of compliance with the Arms Export Control Act is illuminated.

WNP-136 is not a classification guideline because it does not have any of the key attributes necessary to—in fact—be derivative of Executive Order 13526. Executive Order 13526 is currently the supreme executive authority outlining how classified information should be handled, revoking and replacing all previous Executive Orders formerly performing this role, Executive Order 12958 and Executive Order 13292.  When EO 13526 was implemented in 2009, its purpose as communicated to the American public was to serve the function of improving transparency and open access to the Federal government and the information it produces. "Our democratic principles require that the American people be informed of the activities of their Government." See *Executive Order 13526-Classified National Security Information, December 29, 2009, White House Office of the Secretary*[1]

Executive Order 13526 was never intended to put inconvenient genies back into their bottles, which is the sole function of WNP-136 and by extension "nuclear ambiguity" in the year 2017. Defendants have not so far troubled themselves to compare what WNP-136 accomplishes, compared to what the supreme classification authority EO 13526 requires—for very good reason. WNP-136 is the very embodiment of how government secrecy classification is often misused by avoid transparency and accountability and sometimes violate the law and perpetrate expensive frauds upon the American people. Courts have long had a very large role in reviewing the misuse of government secrecy because Federal agencies in collusion with White House

---

[1] https://www.whitehouse.gov/the-press-office/executive-order-classified-national-security-information

continue to refine and abuse the privilege they have assumed in for themselves in the classification of secrecy. Appealing to fear protected only by secrecy has become a mainstay supporting an entire industry. See *Victor Marchetti in* T*he CIA and the Cult of Intelligence, Knopf, 1974*. The court's role in beating back such baseless appeals is vital. "Simply saying `military secret,' `national security' or `terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege."-See *Meshal v. Higgenbotham, 2015*

Executive Order 13526 Part 1, Section 2 clearly explains the limits of "Original Classification." It limits the classification authority to "information that is owned by, produced by and for, or is under the control of the United States Government." WNP-136, however, attempts to extend classification authority over information widely circulating in the public domain and indeed to "impose legally binding obligations or prohibitions on regulated parties" *Nat'l Mining Ass'n*, 758 F.3d at 251.WPN-136 is not, as Defendants insist "at most interpretative rules or policy statements." *See Opp cite Doc 24 page 14.*  It is a legislative rule of illegitimate provenance and vast reach and application, which never went through the appropriate procedures to reach such a status. In particular, as a legislative rule, WPN-136 should have undergone a notice-and-comment process, announcement in the *Federal Register,* and Defendants DOE and DOS should have compiled responses to expert public input from all stakeholders impacted by the new legislative rule. However, Defendants did not engage in such a process because they certainly knew it could not have survived a bona fide legislative rulemaking process. Defendants instead wanted to use secrecy classification as their stalking horse because it offered a shortcut to hoisting the lance they wished to pierce and injure government employees, contractors and the

public interest research community in order to bilk taxpayers. One must only review the case of James E. Doyle to understand the true nature of WPN-136.

James E. Doyle, a non-employee nuclear security and nonproliferation specialist contractor at the Los Alamos National Laboratory, published an article titled *Why Eliminate Nuclear Weapons* on February 1, 2013 at the International Institute for Strategic Studies.[2]  Doyle made three passing references to the Israeli nuclear weapons program in his article.

> *The contribution that nuclear weapons make today to deterring the most likely threats to the security of the United States and its allies is also dubious. America exists in a world where none of the other states possessing nuclear arms (with the possible exception of North Korea, the strength of whose rudimentary nuclear-weapons capabilities remains unknown) has state goals or conducts a foreign policy fundamentally hostile to the interests of the United States. Today, a terrorist attack is thought to be much more likely than an attack by another state. US nuclear weapons do not deter terrorist attacks. Al-Qaeda has attacked the United States, Great Britain, Pakistan, several NATO countries**, and Israeli citizens and interests**. Russia has also suffered terror attacks. All these states possess nuclear arms or are in alliance with nuclear powers….*
>
> *Nuclear weapons did not deter Egypt and Syria from attacking **Israel** in 1973, Argentina from attacking British territory in the 1982 Falklands War or Iraq from attacking **Israel** during the 1991 Gulf War.*

---

[2] http://www.iiss.org/en/publications/survival/sections/2013-94b0/survival--global-politics-and-strategy-february-march-2013-3db7/55-1-02-doyle-a88b

James Doyle's article passed a LANL pre-publication review. But the references to Israel's nuclear weapons program upset a member of the House Armed Services Committee. The member was in a position to threaten funding for Los Alamos National Laboratory programs, and demanded a second review. Acting in response to the demand and the congress member's likely concern that someday Israel's foreign aid could be cut off by such truthful government information to the public, two members of the Los Alamos Security Inquiries Team charged Doyle with publishing classified information in his IISS article. The "classified" information was Doyle's references to Israel's nuclear weapons program. The classification authority invoked was WPN-136. "LANL misapplied classification guidance or policy…specific misue of guidance was to use DOE Classification Bulletin WPN-136 as the most relevant guidance…" *See Exhibit A US Department of Energy Office of Hearings and Appeals, Case No WBU-14-002, June 24, 2014.*

Doyle's computer was searched, his security clearances revoked, and he was fired.[3] See *Douglas Birch, Nuclear weapons lab employee fired after publishing scathing critique of the arms race, Center for Public Integrity, July 31, 2014.*

The case illustrates another reason why WPN-136 is not a classification guideline, but rather a legislative rule. Had Doyle chosen to footnote his article, he could have cited Israeli dissident Mordechai Vanunu's revelation of Israel's nuclear weapons program, complete with photos of nuclear weapons, published in the London Sunday Times. See, *Revealed: the secrets of Israel's nuclear arsenal, October 5 1986 The Sunday Times*. Or, he could have cited Seymour Hersh's seminal book about the Israeli nuclear program. See *Seymour Hersh, The Samson Option:*

---

[3]

*Israel's Nuclear Arsenal and American Policy, 1991 Random House*. Doyle could have footnoted Avner Cohen's extensive work. *See Avner Cohen, Israel and the Bomb, 1998 Columbia University Press*. Doyle could have easily done this because knowledge of Israel's nuclear weapons program has long been in the public domain. It is clearly not "information …owned by, produced by or for, or…under the control of the United States Government." However, Doyle would have been fired anyway, not because he leaked actual secrets, but because WPN-136, as a legislative rule, demands that employees, contractors and the public not "know" or "say" what is already common knowledge—that Israel has a nuclear weapons program.

For reasons elaborated in the first amended complaint, the White House and agencies do not want employees and contractors in positions of authority holding high-level security clearances (like Doyle) to state those already publicly known facts. Therefore, they use their unlawful legislative rule, WPN-136, to punish and eject them from government and serve as a deterrent against others thinking about performing the same public services.

Executive Order 13526 Part 1, Section 4 further explains what classification authorities are supposed to accomplish, "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage."

WPN-136 is not a classification guideline in abidance with EO 13526 because it cannot address "the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security." The fact of Israel's nuclear weapons is already in the public domain. Whether or not the U.S. "officially acknowledges" it only impacts the delivery of foreign aid to

Israel and long-ago debunked U.S. claims of leadership in the Nuclear Non-Proliferation Treaty movement. But those cats are long out of the bag. The world, for the most part, has already come to grips with the fact that the U.S. has only championed the Nuclear Non-Proliferation Treaty as applied to countries other than India, Pakistan, and Israel. Israel's nuclear weapons program is also not a secret from which the American people must be protected. A statistically significant Google Survey fielded September 26, 2014 reveals that 63.9 percent of Americans believe Israel has nuclear weapons. See Goggle Consumer Surveys "Do You believe Israel has nuclear weapons?" 2014.[4]  There simply can no longer be any "unauthorized disclosure" about the fact of Israel's nuclear weapons program, because everybody who matters already knows about it.

Executive Order 13526 Part 1, Section 4 does indicate why this court should carefully review as requested repeatedly by Plaintiff, *in camera*, WPN-136. That is because WPN-136 would have to be "able to identify or describe the damage" of release of the information it purports to protect. It cannot, because it is not really a classification guideline, but rather a legislative rule designed to gag and punish those—like James E. Doyle and the Plaintiff—who work in serving the public interest through disclosure and analysis. WPN-136 is the legislative rule linchpin of the Defendant program of continuous provision of unlawful aid to Israel through the codification of nuclear ambiguity.

That sort of ends is not a function the secrecy classification system was ever intended to perform. An early review of the misuse of government classification performed by the Coolidge Committee in 1956 covered 10 recommendations about over classification. The Committee urged that the classification system "is not to be used to protect information not affecting the

---

[4] https://surveys.google.com/view?survey=7gfftskexqbf4&question=1&filter=&rw=1

national security, and specifically prohibits its use for administrative matters." *See Daniel P. Moynihan and Larry Combest "Secrecy: A brief Account of the American Experience" at-59 Yale University Press, 1999.*

WPN-136 is therefore clearly not a defensible or legitimate extension of the classification of national defense information, but rather yet another milestone in a largely unbroken history of abuse of the classification system. "Once a secrecy capacity exists, the public cannot benefit from the uses of classification while monitoring the content of what is kept from them…This means the capacity for secrecy has the potential to be abused for non-security motives…[they can] target domestic opposition and cover up incompetence and corruption. By the 1970's, it was clear the US national security secrecy had been abused to spy on potential opposition voices and senators, as well as to attempt to cover up Watergate." See *Michael P. Colaresi "Democracy Declassified; the Secrecy Dilemma in National Security." Oxford University Press P. 6 2014*

The non-national security motive for WPN-136 is to override FOIA, punish public interest researchers inside and outside government, in order to continue the provision of aid that is clearly unlawful under existing Arms Export Control Act bans.

The Defendants seem to take great satisfaction in the fact that most of WPN-136 was censored before FOIA release to the Plaintiff and the public. "Despite plaintiff's allegations about the content of Classification Bulletin WNP-136, plaintiff does not actually know what the Classification Bulletin says because the Department of Energy withheld most of it under FOIA Exemptions 1 and 7(E) when responding to plaintiff's FOIA request—a decision plaintiff does not challenge under FOIA. In his opposition, Plaintiff asks the Court to order the Department of Energy to "ma[k]e" the Classification Bulletin "public, along with the institutional history of its

agency champions, their names and all related information about how and why it was developed," or to review the Classification Bulletin *in camera*. Pl.'s Opp'n at 23, 27, 29. The APA, however, does not authorize such relief. See 5 U.S.C. § 706." *See Opp cite Doc 24 footnote 12 and 13.*

However, this satisfaction on the part of the Defendants is premature. That is because WPN-136, in contrast to the old adage, is a book that truly can be read by its cover, or rather, title.

That WPN-136 is not a legitimate classification guideline but rather an unlawful legislative rule is made obvious by the dubiously conditional attributes of the words contained in its title. This is made all the more obvious by running some simulations of how it could be deployed as an unlawful legislative rule in collusion with a hypothetical future administration's own desire to break the law in other domains.

Department of Energy Classification Bulletin WNP-136 bears the curious title "Guidance on Release of Information Relating to the Potential for an Israeli Nuclear Capability." The word "potential" attempts to indicate that "Israeli nuclear capability" has somehow not yet entered the realm of fact, despite the volumes of evidence to the contrary already in the public domain. "Capability" is another attempt to throw into the realm of "disputed claims" the issue. Yet most respected non-governmental scholarly and authoritative sources cite, "the Israeli nuclear weapons program" and do not follow such syntactical evasions. This court must question why a "classification bulletin" title would advance and perpetuate a world of fantasy, rather than fact.

The title clearly reveals the intent of WPN-136, which is only two pages long, and why special DOE "training" must be given to government employees struggling to implement it. "…reference to the existence of Israel's nuclear arsenal reflects the consensus intelligence judgment within DOE nuclear weapons-related laboratories, former officials say. But some said they find it so hard to avoid any public reference to the weapons that classification officers periodically hold special briefings about skirting the issue." *See Douglas Birch, Israel's Worst Kept Secret: Is Silence over Israeli Nukes doing more Harm than Good? The Atlantic, September 16, 2014*

WPN-136 is designed to "bind and regulate parties" to conduct themselves and interchange information in ways that belie their knowledge of Israel's nuclear weapons program and any admission that it exists. This is the hallmark of the legislative rule, not a classification guideline. It is also Orwellian.

If such misuse of the U.S. secrecy classification system to promulgate what is really a legislative rule is allowed to stand, it is not hard to imagine how a hypothetical future administration might continue to abuse it, in concert with their appointed agency heads,

Imagine if a president with close ties to the Russian government were elected into office. Desiring a reset of the US-Russian nuclear standoff that might grease the skids on forming a private family-owned casino chain in Russia, in concert with the Department of Energy, the president causes to be issued WPN-137 "Guidance on Release of Information Relating to the Potential for a Russian Nuclear Capability." James Doyle, who has clawed back a job a LANL in

this hypothetical scenario, is subsequently fired again because his previous articles stated as fact that the Russians have nuclear weapons.

The Defendants claim the "Executive Order does not establish binding standards that are enforceable through the APA; the Executive Order makes clear that it 'does not create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, [or its agencies].' Exec. Order No. 13526, § 6.2(d)." Opp Cite 24 page 12. That may, or may not, be true. The powers claimed by EO 13526 2012 have neither been extensively tested nor received many precedential rulings by the courts. But that does not preclude the courts from examining whether classification guidelines claiming EO 13526 authorities are, in fact, legislative rules. The Defendants repeatedly ask the court to presume that WPN-136 is a classification guideline when all of its attributes clearly reveal it is not.

## B.  Classification Bulletin WPN-136 is a legislative rule that is ripe for review

WPN-136 is not a classification guide for the many reasons stated above. It is a legislative rule masquerading as classification guideline only purporting to protect "national security." An *in camera* review will quickly determine that it was promulgated solely to perpetuate unlawful aid to Israel, delivered in concert, by the defendants.

WPN-136 is never cited in FOIA denials because it is a legislative rule masquerading as a classification guideline that hovers above FOIA. This is why the Plaintiff brings the present action as opposed to the proposed, impossible route repeatedly recommended by the Defendants,

"challenge under FOIA." *See Opp cite 24 p 12*. WPN-136 is a tautology not challengeable in

FOIA lawsuits.

Since the year 2012, FOIA officers have refused to release U.S. government information about

Israel's nuclear weapons program, and related information about Israel's unpunished theft of

materials and technology from the United States, and other matters the Plaintiff has sought under

sunshine laws. WPN-136 is never cited in FOIA denials pertaining to Israel's nuclear weapons

program. Rather, FOIA officers withhold information by claiming it is currently and properly

classified pursuant to Section 1.4 of Executive Order 13526. WPN-136 is the "invisible" self-

referential and unchallengeable intermediary that predetermines all information relating to

Israel's nuclear weapons program is "currently and properly" classified under EO 13526. It has

cut off entirely the flow of information which could be obtained under the administrative process

before 2012.

Because of its de facto use as a legislative rule, it is not as the Defendants assert "committed to

an agency's discretion.*" Opp 24 cite 13*. The secrecy the Defendants maintain over WPN-136's

own contents, when so many legitimate classification guides have already been publicly released,

only erodes claims about its legitimacy.

The Defendants claim that "The notice-and-comment procedures of the APA do not apply to

every agency pronouncement. In particular, the APA explicitly exempts "interpretative rules"

and "general statements of policy" from its procedural requirements. 5 U.S.C. § 553(b)(3)(A).

Unlike legislative (or substantive) rules, interpretative rules and general statements of policy do

not have the "force and effect of law." Am. Mining Cong. v. Mine Safety & Health Admin., 995

F.2d 1106, 1109 (D.C. Cir. 1993)." Opp cite 13.

WPN-136 is clearly not a "general statement of policy." It is the equivalent of NASA reversing

itself and telling its employees to revert to the Ptolemaic model of the heavens, while ejecting

and firing stubborn contractors or thwarting sunshine law filers seeking formerly available, now

"classified" scientific papers consistent with the Copernican Revolution.

As a legislative rule, WPN-136 "*modifies* or *adds* to a legal norm based on [an] agency's *own*

*authority." Syncor Inern corp v Shalala 127 F.3d at 95*. That norm is the "nuclear ambiguity"

policy as detailed and revealed in the first amended complaint, and the President's own abidance

of not "speculating" whether Israel is a nuclear weapons state. WPN-136 is the corrupt norm the

DOE hopes to build upon in concert with the other Defendants. It purports to—and in fact

does—"impose legally binding obligations or prohibitions on regulated parties." *Nat'l Mining*

*Ass'n v. McCarthy*, 758 F.3d 243. 251 (D.C. Cir. 2014)".

### C.  WPN-136 is not challengeable under FOIA

WPN-136's enforcement means it is now the law of the land that government employees and

contractors may no longer inform the public about what they know about Israel's nuclear

weapons program for fear of dismissal and other punishments. FOIA officers, with training

under this legislative rule, know that they must now carefully (and improperly) apply existing

FOIA exclusions, in particular FOIA Exemption 1, in "compliance" with WPN-136. The

Defendants concede this. "Notable, and as pertinent here, in response to requests for information

under FOIA by private citizens such as plaintiff, classification guides may describe the basis for withholding information that is classified." *Opp Cite 24, 14*. The implementation of this legislative rule, WPN-136, is why FOIA administrative releases about Israel's nuclear program dried up since 2012. Wherever WPN-136 informs—improperly as a Legislative rule as the Plaintiff asserts—FOIA release of information citing EO 13526 in court—it is revealed as having a binding effect on courts. FOIA can never resolve the claims that WPN-136 itself should not be secret. DOE claims it is properly classified, without revealing that WPN-136 is the basis for its own "properly classified" claims. Exemption 1 is a mobius strip crafted from an invisible tautology: WPN-136.

The Defendant's assertion that WPN-136 is merely an interpretative rule does not stand up to close scrutiny. *Opp cite 24, 13*. WPN-136 does not interpret "an Executive Order" because it is in direct conflict with E.O. 13526's first two attributes, as discussed above. Most worryingly, and what provides "connective tissue" between foreign aid to Israel and injuries inflicted on the Plaintiff, is that it violates the single most important: "(a) In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law…" .EO. 13526. The Defendants appear to concede that WPN-136 is the linchpin of an illegal foreign aid delivery scheme.in *Opp Doc 22, p24*, by failing repeatedly to address it.

WPN-136 is far, far more than "an agency position" or revelation of how Defendants "will treat… the governing legal norm." By stating "But the guide itself sets no binding policy on any regulated party." *Opp cite 24, 14* Defendants invite a review of how it impacts the outside world.

WPN-136's deployment against James Doyle has established a new career requirement on aspiring US government agencies. Prospective Department of Energy employees who have written long and candidly about Israel's nuclear weapons programs prior to seeking employment will not be hired, since WPN-136 demands the employees and contractors not discuss or convey information about Israel's nuclear weapons program. An otherwise qualified expert who has an authoritative track record can no longer be hired by DOE.

Nor could such a prospective hire enter the Department of State as a nonproliferation expert. WPN-136 demands that proliferation experts not know or say anything about Israel's nuclear weapons programs. WPN-136 precludes experts on Israel's programs from being hired as nonproliferation experts because it has already determined that Israel's program is only a "potential…capability" and not a real-world proliferation threat. As a legislative rule, it requires non-expertise.

In fact, our prospective employee could not be hired for any security-cleared U.S. government position at all. Reviews and background checks would quickly find that such candidates did not "think right" under WPN-136. That it why it is dangerous, but reflective of the unlawful activity it was created to facilitate.

### D.  The Plaintiff has many interwoven claims upon which relief may be granted

As a party "regulated by" WPN-136, which is a legislative rule, the Plaintiff has standing to challenge it. *Opp cite 24 p 9.* The Plaintiff does not "speculate" *Opp cite 24 p 10* that it has been

used to deny him information releasable under FOIA and punish him financially. These injuries have been well documented in the first amended complaint. WPN-136, a legislative rule, demands that FOIA Exemption 1 make all information about Israel's nuclear weapons program to be classified. Whenever the Plaintiff seeks information under FOIA, Exemption 1 is improperly invoked, via WPN-136, to deny it. Since it was implemented in 2012, no FOIA administrative process has succeeded in obtaining information release.

The plaintiff believes, since DOE denied release of WPN-136 through a circular, self-referential invocation of WPN-136, that the best way to reveal the impact of WPN-136 is for the full release of information about its DOE agency champions, legislating communications with the White House leadership during its drafting, extent of its circulation inside government, etc through *in camera* review, discovery in general and interrogatories in particular.

The Defendants have set up straw men, "Although an alleged informational injury may be sufficient for purposes of a FOIA claim (which plaintiff does not assert here)" only to knock them back down, "it is not sufficient to challenge the Classification Bulletin under the APA." *Opp cite doc 24, 10.*

The Plaintiff is happy to disclose which of his FOIA requests have been improperly quashed by the legislative rule WPN-136 via spurious EO 13526 exclusion claims and other WPN-136 subterfuges. The following FOIAs are not currently releasable because they would reveal what WPN-136 legislatively mandates does not exist, an Israeli nuclear weapons program the United States is both aware of, and frequently victimized by:

a.  Department of Energy WPN-136 itself and all of its bureaucratic champions, drafts and deliberations and proposed successor instruments.

b.  Department of Justice Office of Legal Counsel guidance on Symington & Glenn and foreign aid to Israel.

c.  The complete FBI/CIA file on Zalman Shapiro (1920-2016) an American Zionist Organization of America official who helped Israeli agents steal and smuggle weapons-grade uranium from his Atomic Energy Agency contracted plant in Pennsylvania.

d.  FBI files and analysis on Israeli espionage against Congress and bodies negotiating the JCPOA in order to protect their nuclear weapons monopoly in the Middle East.

e.  CIA information on its own clandestine intelligence aid to Israel and consideration of Symington & Glenn related issues.

f.  FBI files on all recent Israeli espionage in the United States, including nuclear espionage.

g.  FBI records on New Regency Productions, a company owned by admitted Israeli nuclear spy and long term US resident Arnon Milchan.

h.  US Department of State records on Israeli Prime Minister Netanyahu's intervention to get his former collaborator, nuclear spy Arnon Milchan, a long-term residency visa in the United States.

i.  FBI file on convicted felon and Mossad asset Marc Rich (1934-2013) and his role in financing Israel's nuclear weapons program.

j.  National Security Council files regarding US policy on Israel's nuclear weapons program and commitments to advance the Nuclear Non-Proliferation Treaty.

k.  FBI files on Mossad/LAKAM operations in the United States targeting nuclear facilities.

l.  OMB/DOJ/USACE/FBI/CIA/NNSA meetings on how to clean up and pay for the toxic dump left behind in Apollo and Parks Township, PA after NUMEC was looted by Israel for its weapons-grade uranium.

m.  FBI files on Alliance for Competitive Technology nuclear espionage for Israel.

n.  BIS files on Israeli nuclear weapons technology smuggling through Telogy

o. IRS documents on why it granted tax-exempt status to the Weizmann Institute for Science, Israel's primary nuclear weapons development financial fundraising front organization in the United States. FBI files on the Weizmann Institute.

p. Israel Aerospace Industries founder Al Schwimmer's involvement in Israel's nuclear weapons program – FBI files.

q. Directorate of National Intelligence files on Israeli economic and nuclear espionage against the United States and existence of any legislative orders like WPN-136 that limit its ability to freely exchange information about Israeli nuclear espionage.

r. DOJ report on why it shut down the NUMEC investigation into the theft and transfer of US government owned weapons-grade uranium.

s. FBI file on Israeli spy Ephraim Beigun's (1932-2007) role in smuggling stolen US-government owned weapons-grade uranium from the US to Israel.

t. FBI files on the head of Israel's nuclear weapons program, Avraham Hermoni's, (1926-2006) activities in the United States while posing as an Israeli diplomat.

u.  FBI files on chief nuclear espionage agent Rafael Eitan's nuclear smuggling and

espionage activities in the United States

All of this information is both "useful, and required by Congress to be Disclosed" under FOIA.

Yet no FOIA process can dislodge it as long as WPN-136's status as a "classification bulletin"

proceeds  unchallenged.

## II. DEFENDANTS HAVE INJURED THE PLAINTIFF AS A DIRECT FUNCTION OF PROVIDING AID TO ISRAEL

### A.  Plaintiff was injured by the Defendant's enactment of their foreign aid delivery scheme

The Defendants argue "Plaintiff lacks standing to assert this claim because he has not alleged

any particularized injury stemming from the President's failure to make a determination under §

2799aa-1 or from the Government's provision of foreign assistance to Israel." Defendants again

attempt to ignore previous evidence of particularized injuries to Plaintiff and again lead with

disparaging references to "generalized grievances." *Opp 24 cite 6*. The Plaintiff has documented

numerous injuries, including financial injuries inflicted upon him, that are the direct result of the

chain of causation between the Defendant's imposition of their unlawful legislative rule made to

protect foreign aid to Israel from sanctions required under § 2799aa-1 and the foreign aid

disbursements. Contrary to Defendant's claims, redressability is easy: the chain of causation

simply must be broken and not allowed to reform itself. Both the symptoms (Nuclear ambiguity,

now codified in legislative rule WPN-136) and disease (illegal and unconditional aid to Israel,

made by politicians to please political patrons) must be cured.

The Plaintiff notes the Defendants have not challenged, and thereby presumably accept, the cause of all this unlawful behavior. Presidents and political appointees are beholden to the Israel lobby and seek to maintain themselves in its graces for the good of their careers and party. This extremely damaging state of affairs has been building for decades in the United States. *See Grant F. Smith*, *Spy Trade: How Israel's lobby Undermines America's Economy, IRmep, November 2009*. The Council on Foreign Relations President Emeritus believed that the Israel lobby in the US was well-positioned to keep the U.S. from enforcing its own laws pertaining to Israel's nuclear weapons program four decades ago. "Whatever the state of the Nixon-Meir bargain was in 1978, Gelb took it for granted that the Israeli nuclear program was impervious to the rules of the nuclear nonproliferation regime. Even though he believed, or may have wished, that Israel's dependence on U.S. aid gave Washington 'extensive non-proliferation leverage,' he pointed to a number of considerations that made that leverage nugatory: 'strong domestic US interests supporting Israel unequivocally,' 'the clandestine character of the Israeli nuclear program,' and the 'high US priority in finding a peace settlement in the area is overriding and inhibits effective pursuit of non-proliferation objectives.'" *See The Vela Incident: South Atlantic Mystery Flash in September 1979 Raised Questions about Nuclear Test, National Security Archive, December 8, 2016*.[5]

This court must determine whether the Defendants unlawful legislative order to block release of all government information about Israel's nuclear weapons program, and punished challengers, such as the Plaintiff through non-payment of fees and unlawful refusals to release information and other injuries is lawful. The chain of causation is clear. This is all done in order that Defendants may continue to ignore § 2799aa-1 and deliver billions in illegal foreign aid to Israel

---

[5] http://nsarchive.gwu.edu/nukevault/ebb570-The-22-September-1979-Vela-Satellite-Incident/

extracted from U.S. citizens who do not support this use of their tax dollars, in violation of the

Arms Export Control Act. The Defendant's infliction of injuries to the Plaintiffs and James

Doyles of the world is the merely means, unlawful aid in response to political patron demands is

the ends. The Defendants simply could not continue to provide unlawful aid and ignore §

2799aa- if America were awash in properly released, authoritative information from the U.S.

government about Israel's nuclear weapons program. The Plaintiff seeks to advantage himself

with information to be a better reporter, citizen and voter. The Defendants claim they can

disadvantage and injure him with impunity. However, "[V] oters who allege facts showing

disadvantage to themselves as individuals have standing to sue." *Baker v. Carr, 369 U.S. 186,*

*206 (1962).*

Because the President has promulgated an unlawful legislative order in violation of the

Administrative Procedure Act ("APA"), § 2799aa-1, Mandamus, and the Take Care Clause of

the U.S. Constitution that harmed the Plaintiff, with largely the sole purpose of continuing to

provide illegal foreign aid, the Plaintiff clearly has standing to challenge the chain of causation.

The current president, like president Jimmy Carter, through his agencies, knows that Israel

engaged in conduct specified § 2799aa-1(a)(1) and/or (b)(1). For example, the Plaintiff has

shown that the President's Department of Commerce, BIS in 2012 internally identified illegal

nuclear weapons technology smuggling from the United States to Israel. (the Department of

Commerce also wished to charge the Plaintiff $6,984.50 to release this information under FOIA,

in attempt to discourage the Plaintiff and comply with WPN-136). The President cannot willfully

ignore information expressly developed for his compliance with the laws of the land, by

punishing others so that he becomes "willfully ignorant." The Defendant has not refuted this the

Plaintiff arguments about willful ignorance made 14 occasions in Doc 22. The Court, therefore,

should dismiss as conceded all portions of Defendant's arguments that claim the President, uniquely among Americans, can claim "willful ignorance" and that he "cannot or does not" know that Israel has a nuclear weapons program.

The Defendant refers to Plaintiff argument "[t]he Carter Administration concluded that Israel and Apartheid South Africa conducted a joint nuclear test in 1979," Pl.'s Opp'n at 19, stating it does not equate to a determination by the President under § 2799aa-1(a)(1) and/or (b)(1). Indeed, the crux of plaintiff's claim is that no President has ever made such a determination. *See* Am. Compl. ¶ 24."

The information about Jimmy Carter and the Vela incident is newly published as a result of the recent availability of the journal of Ambassador Gerard C. Smith (1914-1994), U.S. Special Representative for Non-Proliferation Matters and Representative of the U.S.A. to the International Atomic Energy Agency, and its analysis by experts at the National Security Archive. *See The Vela Incident: South Atlantic Mystery Flash in September 1979 Raised Questions about Nuclear Test, National Security Archive, December 8, 2016.*[6] It is not yet clear that Carter Administration's finding that Israel conducted a test with Apartheid South Africa was not a presidential determination under under § 2799aa-1(a)(1) and/or (b)(1) because many of the relevant documents at the National Archives and Records Administration are still classified. The Carter administration covered up the incident. The statute required the president then, as it does now, to take action. The president did not, and yet does not, as the Defendants concede, have the

---

[6] http://nsarchive.gwu.edu/nukevault/ebb570-The-22-September-1979-Vela-Satellite-Incident/

ability to claim "willful ignorance" and then punish internal and external public interest advocates.

The lessons of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) Opp cite 24, 6 is that the President and his agencies enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. The President and his agencies, until Congress changes the law, are required to enforce § 2799aa-1. Defendants have instead chosen to engage in pleas of "willful ignorance" while harming the Plaintiff in their program to violate § 2799aa-1. It is frankly quite sad to see the Department of Justice, which holds itself before the American people as the agency with a mission "To enforce the law and defend the interests of the United States according to the law," advance such arguments to shield this racket.

Defendant claims support from *Levine v. Farley*, 107 F.2d 186, 191 (D.C. Cir. 1939) (explaining that, in a mandamus action, a court may not "go behind the official findings of the postal authorities and try the questions of fact all over again"). However, the Carter administration findings that Israel conducted a nuclear test do not require, "going around" anything. The official record is now publicly available.

The Plaintiff, throughout this action, has asked for the court to intervene and stop the Defendants ongoing financial and other punishment of his efforts to gather and disseminate information. Once the punishment stops, and the information is appropriately disseminated, the Defendants claims of "willful ignorance" will no longer stand and they will have to stop violating § 2799aa-

1(a)(1) and/or (b)(1) and begin to uphold their duties, as required under the Take Care Clause and Mandamus. In sum, striking down WPN-136 is the same as blocking US aid to Israel until § 2799aa-1 is properly enforced. One redress of injury inevitably leads to the other.

### B. There is no Political Question Doctrine barrier to redressing Plaintiff claims

Defendants argue that the Plaintiff is raising a "non-justiciable political question." This is truly grasping at straws. The political question doctrine is as central to modern constitutional adjudication as it was to the outcome in *Marbury vs Madison* at the beginning of our constitutional history. Moreover, the irony at Marbury's core continues to haunt the doctrine two hundred years later. Now, as then, application of the doctrine requires courts to resolve political questions—the very activity the doctrine purports to avoid. Now, as then, this contradiction mocks Chief Justice Marshall's confident assertion that "[i]f some acts be examinable, and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction." See *Marbury, 5 U.S. (1 Cranch) at 165.* The Defendant's effort to make the political question problem an issue here leads nowhere.

Contrary to the Defendant's assertion, "Plaintiff asks the Court to second-guess the President's exercise of exclusive discretion to determine whether Israel has engaged in conduct specified in § 2799aa-1*" See Opp cite doc 24 page 12*, the Plaintiff asserts presidents have found Israel in violation under § 2799aa-1, but chosen not to enforce it. It is therefore not, as the Defendant states, an example of "policy determines about the provision of foreign aid are political questions for the Executive and Legislative Branches." Contrary to the Defendant's claims, no judgement call is needed, from President Carter's secret determination to the present day. As the Defendants worry that a court ordering the government to enforce its own laws would "express [] lack of

[]respect for the "coordinate branches of government," the Defendants need not worry. That ship has sailed. Public belief that they can trust the government "Just about always/Most of the time" fell from 60% in 2002 to 19 percent in 2009. Americans who believed the government does right "only some of the time/Never" rose from 39% to 81% over the same time frame. See the poll *Trust in Government, Gallup*.[7]   American trust in political leaders fell from 64% of Americans in 1976 to a new low of 42% in 2016.[8] The Defendant's efforts to enshrine presidential "willful ignorance" as deserving of popular reverence will surely do nothing to reverse this trend, if allowed to stand.

The Plaintiff is not asking this court to "second-guess a policy determination (or lack thereof) by the President relating to national security and the provision of foreign aid that Congress has explicitly stated the President alone has authority to make." *Opp cite doc 24, page 13*. The Plaintiff merely asks the court to enforce a determination already made by the president, by ordering Defendants to stop punishing the Plaintiff and others for also knowing about it and continuing to ask questions.

It is not, "an abuse of [] discretion to provide discretionary relief" in a case where American citizens are being harmed in order to further illegal activities conducted by the federal government. *Opp cite doc 24, 13*. Courts have long recognized this,. "It is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," *See  Kelley v. SOCIETE ANONYME BELGE D'EXPLOITATION, ETC., 1965*

---

[7] http://www.gallup.com/poll/5392/trust-government.aspx
[8] http://www.gallup.com/poll/195716/americans-trust-political-leaders-public-new-lows.aspx

# CONCLUSION

The Court should declare WPN-136 an unlawful legislative rule. This would inevitably lead to the proper enforcement of § 2799aa-1(a)(1) and/or (b)(1). However, given the Defendants conduct, the court should not wait for this outcome, but also immediately issue an injunction against the disbursement of Foreign Aid to Israel until such time as § 2799aa-1(a)(1) (b)(1) is properly enforced, modified or repealed.

Respectfully submitted,

_____

Grant F. Smith, *PRO SE*
IRmep
P.O. Box 32041
Washington, D.C. 20007

For process service:

Grant F. Smith c/o IRmep
1100 H St. NW Suite 840
Washington, D.C. 20005

(202) 342-7325

Dated:  January 18, 2017